No. 21-3162

# In the United States Court of Appeals for the Seventh Circuit

———————

ARTHUR GRADY,
PETITIONER-APPELLANT,

*v.*

DAVID GOMEZ,
RESPONDENT-APPELLEE.

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION*

*CASE NO. 1:20-CV-02530
THE HONORABLE MARY M. ROWLAND*

———————

## PETITIONER-APPELLANT'S APPENDIX [Vol. II, A15-443]

KELLY MANNION ELLIS
WINSTON & STRAWN
LLP
35 W. Wacker Dr. Chicago,
IL 60601
(312) 558-8321
kmannion@winston.com

*Attorneys for Petitioner-
Appellant*

## CERTIFICATE OF COMPLIANCE

Under Circuit Rule 30(d), I certify that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

/s/ *Kelly M. Ellis*

Dated:  November 23, 2022

# TABLE OF CONTENTS

**Page**

**Volume I**

Judgment in a Civil Case (October 28, 2021)..........................................................................A1

Memorandum Opinion and Order (October 28, 2021) ..........................................................A2

**Volume II**

State Post Conviction Appellate Decision (May 10, 2019) ...................................................A15

Bronson Plea Hearing Report of Proceedings (August 7, 2012) ..........................................A21

Grady Indictment (December 29, 2010) ...............................................................................A41

Transcript Excerpt: Criminal Jury Trial (May 17, 2013)......................................................A60

Transcript Excerpt: Criminal Jury Trial (May 20, 2013)......................................................A65

Transcript Excerpt: Criminal Jury Trial (May 21, 2013)....................................................A147

Transcript Excerpt: Criminal Jury Trial (May 22, 2013)....................................................A157

Transcript Excerpt: Criminal Jury Trial (May 23, 2013)....................................................A173

Jury Verdict Forms (May 24, 2013) ...................................................................................A188

Direct Appeal Brief and Argument of Defendant-Appellant (October 8, 2014) .................A192

Pro-Se Petition for Post-Conviction Relief (July 6, 2016) .................................................A231

State Direct Appeal Decision (October 16, 2015) ..............................................................A306

Illinois Supreme Court Summary Denial (January 20, 2016).............................................A309

State Trial Court Post Conviction Decision (September 28, 2016) .....................................A310

State Post Conviction Brief and Argument of Petitioner-Appellant
    (July 28, 2018) .............................................................................................................A332

Supreme Court Summary Denial of Postconviction Appeal (January 29, 2020) .................A367

Grady Petition to the Northern District of Illinois (April 24, 2020)....................................A368

State's Post Conviction Appellate Brief ............................................................................A381

Grady Jury Instructions......................................................................................................A416

Photo of Bronson ...................................................................................................A440

Photo of Grady ......................................................................................................A442

2019 IL App (1st) 163012-U

2019 IL App (1st) 163012-U

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).
Appellate Court of Illinois, First District, Fifth Division.

The PEOPLE of the State of Illinois, Plaintiff-Appellee,

v.

Arthur GRADY, Defendant-Appellant.

No. 1-16-3012
|
Order filed May 10, 2019

Appeal from the Circuit Court of Cook County. No. 11 CR 00169, Honorable Erica L. Reddick, Judge, presiding.

**ORDER**

JUSTICE HALL delivered the judgment of the court.

**\*1** ¶ 1 *Held*: The trial court's summary dismissal of defendant's *pro se* postconviction petition is affirmed where defendant did not present an arguable claim of ineffective assistance of appellate counsel because he was not prejudiced by counsel's failure to raise a sufficiency of the evidence challenge on direct appeal.

¶ 2 Defendant Arthur Grady, appeals from the summary dismissal of his *pro se* petition for postconviction relief under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 et seq. (West 2016)). Defendant contends the trial court erred in summarily dismissing his petition because he set forth an arguable claim that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal. We affirm.

¶ 3 Following a 2013 jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1)(West 2012)) and sentenced to 60 years' imprisonment. We affirmed on direct appeal over defendant's argument that his sentence was

excessive. *People v. Grady*, 2015 IL App (1st) 132160-U. Because we set forth the facts on direct appeal, we recount them here only to the extent necessary to resolve the issue raised on appeal. See *Grady*, 2015 IL App (1st) 132160-U.

¶ 4 Defendant's conviction arose from the January 30, 2009, shooting death of Ralph Turner, Jr. Defendant and Aaron Bronson were charged with the murder. Bronson pleaded guilty and testified against defendant. The State's theory of the case was that defendant and Bronson planned to rob the victim, whom they had followed out of a casino, but, when the victim resisted, defendant shot him.

¶ 5 The facts adduced at trial show that in the evening hours of January 29, 2009, Turner and his friends Rupert Evans, Robert Currie, Michael Wright and Anthony McGee had dinner at Binion's Steak House located in the Horseshoe Casino in Hammond, Indiana. Evans testified that after dinner, the group went to the casino roulette table to gamble. Currie was doing well gambling and winning money. In order not to spend all his money, Currie would give Turner some casino chips to cash in at the cashier. Evans explained that Turner acted as a "bank" for those winning at the roulette table. Evans left the casino about 2 a.m. on January 30, 2009. While he was at home, he received a call that Turner had been shot and killed. Later in the day, detectives from the Chicago police department came to his home and showed him a photo array. Evans did not identify anyone in the photo array. Later that same day, more detectives came to his home with another photo array. This time, Evans was able to identify defendant's picture from the photo array. On January 31, 2009, Evans went to the police station on 111th Street and viewed a lineup. He identified defendant in the lineup as the person he saw watching him and his friends gambling at the casino two nights before.

¶ 6 Currie testified that on January 29, 2009, he owned a black Mercedes Benz and he drove his friends Turner, Wright, and McGee to the Horseshoe Casino in Hammond. Currie had a pass for dinner and a table in the VIP room of the casino. After dinner, the group decided to go to the gambling floor to play roulette. Currie testified he was winning at the table and would give some of his chips to Turner to cash in thereby "taking money out of the game." During the course of the evening, Currie won between six and nine thousand dollars and gave Turner a casino chip. After Currie finished gambling, he gave Turner, Wright and McGee a ride home. The group left the casino and went to the valet to retrieve Currie's car. On the way home, Currie drove, while Wright

Exhibit C

-A15-

People v. Grady, Not Reported in N.E. Rptr. (2019)

2019 IL App (1st) 163012-U

sat in the front passenger seat and Turner and McGee were in the back seat. When Currie got to Turner's home, Turner and McGee exited the car. Currie drove Wright home and then drove to his house. When Currie arrived at his house he received a phone call from McGee, who told him that Turner had been shot. Later that day, the police showed Currie a photo array but he could not identify anyone. Currie viewed a lineup on January 31, 2009, and identified defendant as being at the casino on January 30 watching them play roulette.

*2  ¶ 7 McGee testified that when the group finished gambling, Currie drove him, Turner, and Wright home. When Currie arrived at Turner's home on 81st Street and Eberhart Avenue, McGee and Turner exited the car and talked for a short while in front of Turner's home. McGee then walked to his car which was parked down the street from Turner's home. As he did so, he saw a large dark colored truck travelling north down the street. McGee stood by the parked cars, believing that the truck was going to pass him. Instead, the truck stopped by Turner's home. McGee thought it was Turner's son, who had a dark colored truck. McGee saw an individual exit the truck. McGee described the person as tall and thin and about as tall as Turner. The person was wearing dark clothing and a dark colored "hoody." As McGee was about to open his car door, he heard a shot. He ran toward Turner's home but heard a second shot and hid between two parked cars. McGee ran to the corner and turned onto 82nd Street where he called Turner's wife and told her to call 911. McGee also called 911. McGee was unable to identify anyone in a photo array or lineup.

¶ 8 Pamela Snow Woodard testified that she is Turner's sister and lived in the same building as Turner but on the first floor. On January 30, 2009, Woodard was awoken from her sleep by a gunshot. Woodard looked out her front window and saw a body on her front lawn and a man in a hoody standing over the body going through the pockets. Woodard called 911. Woodard was unable to identify anyone in a lineup.

¶ 9 Debra Ann Foster-Bonner testified that on January 30 at approximately 3:40 a.m., she was awoken by two loud noises. Foster-Bonner looked out her front window and saw a large black Sports Utility Vehicle (SUV) driving in reverse on Eberhart. Foster-Bonner observed a tall, thin man dressed in dark pants and a large dark jacket with a hood stand in front of her windows. Foster-Bonner continued looking out her window and saw the man walk towards 82nd Street.

¶ 10 Chicago police officer Adam Rose testified that on January 30, 2009, a little before 4 a.m., he was on routine patrol and monitored a call of a shooting. The call described the offender as a male black wearing dark clothing. Rose saw defendant, who fit the description, about three blocks away from the scene of the shooting at approximately 355 East 83rd Street. Rose stopped defendant to perform a field interview and handcuffed him for his protection. Rose searched defendant and took his driver's license to ascertain if he had any outstanding warrants. Rose noted that defendant's address on the driver's license was for a residence on the 6000 block of South Stony Island Avenue which was about three and a half miles away. Rose testified defendant was walking in a direction away from the Stony address. Rose did not detain defendant because there were no active warrants or investigative alerts for defendant.

¶ 11 Chicago police officers arrived on the scene and discovered Turner's body lying face up with blood on his chest. Turner's pants pocket was torn off and lying down the street from his body. The officers found a casino chip under his body and a cell phone on the street. Detective Barsch testified that he tried to determine the owner of the cell phone. When Barsch opened the cell phone, he observed a picture of a young girl that was the screensaver and the name "Nakkia" was printed across the front of the picture. Barsch then opened the call log and observed there were several calls to and from a person named Aaron. Barsch also observed phone numbers for "dad" and another that said "crib." After speaking with Turner's family members, Barsch determined the cell phone did not belong to Turner. Barsch also testified that, after speaking to McGee, he went to the casino and obtained surveillance video footage. Based on the footage and the cell phone recovered at the scene, the police compiled a photo array, and Barsch obtained a search warrant for defendant's apartment. There, defendant was arrested and two handguns were recovered from inside a speaker in the rear bedroom. When Barsch went into the middle bedroom of the apartment, he observed a photo that was the same photo of "Nakkia" as on the cell phone recovered from the crime scene. The guns were sent to the Illinois State Police Crime Laboratory where it was determined that one of the guns fired the bullets recovered from Turner's body. The State introduced into evidence the surveillance video obtained from the casino which showed defendant wearing a black hoody and watching the roulette table as Turner and his friends played roulette.

-A16-

Case: 21-3162    Document: 22        Filed: 11/23/2022      Pages: 433
Case: 1:20-cv-02530 Document #: 18-3 Filed: 10/14/20 Page 3 of 6 PageID #:103
People v. Grady, Not Reported in N.E. Rptr. (2019)

2019 IL App (1st) 163012-U

**\*3**  ¶ 12 Aaron Bronson, the co-defendant, testified that he shared an apartment with defendant and defendant's cousin Shawana Chester on 6300 South Champlain Avenue. Bronson also lived in South Bend Indiana. When Bronson lived on Champlain he would stay in the front bedroom of the apartment while defendant used the middle bedroom and Shawana used the back bedroom. After Bronson moved out of the apartment, Shawana moved into the front bedroom. In January of 2009, Bronson owned a dark blue Chevy Tahoe SUV. Bronson testified that on January 29, 2009, he and defendant went to the Horseshoe Casino in Hammond Indiana to gamble. Bronson wore a brown and tan hoody with a brown coat while defendant wore a black hoody, black jeans and a black hat. Bronson played poker at the casino but did not play cards with defendant. At some point in the evening, defendant approached Bronson and told him that he had lost all his money but some guys were playing roulette and they had about $ 30,000 in winnings. Defendant suggested to Bronson that they should rob the men. Bronson agreed.

¶ 13 Sometime later, defendant approached Bronson and told him that the men were leaving the casino. Bronson went to the parking lot to get his truck while defendant monitored the men. Bronson called defendant when he got to his truck and defendant told him that the men were in a "black Benz." Bronson picked defendant up and they began following the black Mercedes back to Chicago. When the black Mercedes turned onto Eberhart, Bronson pulled his car behind it and saw two men exit from the back seat of the Mercedes. Bronson testified he told defendant not to exit his truck but defendant said he needed the money and jumped out. Defendant was wearing his hood up and had a mask to cover his face. Bronson watched as the Mercedes pulled away. Bronson saw defendant approach Turner, but Turner "stole on him." Bronson explained that "stole on" means the victim fought back and punched defendant in the face knocking him to the ground. As Bronson started to drive in reverse, he heard two to three gunshots.

¶ 14 Bronson drove back to the apartment on Champlain and waited for defendant, who arrived at the apartment about 6 a.m. Bronson and defendant talked about what had happened. Defendant told Bronson "there ain't no money." Defendant then went to Bronson's truck to search for his phone. Bronson testified that defendant said he threw the gun away but was going back to retrieve it because the gun may have his fingerprints on it. Bronson saw the gun later on that morning with defendant when defendant came back to the apartment. Bronson went back to South Bend until his arrest.

He acknowledged that he entered into an agreement with the State to plead guilty to first degree murder and a sentence of 24 years' imprisonment in exchange for his truthful testimony.

¶ 15 On cross-examination, Bronson testified that the gun defendant used to commit the murder once belonged to Bronson but he sold it to defendant. Bronson admitted telling the police that defendant was driving his truck back to Chicago and that he jumped into the back seat to look for gloves and something to cover his face. On redirect examination, Bronson said he is "snitching" on defendant because defendant snitched on him.

¶ 16 Defendant testified that on January 29, 2009, he was at the Horseshoe Casino with Bronson. Defendant walked around the casino watching other gamblers play, while Bronson was at a table gambling. Defendant testified he stopped at Turner's table to see why people were shouting. Defendant explained that whenever he heard people shouting in the casino, he would go over to the table to see what the excitement was. Defendant and Bronson decided to leave the casino. Bronson went to the parking garage to pick up his truck while defendant waited in the valet area of the casino. Bronson drove up and defendant got into the truck. Defendant plugged in his cell phone to charge and fell asleep. He was awoken when the truck came to a sudden stop. Defendant did not recognize where he was. He looked out of the window and saw two men on the sidewalk. The men started walking in opposite directions. Bronson jumped out of the truck and approached one of the men. The man punched Bronson and he fell to the ground. Defendant got out of the passenger seat in order to break up the fight. He then heard two gunshots. Defendant jumped into the driver's seat of the truck and drove in reverse down the block.

**\*4**  ¶ 17 Defendant parked the truck about two blocks away and realized he did not have his cell phone. He decided to walk to a nearby gas station to make a phone call. On his way to the station, he was stopped by the police and they ultimately let him go. Defendant eventually went home and went to sleep. Bronson came home and the pair discussed what happened after defendant left the scene. Defendant was arrested later that afternoon. He testified that the gun recovered from his apartment belonged to Bronson. Defendant testified he wore a black coat, black hoody, black jeans and a black hat on the night of the shooting and Bronson wore a brown coat with a design on the back and a brown hoody. Defendant denied talking to Bronson about robbing anyone.

Case: 21-3162   Document: 22   Filed: 11/23/2022   Pages: 433
Case: 1:20-cv-02530 Document #: 18-3 Filed: 10/14/20 Page 4 of 6 PageID #:104
People v. Grady, Not Reported in N.E. Rptr. (2019)
2019 IL App (1st) 163012-U

¶ 18 The jury found defendant guilty of first degree murder and the court denied his motion for new trial. After a hearing, the court sentenced him to 60 years' imprisonment. We affirmed on direct appeal over defendant's contention that his sentence was excessive. *Grady*, 2015 IL App (1st) 132160-U.

¶ 19 On July 6, 2016, defendant filed a *pro se* postconviction petition raising numerous claims. In pertinent part, defendant argued that he received ineffective assistance of appellate counsel based on counsel's failure to challenge the sufficiency of the evidence to sustain his conviction on direct appeal.

¶ 20 On September 28, 2016, the trial court issued a written order dismissing defendant's *pro se* postconviction petition as frivolous and patently without merit. Specifically, the court found that defendant's claim of ineffective assistance of appellate counsel was without merit where he did not suffer prejudice from counsel's decision to not challenge the sufficiency of the evidence on appeal.

¶ 21 In this court, defendant contends that the trial court erred in summarily dismissing his petition because he presented an arguable claim of ineffective assistance of appellate counsel based on counsel's failure to raise a sufficiency of the evidence argument on direct appeal.

¶ 22 The Act (725 ILCS 5/122-1 *et seq.* (West 2014)) provides that the circuit court adjudicates a petition for postconviction relief in three distinct stages. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the trial court must independently review the petition, taking the allegations as true, and determine whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014). The court may dismiss a petition only if it is " 'frivolous or is patently without merit.' " *People v. Cotto*, 2016 IL 119006, ¶ 26 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2014). A petition is frivolous or patently without merit if it " 'has no arguable basis * * * in law or fact.' " *People v. Papaleo*, 2016 IL App (1st) 150947, ¶ 19 (quoting *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009)). At this stage, a defendant need only "allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act." *Hodges*, 234 Ill. 2d at 9. We review the summary dismissal of a petition *de novo. Id.*

¶ 23 The constitutional right to effective assistance of counsel applies to counsel on a direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Claims of ineffective assistance of appellate counsel are governed by the same test used in assessing claims of ineffective assistance of trial counsel set forth in *Strickland*

*v. Washington*, 466 U.S. 668 (1984). *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 24 In the context of first stage postconviction proceedings, a defendant must show it is arguable that (1) appellate counsel's failure to raise an issue on direct appeal was objectively unreasonable, and (2) defendant was prejudiced by counsel's deficient performance *i.e.* there is a reasonable probability that the appeal would have been successful. *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). The failure to establish either prong of the *Strickland* test defeats a claim of ineffectiveness. *People v. Henderson*, 2013 IL 114040, ¶ 11. If we can dispose of defendant's claim on the basis that he suffered no prejudice, we need not address whether counsel's performance was objectively unreasonable. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 91. Appellate counsel need not brief every conceivable issue on appeal and may refrain from developing nonmeritorious issues without violating *Strickland. People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 43. Therefore, unless the underlying issue is meritorious, the defendant suffers no prejudice from counsel's failure to raise it on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

**\*5** ¶ 25 Here, defendant has alleged that his appellate counsel was ineffective for failing to argue on direct appeal that the State did not prove him guilty of first degree murder beyond a reasonable doubt. In order to assess the merit of this underlying issue we must determine whether it would have been successful if raised on direct appeal. For the reasons that follow, we find that it would not.

¶ 26 The standard of review on a challenge to the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard is applicable in all criminal cases regardless whether the evidence is direct or circumstantial. *People v. Herring*, 324 Ill.App.3d 458, 460 (2001); *People v. Campbell*, 146 Ill. 2d 363, 374-75 (1992). The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Hutchinson*, 2013 IL App (1st) 102332 ¶ 27; *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). When considering the sufficiency of the evidence, it is not the reviewing court's duty to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The State must prove each element of an offense beyond a reasonable doubt. *People*

-A18-

Case: 21-3162    Document: 22    Filed: 11/23/2022    Pages: 433
Case: 1:20-cv-02530 Document #: 18-3 Filed: 10/14/20 Page 5 of 6 PageID #:105
People v. Grady, Not Reported in N.E. Rptr. (2019)

2019 IL App (1st) 163012-U

*v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). This court will not overturn a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 27 In arguing that a challenge to the sufficiency of the evidence would have been successful on direct appeal, defendant does not dispute any of the elements of the offense of first degree murder. Rather, he essentially claims that he was not the offender. In support of this argument, he points to the fact that he was stopped by police shortly after the shooting and police did not recover a weapon or robbery proceeds from his person. He also maintains that the "key evidence" against him, the testimony of codefendant Bronson, was significantly impeached.

¶ 28 We are not persuaded by defendant's argument where the evidence presented against him was overwhelming and thus sufficient for the jury to reasonably conclude that he was guilty of the first degree murder of Turner. Rupert Evans and Robert Currie testified to seeing defendant at the casino watching them play roulette. Both identified defendant in a lineup. Video surveillance footage from the casino shows defendant, wearing a black hoody and black jacket, watching the victim play roulette. McGee testified that, shortly before the shooting, he saw a truck stop by Turner's home and a person exit the truck. He described the person as tall and thin, and wearing dark clothing and a dark hoody. McGee then heard a gunshot. After hearing another gunshot, called 911. Pamela Woodard, Turner's sister, testified she heard a gunshot shot and looked out her window. She saw a body on the ground in front of her house and a man in a hoody going through the pockets of the man who was on the ground. A neighbor, Foster-Bonner, who lived on the block heard two loud noises and looked out her window. She saw a dark SUV travelling in reverse down her block. She also saw a tall, thin man dressed in dark pants and a large dark jacket with a hood stand in front of her windows. The man then walked towards 82nd Street. Chicago police officer Rose testified he responded to a call of a shooting and was given a description of a male black in dark clothing. Rose saw defendant, who matched the description, approximately three blocks from scene of the shooting. Defendant's cell phone was recovered near Turner's body. The murder weapon was recovered from defendant's apartment.

**\*6** ¶ 29 In addition to this evidence, co-defendant Bronson testified and corroborated witnesses' version of events.

Bronson related that he and defendant went to the casino to gamble. Defendant lost all his money but saw Turner and his friends winning at the roulette table and suggested they should rob the men. Bronson agreed and followed Turner and his friends home. When defendant got out of Bronson's truck to rob Turner, Turner fought back and struck defendant in the face knocking him down. Bronson heard a gunshot. He put his truck into reverse and drove away. Bronson waited for defendant at their apartment. When defendant came home and told Bronson what had happened, Bronson fled to Indiana. Bronson explained that he once owned the gun defendant used to murder Turner, but that he had sold it to defendant. This evidence, and the reasonable inferences therefrom, was sufficient for the trier of fact to find defendant guilty of first degree murder. See *People v. Brown*, 2013 IL 114196, ¶ 71 (citing *Wheeler*, 226 Ill. 2d at 117) (The trier of fact is not required to disregard inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt).

¶ 30 In reaching this conclusion, we note that contrary to defendant's argument the fact that Officer Rose did not recover a weapon or robbery proceeds from defendant is not surprising given that the evidence showed defendant disposed of the weapon after the shooting and Turner did not have money on his person. Bronson testified that, after the shooting, defendant told him that he threw the gun away and that he was going back to retrieve it because it may have fingerprints. Defendant also told Bronson that "there ain't no money." We also note that defendant's argument regarding Bronson's testimony being significantly impeached is unavailing where, as mentioned, Bronson's testimony corroborated the sequence of events as related by the other witnesses.

¶ 31 Thus, if appellate counsel had challenged the sufficiency of the evidence to sustain defendant's conviction on direct appeal, there would not have been reasonable probability that this court would have over turned his conviction. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007) (a reviewing court will not overturn a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt."). Accordingly, defendant suffered no arguable prejudice from counsel's failure to challenge his conviction on direct appeal, and therefore the trial court did not err in summarily dismissing defendant's postconviction petition as frivolous and patently without merit.

2019 IL App (1st) 163012-U

¶ 32 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 33 Affirmed.

Presiding Justice Rochford and Justice Lampkin concurred in the judgment.

**All Citations**

Not Reported in N.E. Rptr., 2019 IL App (1st) 163012-U, 2019 WL 2097140

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

1   STATE OF ILLINOIS )
                     )  SS:
2   COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT - CRIMINAL DIVISION
4
    THE PEOPLE OF THE STATE    )
5   OF ILLINOIS,               )
                               )
6              Plaintiff,      )
                               )
7          vs.                 )  No.  11 CR 01690-01
                               )         0016?
8   AARON BRONSON,             )
                               )
9              Defendant.      )

10                        PLEA

11          REPORT OF PROCEEDINGS had in the hearing of the
12  above-entitled cause, before the Honorable Angela M.
    Petrone, Judge of said court, on the 7th day of August,
13  2012.

14  APPEARANCES:

15          HONORABLE ANITA M. ALVAREZ,
                State's Attorney of Cook County, by:
16          Ms. Kim Ward,
            Ms. Lisette Mojica,
17              Assistant State's Attorneys,
                appeared on behalf of the People;
18
            HONORABLE ABISHI C. CUNNINGHAM,
19              Public Defender of Cook County, by:
            Mr. Steven F. Stach,
20              Assistant Public Defender,
                appeared on behalf of the Defendant.
21

22  Lisa A. Ciarrachi, CSR, RPR
    Official Court Reporter
23  2650 S. California Ave., Rm. 4C02
    Chicago, Illinois 60608
24  (773) 674-6065
    License No. 084-004534

                        1

```
 1          THE CLERK:  Aaron Bronson, sheet 2.

 2      MR. STACH:  He's in custody.

 3      THE COURT:  What's your name, sir?

 4      THE DEFENDANT:  Aaron Bronson.

 5      THE COURT:  Could the parties please identify

 6  yourselves for the record?

 7      MS. WARD:  Assistant State's Attorney Kim Ward and

 8  Assistant State's Attorney Lisette Mojica on behalf of

 9  the People.

10      THE COURT:  It's my understanding that there was an

11  agreement that was reached with Judge Higgins regarding

12  this matter; is that correct?

13      MS. WARD:  Yes.

14      THE COURT:  And I did meet with both of you,

15  formally, and I told you that I would go along with the

16  agreement, after you presented certain information to

17  me; is that correct?

18      MS. WARD:  That's correct.

19      THE COURT:  And Counsel.

20      MR. STACH:  Good morning, your Honor.  For the

21  record, my name is Steven F. Stach, S-t-a-c h, from the

22  Public Defender's Office, on behalf of Aaron Bronson,

23  who stands to my immediate right in the custody of the

24  Cook County Sheriff.
```

2

```
 1          THE COURT:  Was what I stated correct about the
 2   agreement?
 3          MR. STACH:  Yes, your Honor.
 4          THE COURT:  Very well.  Okay.  Does the State need
 5   to make any amendments?
 6          MS. WARD:  I do, your Honor.  Your Honor, also a
 7   copy of the original of the agreement is in the court
 8   file.
 9          That I am seeking to amend Count 1 and Count 3.
10   Count 1, I'm seeking to amend as to this Defendant only,
11   strike the language "shot and killed Ralph Turner" and
12   changing that word to "injured and killed," and then
13   striking the word "firearm" and substituting the word
14   "dangerous weapon" on Count 1.
15          And on Count 3, as to Defendant Aaron Bronson
16   only.  Also, striking the word "shot," changing it with
17   the word "injured," and then striking the word
18   "firearm," and substituting the word, "dangerous weapon"
19   on that.
20          In addition, the State would seek to nolle
21   Count 2 and Count 16.
22          MR. STACH:  Defense would -- I'm sorry.
23          MS. WARD:  I'm sorry, as to this Defendant only.
24          MR. STACH:  Defense would obviously have no
```

3

1    objection.  We waive reswearing and re-execution, your

2    Honor.

3        THE COURT:  Thank you.  Did you make those

4    amendments on the face of the complaint?

5        MS. WARD:  I did.

6        THE COURT:  Did you put your initials and the date

7    on that?

8        MS. WARD:  I initialed, I did not date.  I will

9    date right now.

10       THE COURT:  So the same amendments, basically, are

11   being made to Count 1 and Count 3; correct?

12       MS. WARD:  Basically the words, yes.

13       THE COURT:  Okay.

14       And Counsel, you did go over with your client the

15   mandatory supervised release and the plea agreement?

16       MR. STACH:  Judge, he's aware of that.

17       THE COURT:  All right.  Very well.

18       Do you want to have some time --

19       MR. STACH:  No.

20       THE COURT:  -- to speak with your client in private

21   about anything?

22       MR. STACH:  No, your Honor.

23       THE DEFENDANT:  No.

24       THE COURT:  All right.

4

1          MR. STACH:  We're discussing the math.

2          THE COURT:  Mr. Bronson, I heard what your lawyer

3     said.  His math seems to be calculated pretty well.

4     What are you disputing about that, anything?

5          THE DEFENDANT:  Nothing.  I just --

6          THE COURT:  Very good.  State your name, now.  What

7     is your name?

8          THE DEFENDANT:  Aaron Bronson.

9          THE COURT:  All right.  Mr. Bronson, you're charged

10     in Count 1 with the offense of first-degree murder, in

11     that on or about January 30th, 2009, within the County

12     of Cook, you, without lawful justification,

13     intentionally or knowingly injured and killed Ralph

14     Turner while armed with a dangerous weapon.

15          This in violation of Chapter 720, Act 5,

16     Section 9-1(A)(1) of the Illinois Compiled Statutes.  Do

17     you understand that charge against you?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  How do you plead to that charge, guilty

20     or not guilty?

21          THE DEFENDANT:  Guilty.

22          THE COURT:  You're charged in Count 3 with the

23     offense of first-degree murder in that on or about

24     January 30th, 2009, within the County of Cook, you,

5

1    without lawful justification, injured and killed Ralph

2    Turner while armed with a dangerous weapon, during the

3    commission of a forceable felony, that is, armed

4    robbery.

5        This in violation of Chapter 720, Act 5,

6    Section 9-1(A)(3) of the Illinois Compiled Statutes. Do

7    you understand the charge against you?

8        THE DEFENDANT: Yes, ma'am.

9        THE COURT: How do you plead to that charge, guilty

10    or not guilty?

11        THE DEFENDANT: Guilty.

12        THE COURT: Do you understand that first-degree

13    murder is a sentence that carries -- is a charge that

14    carries a possible sentence from 20 up to 60, six oh,

15    years in the Illinois Department of Corrections.

16        Is this a natural life case?

17        MR. STACH: Judge, I believe, mathematically, the

18    way that it was charged --

19        MS. WARD: No.

20        MR. STACH: -- it could be, if proven.

21        THE COURT: That's what I'm seeing.

22        MR. STACH: The armed robbery, during the course of

23    the murder. No? Okay.

24        THE COURT: Well, that's why I asked.

6

1          MS. WARD:  If we could just have a second.

2          MR. STACH:  Yeah.  If the State's Attorneys don't

3     think it is, I'll certainly accept that representation.

4          MS. WARD:  Yeah, the -- it's not the armed robbery,

5     it's the original -- but we've stricken that language,

6     the -- with the enhancement, of the discharge of a

7     firearm.

8          THE COURT:  Let's go off the record for a moment.

9                         (Discussion had off the record.)

10         THE COURT:  Back on the record.  Mr. Bronson, do

11    you understand that this charge of murder carries

12    penalties of 20 up to 60 years in the Illinois

13    Department of Corrections, possibly a sentence of up to

14    natural life without parole?

15         You could also be fined up to $25,000, and that

16    term of incarceration short of natural life would be

17    followed by three years mandatory supervised release.

18    Do you understand that?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Do you understand that you have the

21    right to plead not guilty and ask for trial by a judge

22    or a jury?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  Do you know what a jury is?

7

-A27-

1     THE DEFENDANT: Yes, ma'am.

2     THE COURT: Did you sign this piece of paper?

3     THE DEFENDANT: Yes.

4     THE COURT: Do you understand when you signed this

5   paper, that means you give up the right to trial by

6   judge or jury?

7     THE DEFENDANT: Yes.

8     THE COURT: Do you understand that means you give

9   up the right to see and hear witnesses testify against

10   you; to ask them questions; to present your own

11   witnesses; or to remain silent, say nothing, and have

12   the State prove you guilty beyond a reasonable doubt?

13   Do you understand that?

14     THE DEFENDANT: Yes.

15     THE COURT: Do you understand that if you're not a

16   citizen of the United States, a conviction for this

17   offense may have the consequences of deportation,

18   exclusion from admission to the United States, or denial

19   of naturalization under the laws of the United States?

20     Do you understand that?

21     THE DEFENDANT: Yes.

22     THE COURT: Has anybody forced you, threatened you

23   or promised you anything besides this agreement in order

24   to get you to sign the jury waiver, or to give up the

8

1   right to trial by judge and jury, and plead guilty?

2       THE DEFENDANT:  No.

3       THE COURT:  Did you sign the jury waiver, and are

4   you giving up the right to trial by judge or jury, and

5   are you pleading guilty of your own free will?

6       THE DEFENDANT:  Yes.

7       THE COURT:  I find the jury waiver and guilty pleas

8   have been made knowingly and voluntarily.  They will be

9   accepted.  They will be made part of the record.

10      Is there a factual basis, please?

11      MS. WARD:  Your Honor, if this case -- we're going

12  to ask the Defendant be sworn to the facts as well,

13  Judge, just for the record.

14      THE COURT:  All right.  Mr. Bronson, I want you to

15  listen to the factual basis for the plea that the

16  State's going to put on the record.  I'm going to ask

17  your attorney to stipulate that that would be the

18  evidence that the State would present, if those

19  witnesses were called to testify.

20      I'm going to ask you, then, to raise your right

21  hand to be sworn, that those are the facts that you're

22  pleading guilty to.

23      MS. WARD:  Yes, your Honor.

24      THE COURT:  All right.  So listen when they speak

9

1   now.

2        THE DEFENDANT: Yes, ma'am.

3        THE COURT: All right. Go right ahead. I would

4   just ask everybody else to please not talk while this is

5   going on so there's no distractions.

6        MS. WARD: By way of factual basis, your Honor, if

7   this case were to proceed to trial, the evidence would

8   show that on January 30th, 2009, this Defendant, along

9   with co-offender, Arthur Grady, were together, and went

10  to the Hammond casino.

11        This Defendant and the co-offender, Arthur Grady,

12  were in this Defendant's SUV, dark colored, that was his

13  SUV at the time, car. The victim, Ralph Turner, along

14  with several witnesses --

15        THE COURT: Excuse me. Could we close that door

16  back there, please? Okay.

17        All right. Could you please continue?

18        MS. WARD: Yes. The victim, Ralph Turner, along

19  with several witnesses, were at the roulette table, at

20  one point, while they were at the Hammond casino, and

21  they were winning some United States currency, money,

22  while that.

23        The co-offender, Arthur Grady, and this Defendant

24  watched the victim as the victim would cash out chips

10

-A30-

1   and retrieve money from the cashier and go back to the

2   roulette table.

3        There was a decision eventually made between this

4   Defendant and his co-offender, Arthur Grady, to rob the

5   victim, Ralph Turner.  When Ralph Turner, as well as

6   some of -- several of the witnesses in is this case went

7   to leave, they exited through the valet area.  Ralph

8   Turner as well as some other members of the party

9   entered into a car at the valet area, and this

10  Defendant, who went and retrieved his SUV also came

11  through the valet area behind the car the victim was --

12  entered into.

13       This Defendant picked up co-offender, Arthur

14  Grady, from the valet area, and as victim's car pulled

15  away, the car the victim was in pulled away, this

16  Defendant then followed, driving with Arthur Grady,

17  following the victim's -- the car the victim was in.

18       They followed the victim in the car he was in,

19  and Arthur Grady was armed with a dangerous weapon at

20  that time.  They followed the victim's car, the car the

21  victim was in, to 8129 South Eberhart in Chicago, Cook

22  County, Illinois.

23       The victim and another witness exited that car.

24  The other witnesses remained in that car.  Co-offender

11

1  Arthur Grady approached Ralph Turner at that time, and

2  robbed Ralph Turner using a dangerous weapon.

3  Co-offender Arthur Grady then caused injuries to Ralph

4  Turner, and Ralph Turner died as a result of those

5  injuries sustained during that armed robbery.

6       The Defendant drove off, while in the SUV, and

7  left the area.  Co-offender Arthur Grady remained on

8  foot, and ran and -- away in the area, on foot.

9       This Defendant was living at two addresses at

10  that time.  One was in South Bend, the address where he

11  was eventually arrested on an arrest warrant, and the

12  other was in the City of Chicago, at 6315 South

13  Champlain, Chicago, Cook County, Illinois.  That

14  residence was shared with a female as well as

15  co-offender, Arthur Grady.

16       So stipulated?

17  THE COURT:  All right.  I didn't hear -- maybe I

18  missed it with all these people going in and out of the

19  room.  I didn't hear the Defendant would be identified

20  in open court.

21  MS. WARD:  I'm sorry, your Honor.  The identify --

22  Defendant gave a statement relating that he was involved

23  in this armed robbery of the victim, Ralph Turner, and,

24  in fact, admitted to his participation in this -- Ralph

12

1    Turner's death.

2         The evidence would also show that this Defendant

3    was identified as a person at the casino area through

4    not only video surveillance but a witness.

5         THE COURT:  Would the Defendant be also identified

6    in open court as the person who gave the statement

7    making those admissions you referred to?

8         MS. WARD:  Yes, your Honor.

9         MR. STACH:  So stipulated, your Honor.

10         THE COURT:  Did you hear those facts?  I'm sorry.

11         Did you stipulate to that, Counsel?

12         MR. STACH:  I did, your Honor.

13         THE COURT:  All right.  Mr. Bronson, did you hear

14    the facts that the State's Attorney just said and that

15    your lawyer just stipulated to?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  Are those the facts that you're

18    pleading guilty to?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Let the record reflect the Defendant

21    understands the nature of the charge and the possible

22    penalties under the law.  The plea has been made

23    knowingly and voluntarily.  I find a factual basis

24    exists for the plea, and the plea will be accepted.

13

-A33-

1        Raise your right hand, sir.

2                    (Defendant sworn.)

3                EXAMINATION BY MS. WARD:

4        Q    Mr. Bronson, can you just state your name,

5    please?

6        A    Aaron Bronson.

7        Q    And Mr. Bronson, you heard the facts that I

8    recited during the plea agreement; is that correct?

9        A    Yes, ma'am.

10       Q    And those are -- truly and accurately reflect

11   what happened when Ralph Turner died --

12       A    Yes, ma'am.

13       Q    -- is that correct?  And I also want to show

14   you what I'm marking for plea agreement purposes Exhibit

15   Number 1.  Do you recognize the person in that

16   photograph?

17       A    Yes, ma'am.

18       Q    Who is that?

19       A    Arthur Grady.

20       Q    Okay.  And I'm going to ask you if you

21   recognize what's marked as Plea Agreement Exhibit

22   Number 2.  Do you recognize that?

23       A    Yes, ma'am.

24       Q    And what is that?

                        14

1          A    The plea agreement I signed.

2          Q    Okay.  Is it a true and accurate copy of that

3    plea agreement?

4          A    Yes, ma'am.

5          Q    And you went through that plea agreement with

6    your attorney today; is that correct?

7          A    Yes, ma'am.

8          Q    And you understand it?

9          A    Yes, ma'am.

10         Q    And you signed it freely and voluntarily?

11         A    Yes, ma'am.

12         Q    No threats or promises were made to you in

13    order for you to get -- to make -- to sign that; is that

14    correct?

15         A    Yes.

16         MS. WARD:  Okay.  I have nothing further.

17         THE COURT:  All right.  There will be a finding of

18    guilty to the charge of first-degree murder, judgment

19    will be entered on the finding.

20         Is the there anything additional in aggravation

21    that I have not heard?

22         MS. WARD:  I have nothing else, your Honor.  We

23    would rest.

24         THE COURT:  Anything additional in mitigation?

15

1      MR. STACH:  No, your Honor.

2      THE COURT:  Is there anything you wish to say,

3   Mr. Bronson?

4      THE DEFENDANT:  No, ma'am.

5      THE COURT:  Mr. Bronson, you have the right to a

6   presentence investigation, which is an investigation

7   into your background or your history.  But because this

8   is an agreed-upon sentence, you can give up that

9   investigation.

10         Do you understand that?

11      THE DEFENDANT:  Yes, ma'am.

12      THE COURT:  Did you sign this paper?

13      THE DEFENDANT:  Yes, sir.

14      THE COURT:  Do you understand when you sign this

15   paper that means you give up the right to a presentence

16   investigation?

17      THE DEFENDANT:  Yes, ma'am.

18      THE COURT:  Has anybody forced you or threatened

19   you or promised you anything besides this agreement in

20   order to get you to sign the presentence investigation

21   waiver or to give up that investigation?

22      THE DEFENDANT:  No, ma'am.

23      THE COURT:  Did you sign the waiver and are you

24   giving up the presentence investigation of your own free

16

1   will?

2       THE DEFENDANT: Yes, ma'am.

3       THE COURT: I find the presentence investigation

4   waiver has been made knowingly and voluntarily. It will

5   be accepted. It will be made a part of the record.

6       Mr. Bronson, I said I would go along with the

7   agreement that you worked out with your attorney and the

8   State's Attorney and Judge Higgins.

9       You are sentenced to 24 years in the Illinois

10   Department of Corrections, and did you calculate the

11   credit, Counsel?

12       MR. STACH: I did, your Honor. 624 days. Six two

13   four.

14       THE COURT: Thank you. When you're released from

15   custody, you'll have to serve a term of mandatory

16   supervised release of three years. That used to be

17   called parole. That means you have to abide the terms

18   and conditions of the Illinois Department of

19   Corrections, including but not limited to, you cannot

20   commit any more violations of the law.

21       Do you understand that, sir?

22       THE DEFENDANT: Yes, ma'am.

23       THE COURT: Even though you pled guilty, you have

24   the right to file an appeal. If you want to try to take

17

1  back your guilty plea within 30 days from today, you

2  would have to file a written motion to withdraw your

3  guilty plea and vacate the judgment.

4      In that motion, you would have to state all the

5  reasons why you want to withdraw your guilty plea.  The

6  motion is granted, your guilty plea, the sentence, the

7  judgment would be set aside.  The case would be

8  reinstated, it would be set for trial.

9      Any charges that were dismissed as part of this

10  plea agreement would also be reinstated at the State's

11  request, and they would be set or trial.

12      If the motion is denied, you would have 30 days

13  from the denial to file a written notice of appeal.  Any

14  issue or claim of error not raised in the motion to

15  withdraw your guilty plea and vacate the judgment will

16  be waived for appeal purposes.

17      If you cannot afford an attorney on appeal, one

18  would be appointed to represent you free of charge, and

19  you'll be given a free transcript of today's

20  proceedings.

21      Do you understand your rights to appeal?

22      THE DEFENDANT:  Yes, ma'am.

23      THE COURT:  In fact, I understand there's some

24  people here from the family of the victim; is that

18

-A38-

1  correct?

2      MS. WARD:  Yes, your Honor.

3      THE COURT:  Were they apprised of this agreement

4  before it was entered into?

5      MS. WARD:  Yes.

6      THE COURT:  Very well.  That's the order.

7      MR. STACH:  Thank you, Judge.

8      THE COURT:  Okay.

9      And that sentence is concurrent on both charges,

10  1 and 3.  Does the State have a motion as to the other

11  Counts?

12      MS. WARD:  Yes, your Honor.  Motion State, as to

13  this Defendant only, Count 2 and 16.

14      THE COURT:  Nolle pros?

15      MS. WARD:  Motion State nolle pros, yes.

16                      (Which were all the proceedings

17                      had in the above-entitled cause.)

18

19

20

21

22

23

24

                    19

```
 1   STATE OF ILLINOIS    )
                          )
 2   COUNTY OF C O O K    )

 3
                 IN THE CIRCUIT COURT OF COOK COUNTY
 4                 COUNTY DEPARTMENT - CRIMINAL DIVISION

 5

 6        I, Lisa A. Ciarrachi, an Official Court Reporter

 7   for the Circuit Court of Cook County, County

 8   Department-Criminal Division, do hereby certify that I

 9   reported in shorthand the proceedings, had at the

10   above-entitled cause; that I thereafter caused the

11   foregoing to be transcribed into typewriting, which I

12   hereby certify to be a true and accurate transcript of

13   the proceedings, to the best of my ability, had before

14   the Honorable Angela M. Petrone, Judge of said court.

15

16

17   _____
                   Official Court Reporter
18

19

20

21   Dated this 9th day of August, 2012.

22

23

24
```

1CR-169

CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT
CRIMINAL DIVISION
DECEMBER 2010

The People of the State of
Illinois
v.

Arthur Grady
Aaron Bronson

**INDICTMENT FOR**

FIRST DEGREE MURDER

A TRUE BILL

Foreman of the Grand Jury

WITNESS
DETECTIVE BRIAN M JOHNSON, STAR #20948

Filed _____ , 20 ____
_____ , Clerk
Bail $ _____

COPY

Court
Copy

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

                    Arthur Grady
                    Aaron Bronson

committed the offense of      FIRST DEGREE MURDER

in that THEY, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

                    COUNT NUMBER 2
                    CASE NUMBER 11CR-169
                    CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

*Dangerous Firearm 5-16-13*

Arthur Grady
Aaron Bronson — *Amended to Aaron Bronson only Kew 8-7-12*

committed the offense of     FIRST DEGREE MURDER

in that THEY, WITHOUT LAWFUL JUSTIFICATION, ~~SHOT~~ *injured* AND KILLED RALPH TURNER WHILE ARMED WITH A ~~FIREARM~~ *Dangerous weapon* DURING THE COMMISSION OF A FORCIBLE FELONY, TO WIT: ARMED ROBBERY,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(3) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

COUNT NUMBER 3
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735200

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                    Arthur Grady


committed the offense of      FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT
AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM AND DURING THE
COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(1) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

                    COUNT NUMBER 4
                    CASE NUMBER 11CR-169
                    CHARGE ID CODE: 0735000

-A45-

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

                    Arthur Grady

committed the offense of        FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER AND DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

                    COUNT NUMBER 5
                    CASE NUMBER 11CR-169
                    CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                          Arthur Grady

committed the offense of      FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER
WHILE ARMED WITH A FIREARM DURING THE COMMISSION OF A FORCIBLE FELONY, TO
WIT: ARMED ROBBERY, AND DURING THE COMMISSION OF THE OFFENSE HE
PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(3) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

                          COUNT NUMBER 6
                          CASE NUMBER 11CR-169
                          CHARGE ID CODE: 0735200

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of     FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM AND DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED DEATH,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(1) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

COUNT NUMBER 7
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735000

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of     FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER AND DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED DEATH,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

COUNT NUMBER 8
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of     FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER
WHILE ARMED WITH A FIREARM DURING THE COMMISSION OF A FORCIBLE FELONY, TO
WIT: ARMED ROBBERY, AND DURING THE COMMISSION OF THE OFFENSE OF FIRST
DEGREE MURDER HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED
DEATH,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(3) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

COUNT NUMBER 9
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735200

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                          Arthur Grady

committed the offense of      FIRST DEGREE MURDER

n that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT
AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(1) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED
INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE
OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.


                          COUNT NUMBER 10
                          CASE NUMBER 11CR-169
                          CHARGE ID CODE: 0735000

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                          Arthur Grady

committed the offense of      FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER
WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG
PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED
INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE
OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.


                         COUNT NUMBER 11
                         CASE NUMBER 11CR-169
                         CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of    FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT
AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM AND DURING THE
COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(1) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED
INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE
OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

COUNT NUMBER 12
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735000

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of      FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER AND DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

COUNT NUMBER 13
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of     FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, INTENTIONALLY OR KNOWINGLY SHOT
AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM AND DURING THE
COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM THAT
PROXIMATELY CAUSED DEATH,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(1) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED
INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE
OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.

COUNT NUMBER 14
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735000

*nolle pros 5-16-13*

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

Arthur Grady

committed the offense of     FIRST DEGREE MURDER

in that HE, WITHOUT LAWFUL JUSTIFICATION, SHOT AND KILLED RALPH TURNER WHILE ARMED WITH A FIREARM, KNOWING THAT SUCH ACT CREATED A STRONG PROBABILITY OF DEATH OR GREAT BODILY HARM TO RALPH TURNER AND DURING THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM THAT PROXIMATELY CAUSED DEATH,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 9-1(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

THE STATE SHALL SEEK AN EXTENDED TERM SENTENCE IN THAT THE MURDERED INDIVIDUAL WAS ACTUALLY KILLED BY ARTHUR MARCELL GRADY DURING THE COURSE OF AN UNDERLYING FELONY: ARMED ROBBERY,

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

COUNT NUMBER 15
CASE NUMBER 11CR-169
CHARGE ID CODE: 0735100

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about January 30, 2009 at and within the County of Cook

                        Arthur Grady
                        Aaron Bronson

committed the offense of     ARMED ROBBERY

in that THEY, KNOWINGLY TOOK PROPERTY, TO WIT: CELLULAR TELEPHONE AND UNITED STATES CURRENCY, FROM THE PERSON OR PRESENCE OF RALPH TURNER, BY THE USE OF FORCE OR BY THREATENING THE IMMINENT USE OF FORCE AND THEY CARRIED ON OR ABOUT THEIR PERSON OR WERE OTHERWISE ARMED WITH A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 18-2(a)(2) OF THE ILLINOIS COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same People of the State of Illinois.

                        COUNT NUMBER 16
                        CASE NUMBER 11CR-169
                        CHARGE ID CODE: 0012366

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                    Arthur Grady

committed the offense of    ARMED ROBBERY

in that HE, KNOWINGLY TOOK PROPERTY, TO WIT: CELLULAR TELEPHONE AND
UNITED STATES CURRENCY, FROM THE PERSON OR PRESENCE OF RALPH TURNER, BY
THE USE OF FORCE OR BY THREATENING THE IMMINENT USE OF FORCE, AND DURING
THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 18-2(a)(3) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.


                    COUNT NUMBER 17
                    CASE NUMBER 11CR-169
                    CHARGE ID CODE: 0012367

The Grand Jurors chosen, selected and sworn, in and for the County of
Cook, in the State of Illinois, in the name and by the authority of the
People of the State of Illinois, upon their oaths present that on or
about January 30, 2009 at and within the County of Cook

                          Arthur Grady

committed the offense of      ARMED ROBBERY

in that HE, KNOWINGLY TOOK PROPERTY, TO WIT: CELLULAR TELEPHONE AND
UNITED STATES CURRENCY, FROM THE PERSON OR PRESENCE OF RALPH TURNER, BY
THE USE OF FORCE OR BY THREATENING THE IMMINENT USE OF FORCE, AND DURING
THE COMMISSION OF THE OFFENSE HE PERSONALLY DISCHARGED A FIREARM THAT
PROXIMATELY CAUSED DEATH TO RALPH TURNER,

IN VIOLATION OF CHAPTER 720 ACT 5 SECTION 18-2(a)(4) OF THE ILLINOIS
COMPILED STATUTES 1992 AS AMENDED AND

contrary to the Statute and against the peace and dignity of the same
People of the State of Illinois.


                    COUNT NUMBER 18
                    CASE NUMBER 11CR-169
                    CHARGE ID CODE: 0012368

**Transcript Excerpt:
Criminal Jury Trial (May 17, 2013)**

**[Pages JJ-1, JJ-55, JJ-139-140]**

1     STATE OF ILLINOIS   )
                          )   SS.

2     COUNTY OF C O O K  )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - CRIMINAL DIVISION

4

5     THE PEOPLE OF THE     )
     STATE OF ILLINOIS     )

6                         )

                vs.        )   11 CR 00169

7                        )

     ARTHUR GRADY        )

8

9                   REPORT OF PROCEEDINGS

10        BE IT REMEMBERED that on the 17th day of

11    May, 2013, this cause came on for hearing

12    before the Honorable ROSEMARY G. HIGGINS, Judge of

13    said Court, upon the indictment herein, the

14    Defendant having entered a plea of not guilty.

15     APPEARANCES:

16         HON. ANITA M. ALVAREZ, State's
          Attorney of Cook County, BY:

17         MS. LISETTE MOJICA,
          MS. KIM WARD and

18         MS. STEPHANIE MILLER,
          Assistant State's Attorneys,

19         on behalf of the People;

20         MR. JOHN LYKE,
          on behalf of the Defendant,

21         Arthur Grady.

22

     ROBERT J. MADOCH

23    Official Court Reporter
     Circuit Court of Cook County

24    County Department - Criminal Division
     C.S.R. 84-1194

JJ-1

1    harm's way, we were always taught to be very aware of

2    your surroundings, and what was happening around you.

3    Whenever I saw anything that seemed odd to me, I

4    would pay attention to it. Not out of suspicion so

5    much, but just, you know, out of caution.

6        Q.    Doctor, did something seem odd to you

7    while you were watching?

8        A.    Yes. I saw a gentleman that was standing

9    at the foot of the table. And just watching us. You

10   know, not playing, not placing any bets. Just kind

11   of hanging around. And there was another man and a

12   woman also at the table that weren't playing much,

13   but occasionally the woman would put down a bet. You

14   know, I wasn't paying so much attention to her or

15   him, but I was paying attention to the individual

16   that is just standing there watching.

17       Q.    When you say the individual was watching

18   the table, are you referring to the table where Bob

19   Currie, your friend, was winning?

20       A.    Yes.

21       Q.    And is that the same table where Ralph

22   would take the winnings of Bob and then go over and

23   cash them out?

24       A.    Yes.

1          Q.    In fact, your friends were

2     congratulating you and hugging you and high-fiving

3     you as you were winning?

4          A.    Yes.

5          Q.    They were surrounding you as we saw in

6     the video, is that correct?

7          A.    Yes.

8          Q.    How long had you been a gambler, by the

9     way?

10         A.    At that time, about fifteen years.

11         Q.    Okay.  So, you have been around many

12     gambling tables, true?

13         A.    Yes.

14         Q.    And it is not uncommon when a person is

15     winning to do what you said you do, you yell out and

16     you were happy and what not, is that correct?

17         A.    Yes.

18         Q.    When you do that, it draws the attention

19     of other people around in the gaming area, is that

20     fair?

21         A.    Yes.

22         Q.    People then come around and see who is

23     the lucky person.  That's not uncommon, is it?

24         A.    No.

1          Q.    In fact, that's fairly common, is that
2    true?
3          A.    Yes.
4          Q.    You told the members of the jury that
5    quite often you and your fellow friends would share
6    winnings with Ralph?
7          A.    I say I did.
8          Q.    You did.  You always shared winnings
9    with him when you went?
10         A.    That was the rule of thumb.
11         Q.    Did he gamble?
12         A.    Slightly.
13         Q.    Okay.  Did he gamble that night?
14         A.    He may have dropped one or two chips
15   intermittently.  But I don't recall that he was
16   gambling, sitting at the table.
17         Q.    Pretty much, as the video shows, he was
18   walking around, when he wasn't standing near you?
19         A.    Yes.
20         Q.    Now, let's go to 81st and Eberhart when
21   you had dropped Mr. Turner off and Mr. McGee.  You
22   told the members of the jury that after you dropped
23   them off, there was small banter going back and
24   forth.  Mr. McGee and Mr. Turner was on the sidewalk

JJ-140

-A64-

**Transcript Excerpt:
Criminal Jury Trial (May 20, 2013)**

**[Pages 1-LL, 59-62-LL, 129-LL, 148-LL,
150-LL, 154-LL, 168-LL, 173-LL,
176-177-LL, 181-LL 200-265-LL, 285-LL]**

1    STATE OF ILLINOIS)
                    ) SS
2    COUNTY OF C O O K)

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE        )
5    STATE OF ILLINOIS,       )
                              )
6          Plaintiff,         )
                              )
7          vs.                )    Case No. 11 CR 169
                              )
8    ARTHUR GRADY,            )
                              )
9          Defendant.         )

10              REPORT OF PROCEEDINGS had at the trial

11   had before the Honorable ROSEMARY GRANT HIGGINS, one

12   of the judges of said court, and JURY, on the 20th

13   day of May, 2013.

14

15    APPEARANCES:

16            HON. ANITA ALVAREZ, State's Attorney
              of Cook County, by:
17            MS. KIM WARD, MS. LISETTE MOJICA and
              MS. STEPHANIE MILLER,
18            Assistant State's Attorneys,
              on behalf of the People;
19
              MESSRS. JOHN LYKE and
20            BRANDON BROWN,
              on behalf of the Defendant.
21

22
     Dorothy M. Nagle, CSR
23   Official Court Reporter
     Criminal Division
24   CSR #084-003564

1    same condition as when you saw it?

2         A.    Yes.

3         Q.    Did you in fact sign that?

4         A.    Yes.

5         Q.    After you signed that, were you shown

6    anything?

7         A.    Yes.

8         Q.    What were you shown?

9         A.    Some pictures of some gentlemen.

10        Q.    I will show you what's marked as 14-B.

11   Do you recognize that?

12        A.    Well, I recognize the picture, but I

13   don't recognize anybody in the picture.

14        Q.    That's what I'm going to ask you. Were

15   those the pictures that were shown to you on

16   January 30th, 2009?

17        A.    Yes.

18        Q.    And, in fact, were you able to identify

19   anybody as being at Ralph's house when he was shot?

20        A.    No.

21        Q.    In both 14-A and 14-B are in the same or

22   substantially the same condition as when you looked

23   at them?

24        A.    Yes.

1          Q.    Sir, I would like to draw your attention

2     to January 31st, 2009, just the next day.  Did you

3     have an opportunity to go to the police station?

4          A.    Yes.

5          Q.    When you went to the police station, did

6     you speak with any detectives?

7          A.    Yes.

8          Q.    Did you see anything, did you view

9     anything?

10         A.    Yes.

11         Q.    Was that what someone would call like a

12    bunch of people, like, in a lineup?

13         A.    Yes.

14         Q.    Prior to that lineup, did the police

15    show you anything?

16         A.    I think I signed another form.

17         MS. WARD:  I will show defense what I'm

18    marking as People's Exhibit No. 15 and what was

19    previously marked as People's 5.

20              May I approach?

21         THE COURT:  You may.

22    BY MS. WARD:

23         Q.    Sir, I will show you what's been marked

24    as People's Exhibit No. 15.  Do you recognize that?

```
 1        A.    Yes.

 2        Q.    What is that?

 3        A.    Lineup photo spread advisory form.

 4        Q.    And have you seen that form before?

 5        A.    Yes.

 6        Q.    When did you see it?

 7        A.    1-31 I think.

 8        Q.    '09?

 9        A.    '09.

10        Q.    When you saw it, did you in fact -- did

11   you read it or did someone read it out loud to you?

12        A.    I read it and then signed it.

13        Q.    And is it in the same or substantially

14   the same condition as when you signed it?

15        A.    Yes.

16        Q.    I will ask you to look at People's

17   Exhibit No. 5.  Do you recognize what that's a

18   photograph of?

19        A.    I recognize it's a photograph of people

20   that were in a lineup, yes.

21        Q.    Is it a true and accurate photograph of

22   the people in the lineup?

23        A.    Yes.

24        Q.    Did you identify anybody in that lineup?
```

61-LL

1        A.    No.

2        MS. WARD: Your Honor, at this point I have

3    no other questions.  Thank you.

4        THE COURT:  Cross?

5        MR. LYKE: Yes, Judge.  Thank you.

6

7                    CROSS EXAMINATION

8    BY MR. LYKE:

9        Q.    Good morning, sir.

10        A.    Good morning.

11        Q.    Sir, I want to ask you some questions

12    about your time at the casino on January 30th --

13    January 29th leading into January 30th, 2009.

14    Okay?

15        A.    Okay.

16        Q.    You say you were there for dinner with

17    your friends; is that correct?

18        A.    Yes.

19        Q.    You started dinner around what time?

20        A.    6:30, 7:00.

21        Q.    And not only did you have dinner, you

22    had drinks as well?

23        A.    Yes.

24        Q.    What were you drinking?

1        A.    I did.

2        Q.    When you went to the police station on

3    that date, did you actually look at a group of men

4    in what was considered to be a physical lineup?

5        A.    I did.

6        Q.    Were you able to make any identification

7    from looking at that lineup?

8        A.    No.

9        MS. MOJICA:  Your Honor, may I approach the

10    witness with what I have just shown to defense

11    counsel as People's Exhibit No. 16 and People's

12    Exhibit No. 1 for identification?

13        THE COURT:  You may.

14    BY MS. MOJICA:

15        Q.    Ms. Woodard, I'm first showing you

16    what's been previously marked as People's Exhibit

17    No. 16 for identification purpose.  Do you

18    recognize what is shown in this photograph?

19        A.    Yes.

20        Q.    What does it show?

21        A.    It shows Ralph Turner laying in the

22    front yard.

23        Q.    And is this how your brother Ralph

24    Turner appeared when you looked out the window and

129-LL

1    jury what that consisted of?

2         A.    A protective pat down search is a search

3    of the body, making sure he didn't have any

4    instruments or tools that could possibly harm me or

5    my partner.

6         Q.    Did you search the defendant's pockets

7    at that time?

8         A.    Yes, ma'am.

9         Q.    What were the results of your search?

10        A.    He had a photo ID card of himself.

11        Q.    And did you do anything with that photo

12   ID card?

13        A.    Yes, ma'am.  I ran him through our leads

14   system which is a system that checks for warrants

15   or outstanding -- well, outstanding warrants or any

16   investigative alerts.  And then I also ran him

17   through our clear system to make sure his face

18   matched the face on the ID and him as well.

19        Q.    What did you determine from running

20   those two checks?

21        A.    That they were no investigative alerts

22   or active warrants.

23        Q.    Did the person that you were looking at

24   who you just identified as the defendant in open

1    driver's license, ma'am.

2        Q.   Were you looking for anything else when

3    you searched this defendant's person?

4        A.   Yes, ma'am.

5        Q.   What were you looking for?

6        A.   I was looking for a weapon.

7        Q.   Did you find any weapon on this

8    defendant's person?

9        A.   No, ma'am, I didn't.

10       Q.   Did you find any weapon at all in

11   relationship to this defendant?

12       A.   No, ma'am.

13       Q.   Now, the location where you stopped this

14   defendant, about how far away was that from the

15   location of 8125 South Eberhart?

16       A.   Maybe around three blocks.

17       Q.   Did you ask the defendant any questions?

18       A.   Yes, ma'am.

19       Q.   What did you ask him?

20       A.   I asked --

21       MR. LYKE:  Objection, foundation.

22       THE COURT:  Sustained.

23

24

1    actually northeast of where we were.

2         Q.    And to be clear, was the defendant on

3    foot or in a vehicle when you stopped him?

4         A.    He was on foot.

5         Q.    And was he alone?

6         A.    Yes, ma'am, he was alone.

7         Q.    Once you made this stop of the

8    defendant, did you do anything else?

9         A.    No, ma'am.

10        Q.    Once you collected the -- strike that.

11             You mentioned how you obtained an

12   identification card from the defendant's pocket,

13   correct?

14        A.    Yes.

15        Q.    Is that the only way in which you

16   collected information for your contact card?

17        A.    Yes, ma'am, between that and the clear

18   system, that's how I got the information that I

19   needed, yes, ma'am.

20        Q.    Once you verified the identification and

21   made sure that there was nothing regarding holding

22   the defendant, did you let him go?

23        A.    Yes, ma'am.

24        Q.    Can you tell us after that, did you

154-LL

```
 1          Q.    So during a robbery, people take stuff,
 2    right?
 3          A.    Yes, sir.
 4          Q.    You're aware that the victim's wallet
 5    was taken from him, correct?
 6          A.    Yes, sir.
 7          Q.    Usually a victim, a person who has a
 8    wallet has some ID in it, correct?
 9          A.    Yes, sir.
10          Q.    You're also aware that the victim's cell
11    phone was taken, true?
12          A.    Possibility, but I wasn't in detail of
13    everything that was taken at that particular time,
14    sir.
15          Q.    You're aware some money was allegedly
16    taken, correct?
17          A.    Yes, sir.
18          Q.    And you told the members of the jury
19    that you searched Mr. Grady's pockets?
20          A.    Yes, sir.
21          Q.    In fact, you didn't search his pockets.
22    You told him to empty his pockets; isn't that true?
23          A.    No, sir.
24          Q.    Well, isn't it true, sir, you were
```

1          Q.     In front of him or behind him?

2          A.     The handcuffs were behind him, sir.

3          Q.     Then you searched him, correct?

4          A.     Yes, sir.

5          Q.     Thoroughly?

6          A.     Yes, sir.

7          Q.     From head to toe?

8          A.     Yes, sir.

9          Q.     What type of foot gear did he have on?

10         A.     I can't recall the shoes he had on, sir.

11         Q.     Irrespective of what type of foot gear

12    he had on, you searched him and you searched from

13    head to toe, correct?

14         A.     Yes, sir.

15         Q.     You found no gun?

16         A.     No gun, sir.

17         Q.     You found no cell phone?

18         A.     No, sir.

19         Q.     You found no keys?

20         A.     No, sir.

21         Q.     Keys that belonged -- two sets of keys?

22         A.     No, sir.

23         Q.     Did you find -- you said you found

24    money, though?

1          Q.    That box is not marked either?

2          A.    No, sir.

3          Q.    There is also another marked called

4    suspicious person, correct?

5          A.    Yes, sir.

6          Q.    That box is not marked either, it is?

7          A.    No, sir.

8          Q.    They also on the contact card want you

9    to document visible injuries of any sort; is that

10   correct?

11         A.    Visible scars.

12         Q.    Or marks?

13         A.    Yes, sir.

14         Q.    And you looked at Arthur Grady's face

15   that morning, didn't you?

16         A.    Yes, sir.

17         Q.    You didn't see any bruises or any

18   scratches on his face as though he had been in a

19   fight, did you?

20         A.    No, sir.

21         Q.    Because you were looking for dark

22   clothing, so you paid careful attention to his

23   clothing; isn't that true?

24         A.    Yes, sir.

1          Q.    You didn't see any blood on his clothes,
2     did you?
3          A.    No, sir.
4          Q.    In fact, his clothes weren't wet or
5     anything, were they?
6          A.    No, sir.
7          Q.    So after doing your investigation, you
8     determined that he didn't fit the suspect that you
9     were looking for; is that true?
10          A.    No, sir.
11          Q.    You didn't?
12          A.    No, sir.
13          Q.    Well, you didn't arrest him or take him
14     back to the scene, did you?
15          A.    No, sir.
16          Q.    You just let him go?
17          A.    Yes, sir.
18          Q.    When you came over and walked in front
19     of Mr. Grady, you identified him as a male, dark
20     skin, didn't you?
21          A.    Yes, sir.
22          Q.    Because he is dark skin, correct?
23          A.    Yes, sir.
24          THE COURT:  Whose phone is going off?

1    STATE OF ILLINOIS)
                          )  SS
2    COUNTY OF C O O K)

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
             COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE          )
5    STATE OF ILLINOIS,         )
                                )
6          Plaintiff,           )
                                )
7           vs.                 )  Case No. 11 CR 169
                                )  Volume II
8    ARTHUR GRADY,              )
                                )
9          Defendant.           )

10            REPORT OF PROCEEDINGS had at the trial

11   had before the Honorable ROSEMARY GRANT HIGGINS, one

12   of the judges of said court, and JURY, on the 20th

13   day of May, 2013.

14

15     APPEARANCES:

16            HON. ANITA ALVAREZ, State's Attorney
              of Cook County, by:
17            MS. KIM WARD, MS. LISETTE MOJICA and
              MS. STEPHANIE MILLER,
18            Assistant State's Attorneys,
              on behalf of the People;
19
              MESSRS. JOHN LYKE and
20            BRANDON BROWN,
              on behalf of the Defendant.
21

22
     Dorothy M. Nagle, CSR
23   Official Court Reporter
     Criminal Division
24   CSR #084-003564

1    victim, where he was in the casino that night, and

2    they gave us a description of a possible suspect.

3    Once we followed the victim out, we found a suspect

4    matching the description that was given to us.

5        Q.    And where specifically, what camera

6    specifically first made you notice this person that

7    matched the description you were being given?

8        A.    I believe it was camera -- it was in

9    front of valet, 166 or 167.

10       Q.    Then once you saw that person, what was

11   the next step?

12       A.    It was to backtrack and see where he

13   came from and to try to get a license plate.  And

14   we found that he was near the roulette table that

15   the victim was playing at.

16       Q.    Based on that, did that cause you to

17   retrieve certain video footage?

18       A.    Yes.

19       Q.    In fact, you said you were trying to get

20   a license plate.  At some point did you see this

21   individual get into a car?

22       A.    Yes.

23       Q.    What did you do in relation to that car?

24       A.    We followed that car actually from the

1    marina garage to the pavilion garage and then to

2    the front of the casino.

3         Q.   Did you retrieve video of that as well?

4         A.   Yes.

5         Q.   Ma'am, in relation to this case, did you

6    do something else, did you create any other

7    documents?

8         A.   I did.  I did a timeline of events and

9    camera numbers.

10         Q.   Did you also then produce any still

11    photographs and tender those and give those to the

12    detectives?

13         A.   Yes.

14         Q.   Did you create any kind of diagrams or

15    create any diagrams?

16         A.   Yes.

17         Q.   What were those diagrams of?

18         A.   The pavilion entrance and exit to the

19    casino, as well as the front of valet and a map of

20    the casino where the victim was playing and the

21    cashier cage.

22         MS. WARD:  Your Honor, I'm showing defense

23    what's marked as People's Exhibit No. 21 and 22 and

24    then People's Exhibit No. 23 A through E.

1              THE COURT:  The record may so reflect.

2              MS. WARD:  May I approach?

3              THE COURT:  You may.

4                      You said it was Defendant's 21 and 22?

5              MS. WARD:  No.  State's Exhibit No. 21, 22

6      and 23 A through E.

7              THE COURT:  Okay.

8              MS. WARD:  May I approach?

9              THE COURT:  You may.

10     BY MS. WARD:

11         Q.    I will show you what's been previously

12     marked as People's Exhibit No. 21.  Do you

13     recognize that?

14         A.    Yes, that is a map of the casino.

15         Q.    When you say it's a map of the casino,

16     is it a map of a particular area in the casino?

17         A.    Yes.

18         Q.    Which area is that?

19         A.    Pretty much the middle of the casino.

20         Q.    Is pit number three pictured on that

21     map?

22         A.    Yes.

23         Q.    Is this a true and accurate map of this

24     area of the casino?

1          A.    Yes.

2          Q.    I will show you what's been mark as

3    People's Exhibit No. 22.  Do you recognize that?

4          A.    Yes.

5          Q.    What is that?

6          A.    That is the pavilion board and exit as

7    well as the valet area.

8          Q.    Is that a true and accurate diagram of

9    those areas?

10          A.    Yes.

11          Q.    I will show you what's been marked as

12    People's Exhibit No. 23-A through E.  You want to

13    take a look at these.  I know you have taken a look

14    at them before you testified; is that correct?

15          A.    Yes.

16          Q.    What are those?

17          A.    These are facial shots of the suspect

18    coming out of the casino.

19          Q.    Are those true and accurate still

20    photographs from the video that you retrieved?

21          A.    Yes.

22          MS. WARD:  Your Honor, I will ask that the

23    identification marks from People's Exhibit No. 21

24    and 22 be stricken, and I be allowed to publish

1    those to the jury during the rest of the direct.

2         THE COURT:  Any objection?

3         MR. LYKE:  No.

4         THE COURT:  Granted.

5         MS. WARD:  May I approach the witness one or

6    time?

7         THE COURT:  Yes.

8    BY MS. WARD:

9         Q.    I will give you a highlighter, ma'am.  I

10   just want you to hang onto that because I may ask

11   you to highlight a couple things.

12        A.    Okay.

13        Q.    Now, at certain times, the video that

14   you retrieved, did you concentrate more so on a

15   specific area as to others?

16        A.    Yes.

17        Q.    Why is that?

18        A.    That's where the victim and the suspect

19   seemed to be during the whole time the victim was

20   at the table, the suspect was constantly there.

21        Q.    From People's Exhibit No. 8, you said

22   you viewed that video.  Prior to testifying, you

23   and I also viewed that video; is that correct?

24        A.    Yes.

1          Q.    Would it aid you in your testimony if
2      you saw some of those video clips?
3          A.    Yes.
4          MS. WARD:  Your Honor, may I publish to the
5      jury?
6          THE COURT:  You may.
7      BY MS. WARD:
8          Q.    I will draw your attention to People's
9      Exhibit No. 21 on the screen here.  What have is
10     that?
11         A.    That is the general area of the casino
12     with pit three.
13         Q.    Do you see on the map in front of you
14     the physical map, do you see a camera by the number
15     of 2775?
16         A.    Yes.
17         Q.    Could you highlight that for me, please.
18         A.    (Witness complies.)
19         MS. WARD:  Your Honor, may the record reflect
20     the witness has highlighted to the right of the
21     photograph.
22         THE COURT:  Right in the middle or where?
23         MS. WARD:  It's to the right.  I will have
24     her come down and also point to it, Judge.

1          Q.    Could you come down, please, ma'am.

2                Can you please point for the ladies

3     and gentlemen of the jury exactly where 2775 is?

4          A.    (Indicating).

5          MS. WARD:  Your Honor, in the middle of the

6     photograph to the right, she is pointing to

7     No. 2775.

8          THE COURT:  The record may so reflect.

9     BY MS. WARD:

10         Q.    Why don't you remain down.  Can you tell

11    the ladies and gentlemen of the jury what they are

12    observing at 1:08:15 approximately?

13         A.    This is an overview of pit three.

14         Q.    In fact, what camera is this?

15         A.    Camera 2775.

16         Q.    What date?

17         A.    1-30-09.

18         Q.    Do you see the person that you referred

19    to as the victim in this case that you were

20    focusing on at some point?

21         A.    Right here (Indicating).

22         MS. WARD:  Your Honor, let the record reflect

23    the witness has pointed to the upper corner.

24         Q.    Can you point more specifically --

1          THE COURT:  Which corner, right or left?

2          MS. WARD:  The left.  She was touching a man

3    in the brown coat with a black hat.

4          THE COURT:  Any objection?

5          MR. LYKE:  No.

6          THE COURT:  The record will so reflect.

7     BY MS. WARD:

8          Q.    In fact, this is the view looking down

9    upon that pit?

10         A.    Yes.

11         Q.    Do you also see the person that you

12   later saw and said we're calling a suspect?

13         A.    Yes.

14         Q.    Could you point to him?

15         A.    (Indicating).

16         MS. WARD:  Your Honor, at 1:44:26 she pointed

17   to the left corner of the photograph a person

18   dressed in black.

19         THE COURT:  Any objection?

20         MR. LYKE:  No.

21         THE COURT:  The record may so reflect.

22    BY MS. WARD:

23         Q.    On this video here, this is a what you

24   recorded while you were retrieving this video?

1          A.    Yes.

2          Q.    In fact, are there different times on

3     this video?

4          A.    Yes.

5          Q.    At 1:59:51, do you again see the victim?

6          A.    Yes.

7          Q.    Where is the victim now?

8          A.    Right here (Indicating).

9          MS. WARD:  Your Honor, let the record reflect

10    she is pointing to roulette table 308 and is

11    pointing to the person who is tall with the brown

12    coat and black hat in the left hand portion.

13         THE COURT:  Any objection?

14         MR. LYKE:  No.

15     BY MS. WARD:

16         Q.    That table, is that the same table when

17    you previously pointed the victim out that he was

18    at?

19         A.    No.  He was at table 307 prior.

20         Q.    The table that he is at now is 307?

21         A.    308.

22         Q.    I mean 308.

23              Do you see again that person that you

24    were concentrating on that you referred to as a

1    suspect in this video?

2        A.    Yes, walking past.

3        Q.    He walked past?

4        A.    Yes.

5        Q.    How about now?

6        A.    Yes, he is right here (Indicating).

7        MS. WARD:  At 2:33:28 she is pointing to the

8    very left corner of the mid screen.

9        THE COURT:  Any objection?

10       MR. LYKE:  No.

11       THE COURT:  The record will so reflect.

12   BY MS. WARD:

13       Q.    Ma'am, this is a video that again you

14   retrieved?

15       A.    Yes.

16       Q.    If you want me to stop it at any time,

17   just let me know.

18                    At 2:35:09 do you still see that

19   person that you've identified as the suspect that

20   you were videoing?

21       A.    Yes.

22       Q.    Could you point to him and describe

23   something that he is wearing?

24       A.    All black, black cap and tan boots.

1          MS. WARD:  Your Honor, let the record reflect

2     at 2:35:09 on camera 2775, she pointed to the

3     middle of the screen in the left side.

4          THE COURT:  Any objection?

5          MR. LYKE:  No.

6          THE COURT:  The record may so reflect.

7     BY MS. WARD:

8          Q.   At 307, do you see that same person?

9          A.   Yes.

10          Q.   Could you point to him on the screen at

11     3:07:19?

12          MR. LYKE:  Judge, I will object.  I need a

13     sidebar.

14          THE COURT:  Okay.

15                    (Whereupon, the following

16                     proceedings were had outside the

17                     hearing of the jury.)

18          MR. LYKE:  I want to be a little more clear

19     because you said 2:35 whatever, then you jumped to

20     3:07.  Are you trying to say he was still there

21     from that time?

22          MS. WARD:  No.  I'm just identifying him at

23     key points.

24          MR. LYKE:  I need to see if he left.

1        MS. WARD:  But you have the video.  Judge, he

2    has the video.

3        THE COURT:  Is your objection that it

4    implies --

5        MR. LYKE:  Correct.

6        THE COURT:  That's cross-examination.

7    Overruled.

8                        (Whereupon, the following

9                        proceedings were had in the

10                       presence and hearing of the jury.)

11       THE COURT:  The objection is overruled.  You

12   may proceed.

13   BY MS. WARD:

14       Q.    At 3:09:22 do you still see that same

15   person?

16       A.    Yes.

17       Q.    Could you point to him, please?

18       A.    (Indicating).

19       MS. WARD:  Your Honor, again, the witness has

20   pointed to a person in the mid screen, not quite

21   all the way to the left.

22       THE COURT:  Any objection?

23       MS. WARD:  At 3:09:24.

24       MR. LYKE:  Could it be clear?  It looks like

1  a blur to me.

2      THE COURT:  There is an objection.

3      MR. LYKE:  It's still a blur.  I don't know.

4  Something is there.

5      THE COURT:  State, could you ask that

6  question over.

7  BY MS. WARD:

8      Q.    Do you see the person that you were

9  saying, referring to as a suspect in this clip at

10  3:09;25?

11      A.    Yes (Indicating).

12      MS. WARD:  Your Honor, let the record reflect

13  he is in the middle of the video, not quite flush

14  with the left-hand side.

15      MR. LYKE:  I can't see that.

16      THE COURT:  Over your objection, there is an

17  individual there.  Who that individual is,

18  suspected suspect, it's unclear at this time.  Over

19  your objection, it's just an individual whose

20  located to the left of the screen in the middle.

21  BY MS. WARD:

22      Q.    Again, is that the same person that you

23  had previously identified on each previous clip

24  that has been played for you?

1          A.     Yes.

2          Q.     Now, there is a camera, are you familiar

3     with camera 2811?

4          A.     Yes.

5          Q.     Could you tell the ladies and gentlemen

6     of the jury according to People's Exhibit No. 21,

7     where 2811 is?

8          A.     It's right here (Indicating).

9          MS. WARD:  Your Honor, may the record reflect

10    the witness has pointed to a camera marked 2811,

11    kind of in the center but more towards the bottom.

12         THE COURT:  Any objection?

13         MR. LYKE:  No.

14         THE COURT:  The record will so reflect.

15    BY MS. WARD:

16         Q.     Could you tell the ladies and gentlemen

17    of the jury what camera this view is from?

18         A.     This is camera 2811.

19         Q.     2811 at what time?

20         A.     1:43 in the morning.

21         Q.     That's on what date?

22         A.     1-30-09.

23         Q.     This video at 1:43:45, do you see that

24    person from this angle, that same person you

1    previously identified on the video from the other

2    camera?

3         A.    Yes.

4         Q.    Could you point to him, please?

5         A.    (Indicating).

6         MS. WARD:  Your Honor, could the record

7    reflect the witness is pointing to the individual

8    at the bottom of screen slightly to the right.

9         THE COURT:  Any objection?

10        MR. LYKE:  No.

11        THE COURT:  The record will so reflect.

12   BY MS. WARD:

13        Q.    At this point the victim was at what

14   table number?

15        A.    306.

16        Q.    306, is that clearly pictured in this

17   angle?

18        A.    No.

19        Q.    What table are we seeing from this

20   angle?

21        A.    We're actually seeing 308.  306 is next

22   to it (Indicating).

23        Q.    At 2:09:39 on that camera 2811, do you

24   see that person again that you previously

214-LL

1    identified and referred to as the suspect?

2        A.    Yes.

3        Q.    Will you point to him, please?

4        A.    (Indicating).

5        MS. WARD:  Your Honor, if the record could

6    reflect the witness has pointed mid screen to the

7    left.

8        THE COURT:  Any objection?

9        MR. LYKE:  No.

10       THE COURT:  The record will so reflect.

11   BY MS. WARD:

12       Q.    At this time 2:33:19, are we watching

13   camera 2811?

14       A.    Yes.

15       Q.    What table is the person you referred to

16   as the victim standing at now?

17       A.    308.

18       Q.    Do you see him in this video clip?

19       A.    Yes.

20       Q.    Could you point to him, please?

21       A.    (Indicating).

22       MS. WARD:  Your Honor, may the record reflect

23   the witness has pointed to an individual with a

24   brown jacket and black hat at table 308 in the

1    center to the left of the video?

2         THE COURT:  Any objection?

3         MR. LYKE:  No.

4         THE COURT:  The record will so reflect.

5    BY MS. WARD:

6         Q.   At 2:33:33, do you also see that person

7    that you've been previously identifying as the

8    suspect?

9         A.   Yes.

10        Q.   Could you point to him, please?

11        A.   (Indicating).

12        MS. WARD:  Your Honor, may the record reflect

13   the witness is pointing to a person mid to slightly

14   upper middle of the screen dressed in black.

15        THE COURT:  Any objection?

16        MR. LYKE:  No.

17        THE COURT:  The record will so reflect.

18        MR. LYKE:  Judge, I will object at this time.

19   The time has changed, and there hasn't been a

20   question posed.

21        THE COURT:  The record will reflect that

22   there has been a time lapse.  Over your objection,

23   the State may proceed.

24

216-LL

1    BY MS. WARD:

2        Q.    At 3:07:04, do you again see the person

3    you're terming as a suspect?

4        A.    Yes.

5        Q.    That's the same person that you've

6    identified previously?

7        A.    Yes.

8        Q.    Could you point to him, please?

9        A.    (Indicating).

10       MS. WARD:  Your Honor, may the record reflect

11   the witness is pointing to a person in black,

12   center, just slightly off center toward the top and

13   in the middle of the screen.

14       THE COURT:  Any objection?

15       MR. LYKE:  No.

16       THE COURT:  The record may so reflect.

17            State, do you know the next time this

18   individual will be identified?

19       MS. WARD:  Well, in a few seconds here,

20   Judge.

21       Q.    When the individual walked away a few

22   seconds ago, did you see where he went?

23       A.    Yes.

24       Q.    Where did he go?

1          A.    He went across (Indicating).

2          Q.    The tables?

3          A.    Across the pit.

4          MS. WARD:  Your Honor, let the record reflect

5     the witness has pointed to the area in the upper

6     left hand corner.

7          MR. LYKE:  I will object.  We can't see that.

8     It's not visible to us.

9          THE COURT:  Sustained.

10          MS. WARD:  I can rewind it for you.  We will

11     have to go back to the clip, Judge, and continue to

12     play.

13          Q.    Is the victim -- it's 3:09:15, is the

14     victim still -- where is the victim in this video?

15          A.    Right here (Indicating).

16          MS. WARD:  Your Honor, let the record reflect

17     the witness has pointed to the individual with the

18     brown coat and black hat in the center of the

19     video.

20          THE COURT:  To the left.

21          MS. WARD:  To the left.

22          THE COURT:  Any objection?

23          MR. LYKE:  No.

24          THE COURT:  The record may so reflect.

1    BY MS. WARD:

2         Q.   Do you see the person again at 3:09:26

3    that you called the suspect that you have been

4    previously identifying?

5         A.   Yes.

6         Q.   Can you point to him?

7         A.   (Indicating).

8         MS. WARD:  Your Honor, may the record reflect

9    the witness has pointed to an individual almost

10   center of the video, slightly to the foot of table

11   302, in all black with a black hat.

12        THE COURT:  Any objection?

13        MR. LYKE:  No.

14        THE COURT:  The record will so reflect.

15   BY MS. WARD:

16        Q.   Do see that person in black that you've

17   been identifying at this point?

18        A.   Yes.

19        Q.   Can you point to him?

20        A.   (Indicating).

21        MS. WARD:  Your Honor, let the record reflect

22   she is pointing to the upper left hand corner

23   across from the pit.

24        MR. LYKE:  Where?  I'm sorry.

1          THE WITNESS:  (Indicating).

2          MR. LYKE:  Judge, I'm still going to object.

3     You can't see nothing there.

4          MS. WARD:  You can see as the video was

5     rolling him walk there and stop.

6          THE COURT:  I didn't see it.  You will have

7     to do it again.

8               Can you move over here please, ma'am.

9          MS. WARD:  I will have to replay this entire

10    clip.

11         THE COURT:  Can you show when you see him?

12         MS. WARD:  I rewound it.  It's going to be a

13    minute.

14         THE COURT:  You're going to get to point

15    where it needs to go?

16         MS. WARD:  Judge, it will just take a second.

17         THE WITNESS:  That's him.

18     BY MS. WARD:

19         Q.   That's him?

20         A.   Yes.

21         MS. WARD:  Your Honor, for the record she has

22    pointed to a person with a black hat, black hoodie

23    or black on, standing in the middle slightly to the

24    left of the video.

1          THE COURT:  Any objection to that?

2          MR. LYKE:  No.

3          THE COURT:  The record will so reflect.

4     BY MS. WARD:

5          Q.    When he moves, could you please trace

6     with your marker as he is walking so you can show

7     the court and the jury where he is going?

8          A.    Yes.

9          Q.    You can step right up to there over

10    here.  Follow him with your pen, please?

11         A.    (Indicating).

12         MS. WARD:  Let the record reflect the witness

13    has a pen on the individual and is going to the

14    upper part of the screen around the corner of the

15    tables and around to the other table on the other

16    side and is resting at the table on the other side

17    where the individual in black is standing at that

18    table in the upper right hand corner.

19         THE COURT:  Upper left hand corner?

20         MS. WARD:  Upper left hand corner.  I

21    apologize.

22         THE COURT:  Any objection?

23         MR. LYKE:  Is she saying this person?

24         THE WITNESS:  Yes.

1        MR. LYKE:  Okay.

2        THE COURT:  The record may so reflect.

3        MS. WARD:  Thank you.

4              Judge, was that okay?

5        THE COURT:  Yes.

6    BY MS. WARD:

7        Q.    I'm reshowing again what you previously

8    identified as camera 2811 where we started at

9    1:43:50 on January 30th, 2009.

10             Your Honor, this is going to play for

11   a while to catch up where we left off.

12       THE COURT:  How long is it going to play?

13       MS. WARD:  A little bit.

14       THE COURT:  Can't you speed it up?

15       MS. WARD:  I can't.  I would have to take a

16   break to do that.

17       THE COURT:  Then we will take a recess,

18   technical difficulty.

19                     (Whereupon, the following

20                      proceedings were had outside the

21                      presence and hearing of the jury.)

22       MS. WARD:  Judge, could the witness go into

23   the conference room and wait?

24       THE COURT:  Absolutely.  Ma'am, you're still

1    under oath.  You will not have any conversations

2    with anyone.

3                    (Recess taken.)

4                    (Whereupon, the following

5                    proceedings were had in the

6                    presence and hearing of the jury.)

7        THE COURT:  Ma'am, you can take the witness

8    stand, or actually I think you are still at the

9    screen.

10                  State, have you been able to que that

11   portion?

12       MS. WARD:  I have, your Honor.

13       THE COURT:  Are you ready to proceed?

14       MS. WARD:  I am.

15       THE COURT:  You may.

16       MS. WARD:  Thank you, your Honor.

17       Q.    It's 3:09:18, is that the correct time

18   on that video?

19       A.    Yes.

20       Q.    Do you see the person that you have

21   previously identified on this video as the suspect?

22       A.    Right here I believe (Indicating).

23       MS. WARD:  Your Honor, may the record reflect

24   she is pointing to an individual in the center near

1     the roulette table.

2          MR. LYKE:  I don't see.

3          THE COURT:  She said she believes.  And there

4     was a hesitancy there.  So denied.

5      BY MS. WARD:

6          Q.    I will play it.  You tell me if you

7     notice him.

8          THE COURT:  Do you understand at the point

9     you were identify to him if you noticed him?

10         THE WITNESS:  Yes, this is him.  That was --

11         THE COURT:  You have to speak up for her.

12         THE WITNESS:  That was the correct person.

13         THE COURT:  Do you want to describe where she

14    was pointing to?

15         MS. WARD:  She was pointing to an individual

16    that was walking away down the aisle towards the

17    top, sort of center, slightly to the right of the

18    video screen.

19         THE COURT:  The record may so reflect.

20     BY MS. WARD:

21         Q.    Could you put your pen on this person

22    and follow the direction and where that person goes

23    when I start this video up.  It's 3:09:35?

24         A.    (Witness complies).

224-LL

1          MS. WARD:  Your Honor, let the record reflect

2     the witness has put her pen on the screen, followed

3     the person from around the tables to the other side

4     standing at the other side of the table.

5          THE COURT:  The record may so reflect.

6          MR. LYKE:  Judge, could we pause that?

7          THE COURT:  Yes.

8          MR. LYKE:  Is that the same table.  It looks

9     like a different table on the other side.

10          THE COURT:  Did you want to pose a question

11     at this time since it might be difficult for us to

12     do that?

13          MR. LYKE:  Right.  Yes.

14          THE COURT:  Go ahead.

15          MR. LYKE:  Is that a different table this

16     person is at now?

17          THE WITNESS:  Yes.

18          THE COURT:  State, do you have a question

19     based on that?

20          MS. WARD:  No.

21          Q.    Now, do you still see the victim at

22     3:10:14?

23          A.    Yes, the victim is right here

24     (Indicating).

1      MS. WARD:  Your Honor, let the record reflect

2   she pointed to a man with a black hat on and brown

3   coat at 3:10:18 walking away from the table in the

4   center.

5      THE COURT:  Any objection?

6      MR. LYKE:  No.

7      THE COURT:  The record will so reflect.

8   BY MS. WARD:

9      Q.   Now, is there a camera -- are you

10  familiar with a camera with the number 2817?

11     A.   Yes.

12     Q.   People's Exhibit No. 21, can you point

13  to where 2817 is?

14     A.   (Indicating).

15     MS. WARD:  Your Honor, may the record reflect

16  she has pointed to the mid of the diagram  slightly

17  towards the bottom.

18     THE COURT:  Any objection?

19     MR. LYKE:  No.

20     THE COURT:  The record may so reflect.

21  BY MS. WARD:

22     Q.   That camera, I will show you, is that

23  camera, the footage I'm showing you now at 3:20:25,

24  is that camera 2817?

1          A.    Yes.

2          Q.    That's on January 30th, 2009?

3          A.    Yes.

4          Q.    Did you see the person that you term as

5    victim in this case?

6          A.    Yes.

7          Q.    Could you point to him, please?

8          A.    (Indicating).

9          MS. WARD:  She is pointing to someone with a

10   brown coat, black hat to the right of the screen.

11         THE COURT:  Any objection about mid point?

12         MR. LYKE:  No, Judge.

13         THE COURT:  The record may so reflect.

14   BY MS. WARD:

15         Q.    Do you see the direction that the victim

16   is walking?

17         A.    Yes, he is going towards the exit.

18         Q.    At 3:21:05 do you see that person that

19   term the suspect that you had seen previously?

20         A.    Yes.

21         Q.    And you've identified previously?

22         A.    Yes.

23         Q.    Could you point to him, please?

24         A.    (Indicating).

1          MS. WARD:  Your Honor, let the record reflect

2     the witness has pointed towards the top part of the

3     video screen directly in the center.

4          THE COURT:  Any objection?

5          MR. LYKE:  No.

6          THE COURT:  The record may so reflect.

7     BY MS. WARD:

8          Q.    Do you see that person again?

9          A.    Yes.

10         Q.    At 3:21:58?

11         A.    Yes.

12         Q.    Point to him, please?

13         A.    (Indicating).

14         MS. WARD:  Your Honor, let the record reflect

15    that kind of center to the right, maybe slightly

16    above center.

17         THE COURT:  Any objection?

18         MR. LYKE:  No.

19         THE COURT:  The record may so reflect.

20    BY MS. WARD:

21         Q.    At 3:22:05, what direction is this

22    individual walking?

23         A.    He is going towards the exit.

24         Q.    I will show you what's been marked as

1     People's Exhibit No. 22.  Can you explain to the

2     ladies and gentlemen of the jury what is shown in

3     that exhibit?

4          THE COURT:  Are you returning to any videos

5     after this?

6          MS. WARD:  I am.

7          THE WITNESS:  There is a pavilion boarding

8     area which you will see them walk out.  This is our

9     coat check area.  And this will be the exit to the

10    valet area (Indicating).

11   BY MS. WARD:

12        Q.    Are you familiar with a camera by the

13    number 502?

14        A.    Yes.

15        Q.    Could you point to that for the ladies

16    and gentlemen of the jury?

17        A.    (Indicating).

18        MS. WARD:  Your Honor, let the record reflect

19    the witness is pointing the center of the video.

20        THE COURT:  Any objection?

21        MR. LYKE:  No.

22        THE COURT:  The record will so reflect.

23   BY MS. WARD:

24        Q.    The video that you're viewing, what

1    camera is this?

2        A.    502.

3        Q.    At what time?

4        A.    At 3:21:06.

5        Q.    Who is that?

6        A.    That's our victim (Indicating).

7        Q.    The man with the black hat?

8        A.    Yes.

9        Q.    Now, a short time later at 3:22:33,

10   could you point for the ladies and gentlemen of the

11   jury if you see anyone else?

12       A.    This is the suspect (Indicating).

13       Q.    Is that the same -- that's at 3:22:39,

14   correct?

15       A.    Yes.

16       Q.    Is that the same person that you have

17   been identifying in your testimony earlier?

18       A.    Yes.

19       Q.    Again, when you walk out this way, where

20   are you going?

21       A.    Going towards the pavilion area to the

22   valet vestibule.

23       Q.    Are you familiar with a camera of,

24   returning to People's Exhibit No. 22, 513?

1          A.    Yes.

2          Q.    Could you point to it on that diagram?

3          A.    (Indicating).

4          Q.    What view does that camera show?

5          A.    That's our coat check.

6          MS. WARD:  Your Honor, let the record reflect

7    the witness has pointed to camera 513 towards

8    somewhat of the bottom, a little slight to the

9    left.

10         THE COURT:  Any objection?

11         MR. LYKE:  No objection.

12         THE COURT:  The record will so reflect.

13    BY MS. WARD:

14         Q.    What video is this of?

15         A.    This is camera 513 of the coat check

16    area.

17         Q.    What time?

18         A.    3:21:35.

19         Q.    Now what time?

20         A.    3:22:25.

21         Q.    3:22:27, do you see the victim?

22         A.    Yes.

23         Q.    Could you point to him, please?

24         A.    (Indicating).

1       MS. WARD:  Your Honor, let the record reflect

2   the witness is pointing to someone who is slightly

3   to the left in the black hat and brown coat.

4       THE COURT:  Any objection?

5       MR. LYKE:  No.

6       THE COURT:  The record will so reflect.

7   BY MS. WARD:

8       Q.   What time do they walk away from that

9   coat check area about?

10      A.   3:26.

11      Q.   Are you familiar with a camera 509?

12      A.   Yes.

13      Q.   Could you show the ladies and gentlemen

14  of the jury on People's Exhibit No. 22 where that

15  is?

16      A.   (Indicating).

17      MS. WARD:  Your Honor, let the record reflect

18  the witness has pointed to a camera that is towards

19  the top, maybe mid diagram.

20      THE COURT:  Any objection?

21      MR. LYKE:  No.

22      THE COURT:  The record will so reflect.

23  BY MS. WARD:

24      Q.   What is viewed in this at 3:22:40, what

1    kind of view is that?

2         A.    This is of the coat check area. That is

3    of the pavilion boarding, exiting the casino.

4         Q.    Which way would be the valet?

5         A.    To the right (Indicating).

6         Q.    Do you see that person that you called

7    the suspect in the video at 3:22:44?

8         A.    Yes.

9         Q.    Could you point to him, please?

10        A.    (Indicating).

11        MS. WARD:  Your Honor, let the record reflect

12   that she pointed towards the left at the top of the

13   video.

14        THE COURT:  The record may so reflect.

15   BY MS. WARD:

16        Q.    Are you familiar with camera 147?

17        A.    Yes.

18        Q.    In People's Exhibit No. 22, where is

19   camera 147?

20        A.    (Indicating).

21        Q.    What is that area?

22        A.    That is the valet vestibule area.

23        Q.    Can you tell the ladies and gentlemen of

24   the jury is this camera 147?

1       A.    Yes.

2       Q.    At 3:23:34, do you see someone that you

3   had recognized in the video?

4       A.    Yes.

5       MS. WARD:  Your Honor, let the record reflect

6   she is pointing to the sole person in the video

7   slightly towards the left.

8       THE COURT:  Any objection?

9       MR. LYKE:  No.

10      THE COURT:  The record may so reflect.

11  BY MS. WARD:

12      Q.    Is that that same area?

13      A.    Yes.

14      Q.    This is at 3:28:48?

15      A.    Yes.

16      Q.    Do you see the victim that you've

17  previously identified?

18      A.    Yes.

19      Q.    Could you point to him, please?

20      A.    (Indicating).

21      MS. WARD:  Your Honor, let the record reflect

22  the witness has pointed to the person in the brown

23  jacket and the black hat.

24      THE COURT:  The record will so reflect

1    without objection.

2    BY MS. WARD:

3         Q.    Are you familiar with camera 134?

4         A.    Yes.

5         Q.    Where is that on People's Exhibit No.

6    22, if could you please point?

7         A.    Right here (Indicating).

8         MS. WARD:  Your Honor, let the record reflect

9    the witness has pointed to the camera to the left

10   of the photograph and slightly down from the top.

11        THE COURT:  Any objection?

12        MR. LYKE:  No.

13        THE COURT:  The record may so reflect.

14   BY MS. WARD:

15        Q.    What area is this showing at 3:22:38?

16        A.    This is the valet vestibule.

17        Q.    Is that camera 134?

18        A.    Yes.

19        Q.    Do you see the person that you called

20   the suspect that you have been identifying in your

21   testimony?

22        A.    Yes.

23        Q.    Could you point to him, please?

24        A.    (Indicating).

1          MS. WARD:  Your Honor, let the record reflect

2     the witness has pointed to the person towards the

3     right at the bottom of the screen.

4          THE WITNESS:  Without objection, the record

5     will so reflect.

6          MR. LYKE:  What is this area?

7          THE COURT:  Go ahead.

8          MR. LYKE:  What is this area again?

9          THE WITNESS:  This is the valet vestibule.

10         THE COURT:  Any questions based on that?

11         MS. WARD:  No.

12         Q.    At 3:28:46 or 48, do you see the victim?

13         A.    Yes.

14         Q.    Could you point to him, please?

15         A.    (Indicating).

16         MS. WARD:  Your Honor, let the record reflect

17    she has pointed to the individual slightly to the

18    left in the center of screen with the black hat and

19    brown coat.

20         THE COURT:  Without objection, the record may

21    so reflect.

22    BY MS. WARD:

23         Q.    This valet vestibule, is this where

24    someone would wait to get their car if they valeted

1    park?

2         A.    Yes.

3         Q.    Do you see that person that you called

4    the suspect at this time?

5         A.    Yes.

6         Q.    Could you point to him, please?

7         A.    (Indicating).

8         MS. WARD:  Your Honor, let the record reflect

9    the person -- she pointed to a person in black

10   walking towards the bench in the upper, slightly to

11   the right of the video.

12        THE COURT:  That's correct.  Without

13   objection, the record may so reflect.

14   BY MS. WARD:

15        Q.    At 3:31, the person that you pointed out

16   as the victim, did you see where they went?

17        A.    Yes, they are exiting the vestibule

18   going into their vehicle.  They parked in valet.

19        Q.    The person you've identified as 3:31:17,

20   the person you've identified previously as the

21   suspect, do you see him within that vestibule?

22        A.    Yes.

23        Q.    Could you point to him, please?

24        A.    (Indicating).

```
 1        MS. WARD:  Your Honor, let the record reflect
 2   she is pointing to an individual sitting alone on a
 3   bench toward the upper right hand portion of the
 4   video.
 5        THE COURT:  If there is no objection, the
 6   record may so reflect.
 7   BY MS. WARD:
 8        Q.    At 3:31:51, what happened to that person
 9   that you previously identified as the suspect?
10        A.    He exited the valet vestibule.
11        Q.    Are you familiar with camera --
12        MR. LYKE:  I'm sorry, Judge; I didn't get the
13   time.
14        THE COURT:  Could I ask the court reporter to
15   read that back?
16                    (Record read.)
17   BY MS. WARD:
18        Q.    Going to back to Exhibit No. 22, are you
19   familiar with camera 166?
20        A.    Yes.
21        Q.    Can you point to that camera, please.
22        A.    (Indicating).
23        Q.    How about camera 157, where is that?
24        A.    (Indicating).
```

238-LL

-A118-

1        Q.    These two cameras, are they inside the

2    casino complex or are they actually showing an

3    outside portion?

4        A.    They are on the outside.

5        Q.    I will show you -- what camera is this?

6        A.    166.

7        Q.    It's at 3:30:57?

8        A.    Yes.

9        Q.    Do you see the person that you call the

10   victim in this video?

11       A.    Yes.

12       Q.    At 3:31:01, where is that person?

13       A.    (Indicating).

14       MS. WARD:  Your Honor, let the record reflect

15   she is pointing to person in the distance towards

16   the top of the video.

17       THE COURT:  To the left of center.  Do you

18   have any objection?

19       MR. LYKE:  No.

20       THE COURT:  The record will so reflect.

21   BY MS. WARD:

22       Q.    Now, the car that the person that you

23   termed the victim, do you see that car in this

24   video?

1          A.    Yes.

2          Q.    At 3:32:04 where is it?

3          A.    (Indicating).

4          MS. WARD:  Your Honor, let the record reflect

5     she is pointing to the first car in order with the

6     lights on parked towards the top of the screen.

7          THE COURT:  Any objection?

8          MR. LYKE:  No objection.

9          THE COURT:  The record may so reflect.

10    BY MS. WARD:

11         Q.    Is there another car in this video?

12         A.    Yes.

13         Q.    Could you point to that car?

14         A.    (Indicating).

15         MS. WARD:  Your Honor, let the record reflect

16    it's in the far -- towards the top, further back

17    than the car she identified as the victim's.

18         THE COURT:  Any objection?

19         MR. LYKE:  Is that the one with the lights I

20    guess?

21         THE WITNESS:  Yes.

22         MR. LYKE:  No objection.

23         THE COURT:  The record may so reflect.

24

```
1     BY MS. WARD:

2          Q.    Did someone go up to that car when you

3     were watching this video?

4          A.    Yes.

5          Q.    That was approximately 3:32:12?

6          A.    Correct.

7          Q.    When you watched that, did that draw

8     your attention specifically to that car?

9          A.    Yes.

10         Q.    Why is that?

11         A.    We were looking for possibly somebody

12    following the victim out and our suspect exited the

13    vestibule and got into that dark colored SUV.

14         Q.    In fact, is it fair to say -- what

15    camera is this?

16         A.    167.

17         Q.    That's on the same date, correct?

18         A.    Yes.

19         Q.    Is this just a different view of the

20    footage we've previously just viewed?

21         A.    Yes.

22         Q.    Do you see the victim at 3:31:02?

23         A.    Yes.

24         Q.    Could you point to him, please?
```

241-LL

1          A.    (Indicating).

2          MS. WARD:  Your Honor, let the record reflect

3     she has pointed to the individual with the brown

4     coat and the black hat towards the left.

5          THE COURT:  Any objection?

6          MR. LYKE:  No.

7          THE COURT:  The record may so reflect.

8     BY MS. WARD:

9          Q.    Now at 3:31:52, do you still see the car

10    the victim had gotten into?

11         A.    Yes.

12         Q.    Could you point to it?

13         A.    (Indicating).

14         MS. WARD:  Your Honor, let the record reflect

15    she pointed to the car to the left of the

16    photograph.

17         THE COURT:  Without objection, the record

18    will so reflect.

19    BY MS. WARD:

20         Q.    Do you see the person that you've been

21    identifying in the other clips that you termed the

22    suspect?

23         A.    Yes.

24         Q.    Could you point to him?

1          A.    (Indicating).

2          MS. WARD:  Your Honor, let the record reflect

3     she has pointed to an individual slightly towards

4     the right and slightly upwards.

5          THE COURT:  Any objection?

6          MR. LYKE:  No.

7          THE COURT:  The record will so reflect.

8     BY MS. WARD:

9          Q.    Is that the video clip that drew your

10    attention to him?

11         A.    Yes.

12         Q.    Ma'am, you stated that you saw that

13    person that you termed as a suspect get into a

14    vehicle --

15         THE COURT:  Do you have anything else you're

16    going to show her?

17         MS. WARD:  I just have a couple things

18    regarding that car.

19         THE COURT:  Questions or are you showing her

20    something?

21         MS. WARD:  I have video of it.

22         Q.    What did you do, in fact, with that

23    information relating to the vehicle?

24         A.    We were given a description of the

1    suspect and the vehicle.  And when we saw him walk

2    out of the casino, identified him as the suspect

3    and saw that he got into the vehicle that was also

4    described.

5        Q.    Did do you anything in relation to that

6    vehicle?

7        A.    We did.  We backtracked that vehicle

8    into the marina garage to possibly get a license

9    plate off of it.  It went from the marina garage

10   into the pavilion garage where we obtained a

11   license plate.

12       Q.    Did you in fact -- I'm showing you --

13   what camera is this?

14       A.    This is camera 1309.

15       Q.    It's at 2:34:21 in the morning?

16       A.    Yes.

17       Q.    Is this one of the clips that you

18   retrieved relating to that vehicle?

19       A.    Yes.

20       Q.    At this point is the car coming or

21   going?

22       A.    It's arriving.

23       Q.    Do you see the car on this video?

24       A.    Yes.

1          Q.    Could you point to it, please?

2          A.    (Indicating).

3          MS. WARD:  Your Honor, let the record reflect

4     she pointed to a car that's toward the top and to

5     the right.

6          THE COURT:  The record may so reflect.

7     BY MS. WARD:

8          Q.    As you were watching this video on

9     camera 1309, did you see someone actually get out

10    of that car?

11         A.    Yes.

12         Q.    Is that someone you also retrieved some

13    video relating to?

14         A.    Yes.

15         Q.    Did that person ever go back to that

16    car?

17         A.    Yes.

18         Q.    Was that later in the morning?

19         A.    Yes.

20         THE COURT:  State, I would prefer if you let

21    the witness answer the questions.

22    BY MS. WARD:

23         Q.    Do you see the person at 2:34:59 that

24    exited that car that you identified?

1          A.    Yes.

2          Q.    Could you point to him, please?

3          A.    (Indicating).

4          MS. WARD:  Your Honor, let the record reflect

5     she pointed to someone in the center of the video

6     screen slightly upward.

7          THE WITNESS:  Without objection, the record

8     may so reflect.

9     BY MS. WARD:

10         Q.    Now, at 3:24:07, did you retrieve video

11    from that same camera?

12         A.    Yes.

13         Q.    Could you tell the ladies and gentlemen

14    of the jury what you saw at that point?

15         A.    The driver going back to the vehicle in

16    question (Indicating).

17         MS. WARD:  Your Honor, let the record reflect

18    that's 3:24:07.

19         THE COURT:  The record will so reflect.

20    BY MS. WARD:

21         Q.    Ma'am, with regards to the marina

22    garage, in order to exit the garage on foot to get

23    into the casino, how would you do so?

24         A.    We have a marina exit from the casino in

246-LL

-A126-

```
 1   which you take an elevator up to your level that's

 2   connected right to the casino.

 3        Q.    In order to get to the casino, do you

 4   have to take an escalator or elevator or can you

 5   walk stairs?

 6        A.    You can walk stairs.

 7        Q.    Did you retrieve video in this case

 8   relating to that person you saw exit the car?

 9        A.    Yes.

10        Q.    On foot?

11        A.    Yes.

12        Q.    Did that person use the stairs to get

13   out of that garage?

14        A.    He used the elevator.

15        Q.    Can you tell the ladies and gentlemen of

16   the jury at 2:35:09 what camera is this?

17        A.    Camera 1083.

18        Q.    On January 30th, 2009?

19        A.    Yes.

20        Q.    What area is being shown?

21        A.    The third level vestibule of the marina

22   garage, level three.

23        Q.    In there, do you see anyone that you saw

24   in relation to that car that parked?
```

247-LL

```
1        A.    Yes, the driver.

2        Q.    Could you point to him, please?

3        A.    (Indicating).

4        MS. WARD:  Your Honor, let the record reflect

5   she pointed to an individual to the left towards

6   the top.

7        THE COURT:  Any objection?

8        MR. LYKE:  No.

9        THE COURT:  The record may so reflect.

10  BY MS. WARD:

11       Q.    There are cameras located inside those

12  elevators?

13       A.    Yes.

14       Q.    Did you capture any video from inside

15  the elevators relating to this case?

16       A.    Yes.

17       MS. WARD:  Let the record reflect I'm showing

18  3:33:38.

19       Q.    What camera is that?

20       A.    Camera 1010.

21       Q.    Where is that located?

22       A.    That is the elevator in the marina

23  garage.

24       Q.    Do you see anyone that you know in
```

1    relation to this case?

2          A.    Yes.

3          Q.    Could you point to that person?

4          A.    (Indicating).

5          MS. WARD:  Your Honor, let the record reflect

6    at 3:23:436 she pointed to the individual to the --

7    in the middle, slightly to the top.

8          THE COURT:  Any objection?

9          MR. LYKE:  No.

10         THE COURT:  The record may so reflect.

11   BY MS. WARD:

12         Q.    Can you tell the ladies and gentlemen of

13   the jury what camera this is?

14         A.    It's camera 1322.

15         Q.    Where is that located?

16         A.    On the ramp from the third level of the

17   marina garage.

18         Q.    When you say the third level, what is

19   the significance of the third level in relation to

20   this case?

21         A.    That is where the suspected vehicle was

22   parked.

23         Q.    Could you tell the ladies and gentlemen

24   of the jury if you see that car that you identified

1   the person who is the driver and you saw

2   previously?

3         A.    Yes.

4         Q.    Could you point to it, please?

5         A.    (Indicating).

6         MS. WARD:  Your Honor, let the record reflect

7   that at 3:25:52, she pointed to a car to the left

8   in the top of the video screen.

9         THE WITNESS:  Any objection?

10        MR. LYKE:  None at all.

11        THE COURT:  The record may so reflect.

12   BY MS. WARD:

13        Q.    Tell the ladies and gentlemen of the

14   jury what that is, what camera this is?

15        A.    This is the exiting camera in the marina

16   garage.

17        Q.    That's at 3:26:02?

18        A.    Yes.

19        Q.    Did that capture the -- were you

20   attempting to capture the license plate of the car

21   that had driven -- that you had --

22        THE COURT:  State, can you ask her what she

23   was trying to do.

24

```
 1    BY MS. WARD:
 2         Q.    What were you trying to do when you took
 3    that video?
 4         A.    Attempting to obtain a license plate.
 5         Q.    Were you able to do so?
 6         A.    No.
 7         Q.    I will show you -- are you familiar with
 8    camera No. 10?
 9         A.    Yes.
10         Q.    What is camera No. 10?
11         A.    10 is the entrance to the pavilion
12    garage, which we call the helix.
13         Q.    That's at 3:237:23; is that correct?
14         A.    Correct.
15         Q.    Where is this in relation to the marina
16    garage?
17         A.    It's actually across from it.
18         Q.    Can you get from the marina garage to
19    this area?
20         A.    Only through the casino.
21         Q.    How about in a car?
22         A.    Yes.
23         Q.    How would you do that?
24         A.    When you exit the marina garage, you
```

```
 1   make a left-hand turn on the Casino Center Drive

 2   and then make a right and it comes right into here

 3   (Indicating).

 4        Q.   Do you see the car that you saw in the

 5   marina garage with the person you identified

 6   driving?

 7        A.   Yes.

 8        Q.   Could you point to it, please?

 9        A.   (Indicating).

10        MS. WARD:  Your Honor, let the record reflect

11   at 3:31:28 she pointed to a car in the center

12   slightly to the top of the video.

13        THE COURT:  Without objection, the record may

14   so reflect.

15             Please ask the witness what she is

16   seeing rather than telling her what she is seeing.

17   BY MS. WARD:

18        Q.   What's this a picture of?

19        A.   This is the license plate camera coming

20   out of the pavilion garage.

21        Q.   What camera is that?

22        A.   29.

23        Q.   What time?

24        A.   3:30:38.
```

1          Q.    At that point were you ever able to

2    ascertain a license plate of the car that you were

3    surveilling?

4          A.    Yes.

5          Q.    Can I ask you what camera this is?

6          A.    This is camera 70, the entrance to level

7    seven of the pavilion garage.

8          Q.    Do you see the car that you were

9    surveilling in this video?

10         A.    Yes.

11         Q.    Where?

12         A.    Right here (Indicating).

13         MS. WARD:  Your Honor, she pointed to a car

14   in the top portion, center of the video.

15         Q.    Did you film this car?

16         A.    This was --

17         THE COURT:  First of all, is there any

18   objection?

19         MR. LYKE:  No.

20         THE COURT:  The record may so reflect.

21         THE WITNESS:  -- the suspected vehicle.

22    BY MS. WARD:

23         Q.    Tell the ladies and gentlemen of the

24   jury what camera this is?

```
 1          A.    1101.

 2          Q.    The time?

 3          A.    At 3:30.

 4          Q.    Could you tell them what in fact does

 5     this area show?

 6          A.    This is the entrance into where you

 7     would go around in the helix into the pavilion

 8     garage.  It also shows part of the valet area.

 9          Q.    What are they seeing now?

10          A.    This is the suspected vehicle exiting

11     the pavilion garage.

12          Q.    At 3:30:48 could you point to that

13     vehicle specifically?

14          A.    (Indicating).

15          MS. WARD:  Your Honor, may the record reflect

16     she has pointed to a car slightly to the left in

17     the center.

18          THE COURT:  Any objection?

19          MR. LYKE:  No.

20          THE COURT:  The record may so reflect.

21     BY MS. WARD:

22          Q.    What camera is this?

23          A.    1102.

24          Q.    What time?
```

```
 1            A.    3:30:47.

 2            Q.    What view is this?

 3            A.    This is where you would exit to go to

 4    Center Drive to leave the casino area.

 5            Q.    Could you tell the ladies and gentlemen

 6    what they are viewing at this time?

 7            A.    This is the suspected vehicle exiting.

 8            Q.    At 3:30:56.  Can you please point to it?

 9            A.    (Indicating).

10            MS. WARD:  Let the record reflect she is

11    pointing to the car right of the video screen.

12            THE WITNESS:  Any objection?

13            MR. LYKE:  No.

14            THE COURT:  The record will so reflect.

15    BY MS. WARD:

16            Q.    As you watched this car, did this car

17    actually leave?

18            A.    Yes.

19            Q.    What are we viewing now?

20            A.    This is the opposite view of camera 1103

21    at 3:30:59t.  That is the suspect vehicle going

22    towards Center Drive (Indicating).

23            MS. WARD:  Your Honor, let the record reflect

24    she has pointed to a car in the upper right hand
```

1    corner with the taillights showing.

2        THE COURT:  If there is no objection, the

3    record will so reflect.

4    BY MS. WARD:

5        Q.    What is the car doing now?

6        A.    The car is going -- going to show it's

7    going to make a U-turn.  And it's going to drive

8    back to the valet area.

9        Q.    Could you point to it at 3:31:16?

10       A.    (Indicating).

11       MS. WARD:  Your Honor, if the record could

12   reflect, she is pointing to car towards the top of

13   the screen in the center with its headlights facing

14   to the left.

15       THE COURT:  Without objection, the record may

16   so reflect.

17   BY MS. WARD:

18       Q.    Could you tell the ladies and gentlemen

19   of the jury what camera this is?

20       A.    Camera 169.

21       Q.    What kind of view is this?

22       A.    This is an overview of the valet area

23   shooting from the pavilion building.

24       Q.    Could you show the ladies and gentlemen

1   of the jury the video that we have been observing

2   with that SUV, point to the garage and the area

3   that we've been watching?

4        A.     The pavilion garage is on the left, and

5   the marina garage is actually on the right

6   (Indicating).

7        MS. WARD:  Your Honor, let the record reflect

8   the witness has pointed to the left of the screen

9   and then to the right of the screen.

10       THE COURT:  Any objection?

11       MR. LYKE:  No objection.

12       THE COURT:  The record will so reflect.

13  BY MS. WARD:

14       Q.     At 3:31  do you see the victim's car?

15       A.     Yes.

16       Q.     Could you point to it, please?

17       A.     (Indicating).

18       MS. WARD:  Your Honor, let the record reflect

19  she is pointing to a car at the very bottom of the

20  screen.

21       MR. LYKE:  I'm sorry?

22       THE COURT:  I don't see it either.

23       MR. LYKE:  Here (Indicating)?

24       THE WITNESS:  Here (Indicating).

1          THE COURT:  Bottom to the right?

2          MS. WARD:  Yes.

3          THE COURT:  The record may so reflect.

4      BY MS. WARD:

5          Q.   Could you describe for the ladies and

6      gentlemen of the jury as the video plays, could you

7      describe you what observe?

8          A.    The victim and his friends are entering

9      the vehicle (Indicating).

10         MS. WARD:  Your Honor, the witness is

11     pointing to the same car at the bottom of the

12     screen to the right.

13         THE COURT:  Without objection, the record may

14     so reflect.

15     BY MS. WARD:

16         Q.    Now what's being pictured here at

17     3:31:34?

18         A.    The suspected vehicle is coming to the

19     front of the casino.

20         MS. WARD:  Your Honor, if the record could

21     reflect the witness is pointing to left of the

22     video.

23         THE COURT:  Any objection?

24         MR. LYKE:  No.

1          THE COURT:  Is everybody okay over there?

2     All right.

3               State, do you have any more questions?

4          MS. WARD:  Judge, if I could have one second.

5          Q.    Ma'am, when you retrieved the video for

6     the police detectives, People's Exhibit No. 8, the

7     CD, did you alter the video or change it in any way

8     before you gave it to the police?

9          A.    No.

10         MS. WARD:  I don't have any other questions.

11         THE COURT:  Cross?

12         MR. LYKE:  Yes.

13

14                    CROSS EXAMINATION

15    BY MR. LYKE:

16         Q.    Good morning, ma'am.  How are you?

17         A.    Good.

18         Q.    We saw lots of footage of a person you

19    were calling a victim?

20         A.    Yes.

21         Q.    And that was the person that was in the

22    gold jacket?

23         A.    Yes.

24         Q.    Black hat?

1        A.    Yes.

2        Q.    During that video clip that we watched,

3    at no point did he ever sit down and play at the

4    table, did he?

5        A.    Not to my knowledge, no.

6        Q.    Well, you saw the videotape.  At any

7    time while you were watching it, did you ever see

8    him sit down and play at that table?

9        A.    No.

10       Q.    Did you ever see the dealer or the --

11    what do you call the person that runs the roulette?

12       A.    The dealer.

13       Q.    The dealer, at no point did you ever see

14    the dealer hand him any chips, did you?

15       A.    No.

16       Q.    At no point did you ever see anyone else

17    who was at the roulette table hand him any chips,

18    did you?

19       A.    No.

20       Q.    We saw no video footage of the person

21    you called the victim at the cashier's counter

22    cashing chips in, do we?

23       A.    Correct.

24       Q.    And while they were at, when I say they,

1    I'm talking about the person you're calling the

2    victim as well as his friends, when they went to

3    the coat check, you didn't see him pay for his

4    coat, did you?

5         A.    No.

6         Q.    In fact, you didn't see any money in his

7    hand at all, did you?

8         A.    No.

9         Q.    At no point in the video did you ever

10   see him in possession of any large amounts of

11   money, did you?

12        A.    No.

13        Q.    You watched this video and the only the

14   person that you're calling the victim -- let me

15   back up.

16             You watched this video in conjunction

17   with Chicago Police detectives; is that correct?

18        A.    Correct.

19        Q.    And that was on the same day or January

20   the 30th or was it the 31st?

21        A.    It was January 30th.

22        Q.    And this was at the Horseshoe Casino in

23   Hammond?

24        A.    Yes.

1      Q.     One of the detectives was a Detective

2   Barsch?

3      A.     Yes.

4      Q.     And a Detective Weber?

5      A.     I don't recall the other detective.

6      Q.     But you do recall Detective Barsch?

7      A.     Yes.

8      Q.     And prior to trying to find the video

9   footage, he shared with you the information he had

10  relative to suspects and the victim; is that

11  correct?

12     A.     Yes.

13     Q.     He also shared with you facts that the

14  victim had -- was with some friends?

15     A.     Yes.

16     Q.     And we saw several people at the coat

17  check in the video?

18     A.     Yes.

19     Q.     And the detectives informed you those

20  were friends of the victim?

21     A.     Yes.

22     Q.     In that video at the coat check or at

23  any point did you ever see any of those players

24  with a large sum of money?

```
1          A.    No.

2          Q.    During all this video that you watched,

3   you never saw any of the friends go to the cashier

4   and receive a large sum of money either, did you?

5          A.    No.

6          Q.    The driver of the car, one of the clips

7   you showed the vehicle, the suspect vehicle, the

8   dark SUV, pull into the parking garage, the driver

9   of that vehicle was not the person that you was

10  calling a suspect throughout the video; is that

11  fair?

12         A.    Correct.

13         Q.    But the driver in the video though had

14  on dark clothes, didn't he?

15         A.    Yes.

16         Q.    In fact, he also had on what's called a

17  hoodie; is that true?

18         A.    I would call it a jacket.

19         Q.    But it had a hood on it?

20         A.    Yes.

21         Q.    In fact, he put that hood on when he got

22  inside the elevator, didn't he?

23         A.    Yes.

24         Q.    Then at any point in the video when the
```

1  person you called the suspect, you never saw him

2  put his hood on his head, did you?

3       A.   No.

4       Q.   In fact, he had a cap on; is that

5  correct?

6       A.   Yes.

7       Q.   And the person who entered the elevator

8  and he put his hood on, it would be fair to say he

9  was shivering like he was cold?

10      A.   I didn't --

11      MS. WARD:   Objection.

12      THE COURT:   Overruled.

13  BY MR. LYKE:

14      Q.   Did you notice that?

15      A.   No.

16      Q.   At some point did you notice him at all

17  shivering?

18      A.   No.

19      Q.   The person that you're calling a suspect

20  throughout all these videos, he never stood

21  directly behind the victim, did he, and stop?

22      A.   No.

23      Q.   In fact, primarily he was walking -- he

24  was on the opposite side of where the victim was

1    throughout most of the video; is that true?

2         A.    He was in the area, yes.

3         Q.    In fact, in some of the clips, he was in

4    fact engaged in conversation with other people; is

5    that correct?

6         A.    Correct.

7         Q.    In fact, when he was walking for the

8    most part, he didn't even look in the direction of

9    the person you're calling the victim; is that true?

10        A.    Yes.

11        Q.    In one part of the video when the judge

12   allowed me to ask you a question in there, I asked

13   you when he left from several feet from the person

14   you're calling the victim, he went around and you

15   identified him at another table?

16        A.    Correct.

17        Q.    And he was watching those people play at

18   that table?

19        A.    I don't know.

20        Q.    He was standing there at another table?

21        A.    Correct.

22        Q.    Let's talk about the exit video that you

23   described for us.  The victim and his friends

24   exited first; is that fair?

1        Q.     When you saw the victim lying on the

2    sidewalk, did you see any blood on the ground?

3        A.     I saw blood on his chest.

4        Q.     Did you see any blood in the snow?

5        A.     I don't recall, but I saw blood on his

6    chest.

7        Q.     Did you see blood on that swatch of the

8    pants leg?

9        A.     On the swatch of the pants leg, I

10   believe he had blood on his chest and on the side

11   of his body.

12       Q.     My question was you told the members of

13   the jury that you saw like a piece of a pants leg

14   some ways away from the victim; is that correct?

15       A.     I told the jury I saw pants legs in the

16   -- a cut off piece of pants leg in the middle of

17   the street.

18       Q.     That's what I'm referring to.  That

19   piece of pants leg, did you see blood on that?

20       A.     Not that I can recall.

21       Q.     Did you look at it?

22       A.     I'm sure I did, but I don't recall what

23   I saw at this time.

24       Q.     The glasses that you pointed out for us

285-LL

**Transcript Excerpt:
Criminal Jury Trial (May 21, 2013)**

**[Pages MM-1, MM-49, MM-127-128,
MM-134-135, MM-140, MM-146, MM-156]**

```
 1    STATE OF ILLINOIS    )
                           )  SS.
 2    COUNTY OF COOK       )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE    )
 5    STATE OF ILLINOIS,   )Case No. 11 CR 00169-01
                           )
 6              Plaintiff, )
                           )
 7         VS              )
                           )
 8    ARTHUR GRADY,        )
                           )
 9              Defendant. )

10

11                        REPORT OF PROCEEDINGS had at the

12    trial in the above-entitled cause before the

13    Honorable ROSEMARY GRANTS HIGGINS, Judge of said

14    Court on the 21st day of May, A.D. 2013.

15

16         APPEARANCES:

17              HONORABLE ANITA M. ALVAREZ,
                State's Attorney of Cook County, by
18              MS. KIM WARD and
                MS. STEPHANIE MILLER,
19              Assistant State's Attorney,
                appeared for the People;
20
                MR. JOHN LYKE,
21              appeared for the Defendant.

22    Sherry L. Jones, RPR, CSR, CRR, RMR
      Criminal Court
23    Official Court Reporter
      License No. 084-004024
24
```

MM-1

1    was your attention drawn to anything?

2        A.   Our attention was drawn to -- we also

3    observed part of the pants that was ripped off his

4    leg was down the block, farther south down the

5    block, maybe five houses down.  It also had blood on

6    it.

7                We were also notified that there was a

8    cell phone in between two cars on the street closer

9    to the east side of the street.  So it would be on

10   the east parkway closer to the cars parked on the

11   curb, on the east side of the street.

12       Q.   With regards to that cell phone can you

13   describe what that cell phone looked like?

14       A.   The cell phone was a Samsung flip phone,

15   just an older model flip phone.

16           MS. WARD:  Your Honor, I'm going to show

17   Defense what's been previously marked as People's

18   Exhibit Nos. 39, 47, and 50.

19                May I approach?

20                THE COURT:  Yes.

21   BY MS. WARD:

22       Q.   Detective, I'm going to show you what's been

23   marked previously as People's Exhibit No. 47.  Can

24   you tell me what is that a photograph of?

1        A.   Yes.

2        Q.   Prior to doing that you did a physical and

3   visual inspection of those clothes prior to that; is

4   that true?

5        A.   Yes.

6        Q.   You looked at the black hoody, correct?

7        A.   Correct.

8        Q.   You didn't see anything that you would have

9   thought was blood on it, did you?

10       A.   On the Timberland boots --

11       Q.   No, no, we're going to get there.  I am

12   talking about the hoody first.

13       A.   Oh, on the hoody, no, I didn't see anything

14   that would be considered blood.

15       Q.   And you didn't see anything on the black

16   jeans that also was inventoried, anything that

17   struck you as being blood or potentially being

18   blood?

19       A.   I did not see anything.

20       Q.   Now, you mentioned Timberland boots,

21   correct?

22       A.   Correct.

23       Q.   You saw something that in your experience

24   as a detective you believed was blood at the time?

MM-127

-A150-

1        A.    Correct.

2        Q.    And you sent those as well for testing?

3        A.    That is correct.

4        Q.    That's because at the crime scene you were

5    aware that the victim had bled; is that correct?

6        A.    Correct.

7        Q.    And you wanted to see whether or not blood

8    was transferred from the victim on to the boots of

9    Arthur Grady?

10       A.    That is correct.

11       Q.    Not only the area that you saw that appeared

12   to be blood but potentially even the bottom of the

13   boot; is that true?

14       A.    We inspected the whole boot.

15       Q.    During the course of your investigation you

16   became aware that the victim's blood was not on

17   those boots at all?

18            MS. WARD:  Objection.

19            THE COURT:  Basis?

20            MS. WARD:  Hearsay.

21            THE COURT:  Sustained.  Stricken.  To be

22   disregarded.

23   BY MR. LYKE:

24       Q.    You told the members of the jury that you in

MM-128

1    submission report form?

2        A.   Yes.

3        Q.   Can you please tender those back to me,

4    please.

5             Is that the document you were referring

6    to?

7        A.   Yes.

8        Q.   Take a look at that document and refresh

9    your memory as to whether or not a gunshot residue

10   test for the hoody of Arthur Grady was ever

11   ordered?

12       A.   The two tests is DNA, forensic biology --

13       Q.   I'm sorry, Detective.  Just answer my

14   question, please.

15       A.   A specific gunshot residue test was not

16   ordered.

17       Q.   And was a gunshot residue test ordered for

18   the pants of Arthur Grady?

19       A.   No.

20       Q.   And was a gunshot residue test ordered for

21   the boots of Arthur Grady?

22       A.   No.

23       Q.   Was a gunshot residue test ordered for the

24   knit cap of Arthur Grady?

MM-134

1        A.   No.

2        Q.   And was a gunshot residue test of Arthur

3   Grady's hands ever done?

4        A.   No.

5        Q.   Detective, you learned during your

6   investigation that certain items were taken from

7   Ralph Turner during this robbery; is that correct?

8        A.   That is correct.

9        Q.   One of those items was Mr. Turner's wallet;

10  is that correct?

11       A.   I can't -- I don't recall if that was taken

12  or not.  I have to take a look at the reports to see

13  if that was one of the items missing.

14       Q.   Which report?

15       A.   The clear -- how about the scene report.

16       Q.   Which one?

17       A.   The scene.

18       Q.   Crime scene?

19       A.   Crime scene report, yes.

20       Q.   You're talking about the crime scene

21  processing report?

22       A.   That's correct.

23            THE COURT:  Off the record.  Can the

24  attorneys approach for a second.


MM-135

1        Q.   In January of 2009 it would be fair to say

2    that Aaron Bronson's fingerprints was not compared

3    to that gun in January of 2009?

4        A.   In January of 2009?

5        Q.   Correct.

6        A.   Or February of 2009 --

7        Q.   Or February of 2009.

8        A.   At that time, no.

9        Q.   In fact, you told the members of the jury he

10   was arrested approximately two years later; isn't

11   that true?

12       A.   That's correct.

13       Q.   Was his fingerprints -- was he fingerprinted

14   when he was arrested?

15       A.   He was.

16       Q.   Were those fingerprints then tested against

17   the gun?

18       A.   There were no fingerprints found on the gun.

19   There was nothing to test against the gun that I

20   recall.

21       Q.   So when you say no fingerprints were found

22   on the gun, Arthur Grady's fingerprints were not on

23   that gun?

24       A.   Yes, Arthur Grady's fingerprints -- no one's

MM-140

1  witness was a little different.  Some were at the

2  Horseshoe.  Some of them were at the scene.

3  Depending on what their involvement was, what they

4  told us we were going to be showing for you're at

5  the casino.  Did you see him at the casino or did

6  you see him at the scene.

7      Q.  There were two positive identifications of

8  Arthur Grady per the photo array for being seen at

9  Horseshoe; is that correct?

10     A.  I believe so, yes.  I would have to double

11  check.

12     Q.  There were no positive identifications of

13  Arthur Grady as being the shooter at 8125 at the

14  lineups that you ran; is that correct?

15     A.  That is correct.

16     Q.  You told the members of the jury that you

17  had learned some information from Arthur Grady; is

18  that correct?

19     A.  Yes.

20     Q.  In fact, he was arrested and taken to the

21  police station?

22     A.  Yes.

23     Q.  He was read what's called Miranda

24  warnings?

MM-146

```
 1    person that he noticed standing around the table he

 2    never -- he told you that the description of that

 3    person was light complexion to medium brown, 5,9 to

 4    160 pounds, didn't he?

 5              MS. WARD:  Objection.

 6              THE COURT:  Basis?

 7              MS. WARD:  Misstatement.

 8              THE COURT:  Why don't you talk to Mr. Lyke

 9    for a moment.

10    BY MR. LYKE:

11        Q.  Isn't it true that he told you that he was

12    light to medium complexion, 5, 9, 160 pounds?

13        A.  Yes, that's what's in the GPR.

14        Q.  And that's what he told you?

15        A.  Yes.

16        Q.  Now, I want to ask you some questions

17    regarding your interview you had with Anthony McGee,

18    and that interview was done at 8125 South Eberhart

19    later in January -- later that night January 30th;

20    is that correct?

21        A.  Yes, it was done on January 30th.

22        Q.  And you were with the same fellow detective

23    that you can't recall his name at this point?

24        A.  That one was Detective Weber.  It depends on
```

MM-156

**Transcript Excerpt:**
**Criminal Jury Trial (May 22, 2013)**

**[Pages 1-NN, 42-NN, 80-NN, 90-91-NN, 95-96-NN,**
**106-108-NN, 137-138-NN, 141-142-NN, 152-NN]**

1    STATE OF ILLINOIS)
                     ) SS
2    COUNTY OF C O O K)

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION

4    THE PEOPLE OF THE        )
5    STATE OF ILLINOIS,       )
                              )
6         Plaintiff,          )
                              )
7         vs.                 )    Case No. 11 CR 169
                              )
8    ARTHUR GRADY,            )
                              )
9         Defendant.          )

10              REPORT OF PROCEEDINGS had at the trial

11   had before the Honorable ROSEMARY HIGGINS, one of

12   the judges of said court, and JURY, on the 22nd day

13   of May, 2013.

14

15    APPEARANCES:

16              HON. ANITA ALVAREZ, State's Attorney
                of Cook County, by:
17              MS. KIM WARD and
                MS. STEPHANIE MILLER,
18              Assistant State's Attorneys,
                on behalf of the People;
19
                MESSRS. JOHN LYKE and
20              BRANDON BROWN,
                on behalf of the Defendant.
21

22
     Dorothy M. Nagle, CSR
23   Official Court Reporter
     Criminal Division
24   CSR #084-003564

1    Indiana.

2         Q.    Who were you living with?

3         A.    Jocelyn Banks, my girlfriend.

4         Q.    You said where, in Indiana?

5         A.    518 South 28th Street.

6         Q.    What city?

7         A.    South Bend.

8         Q.    From time to time, did you ever sleep

9    anywhere else while you were living in South Bend,

10   Indiana?

11        A.    Yeah, sometimes I go to Chicago.

12        Q.    When you go to Chicago, where do you

13   stay?

14        A.    On 6315 Champlain.

15        Q.    Have you ever lived at that address

16   before?

17        A.    Yes.

18        Q.    When you lived at that address, is that

19   a house or an apartment?

20        A.    Apartment, second floor.

21        Q.    When you lived at that house or

22   apartment on the second floor, did you live with

23   anybody?

24        A.    I lived with Marcel, his baby mama at a

```
1          A.    Yes.

2          Q.    What did he have?

3          A.    He had his jacket and the black clothes

4    he had on.  Oh, he had a mask and he had his hat on

5    and a hood I think.

6          Q.    When you say his hood, was his hood

7    under his hat or over it?

8          A.    Over.

9          Q.    When he jumped out, did you see where he

10   went?

11         A.    He went straight towards the man with

12   the hat.

13         Q.    What happened?

14         A.    The man with the hat stole on him.  He

15   hit the ground, and I pulled off.

16         Q.    Wait.  When you say stole on him, could

17   you explain what that means?

18         A.    He punched him in the face.  He fell

19   down towards the ground, and I put my car in

20   reverse.

21         Q.    When you say he hit him, or he swung on

22   him you said -- what did he do?

23         A.    The man with the hat swung, punched him

24   in the face, punched Marcel in the face.  Marcel
```

80-NN

1     BY MS. WARD:

2          Q.     Aaron, I just want to ask you.  When you

3     were in South Bend, Indiana, eventually did the

4     police come to that address?

5          A.     Yes.

6          Q.     Was that on November 23rd, 2010?

7          A.     Yes.

8          Q.     When they came to that address, were you

9     ultimately arrested?

10          A.     Yes.

11          Q.     Where was that Chevy Tahoe at that time?

12          A.     Parked in the back.

13          Q.     I will take you back to the casino on

14     January 29th, 2009 and the morning of January 30th,

15     2009.  You said you spoken to the defendant by

16     phone at some time?

17          A.     Yes.

18          Q.     Did he call you or did you call him?

19          A.     Both, we was calling each other.

20          Q.     I want to take you back to when you said

21     you saw 66-A in the 6315 South Champlain address on

22     January 30th, 2009 when the defendant brought it.

23     Did you see what he did with it?

24          A.     He put it in his room.

1          Q.     Did you ever see that gun again after

2     that?

3          A.     No.

4          MS. WARD:  I'm showing counsel what is marked

5     as People's Exhibit No. 50.

6                    May I approach?

7          THE COURT:  You may.

8     BY MS. WARD:

9          Q.     Aaron, I'm showing you what's marked as

10    People's Exhibit No. 50.  Can you take a look at

11    it?

12         A.     Yeah.

13         Q.     Do you recognize what that is?

14         A.     It's Marcel phone.

15         Q.     Does that truly and accurately show how

16    that looked on January 29, 2009?

17         A.     Yes.

18         MS. WARD:  Judge, I don't have any other

19    questions.

20         THE COURT:  Cross?

21         MR. LYKE:  Yes.

22

23

24

1          A.    Yeah.

2          Q.    You told the members of the jury --

3     let's talk about your clothes now.  You had on dark

4     jeans that day, right?

5          A.    Yeah, blue jeans.

6          Q.    Hoodie?

7          A.    Yeah.

8          Q.    Dark jacket?

9          A.    Yeah.

10         Q.    Boots?

11         A.    Yeah.

12         Q.    You told the members of the jury that

13    you had sold that gun to Arthur Grady long before

14    this happened; is that correct?

15         A.    Yep.

16         Q.    You don't have a gun license, do you?

17         A.    No.

18         Q.    You're not authorized to sell guns, are

19    you?

20         A.    No.

21         Q.    Did you give him a receipt for his

22    purchase?

23         A.    No.

24         Q.    So that was your gun, correct?

95-NN

1          A.    No.

2          Q.    It was never your gun?

3          A.    Yeah.

4          Q.    Until you sold it, right?

5          A.    Yeah.

6          Q.    When did you sell it to him, the exact

7    date?

8          A.    Don't remember the exact date.

9          Q.    You told the members of the jury that

10   you were gambling; is that correct?

11         A.    Yes.

12         Q.    You were winning?

13         A.    I was losing at first, then I started

14   winning.

15         Q.    And at some point, you left the

16   Horseshoe Casino?

17         A.    Yes.

18         Q.    So roughly you got there approximately

19   7:00 or 8:0 0 clock; is that fair?

20         A.    I don't remember the exact time.

21         Q.    Well, it was in the evening time; is

22   that fair?

23         A.    Yeah.

24         Q.    And you left the Horseshoe Casino

1    withe Arthur; isn't that true?

2         A.    No.

3         Q.    Isn't it true, sir, during your

4    conversation with the detective on December the

5    1st, 2010, you told them that Arthur was driving at

6    some point, didn't you?

7         A.    Yes.

8         Q.    That was a lie?

9         A.    Yes.

10        Q.    You told them that Arthur drove and you

11   switched places with him, isn't that true?

12        A.    Yes.

13        Q.    That too was a lie?

14        A.    Yes.

15        Q.    You told them, in fact, you got in the

16   back seat, correct?

17        A.    I think so.

18        Q.    And you start trying to find something

19   to cover your face up; is that true?

20        A.    I think so.

21        Q.    And you also told them that you were

22   looking for some gloves; is that correct?

23        A.    I think so, yeah.

24        Q.    You told them that Arthur put on a mask;

1   is that true?

2          A.     Probably, yeah.

3          Q.     That was a lie?

4          A.     What was a lie, all of those?

5          Q.     The last question, that Arthur -- let me

6   take them one at time.  I don't want to confuse

7   you.

8                 When you told the detectives in that

9   interview that you got in the back seat, that was a

10  lie?

11         A.     Yep.

12         Q.     When you told the detectives that Arthur

13  then started driving, that was a lie?

14         A.     Yep.

15         Q.     When you told the detectives you were

16  looking for something to cover up your face in the

17  back seat, that was a lie?

18         A.     Yeah.

19         Q.     When you told the detectives you were

20  look for some gloves to put on your hands, that was

21  a lie?

22         A.     Yep.

23         Q.     When you told the detectives that Arthur

24  started driving the car following them, that was a

```
 1  lie?

 2       A.   Yep.

 3       Q.   You told the members of the jury that

 4  the car, the black Mercedes stopped in the middle

 5  of 81st and Eberhart and you pulled behind it;

 6  isn't that correct?

 7       A.   Yep.

 8       Q.   You told the detectives on December 1st,

 9  2010 that Arthur Grady pulled up behind that car;

10  isn't that true?

11       A.   I think so.

12       Q.   That was a lie?

13       A.   If I said it, yeah, it was a lie.

14       Q.   You told them that the black Mercedes

15  was still present when Arthur allegedly jumped out

16  of the car; is that correct?

17       A.   I don't remember everything I said.  I

18  don't remember everything I said.

19       Q.   Let me ask you; was the black car still

20  present when whoever pulled up behind them?

21       A.   Yes.

22       Q.   And the black car was still present when

23  the shots started ringing out; is that correct?

24       A.   No.
```

108-NN

```
 1                    (Record read.)
 2         THE COURT:  Overruled.
 3    BY MR. LYKE:
 4         Q.    Isn't it true you wrote "Arthur snitched
 5    on me when he first got arrested," didn't you say
 6    that?
 7         A.    Yeah, I guess.
 8         Q.    I don't want you to guess, sir.
 9               Judge, may the record reflect I'm
10    approaching the witness with Defense Exhibit No. 9?
11         THE COURT:  Yes, you may approach.
12    BY MR. LYKE:
13         Q.    Take a look at this letter.
14         A.    Yep.
15         Q.    Read it for the jury, that part where it
16    says "Arthur snitched on me"?
17         A.    "Arthur snitched on he me when he first
18    got arrested, implicating me as the shooter in this
19    case, called the police" --
20         Q.    I just wanted the snitch part.  We will
21    get to the rest.
22               You also wrote that he implicated you
23    as the shooter, correct?
24         A.    Yep.
```

137-NN

1        Q.      Which caused the police to put a warrant

2   out for your arrest?

3        A.      Yep.

4        Q.      And then you wrote "well, what goes

5   around comes around," correct?

6        A.      Yep.

7        Q.      And you said that "now the State wants

8   me to testify against him;" is that correct?

9        A.      Yeah.

10       Q.      And then in the letter you start feeling

11  bad about what you was about to do to Arthur; is

12  that true?

13       A.      Yeah --

14       MS. WARD:  Objection.

15       THE COURT:  Basis?

16       MS. WARD:  Form of the question.

17       MR. LYKE:  He answered it.

18       THE COURT:  Overruled.  The answer may stand.

19  BY MR. LYKE:

20       Q.      Specifically, you said "I'm just trying

21  to be helpful because I pretty much hate the

22  police, and I can't see myself being the reason

23  another nigga is in jail for the rest of his life,"

24  that's you what wrote, right?

1    wasn't in my right mind. That's you what meant by

2    that; isn't that true?

3        A.    Pretty much.

4        Q.    You told Ashley further "I know this

5    sounds crazy and maybe even clique, but I think I

6    fell in love with you at the first sight, and I

7    would do anything to please you," right?

8        A.    Yeah.

9        Q.    And you wanted her to send you a

10   picture?

11       A.    Yeah.

12       Q.    What were you going to do with that

13   picture?

14       A.    Keep it.

15       Q.    You told her "I hope to hear from you,

16   see you or maybe even receive a picture, especially

17   before Arthur goes to trial"; is that true?

18       A.    Yeah.

19       Q.    Then you told her "I don't want to hurt

20   my deal, though," you told her that, didn't you?

21       A.    Yeah.

22       Q.    You said "please don't jeopardize my

23   agreement with the State by showing them this

24   letter if it is incriminating enough;" isn't that

```
 1    true?

 2         A.    Yeah.

 3         Q.    Then you start even commenting on your

 4    own credibility, didn't you?

 5         A.    Yeah.

 6         Q.    You said, quote, I hate the sound of me

 7    being a credible witness.  It sounds very creepy to

 8    me.  You wrote that, didn't you?

 9         A.    Yeah.

10         Q.    Because it does sound creepy if somebody

11    thinks you're credible, right?

12         A.    No.  I don't like being a snitch.

13    That's what's kind of creepy.

14         Q.    Nobody put no gun to your head to be a

15    snitch, did they?

16         A.    No.

17         Q.    But you like being a snitch?

18         A.    No, I don't --

19         MS. WARD:  Objection.

20         THE COURT:  Overruled.

21         MR. LYKE:  Judge, may I approach to lay the

22    foundation for the letter?

23         THE COURT:  Yes.

24
```

1        Q.    You knew the police were looking for

2    you?

3        A.    Looking for us.

4        Q.    No, he was arrested.  You knew they were

5    looking for you?

6        A.    Yeah, after he got arrested, yeah.

7        Q.    Tell the members of the jury for those

8    two years where were you?

9        A.    I was in a few places.  I was going back

10    and forth from house to house to stay away from the

11    police.

12        Q.    Because you found out that they hit some

13    houses that people knew you, right?

14        A.    Yeah.

15        MS. WARD: Objection, hearsay.

16        THE COURT:  Sustained.

17    BY MR. LYKE:

18        Q.    And when those people told you the

19    police were there, you knew not go back there?

20        MS. WARD:  Objection.

21        THE COURT:  Sustained.  Stricken.

22    BY MR. LYKE:

23        Q.    So you were just on the run?

24        A.    Yeah.

**Transcript Excerpt:
Criminal Jury Trial (May 23, 2013)**

**[Pages OO-1, OO-14, OO-22-23, OO-37,
OO-46-47, OO-206, OO-224-225, OO-243,
OO-277, OO-282, OO-284]**

```
1   STATE OF ILLINOIS    )
                         )   SS.
2   COUNTY OF COOK       )

3           IN THE CIRCUIT COURT OF COOK COUNTY
            COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE    )
5   STATE OF ILLINOIS,   )Case No. 11 CR 00169-01
                         )
6           Plaintiff,   )
                         )
7        VS              )
                         )
8   ARTHUR GRADY,        )
                         )
9           Defendant.   )

10                       VOLUME I

11                  REPORT OF PROCEEDINGS had at the

12  trial in the above-entitled cause before the

13  Honorable ROSEMARY GRANTS HIGGINS, Judge of said

14  Court on the 23rd day of May, A.D. 2013.

15       APPEARANCES:

16           HONORABLE ANITA M. ALVAREZ,
             State's Attorney of Cook County, by
17           MS. KIM WARD,
             MS. LISETTE MOJICA, and
18           MS. STEPHANIE MILLER
             Assistant State's Attorney,
19           appeared for the People;

20           MR. JOHN LYKE and
             MR. BRANDON BROWN,
21           appeared for the Defendant.

22
    Sherry L. Jones, RPR, CSR, CRR, RMR
23  Criminal Court
    Official Court Reporter
24  License No. 084-004024
```

OO-1

1        A.   Yes, I had two roommates.

2        Q.   And who were they?

3        A.   Aaron Bronson and Shawana Chester.

4        Q.   Can you describe for the men how that

5   apartment was laid out and who slept where?

6        A.   Aaron slept in the front bedroom, I had the

7   middle bedroom, and Shawana had the backroom.

8        Q.   And was Shawana and Aaron related to one

9   another?

10       A.   They were first cousins.

11       Q.   Could you describe for the members of the

12   jury the layout of the apartment?

13       A.   I don't understand the question.

14       Q.   Well, the back bedroom you said was Shawana

15   Chester's?

16       A.   Yes.

17       Q.   Was anything else back there?

18       A.   It use to be a storage area.  So it was a

19   whole bunch of things back there.

20       Q.   And whose stuff was stored back there?

21       A.   Aaron's.

22       Q.   Was your stuff stored back there at all?

23       A.   No.

24       Q.   During that time on January 29, 2009,

OO-14

1       A.   Because it was on the charger.

2       Q.   And his truck took off.  Tell the members of

3   the jury what you were doing after his truck pulled

4   off?

5       A.   I reclined the seat and I went to sleep.

6       Q.   At some point were you awaken?

7       A.   Yes.

8       Q.   Explain to the members of the jury what

9   happened.

10      A.   I felt the truck come to a sudden stop, and

11  it jerked me forward and I sat up.

12      Q.   What happened next?

13      A.   I looked out the front.  I saw we was on the

14  street that I didn't recognize.

15      Q.   I'm sorry.  Go ahead.  What happened next?

16      A.   Then I looked out the passenger window.

17      Q.   What happened next?

18      A.   I saw two people walking down the

19  sidewalk.

20      Q.   What happened next?

21      A.   One guy was walking south.  The other guy

22  was walking the other way, and then Aaron put the

23  truck in park.

24      Q.   Then what happened next?

1      A.    He got out the truck and started walking

2   towards the back of the truck.

3      Q.    What happened next?

4      A.    He walked around, cut through the cars, and

5   approached the man walking down the sidewalk.

6      Q.    Then what happened?

7      A.    Him and the man looked like they were having

8   a conversation.  Then the guy punched him in the

9   face.

10      Q.    Then what happened next?

11      A.    They started fighting.  They fell to the

12   ground and I couldn't see.

13      Q.    Then what happened?

14      A.    I seen the other man that was walking away

15   turn around and head back their way.  So I tried to

16   get out of the truck to try to break up the fight.

17      Q.    What happened next?

18      A.    Once I stepped out I heard two gunshots, one

19   then followed by another one, and then I turned

20   around and got back in the truck.

21      Q.    What did you do next?

22      A.    I climbed over to the driver's seat.  I

23   closed the driver's door.  I noticed the man that

24   was walking towards them turn around and run the

OO-23

1        Q.  And what clothes were those?

2        A.  Black shirt hoody and black jeans.

3        Q.  Were those the same clothes that you had

4    worn to the Horseshoe Casino?

5        A.  Yes.

6        Q.  Did you put on the same boots that you had

7    worn as well?

8        A.  Yes.

9        Q.  What about the jacket you had on that night?

10   Did the police give you the jacket?

11       A.  They wouldn't let me get it.

12       Q.  Was it still cold the day they took you out

13   of the house and arrested you?

14       A.  Yes, it was.

15       Q.  When the police came to your house did you

16   try to run?

17       A.  No.

18       Q.  You heard Aaron Bronson tell the members of

19   the jury that he told you to run.  Why didn't you

20   run?

21       A.  Because I didn't do anything wrong.

22       Q.  Sir, on January 30, 2009, did you rob -- did

23   you plan a robbery with Aaron Bronson?

24       A.  No, I didn't.

1        A.   Yes.

2        Q.   And he moved to South Bend a year before --

3   at least a couple of years before this happened,

4   correct?

5        A.   No.

6        Q.   It was before January 29, 2009; isn't that

7   correct?

8        A.   Yes.

9        Q.   He wasn't living there, was he?

10       A.   Yes, he was still living there too.

11       Q.   Okay.  Where was he sleeping every night?

12       A.   In the front bedroom.

13       Q.   So when did he stay in South Bend?

14       A.   When he wasn't there, I guess.

15       Q.   Well, how many -- tell the ladies and

16   gentlemen of the jury how many nights a week he

17   would stay in Champlain.

18       A.   I wouldn't know.

19            MR. LYKE:  Objection, Judge.

20            THE COURT:  Basis?

21            MR. LYKE:  How would he know?  Basis of

22   knowledge.

23            THE COURT:  If he knows.

24            THE WITNESS:  I don't know.

OO-46

1    BY MS. WARD:

2         Q.   You don't know how many nights he would stay

3    at the address you were living?

4         A.   No, because I didn't stay there every night

5    either.

6         Q.   You were living there, correct?

7         A.   Yes.

8         Q.   You had a bedroom?

9         A.   Yes.

10        Q.   And it has a backroom; isn't that correct?

11        A.   Yes.

12        Q.   And that backroom was a common area,

13   right?

14        A.   It use to be a storage area.

15        Q.   Right.  You stored things there, correct?

16        A.   No.

17        Q.   Aaron stored things there right?

18        A.   Yes.

19        Q.   Shawana stored things there too?

20        A.   Yes.

21        Q.   There is no door on that room, is there?

22        A.   No.

23        Q.   It's never locked, right?

24        A.   No, Shawana has a sheet hanging over it so

OO-47

1   STATE OF ILLINOIS      )
                           )    SS.
2   COUNTY OF COOK         )

3            IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE      )
5   STATE OF ILLINOIS,     )Case No. 11 CR 00169-01
                           )
6            Plaintiff,    )
                           )
7        VS                )
                           )
8   ARTHUR GRADY,          )
                           )
9            Defendant.    )

10                    VOLUME II

11            REPORT OF PROCEEDINGS had at the

12   trial in the above-entitled cause before the

13   Honorable ROSEMARY GRANTS HIGGINS, Judge of said

14   Court on the 23rd day of May, A.D. 2013.

15
             APPEARANCES:
16
                  HONORABLE ANITA M. ALVAREZ,
17                State's Attorney of Cook County, by
                  MS. KIM WARD,
18                MS. LISETTE MOJICA, and
                  MS. STEPHANIE MILLER
19                Assistant State's Attorney,
                  appeared for the People;
20
                  MR. JOHN LYKE and
21                MR. BRANDON BROWN,
                  appeared for the Defendant.
22
    Sherry L. Jones, RPR, CSR, CRR, RMR
23  Criminal Court
    Official Court Reporter
24  License No. 084-004024

1     that he kept calling but he didn't pick up.

2                    Phone records don't lie.  Look at it.

3     When it says answer status, there are three Y's,

4     yes.  That means call connected.  Look at the

5     duration, 33 seconds, 33 seconds, 36 seconds.  Not

6     to be believed.  All of this is circumstantial

7     evidence pointing the finger at the defendant as the

8     defendant as the person who shot and killed Ralph

9     Turner and rifling through his pockets taking items

10    from him.  Everything evidence wise that points at

11    the defendant.

12                    You're going to get another

13    instruction, and it states a person is legally

14    responsible for the conduct of another person when

15    either before or during the commission of an offense

16    and with the intent to promote or facilitate the

17    commission of the offense he knowingly solicits,

18    aids, abets, agrees to aid, or attempts to aid the

19    other person in the planning or commission of the

20    offense.  The word conduct includes any criminal act

21    done in furtherance of the planned and intended

22    act.

23                    Ladies and gentlemen, what this jury

24    instruction talks about is it talks about the

1    agreement, the agreement between Aaron Bronson and

2    this defendant when they formulate their plan, when

3    they put their plan into action, and it starts at

4    the casino early on when Robert Curry is winning

5    money.  That's when it starts.

6              It starts before Ralph is killed.  They

7    are at the casino.  It continues through following

8    everybody to the valet.  It continues in getting in

9    Aaron Bronson's car and Aaron Bronson's SUV

10   following the victim and his friends, who were in

11   the Benz.  You can see them on the casino video

12   following right after.

13             Aaron Bronson was the driver, aids,

14   abets, agrees to aid.  This defendant, the actor.

15   This defendant, the one who pulls the trigger.

16   That's what the evidence shows.

17             Ladies and gentlemen, when you go back

18   to deliberate you're going to take with you several

19   things.  You're going to take with you the evidence

20   that you've heard in the form of testimony from the

21   stand.  You're going to take with you evidence that

22   has been admitted into evidence in the form of

23   photos, in the form of actual live evidence, in the

24   form of video clips.  You're going to take with you

1    said what she said.  Detective, did you locate

2    Gwendolyn Henry?  No.  You had a phone number and

3    address for her, didn't you?  Yes.

4           And the male caller who said light

5    skinned, did you find him?  Did you locate him?  No.

6    Why not?  Don't you want to talk to that person?

7    Because of all the 911 calls this is the only person

8    who you heard about who saw the person's face, at

9    least the complexion.  That's the one you're going

10   to get all of the details from, not Ms. Woodard who

11   was asleep when the shots rang out, not her.  She

12   didn't see it.  She was asleep.  Not Debra Bonner,

13   who tells you she's cross eyed basically.  She's

14   looking forward and she's looking north and south

15   when she should be looking at the driver.

16          You talk to that person.  He didn't do

17   it.  He didn't do it because he didn't match their

18   description, but that guy describes the shooter.  He

19   had a name Teresea Goodson.  He didn't follow-up on

20   that.  Then even more egregious, ladies and

21   gentlemen, Officer -- well, the detective -- lead

22   detective, didn't you find out that this young man

23   was stopped by one of your police officers and

24   questioned and a contact card was done?  Oh, I found

OO-243

1    of that casino so they can spring into action.  They

2    have to.  One person would go to their car and they

3    wouldn't know to drive around enough and how long to

4    get exactly behind them.  They would lose them.

5    It's not possible.  It's a two man job.

6              Idiot number one, Aaron Bronson.

7    Guilty man number two just like Aaron told you, this

8    man.  Aaron told you I'm an accessory.  He explained

9    that to you.  He knew what his responsibility was.

10   He knew what role he played.  Everybody has a role

11   absolutely, and we will get back to Aaron in a

12   second.

13             Counsel talks about the gun and how

14   Officer Rose stopped him and he couldn't find the

15   gun.  Aaron told you he said he hid it.  Now think

16   about that too.  He is pretty crafty because he

17   thought to ditch the gun as the police were coming.

18   Counsel is right.  They are responding to a murder.

19   They must have had their lights on.  They are going

20   fairly quickly, and they are coming at him.

21             So he is walking this way, and they are

22   driving right at him.  It's cold.  It's the morning

23   hours.  There is no one on that street.  There is no

24   traffic.  He saw them coming from a mile away.  When

1          MS. WARD:  And that's what Anthony McGee
2    told you, and the person sitting in that passenger
3    side, the person you saw getting in and the person
4    who got out, the defendant.
5               Aaron is not the shooter in this case.
6    He is not.  The only -- he might be tall.  He might
7    be thin, but the only person there that night, the
8    only person dressed in all dark clothes, the only
9    person all in black was the defendant.  The
10   defendant is the one, the defendant.
11              Counsel talks about this sweetheart of
12   a deal that he wants to say he got 24 years at 100
13   percent time.  He told you 24 years.  Now, to
14   Mr. Lyke that might sound like a sweetheart of a
15   deal, but I guarantee you to Aaron Bronson who sits
16   there every day, day after day for 24 years it
17   doesn't sound so sweet.
18              But he plead to first degree murder,
19   and he told you why.  He told you because he was an
20   accessory.  He told you because he drove the car.
21   He explained to you that he is just as responsible
22   as him, and that's why he said first degree murder,
23   yeah, I'm guilty; and that's why he took the
24   agreement.  That's why we entered into an agreement

OO-282

1    had to get up on that stand and he had to take an

2    oath unlike anywhere else when he was facing

3    possibly perjury if he lied?  He couldn't help him

4    anymore.  I said are you helping him today?  No, I

5    can't anymore.  I tried but I can't.  He has no

6    reason to lie.

7              Because he was an accessory.  You have

8    a felony murder here.  There is a felony murder

9    rule, and it deals with armed robbery.  Like Aaron

10   told you if you're going to do an armed robbery, if

11   you find that we have shown that and they were

12   working together just for that and whether you

13   believe he was the shooter -- and believe me he was,

14   but let's say you don't.  Even if you don't believe

15   he wasn't the shooter, if you believe he was setting

16   Ralph Turner up, if you believe he was doing

17   anything for this armed robbery and he was in for

18   that, he is guilty of first degree murder.  Guilty

19   because he played a role.

20             In his words -- you know how he told

21   you I lost all my money, I was playing Texas Hold'em

22   and I was all in?  Well, on January 30, 2009 when he

23   went to that street to rob Ralph and his friends, he

24   was all in.  That's it.  Game over.  You go in for

We, the jury, find the allegation was not proven that during the commission of the offense of first degree murder the defendant, Arthur Grady, personally discharged a firearm that proximately caused death to another person.

_____ Foreperson



FILED
JUDGE ROSEMARY GRANT-HIGGINS-1872
MAY 24 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

We, the jury, find the defendant, Arthur Grady, Guilty of First Degree Murder.



Foreperson

FILED

JUDGE ROSEMARY GRANT-HIGGINS-1872

MAY 24 2013

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

We, the jury, find the allegation was proven that during the commission of the offense of first degree murder the defendant, Arthur Grady, personally discharged a firearm that proximately caused death to another person.

_____

Foreperson

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

We, the jury, find the defendant, Arthur Grady, Not Guilty of First Degree Murder.

_____
Foreperson

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

RECEIVED
CRIMINAL APPEALS

OCT 0 8 2014

309 RICHARD J. ...EY C...
ANITA AL... ...
STATE'S ATTC ... ...

No. 1-13-2160

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| -vs- | ) | 11 CR 169 (01) |
| ARTHUR GRADY, | ) | Honorable Rosemary Higgins-Grant, |
| Defendant-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

MICHAEL J. PELLETIER
State Appellate Defender

ALAN D. GOLDBERG
Deputy Defender

ARIANNE STEIN
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle, 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

Exhibit G

POINTS AND AUTHORITIES     Page

I.     The trial court abused its discretion in sentencing Grady to 60 years in prison – essentially a life sentence – for first degree murder, where the jury found that he was not the shooter, his criminal history was not extensive, he has rehabilitative potential warranting a sentence below the maximum, and where the co-defendant and principal offender received a 24-year sentence . . . . . . . . . . . . 16

*People v. Simms,* 143 Ill. 2d 154 (1991) . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Lewis,* 234 Ill. 2d 32 (2009) . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Cooper,* 283 Ill. App. 3d 86 (1st Dist. 1996) . . . . . . . . . 16, 17

*People v. Bolyard,* 61 Ill. 2d 583 (1975) . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Steffens,* 131 Ill. App. 3d 141 (1st Dist. 1985) . . . . . . . . . . 17

*People v. Center,* 198 Ill. App. 3d 1025 (1st Dist. 1990) . . . . . . . . . . 17

*People v. Richard,* 99 Ill. App. 3d 914 (1st Dist. 1981) . . . . . . . . . . . 17

*United States v. Wurzinger,* 467 F.3d 649 (7th Cir. 2006) . . . . . . . . . 17

*Enmund v. Florida,* 458 U.S. 782 (1982) . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Juarez,* 278 Ill. App. 3d 286 (1st Dist. 1996) . . . . . . . . . . . 19

*People v. Godinez,* 91 Ill. 2d 47 (1982) . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Gildon,* 239 Ill. App. 3d 984 (3rd Dist. 1993) . . . . . . . . . . . 19

*People v. Bares,* 97 Ill. App. 3d 728 (2d Dist. 1981) . . . . . . . . . . . . . 19

*People v. Margentina,* 261 Ill. App. 3d 247 (3d Dist. 1994) . . . . . . . . 20

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Ill. Const. 1970, art. I §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Ill. Const. 1970, art. I, §11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

730 ILCS 5/5-8-1(a)(1)(a) (West 2008) . . . . . . . . . . . . . . . . . . . . . . . 17

-i-

730 ILCS 5/3-6-3(a)(2)(i) (West 2008) . . . . . . . . . . . . . . . . . . . . . . . . 17

II.    **The mittimus should be corrected to reflect 1,600 days of credit
for the time that Grady spent in custody prior to sentencing**  21

*People v. Williams*, 239 Ill. 2d 503 (2011) . . . . . . . . . . . . . . . . . . . . . 21

*People v. Whitmore*, 313 Ill. App. 3d 117 (2d Dist. 2000) . . . . . . . . . 21

*People v. Krueger*, 175 Ill. 2d 60 (1996) . . . . . . . . . . . . . . . . . . . . . . 21

*People v. McCray*, 273 Ill. App. 3d 396 (1st Dist. 1995) . . . . . . . 21, 22

*People v. Quintana*, 332 Ill. App. 3d 96 (1st Dist. 2002) . . . . . . . . . . 21

730 ILCS 5/5-4.5-100(b) (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## NATURE OF THE CASE

Arthur Grady was convicted of first degree murder after a jury trial and was sentenced to 60 years in prison.

This is a direct appeal from the judgment of the court below.  No issue is raised challenging the charging instrument.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the trial court abused its discretion in sentencing Grady to 60 years in prison – essentially a life sentence – for first degree murder, where the jury found that he was not the shooter, his criminal history was not extensive, he has rehabilitative potential warranting a sentence below the maximum, and where the co-defendant and principal offender received a 24-year sentence.

2.      Whether the mittimus should be corrected to reflect 1,600 days of credit for the time that Grady spent in custody prior to sentencing.

## JURISDICTION

Arthur Grady appeals from a final judgment of conviction in a criminal case. He was sentenced on June 19, 2013. (C. 240-241) Notice of appeal was timely filed on June 19, 2013. (C. 300) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

Arthur Grady was convicted of the first degree murder of Ralph Turner. (C. 240-241) The State alleged at trial that he and co-defendant Aaron Bronson followed Turner home from a casino, and that one of them shot Turner while attempting to rob him of his winnings. (R. PP5)

*Motion to Quash Arrest and Suppress Evidence*

Prior to trial, Grady filed a motion to quash arrest and suppress evidence, arguing that the police officers did not have a warrant to search his apartment and did not have probable cause to arrest him. (C. 93-95) Police officers testified they received written consent from Grady's roommate to search the apartment. (R. EE76-116) The court found the officers credible and found they had probable cause to arrest Grady at the time of the search.(R. EE157-161, HH18-19)

*Eyewitness Testimony*

At the jury trial, Turner's friends Rupert Evans, Robert Currie, and Anthony McGee testified that on the night of January 29 through the early morning of January 30, 2009, they were at the Horseshoe Casino with Ralph Turner and several other friends. (R. JJ49-50, JJ84-87, LL32). Turner stood at the roulette table with some of his friends and may have placed some bets, but primarily acted as the bank for Robert Currie, who was on a winning streak; when Currie won, Turner would cash in his chips at the cashier. (R. JJ52-53) Currie won between $6,000 and $9,000 that night. (R. JJ125) Turner gave most of the cash to Currie, but also kept some for himself. (R. JJ101, JJ124)

While gambling, Evans and Currie saw a man watching them gamble at the roulette table. (R. JJ55) Evans and Currie identified the man in a lineup and

-4-

in court as Grady. (R. JJ66-68, JJ120-122) During Currie's testimony, the State played a video taken from the casino, showing Currie playing roulette with his friends. (R. JJ94-101, ST Exh 8A) Currie pointed out his friends in the video and pointed out when he and his friends left the casino. (R. JJ106-107)

Anthony McGee further testified that when they left the casino, Currie drove him, Turner, and another friend back to Turner's house at 8125 S. Eberhart where McGee had left his car. (R. L37-40) McGee and Turner got out of the car and Currie pulled away. (R. LL40) McGee turned toward where his car was parked about three houses north of Turner's home. (R. LL40, LL68)

As he was walking, McGee noticed headlights behind him and he turned around. (R. LL42) From a distance of 40 feet away, McGee saw a person get out of the passenger side of a dark SUV. (R. LL42-43, LL115) He did not see anyone else exit that car. (R. LL46) McGee heard a gunshot and ran towards Turner's house. (R. LL43-44) Seconds after the first gunshot, he heard a second gunshot and turned around, ran north again, and hid between two cars. (R. LL44-45)

Turner's sister, Pamela Woodard, testified that she lived on the first floor of the same building as Turner. (R. LL119) The night of the incident, just before 4:00 a.m., she heard a gunshot, looked out her front window and saw a man in a black hoodie searching the pockets of a body lying on the ground. (R. LL121-122) Debra Ann Foster-Bonner testified that she lived four buildings south of Turner on the same side of the street. (R. MM211, MM220) On the night of the incident, she heard two loud noises and looked out her window. (R. MM212-213) She saw a black SUV driving in reverse onto 82nd Street, and then drove forward, heading west on 82nd. (R. MM216) She then saw a person wearing a hood standing at

-5-

8135 S. Eberhart, which was about 20 feet from her window. (R. MM217-218) The person walked past her a few times, but she was unable to identify that person in a lineup. (R. MM218)

Officer Adam Rose testified that at around 3:50 a.m., he received a call over the dispatch radio regarding the shooting at 81st and Eberhart. (R. LL140-143, LL171) Between 3:55 and 4:00 a.m., while driving on his way to the shooting location, he saw a man walking west at 355 E. 83rd Street, wearing a brown jacket, a black hoodie and black pants. (R. LL141-145, LL147) Rose conducted a field investigation of the man, whom he identified in court as Grady, because he matched the description of the offender, which was a black male in dark clothing. (R. LL145, LL165) Rose immediately handcuffed Grady and then patted him down and searched his pockets. (R. LL148, LL171) Rose did not find a gun, a phone, or keys on Grady, but did find a small, insignificant amount of money. (R. LL173-174) Rose also found a photo identification in Grady's pockets and he ran Grady's name through his computer system and found no outstanding warrants for Grady. (R. LL148) Grady was cooperative and did not try to run at any time. (R. LL163) After the stop, Officer Rose released Grady. (R. LL154)

*At the Scene*

Officer Anthony Ellis arrived at the scene and found Turner lying face-up on the ground, bleeding from his chest, with torn pants. (R. LL274, LL281) Ellis found what appeared to be the remainder of Turner's pants in the street near his home. (R. LL275-276, 279-280) Ellis also found a cell phone between two cars on the street in front of Turner's home. (R. LL275-276) Officer Carl Brasic collected and inventoried items found at the scene, including a gambling chip found under

-6-

Turner's body, the cell phone found in the street near the home, and the remainder of the pants found in the street. (R. MM22-28)

Detective Henry Barsch testified that he went to the scene shortly after the shooting. (R. MM45-46) He picked up the cell phone lying in the street. (R. MM53) Upon learning that the number of the cell phone was (773) 440-8701, Barsch obtained a photograph of Grady. (R. MM53, MM63) Barsch also saw that there were several calls made to (574) 310-4282, listed under the name "Aaron." (R. MM52) A subpoena specialist for US Cellular testified that this number belonged to Bronson, and that several calls were made between these numbers between 1:26 a.m. and 3:29 a.m. (R. NN180-195) In addition, Turner's wallet was taken during the incident. (R. MM136)

*Post-Mortem Examination*

Medical examiner Ponni Arunkumar testified that he conducted the autopsy and that Turner died from one gunshot wound to the chest and one gunshot wound to the thigh. (R. MM183, MM185) Arunkumar found no evidence of close range firing. (R. MM183, MM185)

*Casino Videos*

Detective Barsch spoke with Anthony McGee on the scene and learned that Turner had been at the casino the night before. (R. MM53) After that time, Barsch was looking for a suspect who was tall, had a thin to slim build, was driving a dark colored SUV, and was wearing a black hooded sweatshirt and baggy jeans. (R. MM56) Barsch went to the casino and spoke with Jennifer Czerwinski. (R. MM57-59)

Jennifer Czerwinski testified that she is a lead surveillance operator at

Horseshoe Casino. (R. LL186-186) She created a video of the night's recordings,

still photos taken from the videos, a time line of events, and diagrams and maps

of the casino for the detectives. (R. LL201) The video was played during her

testimony and she pointed out areas of the casino where she saw Turner and Grady

during the night. (R. LL204-259) At one point in time, the video showed Grady

sitting by the roulette table where Turner was sitting. (St. Exh 8A) The video

also showed Grady leaving the casino at the valet right after Turner and his friends

left. (St. Exh 8A) The video showed Grady entering an SUV with the license plate

X482693. (R. MM59-60) Barsch determined that the car was registered to Aaron

Bronson at 6135 S. Champlain. (R. MM60-61)

*Search of Grady's Apartment and Arrest*

During a search of Grady's and Bronson's residence, Barsch found two guns,

one a revolver with four live rounds and two empty chambers in the rear bedroom.

(R. MM80, M86). A firearm expert determined that the fired bullet and bullet

jacket found inside of Turner's body were fired from the revolver. (R. NN17; MM184-

185)

Barsch learned from Grady's girlfriend, Angela Baker, that Grady slept

in the middle bedroom in the apartment. (R. MM124-125) Approximately $840

was found in the middle bedroom. (R. MM122, MM137) After he was arrested,

Grady had several interviews with the detectives. (R. MM149) In October 2009,

Barsch arrested Bronson in South Bend, Indiana. (R. MM96-97)

*Co-defendant's Testimony*

Co-defendant Aaron Bronson testified that he pled guilty to first degree

murder in the instant case in exchange for a 24-year sentence. (R. NN39) He believed

he was otherwise facing a sentence of 35 years to life. (R. NN125-126) As part
of the plea deal, Bronson had to testify in Grady's case. (R. NN40) On the day
of the shooting, Bronson lived in South Bend, but he had lived with Grady and
still stayed at Grady's apartment when he came to Chicago. (R. NN41-42) Bronson
slept in the front bedroom of the apartment and kept storage items in the back
room of the apartment. (R. NN43-44) Bronson testified that he was at the Horseshoe
Casino with Grady and during his testimony, the State played the video recording
of the casino and Bronson identified his car and Grady from the video. (R. NN

While gambling at the casino, Grady told Bronson that he lost all his money
and that they should rob some men who had about $30,000. (R. NN56) Bronson
saw the men Grady mentioned and saw they were winning a lot of money. (R.
NN57) Grady told Bronson that he followed one of the men to the bathroom and
to the cashier's counter where he cashed in a lot of chips. (R. NN63) Grady informed
Bronson when the winning men appeared to be leaving. (R. NN61) Bronson went
to his truck while Grady watched the men. (R. NN61)

Bronson picked up Grady at the valet and Grady relayed that the men were
in a black Mercedes Benz in front of them. (R. NN67) Bronson then followed the
Mercedes to 81st and Eberhart. (R. NN77-78) While in the car, Bronson and Grady
discussed the plan to rob the men. (R. NN75-77) Bronson knew that Grady had
a revolver on him that Bronson had previously sold to him. (R. NN74-75) On
Eberhart, the Mercedes stopped in the middle of the street and Bronson stopped
his car about 10 feet behind it. (R. NN78) Two men exited the back of the Mercedes
and walked to the curb. (R. NN78) While wearing a face mask, Grady told Bronson
he needed the money and jumped out of the car and ran up to Turner. (R. NN80,

NN117) Turner punched Grady, and Grady fell to the ground. (R. NN80) Bronson put his car in reverse and backed down the street. (R. NN81) Bronson saw the second man who had gotten out of the Mercedes walk across the median in the street. (R. NN81) While driving in reverse, Bronson heard two gunshots. (R. NN82) On cross examination, Bronson testified that he believed Grady was on the ground when he fired both shots. (R. NN109-110)

Bronson drove back to his apartment on Champlain. (R. NN83) Grady arrived home a few hours later. (R. NN84) Grady told Bronson that he did not get any money from the man. (R. NN84) He also said that he lost his cell phone and was stopped by the police. (R. NN85) Bronson and Grady checked the SUV for the cell phone but did not find it. (R. NN85) Grady told Bronson that he had thrown the gun after the incident and had to go retrieve it. (R. NN86) Grady returned with the gun and Bronson saw him put the gun in his room. (R. NN90) Bronson left Chicago the next day, went to South Bend, and moved around to different residences to evade the police. (R. NN86, NN152)

Bronson admitted that he lied when speaking to a detective in December 2010 when he said that although he drove the SUV first, Grady switched places with him and began driving the SUV at some point while behind the Mercedes. (R. NN106) Bronson also said he lied to the detective when he said he went into the backseat to look for gloves and something to cover his face. (R. NN106-107) Bronson also did not initially tell detectives about Grady retrieving the gun because he was trying to keep himself out of the incident. (R. NN159)

Bronson admitted to writing a letter to defense counsel's associate, lawyer Ashley Shambley after Shambley interviewed him. (R. NN133) In the letter, Bronson

told Shambley that he had fallen in love with her and wanted a picture of her. (R. NN133, NN141) Bronson also stated that he pled guilty and that he agreed to testify against Grady because Grady snitched on Bronson, noting "what goes around comes around." (R. NN137-138) In the letter, he said that he was under the impression he was never going to beat his case and that the sound of him being a credible witness was "creepy." (R. NN142-145)

*Grady's Testimony*

Grady testified that on the night of the incident, he and Bronson arrived at the casino sometime after 6:00 p.m. (R. OO15-16) Grady gambled alone for three to four hours, lost his money, then asked Bronson if he was ready to leave. (R. OO16) Bronson wanted to stay, so Grady walked around the casino. (R. OO17) He would hear people cheering when they won, and would walk up to their table to see the excitement. (R. OO17-18) Grady walked near Turner's roulette table at different times throughout the night when they were winning, but also walked by other winning tables. (R. OO17-18) Grady never saw Turner actually playing roulette and never saw him trading in chips at the cashier's counter. (R. OO39) Grady never had a conversation with Bronson at the casino about robbing anyone. (R. OO18-19) Grady did not know that Bronson left the casino around 1:40 a.m. and then returned. (R. OO19-20)

When they decided to leave, Bronson agreed to pick Grady up at the valet because Grady did not want to walk outside to Bronson's car as it was very cold out and he had left his coat in the car. (R. OO20-21) Grady also switched cell phones with Bronson before Bronson went to get the car; Grady's phone battery was dying and Bronson would be able to plug the phone into the car charger and Grady could

-11-

use Bronson's phone to call Bronson if anything happened while Grady was waiting. (R. OO84-86, OO162) When Grady entered Bronson's car, he put on his coat, put his cell phone, which was attached to the charger, in his lap, and fell asleep. (R. OO21-22)

Grady woke up when the car came to a sudden stop and jerked him forward. (R. OO22) Grady did not recognize the street they were on when he woke up. (R. OO22) He saw two men walking on the sidewalk, one walking north and one south. (R. OO22) Bronson immediately jumped out of the car, approached one of the men, and had a conversation with him. (R. OO23) The man punched Bronson in the face and the two started fighting and fell to the ground. (R. OO23) Grady was going to break up the fight and stepped out of the car. (R. OO23) He then heard two gunshots. (R. OO23) Grady jumped back into the passenger side of the car, climbed over to the driver's seat, shut the driver's door, and drove the car in reverse. (R. OO23-24) He turned west on 82nd and parked the car about one block away. (R. OO24) At that time, he realized his cell phone was missing. (R. OO24) He tried to use a pay phone at a gas station located at 83rd and Vernon, but the phone was broken. (R. OO24-25) On his way to another gas station, he was stopped by the police. (R. OO25-26) The police officer patted him down and he emptied his pockets for the officer. (R. OO26) After checking his identification, the officers let him go. (R. OO28)

Grady eventually made it home to his apartment and went to sleep. (R. OO29) He used his home phone to call his own cell phone and Bronson's phone, but received no answer. (R. OO29) He woke up when Bronson was hovering over him, angry at Grady for leaving him at the scene. (R. OO29)

Later that day, Grady picked up his girlfriend, Angela Baker, and got a
new cell phone but kept his cell phone number. (R. OO32-33) He then returned
home and was asleep that night when the police arrived to conduct a search of
his apartment. (R. OO36) Grady testified that Bronson and Chester stored items
in the back room of the apartment, but he did not. (R. OO47) He also testified
that the gun found at his apartment belonged to Bronson and he never bought
the gun from him. (R. OO175)

Grady admitted that the cell phone found at the scene belonged to him.
(R. OO67) He also testified that he lied when speaking to Detective Barsch after
he was arrested when he said that he ran from the scene of the shooting. (R. OO124-
126) He explained that he lied because he did not want to get involved and did
not want Bronson to get in trouble. (R. OO164) Grady further lied to the detective
when he said that on January 29, he was with Bronson in South Bend at Bronson's
girlfriend's home and fell asleep on her couch. (R. OO143-145)

During cross examination, the State showed Grady the casino video, totaling
less than five minutes, wherein Grady admitted he was on the video and there
were times when he was watching Turner's table win. (R. OO48-53, OO74-95,
OO159)

During the State's rebuttal case, the parties stipulated that Angela Baker
would testify that she was Grady's girlfriend and that the morning of the apartment
search, she withdrew some of her income tax return from an ATM. (R. OO202-203)
She placed the money, which was between $1,000 and $1,100, on a stand by a
picture frame in the apartment. (R. OO203) The State also admitted a certified
copy of conviction for Grady's prior convictions of aggravated battery to a police

-13-

officer and "resisting, obstructing a police officer causing injury." (R. OO204)

The jury was given an instruction on accountability as well as an instruction concerning the elements needed to establish whether Grady discharged a firearm during the incident that caused great bodily harm. (C. 146, 150)

*Verdict, Post-Trial Motion, and Sentencing*

The jury found Grady guilty of first degree murder, but not guilty of possessing a firearm and discharging the weapon causing great bodily harm during the incident. (R. PP5; C. 158-159) The court denied Grady's motion for new trial (C. 243-244; R. RR44)

At sentencing, the State told the court that Grady was previously convicted of a Class 4 possession of a controlled substance, and was also convicted of two felonies, a Class 3 aggravated battery to a police officer, and a Class 4 resisting arrest and obstructing an officer, following the same incident. (R. RR60) In mitigation, defense counsel discussed that Grady was working on getting his associate's degree when arrested, that he had worked in landscaping and painting, and worked for Woodlawn Organization doing housing development for a period of two years. (R. RR74-75) Grady's grandfather testified that Grady was a smart man and was close with his daughters. (R. RR64-65) In allocution, Grady apologized to Turner's family. (R. RR77)

The court sentenced Grady, who was 30 years old when arrested, to the maximum term of 60 years' imprisonment. (R. RR83, C. 11-16, C.240) The court also credited Grady with 1,431 days for time served in custody prior to sentencing. (C. 241)

The court denied Grady's motion to reconsider his sentence, which

-14-

alleged the sentence was excessive. (C. 242, R. RR93)

## ARGUMENT

I.    **The trial court abused its discretion in sentencing Grady to 60 years in prison – essentially a life sentence – for first degree murder, where the jury found that he was not the shooter, his criminal history was not extensive, he has rehabilitative potential warranting a sentence below the maximum, and where the co-defendant and principal offender received a 24-year sentence.**

Grady was sentenced to 60 years in prison, three times the minimum sentence for first degree murder. This *de facto* life sentence is excessive in light of the fact that the maximum sentence was not warranted by either a lengthy criminal history, the circumstances of the offense, or a lack of mitigating factors, and that the co-defendant received a 24-year sentence, and where the jury determined that the State only proved Grady was accountable for the actions of the co-defendant. As a result, this Court should reduce the sentence or remand the case for resentencing.

Criminal defendants are constitutionally entitled to fair sentencing hearings, and to sentences that comport with due process. U.S. Const. amend. XIV; Ill. Const. 1970, art. I §2; *People v. Simms*, 143 Ill. 2d 154, 170 (1991). A trial judge's failure to base his sentencing decision on applicable standards and appropriate evidence undermines the integrity of the judicial process and violates the defendant's right to a fair sentencing hearing. *People v. Lewis*, 234 Ill. 2d 32, 48 (2009). The Illinois Constitution requires that all sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11; *People v. Cooper*, 283 Ill. App. 3d 86, 95 (1st Dist. 1996).

Appellate courts generally review sentences for an abuse of discretion, which occurs if a sentence diverges greatly from the purpose and spirit of the law, if it does not reflect adequate consideration of relevant mitigating factors and the

-16-

constitutionally-mandated objective of rehabilitation, or if it is highly disproportionate to the offense. *People v. Bolyard*, 61 Ill. 2d 583, 587 (1975); *Cooper*, 283 Ill. App. 3d at 95; *People v. Steffens*, 131 Ill. App. 3d 141, 152-53 (1st Dist. 1985). Under Illinois Supreme Court Rule 615, this Court may reduce an excessive sentence. Ill. Sup. Ct. R. 615(b)(4); *People v. Center*, 198 Ill. App. 3d 1025, 1032 (1st Dist. 1990).

Here, the sentencing range for murder is between 20 and 60 years in prison. 730 ILCS 5/5-8-1(a)(1)(a) (West 2008). Grady's sentence is 40 years above the minimum and he will serve every day of his 60-year sentence. 730 ILCS 5/3-6-3(a)(2)(i) (West 2008). Grady was 30 years old when arrested in this case. (C. 11-16) This means Grady will remain incarcerated until he is 90 years old, meaning his sentence is almost certainly a life term. (C. 162). Assuming a life expectancy of 73.5 years, 60 years is a *de facto* life sentence for Grady. *See* U.S. Census Bureau, Statistical Abstract of the United States: 2012 (Table 105 indicating a black male who was 30 in 2008 is expected to live another 43.5 years), *available at* http://www.census.gov/compendia/statab/2012/tables/12s0105.pdf (last viewed September 18, 2014). Accordingly, the sentence is needlessly excessive. *People v. Richard*, 99 Ill. App. 3d 914, 918-19 (1st Dist. 1981) (abuse of discretion to sentence 32-year-old murder defendant to term of years equaling a *de facto* life sentence: "While we recognize that the crime of which he was convicted, murder, is the most serious offense, we believe that the sentence imposed effectively negates any possibility of defendant's rehabilitation."); *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) ("Death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give

-17-

pause to a sentencing court."). Sentencing Grady to grow old and die in prison is solely punitive. By its very length, the sentence provides no hope of rehabilitation.

In addition, the circumstances of the offense do not warrant a maximum sentence. Grady and Bronson planned to rob Turner for casino winnings, but they never planned to kill him. (R. NN75-77) The incident only turned deadly when Turner punched the shooter. (R. NN80) Though the crime was serious, it did not rise to the level of a premeditated murder, but only a premeditated robbery. Along these lines, the sentence was grossly excessive where Grady was found accountable (either via accountability or felony murder), but where the jury did not find that the State proved he was the shooter. (C. 158) *Enmund v. Florida*, 458 U.S. 782, 797-801 (1982) (recognizing a lesser level of accountability for defendants convicted of felony murder based on robbery).

Grady's background likewise does not merit the maximum sentence. Although Grady was convicted of prior felonies, including aggravated battery to an officer at the same time as a resisting arrest charge, and possession of a controlled substance, these prior convictions, each only Class 3 or 4 felonies, are not extensive, particularly considering Grady was 30 years old when arrested in this case. (R. OO204, R. RR60, C. 164-165) These prior felonies were not sufficient to elevate Grady's sentence to a maximum term. *Bares*, 97 Ill. App. at 737-739 (co-defendant's armed robbery conviction did not warrant 20-year difference).

Furthermore, other factors in mitigation establish that the given sentence was excessive. Prior to his arrest, Grady was working for a contractor, doing landscaping, plumbing, and painting. (C. 169) Before that, he was employed with the Woodlawn Organization where he worked in housing development for two

-18-

years. (C. 169) Before incarceration, he was also taking college classes online at Colorado Technical University and was only two classes away from receiving an associate's degree in business management. (C. 168) In addition, Grady's grandfather testified at the sentencing hearing that Grady was smart and very close with his daughters. (R. RR64-65) These facts have been deemed important considerations in determining rehabilitative potential. *See People v. Juarez*, 278 Ill. App. 3d 286, 295 (1st Dist. 1996) (reducing sentence where trial court failed to give adequate weight to defendant's rehabilitative potential, including prior employment and family ties).

Significantly, co-defendant Bronson only received a 24-year sentence. Fundamental fairness and respect for the law prohibit an arbitrary and unreasonable disparity in the sentences of similarly situated co-defendants. U.S. Const. amend. XIV; Ill. Const. (1970 )art. I, §2; *People v. Godinez*, 91 Ill. 2d 47, 55 (1982); *People v. Gildon*, 239 Ill. App. 3d 984, 985 (3rd Dist. 1993). A disparity in sentences should be corrected if the disparity is not warranted by differences in either the extent of their culpability and participation in the offense, differences in their criminal records, or differences in rehabilitative potential. *Godinez,* 91 Ill. 2d at 54-55*; People v. Bares*, 97 Ill. App. 3d 728, 738 (2d Dist. 1981).

In addition, Bronson fled to South Bend after the incident and admitted to moving residences continually so as to avoid being found by police. (R. NN86, NN152) Grady, on the other hand, stayed at his listed residence and did not run when approached by police immediately after the incident or during the apartment search. (R. LL163, MM115) Grady's sentence, which is two and a half times longer than Bronson's, is unreasonable where they are at least equally culpable for the

offense.

Grady, convicted as an accomplice, should not have received a sentence 36 years longer than the co-defendant and 40 years longer than the minimum. *See People v. Margentina*, 261 Ill. App. 3d 247, 250 (3d Dist. 1994) (50-year sentence for murder, more than twice the minimum, was excessive). The Illinois Constitution and this Court's jurisprudence require that Grady's sentence take into account the fact that the jury did not find he was the shooter, his minimal criminal history, and his potential for rehabilitation. Accordingly, Grady requests that this Court reduce his *de facto* life sentence or remand for a new sentencing hearing.

II.    **The mittimus should be corrected to reflect 1,600 days of credit for the time that Grady spent in custody prior to sentencing.**

The mittimus erroneously reflects 1,431 days of credit for the time Grady spent in custody prior to sentencing, when in fact he is entitled to 1,600 days. (C. 241)  Grady therefore asks this Court to correct the mittimus to accurately reflect his sentence credit.

A defendant is entitled to have the mittimus reflect credit against his sentence for any part of any day he spends in custody, up to but not including the date of sentencing.  730 ILCS 5/5-4.5-100(b) (2012); *People v. Williams*, 239 Ill. 2d 503, 508-510 (2011).  Sentence credit for time served is mandatory and such a claim of error cannot be waived. *People v. Whitmore*, 313 Ill. App. 3d 117, 121 (2d Dist. 2000).

Because a defendant's entitlement to a correction of his or her mittimus is a purely legal issue, the issue is reviewed *de novo. People v. Krueger*, 175 Ill. 2d 60, 64 (1996). Under Illinois Supreme Court Rule 615(b)(1), this Court has authority to order the clerk of the circuit court to make corrections to the mittimus. *People v. McCray*, 273 Ill. App. 3d 396, 403 (1st Dist. 1995); Ill. Sup. Ct. R. 615(b)(1). Moreover, an amended mittimus may be issued at any time. *People v. Quintana*, 332 Ill. App. 3d 96, 110 (1st Dist. 2002).

The mittimus in this case reflects an insufficient amount of credit for the time that Grady spent in custody prior to sentencing. (C. 241) The mittimus shows that Grady is to receive 1,431 days of credit.  (C. 241)  However, counting from the day of arrest on January 31, 2009, (C. 11), up to but not including the day of sentencing on June 19, 2013 (C. 241), Grady should have received 1,600 days of credit against his sentence.

Accordingly, this Court should order the clerk of the circuit court to correct Grady's mittimus to reflect his entitlement to 1,600 days of credit for time spent in custody prior to sentencing. *McCray*, 273 Ill. App. 3d at 403; Ill. Sup. Ct. R. 615(b)(1).

## CONCLUSION

For the foregoing reasons, Arthur Grady, defendant-appellant, respectfully requests that this Court reduce his sentence or remand for a new sentencing hearing, pursuant to Argument I, and amend the mittimus to reflect 1,600 days of pre-sentence custody credit, pursuant to Argument II.

Respectfully submitted,

MICHAEL J. PELLETIER
State Appellate Defender

ALAN D. GOLDBERG
Deputy Defender

ARIANNE STEIN
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle, 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR DEFENDANT-APPELLANT

**CERTIFICATE OF COMPLIANCE**

I, Arianne Stein, certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages containing the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is _23_ pages.

ARIANNE STEIN
Assistant Appellate Defender

## APPENDIX TO THE BRIEF

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Judgment Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                    **Page**

Memorandum of Orders ("Half Sheet") ................................... C2

Arrest Report (January 31, 2009) ...................................... C11

Complaint for Preliminary Examination (February 1, 2009) ................. C17

Appearance (February 26, 2009) ....................................... C21

Motion for Buccal Samples from the Defendant (February 26, 2009) .......... C23

Indictment (December 29, 2010) ....................................... C25

State's Motion for Discovery (October 27, 2011) .......................... C55

Motion to Produce (January 10, 2012) ................................... C64

Motion to Suppress Evidence Illegally Seized (October 17, 2012) ............ C74

Motion for Continuance (April 22, 2013) ................................ C83

Certificate of Judge Adjudging Named person a Material Witness (May 13, 2013   C90

Motion to Supplemental Motion to uash Arrest and Suppss Evidence Illegally Seized
(May 13, 2013) ...................................................... C93

Defendant's Response to State's Memorandum of Law (May 16, 2013) ........ C102

Defense Motion in Limine (May 16, 2013) ........................... C05-C107

Supplemental Motion in Olimine (May6 16, 2013) ....................... C109

Motion to Bar Testimony (May 20, 2013) ......................... C115, C246

Witness List (May 16, 2013) .................................... C120, C249

Jury Note to Honorable Rosemary Higgins-Grant (May 23, 2013) ........... C125

Jury Instructions () ................................................. C128

Jury Verdict Form Signed (May 24, 2013) .............................. C158

Presentence Investigation Report (June 19, 2013) ....................... C162

Victim Impact Statement ...................................... C224-C235

Order Assessing Fines, Fees and Costs (June 19, 2013) .................... C237

Sentencing Order (June 19, 2013) ..................................... C240

Motion to Reconsider Sentence (June 19, 2013) ......................... C242

A-1

Motion for New Trial (June 19, 2013) ................................. C243

**Volume II**

Memorandum of Law ............................................... C254

Notice of Appeal (June 19, 2013) .................................... C300

Circuit Court Appoints Office of the State Appellate Defender to Represent
Defendant on Appeal (June 28, 2013) ................................ C303

**Report of Proceedings ("R")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|

**Volume I**

| | | | | |
|---|---|---|---|---|
| January 12, 2011 - Continuance | | | | A2 |
| January 12, 2011 - Continuance | | | | B2 |
| January 20, 2011 - Continuance | | | | C5 |
| March 1, 2011 - Continuance | | | | E5 |
| April 7, 2011 - Continuance | | | | F3 |
| May 19, 2011 - Continuance | | | | H3 |
| June 28, 2011 - Continuance | | | | I-2 |
| September 25, 2013 - Continuance | | | | J2 |
| August 23, 2011 - Continuance | | | | K4 |
| September 30, 2011 -Continuance | | | | L4 |
| October 27, 2011 - Continuance | | | | M5 |
| December 1, 2011 - Continuance | | | | N2 |
| January 10, 2012 -Continuance | | | | O3 |
| February 7,  2012 -Continuance | | | | P2 |
| March 22, 2012 - Continuance | | | | Q3 |
| April 18, 2012 - Continuance | | | | R2 |
| June 5, 2013 - Continuance | | | | S2 |
| July 12, 2012 - Continuance | | | | T3 |
| September 6,m 2012 - Continuance | | | | U3 |

A-2

| | Direct | Cross | Redir. | Recr. | |
|---|---|---|---|---|---|
| October 17, 2012 - Continuance | | | | | V2 |
| December 11, 2012 - Continuance | | | | | W3 |
| December 27, 2012 -Continuance | | | | | Y3 |
| January 16, 2013 - Continuance | | | | | Z4 |
| March 14, 2013 - Continuance | | | | | AA3A |
| April 22, 2013 - Continuance | | | | | CC5 |
| May 8, 2013 - Continuance | | | | | DD10 |

**Volume II**

May 13, 2013

Supplemental Motion to Quash arrest and suppress evidence

Defense Witnesses

| | Direct | Cross | Redir. | Recr. | |
|---|---|---|---|---|---|
| Angela Baker | EE4 | EE14 | EE27 | | |
| Shawana Chester | EE30 | EE43 | EE56 | | |
| Matthew Weber | EE66 | EE75 | EE96 | EE 100 | |
| Defense Rests | | | | | EE105 |
| State Witness | | | | | |
| Henry Barsch | EE105 | EE114 | EE127 | EE 119 | |
| State Rest | | | | | EE128 |
| Defense Rebuttal Witnesses | | | | | |
| Shawana Chester | EE129 | | | | |
| Angela Baker | EE132 | | | | |
| Defense Rests | | | | | EE134 |
| Arguments | | | | | |
| Ms. Ward | | | | | EE135 |

A-3

|  |  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|---|
|  | Mr. Lyke |  |  |  |  | EEE 150 |
| Court's Rulings |  |  |  |  |  | EE155 |
| **Volume III** |  |  |  |  |  |  |
| May 15, 2013 |  |  |  |  |  |  |
| Memorandum of Law |  |  |  |  |  | GG2 |
| Continuance |  |  |  |  |  | GG24 |
| May 16, 2013 |  |  |  |  |  |  |
| Memorandum of Law |  |  |  |  |  |  |
| Arguments |  |  |  |  |  |  |
|  | Mr. Lyke |  |  |  |  | HH4 |
|  | Ms. Mojica |  |  |  |  | HH7 |
| Rebuttal by | Mr. Lyke |  |  |  |  | HH13 |
| Court's Ruling |  |  |  |  |  | HH17 |
| Supplemental Motion to Quash arrest and suppress evidence |  |  |  |  |  |  |
| Court's Ruling |  |  |  |  |  | HH18 |
| **Jury Trial** |  |  |  |  |  |  |
| Jury Selection |  |  |  |  |  | HH35-HH99 |
| **Volume IV** |  |  |  |  |  |  |
| Jury Selection (cont.) |  |  |  |  |  | II-2-II-217 |
| **Volume V** |  |  |  |  |  |  |
| May 17, 2013 |  |  |  |  |  |  |
| Opening Statements |  |  |  |  |  |  |
|  | Ms. Ward |  |  |  |  | JJ16 |

A-4

|  |  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|---|
|  | Mr. Lyke |  |  |  | JJ25 |
| State Witnesses |  |  |  |  |  |
|  | Ralph Turner Sr. | JJ37 |  |  |  |
|  | Dr. Rupert Evans | JJ46 | JJ73 |  |  |
|  | Robert Currie | JJ83 | JJ125 |  |  |
| **Volume VI** |  |  |  |  |  |
| May 20, 2013 |  |  |  |  |  |
| Motion to Bar Testimony |  |  |  |  |  |
| Argument |  |  |  |  |  |
|  | Mr. Lyke |  |  |  | LL6 |
|  | Ms. Ward |  |  |  | LL16 |
| Court's Rulings |  |  |  |  | LL27 |
| (Trial cont.) |  |  |  |  |  |
|  | Anthony McGee | LL29 | LL62 | LL108 | LL111 |
|  | Pamela Snow Woodard | LL118 | LL132 |  |  |
|  | Officer Adam Rose | LL139 | LL158 |  |  |
| **Volume VII** | Jennifer Czerwinske | LL185 | LL259 |  |  |
|  | Officer Anthony Ellis | LL270 | LL282 |  |  |
| **Volume VIII** | Officer C Brasic | MM6 | MM31 | MM37 | MM39 |
|  | Henry Barsch | MM44 | MM100 | MM162 | MM166 |
|  | Dr. Ponni Arunkumar | MM172 | MM196 |  |  |
|  | Debra Bonner | MM211 | MM221 | MM244 |  |
| **Volume IX** | Justin Barr | NN4 |  |  |  |

A-5

-A224-

|  |  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|---|
|  | Det. David Scarriot | NN22 |  |  |  |  |
|  | Aaron Bronson | NN36 | NN92 | NN153 NN161 NN172 | NN 176 |  |
|  | Salandra Haddock | NN180 | NN190 |  |  |  |
| State Rests |  |  |  |  |  | NN 198 |
| Motion for Directed Verdict - Denied |  |  |  |  |  | NN 202 |
| Stipulation |  |  |  |  |  | NN 203 |
| Defense Rests |  |  |  |  |  | NN 207 |
| Jury Instruction Conference |  |  |  |  |  | NN 209 |
| **Volume X** |  |  |  |  |  |  |
| May 13, 2013 |  |  |  |  |  |  |
| Leave to reopen - granted |  |  |  |  |  | OO4 |
| Defense Witness |  |  |  |  |  |  |
|  | Arthur Brady | OO12 | OO43 | OO155 | OO 181 |  |
| Defense Rests |  |  |  |  |  | OO 189 |
| Jury Instruction Conference |  |  |  |  |  | OO 190 |
| State's Stipulation |  |  |  |  |  | OO 202 |
| People Rest in Rebuttal |  |  |  |  |  | OO 204 |
| **Volume XI** |  |  |  |  |  |  |
| May 23, 2013 |  |  |  |  |  |  |

A-6

|  |  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|---|
| Closing Arguments |  |  |  |  |  |
|  | Ms. Miller |  |  |  | OO 207 |
|  | Mr. Lyke |  |  |  | OO 226 |
| Rebuttal by | Ms. Ward |  |  |  | OO 266 |
| Jury Instructions |  |  |  |  | OO 289 |

**Volume XII**

May 24, 2013

| Verdict of Guilt |  |  |  |  | PP5 |
| Jury Polled |  |  |  |  | PP6 |

June 19, 2013

Motion for New Trial

Arguments

|  | Mr. Lyke |  |  |  | RR3 |
|  | Ms. Ward |  |  |  | RR12 |
| Rebuttal by | Mr. Lyke |  |  |  | RR20 |
| Court's Rulings |  |  |  |  | RR38 |

Sentencing Hearing

State's Witness in Aggravation

|  | Michael Turner | RR44 |  |  |  |
|  | Evelyn Turner | RR48 |  |  |  |
|  | Ralph Turner | RR56 |  |  |  |

Defense Witness in Mitigation

|  | Edward Grady | 61 |  |  |  |

A-7

|                                | Direct | Cross | Redir. | Recr. |      |
| ------------------------------ | ------ | ----- | ------ | ----- | ---- |
| Argument in Aggravation        |        |       |        |       | RR68 |
| Argument in Mitigation         |        |       |        |       | RR77 |
| Allocution                     |        |       |        |       | RR77 |
| Imposition of Sentence         |        |       |        |       | RR77 |
| Motion to Reconsider Sentence  |        |       |        |       |      |
| Arguments                      |        |       |        |       |      |
| Mr. Lyke                       |        |       |        |       | RR84 |
| Ms. Ward                       |        |       |        |       | RR90 |
| Court's Ruling                 |        |       |        |       | RR91 |

**Supplemental Report of Proceedings (SR.I)**

2 volumes of exhibits (photos)

A-8

PEOPLE OF THE STATE OF ILLINOIS )
          V.         )
ARTHUR    GRADY        )
Defendant

CASE NUMBER    **11CR0016901**
DATE OF BIRTH   08/25/78
DATE OF ARREST  01/31/09
IR NUMBER 1222161   SID NUMBER 040324610

### ORDER OF COMMITMENT AND SENTENCE TO
### ILLINOIS DEPARTMENT OF CORRECTIONS
=====================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below is hereby sentenced to the Illinois Department of Corrections as follows:

| Count | Statutory Citation | Offense | Sentence | Class |
|-------|-------------------|---------|----------|-------|
| 009 | 720-5/9-1(a)(3) | MURDER/OTHER FORCIBLE FELONY | YRS. 060  MOS.00 | M |

and said sentence shall run concurrent with count(s) __ __ __ __

_____ and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:    YRS. ___ MOS. ___

_____ and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:    YRS. ___ MOS. ___

_____ and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:    YRS. ___ MOS. ___

_____ and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:    YRS. ___ MOS. ___

On Count ___ defendant having been convicted of a class _ offense is sentenced as a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ___ defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served in custody for a total credit of _1431_ days as of the date of this order

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with the sentence imposed in case number(s) _____
AND: consecutive to the sentence imposed under case number(s)

_____   _____  _____  _____

IT IS FURTHER ORDERED THAT PLUS 3YRS MSR. CTS 2,3,7,8,9 IS TO MERGE INTO COUNT 1 _____

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

DATED _____ JUNE 19, 2013 _____ ENTER: 06/19/13

ENTERED
JUDGE ROSEMARY GRANT-HIGGINS-1872
JUN 19 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

CERTIFIED BY K DOWDELL
    DEPUTY CLERK

JUDGE: HIGGINS-GRANT ROSEMARY  1872

GCP7 06/19/13 16:48:03

CCG N305

C:00241

IN THE CIRCUIT COURT OF COOK COUNTY
CRIMINAL BUREAU

PEOPLE OF THE STATE OF ILLINOIS

V.

ANTHUA GANDY

Case No. _____ 11 Cr 16901
Trial Judge _____ Rossprany Higgins
Court Reporter _____
Attorney _____ Ill applicants defender
Appeal Check Date _____
Appeal Bond _____ 0 _____

NOTICE OF APPEAL

An appeal is taken from the order or judgment described below:

Appellant's Name: _____ Anthua C Gandy
Appellant's Address: _____ IDOC
Appellant's Attorney: _____ Illinois appellate Defender's ofc
Address: _____
Offense: _____ 1st Murder
Judgment: Guilty of _____ 1st Murder
_____ on a _____ Jury Trial
Date: _____ 5-24-13
Sentence: _____ 6-19-13   60 years IDOC
Date Notice Filed: _____ 6-19-13

_____ Appellant

FILED
CRIMINAL APPEALS
JUN 19 2013
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DEPUTY CLERK COOK COUNTY, IL

VERIFIED PETITION FOR REPORT OF PROCEEDINGS AND COMMON LAW RECORD

Under Supreme Court Rules 605-608 Appellant ask the Court to order; (1) the Official Court Reporter to transcribe an original and the copy of the proceedings, file the original with the Clerk and deliver a copy to the Appellant, or upon Appellant's written request to the Appellant's attorney of record, and (2) the Clerk to prepare the Record on Appeal.

The Appellant, being duly sworn, says that at the time of his/her conviction he/she was and he/she now is unable to pay for the Record or an appeal lawyer.

_____ Appellant

BSCRIBED and SWORN TO before me this _____ day of _____, _____

_____ Notary public

ORDER

ERED; 1. _____ Ill applicants Defender
ounsel on appeal, and 2. the record and Report of Proceedings be furnished appellant free.

_____, _____, _____ _____, _____, _____, _____

_____, _____, _____ _____, _____, _____, _____

_____, _____, _____ _____, _____, _____, _____

ENTER: _____
Judge                    Judge' No.

_____
Court Reporter

HY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

-A229-

IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT CRIMINAL DIVISION

FILED

JUL 06 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

PEOPLE OF THE STATE OF ILLINOIS

Respondent,

Case No. 11CR169(01)

-VS-

ARTHUR GRADY

Petitioner

Honorable
Rosemary Higgins-Grant
Judge Presiding

# PETITION FOR POST-CONVICTION RELIEF

Arthur Grady
Arthur Grady
#R01363  Pro se
P.O. Box 112
Joliet, IL 60434

**Exhibit M**

# IN THE
# CIRCUIT COURT OF COOK COUNTY

FILED

JUL 06 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

PEOPLE OF THE STATE OF ILLINOIS )

Respondent

—VS—                                    Cir. Ct NO. 11CR1169(01)

ARTHUR GRADY                             Honorable

Petitioner                               Rosemary Higgins-Grant

                                         Judge Presiding

## PETITION FOR POST-CONVICTION RELIEF

Pursuant to 725 ILCS 5/122-1, Petitioner Arthur Grady comes before the Court and asks that the Judgement in Cook County Indictment No. 11CR1169(01) be vacated.

IN support of this request Petitioner states:

# PROCEDURAL HISTORY

1) On June 19, 2013 Petitioner was sentenced to sixty years by Rosemary Higgins-Grant following a Jury trial for the offense of Intentional First degree murder in indictment No. 11CR1169(01)

2) Petitioner filed a notice of appeal on June 19, 2013. The appeal was docketed in the Illinois Appellate Court as no. 1-13-2160.

3) Petitioner filed a timely pro'se supplemental brief on November 4th, 2014, and a Amended pro'se supplemental brief on February 19th, 2015, that was forwarded to the Court by appellate counsel.

4) Petitioner's pro'se supplemental briefs were denied on February 25th, 2015.

5) Petitioner's conviction and sentence was affirmed by the Appellate Court on October 16, 2015

6) A Petition for leave to appeal to the Illinois Supreme court was denied on February 24, 2016

C: 00073

## Constitutional Grounds for Relief

7. Claim I - Petitioner was denied his sixth amendment right guaranteed him under the United States Constitution and article I, section 8 of the Illinois Constitution of 1970, where trial counsel John Lyke was:

8. Ineffective for failing to produce evidence to show that detectives committed perjury under oath, during the motion to quash arrest.

9. Claim II - Petitioner was further denied his sixth amendment right guaranteed by the U.S. and IL. Const. of 1970 when:

10. Appellate counsel was ineffective for failing to raise on direct appeal, meritorious claims attacking petitioner's conviction.

11. Appellate counsel failed to raise on direct appeal, ineffective assistance of trial counsel for failing to produce evidence showing detectives committed perjury under oath, during the motion to quash arrest.

12. Appellate counsel failed to raise, detectives committed perjury under oath, during the motion to quash arrest.

13. Appellate counsel failed to raise Prosecutorial Misconduct for knowing use of perjury by detectives.

14. Appellate counsel failed to raise Prosecutorial Misconduct for purposely misstating evidence.

15. Appellate counsel failed to raise, Trial court abused its discretion in weighing witness credibility, during the motion to quash arrest.

16. Appellate counsel failed to raise, Trial court abused its discretion when it purposely influenced the State to change its theory, during the motion to quash arrest.

-A234-

17) Appellate counsel failed to raise, Trial Court abused its discretion in ruling that probable cause existed for the warrantless arrest.

18) Appellate counsel failed to raise, Trial Court abused its discretion, when it denied the motion to bar Aaron Bronson's new statements.

19) Appellate counsel failed to raise, Prosecutorial Misconduct for improperly bolstering co-defendant Aaron Bronson's credibility.

20) Appellate counsel failed to raise, Prosecutorial Misconduct by the State for purposely misleading the Jury to believe accountability applied to the facts of petitioner's case and petitioner, for the sole purpose of obtaining a conviction.

21) Appellate counsel failed to raise, Trial Court abused its discretion by tendering the accountability instruction to the Jury.

22) Appellate counsel failed to raise, Trial Court abused its discretion by showing bias to petitioner and petitioner's counsel.

23) Appellate counsel failed to raise, Trial Court abused its discretion when it made evidentiary rulings that favored the State.

24) Appellate counsel failed to raise, Trial Court abused its discretion when it sustained it's own objections, acting as an advocate for the State.

25) Appellate counsel failed to raise, Insufficient evidence to prove Intentional murder beyond a reasonable doubt.

26) Claim III - Detective Borsch and detective Heber committed perjury under oath.

27) Claim IV - Prosecutorial Misconduct for knowing use of perjury.

28) Claim V - Prosecutorial Misconduct for purposely misstating evidence.

29) Claim VI - Trial Court abused its discretion in assessing witness credibility, during the motion to quash arrest.

30) Claim VII - Trial Court abused its discretion when it purposely influenced

the State to change its theory during the motion to quash

31) Claim VIII - Trial court abused its discretion in ruling that probable cause existed for warrantless arrest.

32) Claim IX - Trial Court abused its discretion when it denied the motion to bar Aaron Bronson's new statements

33) Claim X - Prosecutorial misconduct for improperly bolstering co-defendant Aaron Bronson's credibility.

34) Claim XI - Prosecutorial misconduct for misleading the Jury to believe accountability applied to the facts of petitioner's case and petitioner.

35) Claim XII - Trial court abused its discretion when it tendered the accountability instruction to the Jury.

36) Claim XIII - Trial Court abused its discretion when it showed bias to petitioner and defense counsel

37) Claim XIV - Trial Court abused its discretion when it made evidentiary rulings that favored the State.

38) Claim XV - Trial Court abused its discretion when it sustained its own objections and acted as an advocate for the State.

39) Claim XVI - Insufficient evidence to prove petitioner's guilt beyond a reasonable doubt of intentional murder

C:00076

**Claim I**  Trial Counsel John Lyke failed to produce crucial evidence to impeach detective Weber and detective Barsch during the motion to quash arrest and suppress evidence.

40) Petitioner filed a motion to quash arrest and suppress evidence, after he was arrested in a private residence, without a warrant. Probable cause was the key issue of the motion to quash, and detective Weber and detective Barsch both committed perjury under oath, trying to show probable existed, even though they went before a judge and only requested a search warrant. Both detectives lied when they claimed the cellphone recovered at the scene was registered to petitioner and 6315 S. Champlain. Trial counsel's failure to produce the cellphone registration to the Court, was not strategic trial strategy and the reason why the Court ruled both detectives credible and denied petitioner's motion, rendering counsel ineffective.

41) Detective Weber testified falsely under oath about the cellphone information for the phone recovered at the scene and how it was connected to petitioner and 63rd and Champlain, and also that there was video of Ralph Turner gambling(See R.ex. TR EE 77-78, claim III).

42) Trial counsel John Lyke failed to produce the cellphone registration to impeach both detectives, because the registration was listed to Marcell Gray and 501 S. Stony Island, plus counsel didn't properly investigate to show there was no video of Ralph Turner gambling(See R.ex. TR.LL260, ex. T.e. 00141-142, 00167-168).

43) Weber also lied about who was present when Angela Baker claimed she went to the backroom to sign the consent form, and that Weber was the one to recover the money from the middle bedroom(See R.ex. TR EE 87-89, EE94, claim III).

44) Had trial counsel reviewed det. Weber's cleared open supplemental report thoroughly, counsel could have impeached detective Weber again (See R. ex. B page 18).

45) Detective Barsch also lied under oath about who and where the recovered cellphone belonged, and about not being present when Baker signed the consent form (See R. ex. T.R EE 116, ex. T.R MM 61-65, MM 74 EE 120-121).

46) As previously mentioned, trial counsel failed to impeach detective Barsch with the cellphone registration and the cleared open supp. report (See R. ex. T.R 00141-142, 00167-168, EX. B pg 18, claim III).

47) "The Illinois supreme court and United States supreme court have long been established requirements that counsel must meet in order to be effective within the standard proscribed by the sixth amendment of the U.S. const"; Article.1 section 8 IL. const; (Strickland v. Washington, 466 U.S. 668 (1984).

48) Petitioner was prejudiced by trial counsel's actions, where counsel failed to adequately investigate potential evidence for the defense for purposes of impeachment, cannot be classified as effective assistance, tactical decision or trial strategy.

49) Had it not been for trial's counsel's failure to properly investigate the discovery in his possession, the outcome of petitioner's motion to quash arrest would have been different. Petitioner's fourth and sixth amendment rights, under the U.S and IL. Const, from protection of illegal warrantless arrest and ineffective assistance of counsel were violated. Petitioner asks the Court to review this claim in conviction with claim III and the attached claims and reverse petitioner's conviction. 00078

-A238-

**Claim II** Appellate counsel was ineffective for failing to raise on direct appeal, Meritorious claims attacking petitioner's conviction.

50) Petitioner was represented by state appellate defender Arianne Stein on direct appeal. In September of 2014, Petitioner had two phone conversations with appellate counsel, requesting that the claims from the post-trial motion and additional claims found in the trial record, be raised on direct appeal and appellate counsel refused. Appellate counsel stein claimed the issues didn't contain enough merit, but never explained to petitioner why (see ex. A)

51) Appellate counsel Arianne stein chose to raise a claim of excessive sentence over the post-trial motion claims (see ex. C, ex. D).

52) Appellate counsel informed petitioner that if he prepared a Pro se supplemental brief, appellate counsel would forward it to the appellate court (see ex. E, ex. F).

53) Petitioner's pro se briefs were later denied by the appellate court. (see ex. G)

54) When the state responded to petitioner's opening brief, petitioner asked counsel again to amend the opening brief, because the state's reply sparked concern to petitioner's conviction (see ex. H).

55) Appellate counsel claimed petitioner was convicted as an accomplice and the state claimed petitioner was convicted as a principal (see ex. D, ex. H)

56) Appellate counsel addressed the state's response in it's reply brief, but the appellate never addressed it, because the claim was for excessive sentence and not sufficiency of evidence (see ex. I, ex. I.)

57) Before and after petitioner's opening brief was filed, petitioner

wrote appellate counsel multiple letters asking counsel to reconsider raising the claims and appellate counsel refused (see ex. J, ex. K).

58) Prior to filing the opening brief, appellate counsel ignored the fact that trial counsel failed to produce crucial impeaching evidence against detective Weber and detective Barsch at the motion to quash, and that testimony was used as substantial evidence (See R. ex. claim I, claim III)

59) Petitioner filed a complaint to A.R.D.C on appellate counsel Stein and her supervisor for the way his direct appeal was handled, but no action could be taken at that time (See R. ex. M).

60) If there was valid reason why counsel decided not to raise the other post-trial claims, Insufficiency of evidence should have at least been Raised, where petitioner was acquitted of being the shooter but still convicted of intentional murder (See claim XVI).

61) Appellate counsel failed to raise on direct appeal, ineffective assistance of trial counsel for failing to produce impeaching evidence that detectives committed perjury under oath (See claim I).

62) Appellate counsel failed to raise on direct appeal, detective Matthew Weber and detective Henry Barsch committed perjury under oath (See claim III).

63) Appellate counsel failed to raise on direct appeal, prosecutorial Misconduct for knowing use of perjury (See claim IV).

64) Appellate counsel failed to raise on direct appeal, prosecutorial Misconduct for purposely misstating evidence (See claim V).

65) Appellate counsel failed to raise on direct appeal, trial court abused its

discretion in assessing witness credibility, during the motion to quash arrest (See claim VI).

66) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it purposely influenced the state to change its theory, during the motion to quash (See claim VII).

67) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion in ruling that probable cause existed for warrantless arrest (See claim VIII).

68) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it denied the motion to bar Acron Bronson's new statements (See claim IX).

69) Appellate counsel failed to raise on direct appeal, Prosecutorial Misconduct for improperly bolstering co-defendant Acron Bronson's credibility (See claim X).

70) Appellate counsel failed to raise on direct appeal, Prosecutorial misconduct for misleading the jury to believe accountability applied to the facts of petitioner's case and petitioner (See claim XI).

71) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it tendered the accountability instruction to the Jury (See claim XII).

72) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it showed bias to petitioner and defense counsel (See claim XIII).

73) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it made evidentiary rulings that favored the State (See claim XIV).

74) Appellate counsel failed to raise on direct appeal, Trial court abused its discretion when it sustained its own objections and acted as an advocate for the state (See claim XV).

75) Appellate counsel failed to raise on direct appeal, Insufficient evidence to prove

petitioner's guilt beyond a reasonable doubt (see claim XVI)

76) The Supreme Court of the U.S. held that appellate counsel must play role of active advocate, rather than mere friend of the court assisting in detached evaluation of appellate's claims (See Evitts v. Lucey, 469 U.S. 83 (1985)

77) Petitioner was prejudiced, where appellate counsel was constitutionally ineffective under the standard of Strickland v. Washington, 466 U.S. 668 (1984); in that counsel failed to raise a significant and obvious issue, which may have resulted in reversal (See Gray v. Greer, 800 F.2d 644 (7th Cir. 1986); People v. Brumley, 593 N.E.2d at 663).

78) When appellate counsel addressed the fact that petitioner was found not guilty as the shooter, the reasonable doubt claim should have been raised on direct appeal, along with all the additional claims. A review of the record will reveal the claims contain merit and the lack of representation by appellate counsel on direct appeal prejudiced petitioner's right to appeal and review by the appellate court and professional assistance. Had it not been for appellate counsel's actions, the outcome of petitioner's direct appeal would have been different. Petitioner's 4th, 5th, 6th and 14th amendment rights, under the U.S. and IL. Const. to unreasonable arrests and search and seizures, fundamental fairness, effective assistance of counsel and due process of law, were violated. Petitioner asks the Court to review each claim on its merit and reverse and remand or reverse and vacate petitioner's conviction, based on the cumulative effect of all the claims together.

Claim III | Detective Weber and detective Barsch committed perjury under oath, during the motion to quash arrest and trial.

79) Petitioner filed a motion to quash arrest after being arrested in an apartment without a warrant. The main question was whether the police officers had probable cause to arrest petitioner, see also claim I. The police officers went before a Judge and only asked for a search warrant and not an arrest warrant. Both Weber and Barsch testified falsely under oath, that evidence recovered at the crime scene, came back to petitioners and 6315 S. Champlain. The officers misled the Court in an attempt to show probable cause existed, and the court used their testimony as substantial evidence against petitioner.

80) Detective Matthew Weber lied under oath when he told the Court, that the cellphone found at the scene was registered to petitioner and 6315 S. Champlain (see R. ex. T.R. EE77)

81) Detective Henry Barsch also lied under oath and claimed the scene cellphone was registered to petitioner and 63rd and Champlain (see R. ex. T.R. EE116, ex. T.R. MM61-65, MM74).

82) During petitioner's trial evidence was presented by the State attorney showing that the cellphone was registered to Marcell Gray and 501 South Stony Island (see R. ex. T.R. 00141-142, 00167-168).

83) Detective Weber also lied under oath when he claimed there was casino video showing petitioner watching the victim Ralph Turner gamble (see R. ex. T.R. EE78)

84) During Petitioner's motion to quash or trial, no video was played showing Turner ever gambling at any time at the casino (see R. ex. T.R. LL260).

85) Detective Weber then lied about there being several officers present.

When Angela Baker, signed the consent form (See R.ex. T.R.EE 87-89).

85) Detective Barsch also lied when he claimed he was on the 1st fl. for 15 minutes (See R.ex. T.R.EE 120-121).

87) The cleared open supp. report prepared by Weber and Barsch, shows they were the only two present, when Baker signed the consent form (See R.ex. B page 18).

88) Detective Weber even lied when he claimed he was the person who recovered the money from the middle bedroom (See R.ex. T.R.EE 94).

89) Again the cleared open supp. report shows that a detective Dougherty recovered the money from the middle bedroom (See R.ex. B pg 20).

90) The court used the detectives testimony as substantial evidence in weighing the credibility of the witnesses (See R.ex. T.R.EE 156, ex. T.R.HH 20).

91) The court was unaware that the detectives had committed perjury, and had it known, the outcome of the motion would have been different (See R.ex. T.R.EE 158-161).

92) The ineffective assistance of trial counsel as seen in claim I, along with the perjury committed by detective Weber and detective Barsch prejudiced petitioner, where the key issue was probable cause and the actions of trial counsel and both detectives, denied the court from making the correct ruling on the motion. Petitioner's 4th, 5th and 14th amendment rights to the U.S. and IL. const, from warrantless arrest, fair hearings and due process of law, were violated. Petitioner asks the court to review this claim in conjunction with the other attached claims and reverse and remand or reverse and vacate petitioner's conviction.

-A244-

**Claim IV**

Prosecutorial Misconduct, where the State knowingly used perjured testimony to prove probable cause, through detectives

93) During the motion to quash arrest, the state was required to prove that probable cause existed for the warrentless arrest of petitioner in a private dwelling, as mentioned in claim I and claim III also. Prosecutor Kim Ward purposely had detective Weber concede to false evidence about who and where the recovered cellphone was listed to. Along with the fact that this testimony was never rebutted, and the court used it as substantial evidence in making its ruling, the prosecutor's actions amounted to official mis-conduct.

94) The Prosecutor purposely had detective Weber concede to the cellphone being registered to petitioner and the address 6315 s. champlain, as seen in claim III (see R.ex. T.R. EE77, claim III).

95) The prosecutor itself also conceded the phone was listed to petitioner and 63rd and Champlain (see R.ex. T.R. EE136-137, ex. T.R. HH11).

96) At the motion both the Prosecutor and detective made these allegations, but at trial prosecutor Ward introduced the cellphone registration, that proved the allegations were untrue (see R.ex. T.R. 00141-142 pp167-168, claim III).

97) At the motion the prosecutor also had detective Weber concede to a video existing, showing petitioner watching the victim Ralph Turner gamble at the casino (see R.ex. T.R. EE78, claim III).

98) As stated in claim III, there was never any video played at the motion or trial, showing Turner ever gambling at the casino (see R.ex. T.R. LL260, claim III).

99) Again at the motion the Prosecutor conceded there was video of petitioner being identified as watching Turner, but then claimed Rupert Evans identified petitioner, as watching Turner win money (see R.ex. T.R. EE136-139).

100) It wasn't until trial that petitioner learned the general progress report or supplemental report for Rupert Evans, doesn't state any of those facts (see R. ex. T.R. MM 156)

101) The prosecutor went on to argue at the motion, that detective Weber was credible, knowing Weber had lied under oath about material facts of evidence (see R. ex. T.R. EE 141).

102) The court then went on to consider the unrebutted false testimony and argument of detective Weber and Prosecutor Ward, and used it as substantial evidence in ruling on credibility of witnesses and the motion itself (see R. ex. T.R. EE 156, ex. T.R. HH20, claim III).

103) The petitioner was prejudiced by multiple errors that took place during the motion to quash. As in claim I, trial counsel failed to introduce the impeaching evidence against detective Weber. As in claim III, detective Weber committed perjury under oath, and in this claim, the prosecutor purposely used perjured testimony and conceded to it, depriving petitioner of a fair hearing. Petitioner was further prejudiced as stated in claim II, by appellate counsel's failure to raise this claim on direct appeal, along with the attached claims. The majority of the evidence presented by the prosecutor was fabricated, uncorroborated and insufficient to establish probable cause existed, for the officers to make the warrantless arrest of petitioner in an apartment. Petitioner's 4th, 5th and 14th amendment rights, under the U.S. and IL. Const., from unreasonable warrantless arrest and search and seizures, unfair hearings, and due process of law. Petitioner asks the court to review this claim in conduction with claim I, II and III, and reverse and remand or reverse and vacate the conviction.

C-00686

Claim V — Prosecutorial Misconduct, where the State attorney purposely and knowingly misstated facts of evidence.

104) During the motion to quash arrest and trial, the State purposely misstated facts to try to meet its burden of proof, and never attempted to correct the misstates for the Court. The State allowed the Court to use the misstatements in assessing the evidence, and making rulings on improper evidence during the motion and trial and the outcome would have been different, if the State would have corrected the Statements.

105) As mentioned in earlier claims, the State purposely claimed the recovered cellphone was listed to petitioner and 6315 S. Champlain, to try and establish probable cause (See R. ex. T.R. EE77, EE136, ex. T.R. HH11, claim III, claim IV).

106) The State also claimed there was extensive video evidence of petitioner associating with co-defendant Aaron Bronson (See R. ex. T.R. EE 136-137)

107) Now at trial, the State only presented a video clip of petitioner entering Bronson's vehicle, far from extensive video (See R. ex. T.R. 240-241, 257-25811).

108) The State then claimed during the motion that Rupert Evans identified petitioner, as watching Turner win money at the casino, as mentioned in the previous claim (See R. ex. T.R. EE 136-139, claim IV).

109) Petitioner later learned at trial, that the general progress report or supp. report for Rupert Evans, didn't contain any of those facts the State claimed (See R. ex. T.R. MM 155).

110) The State also questioned petitioner at trial with facts that was not in evidence (See R. ex. T.R. 00183-184).

111) The State purposely told the jury that the money recovered from 63rd and Champlain was connected to Turner's death, when there was no evidence of that (See R. ex. T.R. 00288)

C. 00087

112) The State also told the jury, every 911 caller saw a person exit the passenger side of the SUV, when Anthony McGee was the only eyewitness (see R.ex. T.R. 00281-282, ex. T.R. 42-43LL, 73-74LL).

113) The ~~Court~~ Court used all the misstated facts during the motion to quash arrest and the jury used them during ~~the~~ deleberations (see R.ex. T.R. EE 156, ex. T.R. HH30, Claim III, claim IV).

114) Petitioner was presudiced by the misconduct of the prosecutor's actions that resulted in the motion to quash being denied, and ultimately petitioner's conviction at trial. Petitioner was further presudiced by appellate cansel for not raising this claim on direct appeal in conjuction with claims I, III, IV, for the appellate court to review. Had it not been for the prosecutor's improper actions the outcome of the motion and trial would have been different, and Had it been not for Appellate cansel's improper and ineffective assistance, the outcome of petitioner's direct appeal would have been different. Petitioner's 4th, 5th, 6th and 14th amendment rights under the U.S. and IL. Const. for protection from unreasonable warrantless arrest, unfair hearings, ineffective assistance of cansel and unreasonable due process of law was violated. Petitioner asks the court to review this claim along with the attached claims and reverse and remand or reverse and vacate petitioner's conviction.

C 00088

Claim VI — Trial Court abused its discretion in assessing Witness credibility during the motion to quash arrest.

115) During the motion to quash arrest, the Trial Court erred when it ruled that Angela Baker and Shawanna Chester, two defense Witnesses, were incredible, when neither had any motive to lie. Both witnesses had to be subpoenaed to court from different states, and neither were impeached on material facts of evidence. The state conceded that anyone in the apartment could have been charged with the guns that were recovered, adding credence to Chester's testimony that she was threaten. Detective Weber and detective Bersch's testimony, contained multiple conflicts and inconsistencies, that should have concerned the court of their truthfulness, and yet the court ruled them credible.

116) Angela Baker claimed she was threatened by police to open the door, and did not invite them into the apartment, they forced their way in with guns drawn (See R.ex. T.R. EE 4-8, EE28, EE132).

117) Baker also claimed the police removed a child from the front bedroom, then placed them both in the living room, and 10 to 15 officers started searching without consent (See R.ex. T.R. EE8-10, EE20).

118) Baker then claimed the police had her give her signature, saying she had nothing to do with the stuff they found, and on January 30th 2009, Baker lived at 6133 S. Cottage Grove (See R.ex. T.R. EE 11, EE 19).

119) Baker claimed she met Shawanna Chester for the first time after 2am on January 31st 2009, and never babysat for her (See R.ex. T.R. EE 18-19, EE25-26, EE 133).

120) Baker also claimed she never heard Chester tell the police, she didn't want to talk in front of petitioner (See R.ex. T.R. EE 133-134).

121) In January of 2009, Baker had dated petitioner for three and a half years, but

didn't have any kids together (See R.ex. T.R. EE14-15).

121) Baker also claimed she had multiple phone conversations with petitioner since 2009, but lost contact through years 2010, 2011 and 2012 (See R.ex. T.R. EE21-24).

122) Baker claimed she had three kids now, unemployed and supported by the State and family, at the time of the motion hearing, and petitioner's family paid for her transportation back and forth (See R.ex. T.R. EE24-39).

123) Shawanna Chester claimed she lived at 6315 S. Champlain, 2nd FL, with Aaron Bronson and petitioner, and she stayed in the backroom (See R.ex. T.R. EE32, EE43, EE47-48).

124) Chester also claimed only her son and petitioner was in the house, and she asked petitioner to watch her son while she went out (See R.ex. T.R. EE33-34, EE48-49, EE51, EE56-57, EE60-61).

125) Chester then claimed she never received a phone call prior to arriving home after 2am, but did see a lot of police cars, that her apartment was a disaster, and the police were taken pictures of it (See R.ex. T.R. EE35-37, EE45-50, EE55-56, EE61-65, EE130).

126) Chester claimed she never saw petitioner sitting in a bedroom when she arrived or ask a detective to walk and talk (See R.ex. T.R. EE55, EE130-131).

127) Chester also claimed she didn't voluntarily sign the consent form, because she was threaten with Jail and her son going to DCFS, if she didn't cooperate (See R.ex. T.R. EE38-42, EE45-46, EE63, EE65).

128) Chester then claimed she had never met Baker, prior to the night petitioner was arrested, and never asked her to baby-sit (See R.ex. T.R. EE52, EE58-59).

129) Detective Weber claimed he was a five year homicide detective, who was assigned Ralph Turner's homicide, and prior to going to 6315 S. Champlain, 1st FL, he received information connecting petitioner to Turner (See R.ex. T.R. EE75-76).

130) Weber also claimed, when he obtained the search warrant for the 1st FL

of 6315 S. Champlain, he didn't know petitioner would probably be home.(See R.ex. T.R. EE66-70, EE100).

132) Weber then claimed he believed petitioner stayed on the 1st FL even though it was negative for petitioner, and petitioner was later seen on the 2nd FL (See R.ex. T.R. EE71-73, EE80-81).

133) Weber claimed he told Baker he was investigating Turner's case and was invited in, then claimed they identified themselves and was immediately invited in(See R.ex. T.R. EE82-84)

134) Weber also claimed he saw petitioner just standing in the hallway and recognized him from a photo, as the person they were looking for (See R.ex. T.R. EE84-85, EE99).

135) Weber then claimed they were not given consent by petitioner, and contraband was taken from the 2nd FL apartment (See R.ex. T.R. EE74).

136) Weber denied bamushing the 2nd FL door, when Baker opened it, and claimed that him, detective Johnson and detective Otto had Baker sign the consent form, before asking her if she lived in the apartment (See R.ex. T.R. EE87-89, EE95-96, also compare to claim III paragraph).

137) Weber claimed he learned the landlord indicated Chester also lived on the 2nd FL, and Chester arrived after dawn (See R.ex. T.R. EE90,).

138) Weber also claimed his partner explained the consent form to Chester, and she signed in front of him and other officers (See R.ex. T.R. EE90-91).

139) Weber denied that Chester appeared to be intoxicated, or that officers refused to let her read the form (See R.ex. T.R. EE90-93)

140) Weber claimed he learned that the back room belonged to Chester, and when they search it, the evidence found was used in petitioner's prosecution (See R.ex. T.R. EE91-92)

C 00091

141) Weber denied that the apartment was searched before Chester signed the consent form, and denied telling her they would send her son to DCFS (See R.ex. T.R.EE92,EE94).

142) Detective Barsch claimed he was a seven year homicide detective, and first had contact with Chester at her 2nd Fl doorway (See R.ex. T.R.EE105-106,EE121).

143) Barsch also claimed he was told Washington had contacted Chester and told her what was going on, and Chester identified herself as the leaseholder, but then claimed she only lived there (See R.ex. T.R.EE107,EE127).

144) Barsch then claimed he told Chester they executed a search warrant on the 1st Fl, but petitioner no longer lived there (See R.ex. T.R.EE111,EE115).

145) Barsch claimed the 2nd Fl door was open and the officers were in the front bedroom and hallway only, and it took him 25 minutes to make it to the 2nd Fl where he greeted Chester, and he also greeted her when she entered the apartment building itself (See R.ex. T.R.EE112,EE121-123,EE126).

146) Barsch also claimed he saw detectives Weber and Dougherty going in and out the apartment, while they waited on Chester (See R.ex. T.R.EE124-127).

147) Barsch then claimed Chester didn't mention she was out celebrating her birthday and he didn't smell any alcohol either, after 2am in the morning when Chester asked him to walk to the backroom to talk, and petitioner was sitting in a chair in the front bedroom wearing a black hoodie (See R.ex. T.R.EE107-108,EE114-115,EE118,EE123-124).

148) Barsch claimed when he went to the backroom, he saw the butt of a gun outside a hollowed out speaker, then claimed it was inside the speaker (See R.ex. T.R.EE109-110,EE117-118,EE120).

149) Barsch also claimed he asked Chester to take a look at the guns, then they discussed her signing a consent form, and detectives Weber and Otto was present when she

signed the form (See R.ex. T.R. EE110-113).

150) Barsch denied telling Chester she would go to jail and her son to D.C.F.S. custody (See R.ex. T.R. EE106-107, EE111).

151) The State claimed Baker had motive to lie, because she spoke on the phone with petitioner why he was in jail (See R.ex. T.R. EE143).

152) The State also claimed Chester had motive to lie, because why would she leave her son with someone, she spoke to through a door (See R.ex. T.R. EE142-143).

153) The State then claimed Chester lied about being threaten, so petitioner wouldn't hear the truth, and Chester signed the consent form after Barsch saw the guns and discussed her options (See R.ex. T.R. EE141-142).

154) The State claimed the officers learned Baker did not have authority to give consent and waited in the hallway area, and when the gun was discovered in plain view, anyone in the apartment could have been arrested (See R.ex. T.R. EE140-141, EE148).

155) The State argued the officers were credible and did what was necessary for the case (See R.ex. T.R. EE141).

156) The Court claimed Baker had an ongoing relationship with petitioner, and based on her testimony, stayed at the apartment on previous occasions (See R.ex. T.R. EE157-158, ex. T.R. HH18, compare to Baker's testimony).

157) The Court didn't believe Baker signed the consent to search form, without knowing what it was (See R.ex. T.R. EE158, ex. T.R. HH18).

158) The Court also didn't believe Chester wasn't notified prior to arriving home, or under duress when signing the consent form, but did believe Chester didn't want to talk in front of petitioner (See R.ex. T.R. EE159-160).

159) The Court found Baker and Chester's testimony incredible on the facts of

the motion (See R.ex. T.R. HH18, ex. T.R. EE161).

160) The Court believed both detective Weber and detective Barsch attempted to get consent from Baker and Chester, who both had authority (See R.ex. T.R. HH21).

161) The Court also believed the police didn't search based on what Baker said, and tried to gather more information, and wasn't sure detectives knew who petitioner's girlfriend was (See R.ex. T.R. EE 158-160, compare to paragraph 121

162) The Court claimed there was a search going on and a gun was inadvertently found by a detective in a speaker, and Chester signed the consent form after the gun was found (See R.ex. T.R. EE 150).

163) The Court believed the police stayed in the hallway area until Chester invited them to the back, and they received voluntary consent, and the Court found them both credible (See R.ex. T.R. EE160-161, ex. T.R. HH18).

164) The Court also believed the detectives pursued the information in a legally appropriate way, under the 4th amendment, then denied the motion (See R.ex. T.R. HH22).

165) Angela Baker and Shawanna Chester gave the Court no reason to consider them incredible but detective Matthew Weber and Henry Barsch did. Weber claimed he was present when Chester arrived but never mentioned Chester asking to walk to the back or any guns being discovered in plain view. Barsch claimed petitioner was sitting in a chair wearing a black hoodie handcuffed at 2am in the morning. The officers testimonies were full of inconsistencies on material facts to raise doubt.

166) Petitioner was prejudiced by the Court's abuse of discretion when it misstated evidence of the witnesses testimony, during its estimation of their credibility, and appellate counsel's failure to raise this claim in direct appeal. Petitioner's 4th, 5th, 6th and 14th amendment rights, under the U.S. and IL. Const. were violated. Petitioner asks this Court to review claim in conjunction with attached claims and reverse and vacate petitioner's conviction.

Claim VII | Trial Court abused its discretion when it purposely influenced the State to change its theory, during the motion to quash arrest.

167) During the motion to quash arrest, all the witnesses testified that petitioner was handcuffed and arrested. The State conceded to petitioner being arrested, when it gave its argument. At the closing end of the state's argument, the Court interrupted, and improperly implied that petitioner was being detained, when neither detective ever testified to any detainment, or any argument by the State, of detainment, until after the Court introduced it into the motion. The Court's action was clearly an abuse of its discretion on its part.

168) Angela Baker claimed petitioner lived at 6315 S. Champlain, 2nd Fl. and she was awitened by banging on the door, and went to answer it alone (See R.ex. T.R. EE 15-17).

169) Baker also claimed it only took a couple of minutes for the police to remove petitioner from the middle bedroom and out the apartment (See R.ex. T.R. EE 8-9, EE 130-133).

170) Baker then claimed she never saw the police put petitioner in the front bedroom (See R.ex. T.R. EE 133).

171) Detective Weber claimed that him and detective Daugherty saw petitioner, placed him in handcuffs and arrested him (See R.ex. T.R. EE 72, EE 99).

172) Weber also claimed petitioner was arrested before the search, and they didn't have a warrant for the 2nd Fl. (See R.ex. T.R. EE 74-75).

173) Weber then claimed petitioner was arrested and put in the front bedroom to be watched by other officers (See R.ex. T.R. EE 86-87).

174) Detective Barsch claimed petitioner was already arrested when he got to the 2nd Fl. apartment, and sitting in a chair with two officers standing as crime scene protection (See R.ex. T.R. EE 123-124, EE 128).

175) Barsch also claimed he wasn't sure when petitioner was taken out the apartment, but denied it was before Chester arrived (See R.ex. T.R. EE 119, EE 125).

176) The State claimed the officers had reason to believe petitioner was associated with Turner's death when they arrested him, and the arrest occurred when detective Weber observed petitioner (See R.ex. T.R.EE139, EE144).

177) The State then claimed it was reasonable for officers to handcuff petitioner and detain him before searching (See R.ex. T.R.EE141, EE147-148).

178) The State further claimed that they had an alternative position regarding if petitioner was under arrest, and argued it was both a detainment and arrest, depending on the Court's decision (See R.ex. T.R. HH7-8).

179) The State claimed the police actions in merely detaining petitioner was entirely proper (See R.ex. T.R. HH8-9).

180) Defense counsel claimed detective Weber arrested petitioner and immediately placed him into a squad car, and explained the definition of arrest, is whether a reasonable person feels he is free to leave (See R.ex. T.R.EE151-152, EX. T.R. HH6).

181) Counsel also claimed it was a full blown arrest on petitioner, and Weber and the prosecutor conceded to it now the state doesn't want to concede anymore (See R.ex. T.R. HH13).

182) Counsel claims petitioner was under arrest as detective Weber stated (See R.ex. T.R. HH13).

183) The Court questioned whether petitioner was in custody or was it reasonable to detain him with cuffs (See R.ex. T.R.EE150).

184) The Court claimed it wouldn't dispute if the State indicated petitioner needed to be detained for safety reasons, and there was probable cause to detain petitioner for further questioning and a search (See R.ex. T.R.EE146-147, ex. T.R. HH18-19).

185) The Court also claimed the state indicated there was an arrest when petitioner was handcuffed, and the Court believed petitioner was under arrest when he was.

handcuffed and placed in the chair, and there was enough for an arrest or legal detention (See R.ex. TR EE 155-156, ex. TR HH 19-22).

186) Illinois supreme court Rules 62A. Canon 2. A Judge should avoid impropriety and the appearance of impropriety in all the Judges activities.

187) A. A judge should respect and comply with the law and should conduct itself at all times in a manner that promotes public confidence in the integrity and impartiality of the Judiciary.

188) Illinois supreme Court rule 63A(8). A Judge shall perform Judicial duties without bias or prejudice.

189) A. A judge that manifests bias impairs the fairness of the proceeding and brings the judiciary into disrepute.

190) Petitioner was prejudiced when the Court abused its discretion by attempting to lead detective Borsch into conceding to a detainment taking place, after Borsch had already testified to the arrest of petitioner. The Court was successful in leading State's attorney Kim Ward into conceding to detainment, after already arguing to the arrest. The Court purposely misstated the State's argument so it could insert detainment into the motion. Instead of ruling on the motion, the court issued a two day continuance and the state returned and claimed it was either a detainment or an arrest. Had it not been for the abuse of discretion by the Court, the outcome of the motion would have been different, and petitioner was further prejudiced by appellate counsel's failure to raise this claim on direct appeal. Petitioner's 4th, 5th, 6th and 14th amendment rights, under the U.S and IL. Const, to a reasonable arrest, a fair hearing, effective assistance of appellate counsel and due process of law. Petitioner asks the Court to review this claim in conjunction with claim VI and the other attached claims.

and reverse and remand or reverse and vacate petitioner's conviction.

**Claim VIII** Trial Court abused its discretion in ruling that probable cause existed for the warrantless arrest.

191) As mentioned in previous claims, Petitioner filed a motion to quash arrest after being arrested in a apartment without an arrest warrant or probable cause. Prior to petitioner's arrest, the police went in front of a judge and only requested a search warrant, that turned out to be for the wrong apartment. Petitioner was located in another apartment and immediately arrested without probable cause. The Court abused its discretion when it ruled People v. Lower applied to petitioner's case, when the two cases were clearly distinguished. The ruling caused the motion to be denied and petitioner to be prejudiced.

192) Detective Weber claimed petitioner matched the general description of the suspect, and the recovered cellphone it's connected to petitioner and 6315 S. Champlin (See R.ex. T.R.EE 77-79, claim III, claim IV).

193) Weber also claimed no witness had identified petitioner, as being on the scene killing Turner, when he requested the search warrant, and he didn't request a an arrest warrant (See R.ex. T.R.EE 71, EE 98).

194) Detective Barsch claimed the cellphone came back to petitioner and 6315 S. Champlain also (See R.ex. T.R.EE 116-117, claim III).

195) The State claimed there was two interrelated aspects, the motion to quash arrest, based on the lack of probable cause, and the improper search (See R.ex. T.R.EE 135).

196) The State also claimed experienced detectives was assigned the case, and the cellphone was registered to petitioner and 6315 S. Champlain (See R.ex. T.R.EE 135-136, ex. T.R. HH 11, claim IV, claim V).

197) The State then claimed there was extensive video evidence of petitioner with Bronson, and video and witness identifying petitioner, watching Turner win money (See R.ex. T.R.EE 136, EE 139, ex. T.R. HH 10, claim IV, claim V).

198) The State claimed the search warrant was enough to arrest petitioner, because there was enough to justify the arrest, and it was unexpected for detectives to find petitioner at the location (See R.ex. T.R. EE 137, EE 155-156, HH 8-9).

199) The State also claimed petitioner could be arrested based on circumstantial probable cause, and it's disingenuous, if petitioner can't be arrested without a warrant, because he wasn't identified as the actual shooter (See R.ex. T.R. HH9, HH11).

200) The State then claimed petitioner's case was similar to "People V. Lower, 55 Ill. App. 2d 104", because it also relied on circumstantial evidence as a basis for probable cause to arrest that defendant (See R.ex. T.R. HH9).

201) The State further claimed petitioner's case and the Lower case were similar, because of a photo array identification, and Lower allowed you to add up different factors circumstantially to make a warrantless arrest (See R.ex. T.R. HH9, HH11-12).

202) The State acknowledged that the Lower case, was a Modus Operandi type of situation, but claimed it was still similar to petitioner's case, because it didn't involve probable cause, based on identification of defendant actually committing the crime (See R.ex. T.R. HH9-10).

203) The State claimed the Lower case was on all fours and analogous when it comes to their case (See R.ex. T.R. HH12).

204) Defense Counsel questioned was the facts the officers used to get the search warrant, enough to arrest petitioner, and claimed the seasoned detectives conceded there was no probable cause to arrest when they didn't request an arrest warrant too (See R.ex. T.R. EE 150, ex. T.R. HH4, HH14).

205) Counsel also claimed the police requested the right to search petitioner in the search warrant, and the detectives claiming they didn't know petitioner would be here, flies in the face of requesting the authority (See R.ex. T.R. EE 150-151, ex. T.R. HH14...

206) Counsel then claimed the police had no authority for the 2nd Fl apartment and there was no exigency, so the police needed new information to go back to the judge to request an arrest warrant (See R.ex. T.R.EE153, ex. T.R.HH 16-17).

207) Counsel claimed the Lower case was not on all fours, because the officers went to a judge and requested only a search warrant in petitioner's case, and Lower never asserted the police went to a judge (See R.ex. T.R.HH 13-15).

208) Counsel also claimed the state depended on the photo array in Lower, but the difference was a potential victim identified Lower (See R.ex. T.R.HH16).

209) Counsel then claimed the Lower case contained Modus Operandi and that alone is enough to arrest, but petitioner's cas has no Modus Operandi (See R.ex. T.R.HH15).

210) Counsel claimed detectives were trying to get around the 4th amendment, and it would be gutted, if an officer could go to a judge, choose not to request an arrest warrant, then make the arrest (See R.ex. T.R.EE153, ex. T.R.HH15).

211) The Court questioned whether or not there was probable cause when petitioner was arrested in the apartment (See R.ex. T.R.EE161).

212) The Court claimed the police had a cellphone registered to petitioner and video of him near Turner at the roulette table, previous arrest photographs, but didn't request an arrest warrant (See R.ex. T.R.EE156, EE158-159, ex. T.R.HH20).

213) The Court also claimed it believed petitioner dropped the phone, and at the casino, but was it enough for an arrest, because it was enough to cuff petitioner and get more information (See R.ex. T.R.EE159, EE161, ex. T.R.HH18).

214) The Court then claimed it believed the state thought there was probable cause to arrest, when the police only requested a search warrant, and the circumstantial evidence was great enough under the totality of the

circumstances to justify the arrest (See R.ex. T.R.EE 155-156, ex. T.R.HH19-21).

215) The Court also conceded that Lawer was on point with petitioner's case, and petitioner's case contained more circumstantial evidence without an actual identification, so Lawer provided direction (See R.ex. T.R.HH18-21

216) The Court claimed Lawer indicated it was appropriate to have detained petitioner, and up to the Court to use common sense and not engage in a technical analysis of probabilities (See R.ex. T.R.HH18-19, HH22, claim VII )

217) The Court ruled to deny the motion to quash arrest and suppress evidence (See R.ex. T.R.HH22)

218) "If a peace officer has reasonable grounds to believe that a person is committing or has committed a criminal offense, as determined by the knowledge and information possessed by the officer during the arrest, the officer has probable cause to make a warrantless arrest of the suspect" (People v. Thomas, 400 N.E. 2d 1019, 36 Ill.Dec 439; People v. Coleman, 20 Ill.Dec 620, 364 N.E. 2d 742).

219) "Although an objective analysis of the situation confronting the officer is the standard generally used, a court cannot ignore an acknowledgement by the police officer that the arrest was based merely on suspicion" (Thomas, 400 N.E. 2d 1019; In re Woods, 314 N.E. 2d 606; U.S.C.A. Const. Amend. 4).

220) In Thomas, the State claimed that Lawer was factually similar to petitioner's case, in which probable cause was found, as they did in petitioner's case. In Thomas, the Court disagreed with the State and stated that "Lawer had a victim of another attack identify Lawer, as the perpetrator from a composite picture. Since there was probable cause to arrest Lower for one criminal offense, his subsequent

confession to another could not be invalidated for lack of probable cause to make the arrest".

22) Petitioner's case is similar to the Thomas case, where the facts indicated that the police had no more than a suspicion of criminal involvement on the part of the defendant. The Court agreed that probable cause to arrest, did not exist. Petitioner was prejudiced by the abuse of discretion by the court, when it ruled Lauer was on all fours, when that case contained Modus Operandi, and petitioner's case didn't. That was the key fact that led to probable cause and the arrest of Lauer. The Court also abused its discretion In claims VI and VII, further prejudicing petitioner, during the motion to quash arrest. Appellate counsel also prejudiced petitioner, by failing to raise this claim and the additional attached claims in this petition. Petitioner was illegally arrested when the police admitted they went before a judge and didn't request an arrest warrant and nothing changed to provide probable cause, prior to petitioner's arrest. Lauer was distinguishable from petitioner's case and didn't apply, because the police lacked Modus Operandi. Petitioner's 4th, 5th, 6th and 14th amendment rights, under the US. and IL. Const., protection from warrantless arrest and unreasonable search and seizures, fair hearings and due process of law were violated. Petitioner asks the Court to review this claim in conjunction with claims VI and VII and reverse and vacate petitioner's conviction.

Claim IX  Trial Court abused its discretion when it denied the motion
to bar Aaron Bronson's new statements.

221) After trial had already begun for petitioner, and opening statements
and several witnesses had testified, the State returned the following
court date, with new statements that were allegedly made by co-defendant
Aaron Bronson. Bronson was the State's star witness and the new statements
amounted to a confession allegedly made by petitioner to Bronson years earlier.
The court should have barred Bronson from testifying to the new statements,
and abused it discretion, by allowing trial by ambush by the State.

222) On May 17th 2013, the first day of trial, defense counsel filed a motion
to produce any material deviations in Aaron Bronson's statements, and
the State claimed there was none (See R.ex. T.R. JJ 3-4, ex. T.R. LL ex. T.R. RR 21).

223) On May 20th 2013, the second day of trial, defense counsel filed a motion
to bar new statements made by Aaron Bronson, after being blind sided
by the State (See R.ex. T.R. LL, ex. T.R. RR 22, ex. N).

224) Counsel claimed Bronson made new statements after the state heard the
weaknesses in their case, during opening statements, and they contained material
deviations (See R.ex. T.R. 7-11 LL, ex. T.R. RR 4, RR 7, RR 21-25, RR 37-38, ex. N, ex. O).

225) Counsel also claimed Bronson's new statements addressed all the weaknesses
in the State's case and undermined petitioner's case, making it trial by ambush
(See R.ex. T.R. 15-16 LL, ex. T.R. RR 3-9, RR 22-29, RR 37-38, ex. N, ex. O).

226) The State claimed Bronson's new statements contained material deviations,
but that wasn't the extent of their conversation, even though they didn't discuss
anything else (See R.ex. T.R. 16-24 LL, ex. T.R. RR 12-13, RR 17-18, RR 36, ex. N, ex. O).

227) The State used Bronson's new statements as evidence, during closing
arguments at petitioner's trial (See R.ex. T.R. 00269, 00278, ex. O).

229) The Court claimed in the course of a trial when witnesses are interviewed, they flip you all the time, and even though the flip helped and hurt petitioner, it doesn't see a trial by ambush (See R. ex. T.R. 2711 ex. T.R. RR24-25, RR35, RR40-41).

230) The Court believed the State followed every Brady requirement in a timely fashion, and if it barred the statements, it would violate its discretion, then denied the motion to bar testimony (See R. ex. T.R. 2711 ex. T.R. RR38-42, RR44).

231) Aaron Bronson's new statements were material deviations of key facts that helped the State's case, and was unknown to petitioner, prior to trial. Petitioner was prejudiced by the Court's ~~assessment~~ assessment of the new statement and its ruling, that it wasn't trial by ambush. The Court allowed the jury to hear testimony by petitioner's co-defendant, who had already entered into a plea deal and in the penitentiary serving the sentence, make statements he never made prior to trial, that alleged petitioner was the actual shooter. Even though that was the State's theory, there was no witness alleging petitioner shot the victim or seen with a gun after the shooting occured, until Bronson made the new statements. Petitioner was furthered prejudiced by Appellate counsel's failure to raise this claim from the post-trial motion on direct appeal, where the appellate court may have granted relief. Petitioner's 5th, 6th and 14th amendment rights, under the US and IL. const, to a fair trial, effective assistance of counsel and due process of law. Petitioner asks the Court to review this claim in conjunction with all the attached claims and reverse and remand or reverse and vacate petitioner's conviction.

Claim X — Prosecutorial Misconduct for improperly bolstering co-defendant Aaron Bronson's credibility.

232) At Petitioner's trial, the State improperly bolstered Aaron Bronson's credibility to the jury, during closing arguments. The State argued Bronson was telling the truth and had no reason to lie, because they could charge him with perjury. Petitioner's case was purely circumstantial and the verdict rested on Bronson's credibility as a witness, which was heighten by the State's improper influence. Petitioner's case was closely balanced, and had it not been for the State's misconduct, the outcome of trial would have been different.

233) The State argued to the jury that it didn't like Bronson, and there's no surprise Bronson is who he is, but they have to believe him (see R.ex. T.R.00280).

234) The State also argued that part of Bronson's plea agreement, is he has to tell the truth, or he could be charged with perjury (see R.ex. T.R.00283, ex. P, ex. Q).

235) The State then argued Bronson had no motive to lie, and if the jury believed Bronson didn't want to receive anymore time, then they knew he wasn't lying (see R.ex. T.R.00283).

236) "Prosecutors are not permitted to vouch for the credibility of a government witness, nor are they permitted to use the credibility of the State's attorney office to bolster a witness testimony" (People v. Williams, 2015 IL. App (1st) 122745, 30 N.E. 3d 511; Quoting People v. Jackson, 399 I.ll. App. 3d 314, 926 N.E. 2d 786 (2010).

237) "Prosecutor's vouching for the credibility of witnesses poses two dangers", (People v. Townsend, 136 I.ll. App. 3d 385, 483 N.E. 2d 340 (1985); Williams, 30 N.E. 3d 511).

228) In People V. Schaefer, 217 Ill. App. 3d 666, 577 N.E. 2d 855 (1991), the prosecutor stated "the cooperating witness is not the most stellar person in the universe, but I think he told the truth". The Court ruled the statement improper and petitioner's case is similar and relies on Schaefer.

229) Petitioner was prejudiced by the State's misconduct, where the bolstering of Bronson's credibility influenced the jury to believe Bronson over petitioner and find him guilty. Since the evidence was closely balanced, the improper bolstering tipped the scale in favor of the State. Petitioner was further prejudiced by appellate counsel's failure to raise this claim on direct appeal, where the appellate court could have reviewed the claim on its merits and the outcome of petitioner's direct appeal would have been different. Petitioner's 5th, 6th and 14th amendment rights, under the US and IL Const., to fundamental fairness, effective assistance of counsel on appeal, and due process of law. Petitioner asks the Court to review this claim in conjunction with all the attached claims and reverse and remand or reverse and vacate the conviction.

**Claim XI** Prosecutorial Misconduct for misleading the jury to believe accountability applied to the facts of Petitioner's case and Petitioner, for the sole purpose of obtaining a conviction.

240) Petitioner was arrested January 31st 2009 and charged as the principal shooter in the death of Ralph Turner. 18 months after Bronson was arrested, Bronson entered into a plea agreement with the state, where his charges were amended, making him the accomplice and Petitioner the shooter. In opening statements, the state alleged Petitioner was the shooter and used Bronson to try and prove it. During the State's closing argument it discussed accountability to the jury, claiming Petitioner was the shooter and Bronson was the accomplice. But in rebuttal argument, the State improperly mislead the jury to believe it could convict Petitioner for Bronson's actions, if they didn't believe Petitioner shot Turner, and where that was never a state's theory, until that exact moment it was stated. The state committed reversible error by explaining the accountability theory to the jury, which was a direct contradiction to their star witness Aaron Bronson's testimony, that Petitioner was the shooter.

241) The State alleged that Petitioner was the only person who fired the gun that killed Ralph Turner, and the person who took Turner's money, wallet and cellphone (See R.ex. T.R.JJ16-20, JJ25, ex. T.R.00207, 00211, 00215-216, 00219, ex. T.R.RR20, ex. Q pg 11-12).

242) The State also alleged they had video of Petitioner stalking the victim Ralph Turner, and video of Petitioner entering Bronson's vehicle to follow Turner (See R.ex. T.R.JJ18, JJ20, ex. T.R.00275).

243) The State then alleged Petitioner used a loaded weapon to demand money from the victim Turner, and Bronson would give them an inside look of the brutal murder of Ralph Turner (See R.ex. T.R.JJ19-21).

244) The State claimed Bronson drove off and left Petitioner, when Petitioner

shot Turner, and petitioner told him he hid the gun, before the police stopped him (see R.ex. T.R. JJ 20-22).

244) The state also claimed petitioner went back to get the gun that was later found in the apartment he shared with Bronson and Chester (see R.ex. T.R. JJ22, JJ24).

246) The state then claimed when petitioner fired two bullets into Ralph Turner killing him, it was first degree murder (see R.ex. T.R. JJ 25).

247) Aaron Bronson claimed he pleaded guilty to being an accomplice to murder in exchange for a 24 year sentence and his cooperation to testify (see R.ex. T.R. 37-40NN, 92NN, 153-154NN, ex.P, ex.Q).

248) Bronson also claimed he only drove the vehicle, and petitioner was the person who shot and killed Ralph Turner, with the gun petitioner had at the casino (see R.ex. T.R. 69-75NN, 92NN, 104-110NN).

249) Bronson then claimed he followed Turner to 81st and Eberhart, and petitioner jumped out with a gun, then he saw Turner punch petitioner, petitioner fell to the ground, gunshots and petitioner hovering over Turner (see R.ex. T.R. 69-76NN, 79-86NN).

250) Bronson claimed petitioner told him he didn't get any money, he threw the gun, then left and returned to the apartment with it (see R.ex. T.R. 82-86NN, 120NN, 151NN).

251) Petitioner claimed he didn't shoot Ralph Turner or have any involvement in his death (see R.ex. T.R. 0039).

252) In closing argument, the state explained accountability, after alleging only that petitioner was the shooter and Bronson aided and abetted (see R.ex. T.R. 00224-225).

253) In rebuttal, the state claimed petitioner was in control the entire time of what was left on the scene, and it was People versus Petitioner, not Aaron Bronson (see R.ex. T.R. 00268, 00272).

254) The State argued Bronson's role made him an accessory and petitioner was the shooter, and Bronson was accountable for petitioner and petitioner was responsible for Bronson's actions (see Rex. T.R.00277, 00282, 00285).

255) The State asked the jury to convict petitioner of first degree murder for personally discharging the firearm that killed Ralph Turner (see Rex. T.R.00289).

256) Petitioner's counsel objected to the instruction on accountability (see Rex. T.R.00195).

257) "An improper misleading instruction created the risk of jury confusion on the issue's and more importantly, relieved the state of proving beyond a reasonable doubt that petitioner was the shooter" (People V. Williams, 161 Ill. ad 1, 641 N.E.2d 296; People V. Jefferson, 227 Ill.App.3d 491, 592 N.E.2d 134; Carella V. California (1989), 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218, 221; In Re Winship (1970), 357 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

258) When the State entered into the plea agreement with Bronson, it conceded that Bronson was the accomplice and petitioner was the shooter, so the facts was limited for the jury to sort out. In the interest of justice, if the state is unsure who the shooter is, they shouldn't be allowed to offer one defendant leniency to testify against the other to strengthen its case, just to later mislead the jury with an instruction that contradicts their star witness testimony.

259) Petitioner was prejudiced by the prosecution's actions, where the state specifically presented its case in chief, in opening statements that petitioner was the principle in the crime, that petitioner robbed the victim and personally discharged the firearm that caused the death of Ralph Turner. The prosecution would later, during rebuttal closing argument, tell the jury, if they don't believe

Petitioner shot Turner, they could hold petitioner accountable for Bronson's actions, knowing it was a contradiction of Bronson's testimony. The jury returned a finding of guilt for accountability.

260) The State asked the jury to find petitioner guilty of accountability based on co-defendant's actions, who claims he did nothing but drive and petitioner acted alone. Bronson specifically accused petitioner of shooting Ralph Turner alone, ultimately framing petitioner for the crime. Petitioner's position at trial, was his co-defendant who had made a plea deal with the State for a lesser sentence, was framing him. Petitioner always maintained he was present at the casino with Bronson, and in the vehicle with Bronson. Petitioner also maintained that Bronson was lying and shifted the weight on petitioner, when in actuality the robbery and murder of Turner, was a spontaneous act committed by Bronson alone, without petitioner having any knowledge of what Bronson was about to do.

261) During rebuttal closing argument, the prosecution steered away from its initial theory of the case of petitioner being the shooter, and changed its theory to petitioner being responsible for Bronson actions of doing nothing. The sudden change of theory was misleading to petitioner's jury, and done intentionally to lower the State's burden of proving petitioner shot and killed the victim Ralph Turner, which constitutes prosecutorial misconduct. To allow the State to do so, would be making a mockery of the judicial system, because the fact that the State did not present any concrete evidence outside the bias testimony of co-defendant Aaron Bronson, of a common design on petitioner's part. The evidence had to be within the scope, and once the State went outside the scope of the case, the misconduct affected the outcome of trial. Petitioner's 5th, 6th and 14th amendment rights, under the U.S. and IL const, were violated. Petitioner asks this court to review claim with attached claims and reverse and vacate the conviction.

Claim XII | Trial Court abused its discretion when it tendered the Accountability instruction to the jury.

262) Petitioner was arrested and charged with first degree murder as the principal shooter in the shooting death of Ralph Turner and tried on that theory. Through a plea agreement, the state used co-defendant Aaron Bronson as their star witness, to try and prove petitioners actually shot Turner. As previously stated in claim XI, the State's theory and evidence would have established that petitioner was the actual shooter or nothing at all. Defense counsel John Lyke objected to the tendering of the accountability instruction. The trial court abused its discretion by tendering the accountability instruction and the State presented no evidence to support the instruction and the facts of the case was limited.

263) Aaron Bronson alleged petitioner was the person who actually shot, killed and robbed Ralph Turner (See R. ex. T.R.69-75NN, 92NN, 109-110NN, claim XI).

264) Petitioner denied having any involvement in the death and robbery of Turner (See R. ex. T.R.0039, claim XI).

265) Defense counsel objected to the instruction on accountability, and it was overruled by the trial court (See R. ex. T.R.215NN, ex. T.R.00195, claim XI).

266) The State conceded that Bronson was guilty as an accessory and petitioner was the actual shooter, but also claimed petitioner was responsible for Bronson's actions (See R. ex. T.R.00285, claim XI, ex. Q pg 11-12).

267) The trial court overruled defense counsel's objections to the accountability instruction and claimed petitioner was legally responsible for Bronson because there was sufficient evidence, indicating petitioner was connected to Bronson before, during and after the crime took place (See R. ex. T.R.216-217NN, ex. T.R.00195).

268) An "accountability instruction should not be given when the evidence establishes that the defendant was a principal actor and not an accessory (People V. Lusietto,

41 Ill. App. 2d 205, 353 N.E. 2d 385; People v. Crowder, 180 Ill. Dec. 383, 607 N.E. 2d 277 (1993).

269) Petitioner case is similar to Lusietto and Crowder and contends the improper instruction constitutes reversable error, because to inject into a case by way of instruction, issues which are not properly before the jury, is reversible error (See People v. Payne (1990), 194 Ill. App. 3d 238, 141 Ill. Dec. 1168, 550 N.E. 2d 1244; People v. McCauley (1972), 2 Ill. App. 3d 734, 277 N.E. 2d 541).

270) As mentioned in claim XI, the improper instruction created the risk of jury confusion on the issue and more importantly, relieved the State of its burden to prove petitioner guilty beyond a reasonable doubt as the shooter (See People v. Williams, 641 N.E. 2d 296; People v. Jefferson, 592 N.E. 2d 134; Corella V. California, 109 S. Ct. 2419; In re Winship, 90 S. Ct. 1068.

271) The State conceded prior to trial that they believed Petitioner was the actual shooter, when they entered into a plea agreement with co-defendant Aaron Bronson. The State was restricted from discussing accountability to the jury, as pertaining to petitioner. The Trial Court abused it's discretion and prejudiced Petitioner, when it tendered the instruction on accountability, and where the State's theory or the evidence presented didn't support the tendering of the instruction. The trial court allowed the State to get two bites at the apple, with the accountability instruction, allowing the jury to convict petitioner as the shooter or as the accomplice, where the accomplice already pled guilty for a lesser sentence.

272) Petitioner was furthered prejudiced by appellate counsel's failure to raise this post-trial claim on direct appeal. Had it not been for the Court's abuse of discretion and appellate counsel's ineffective assistance, petitioner's trial and direct appeal would have been different. Petitioner's 5th, 6th, and 14th amendment rights, under the US and IL const, were violated. Petitioner asks the court to review claim, with claim XI and reverse and vacate conviction.

37

Claim XIII   Trial Court abused its discretion when it showed Bias toward
Petitioner and defense counsel

273) During the motion to quash arrest, the Court showed bias toward petitioner
when it heard arguments by both the defense and the state, and instead of ruling
on the motion, the Court issued a two day continuance without either attorney
requesting it. The state then returned with case law that was clearly distin-
guishable from petitioner's case, but the ruled it was on all fours, as discussed
in detail in claims VII and VIII. The Court also became irritated and angry
at defense counsel for requesting continuances for valid reasons, and interrupted
counsel multiple times. The Court's actions and remarks was not one of a neutral
Magistrate. The Court showed bias in claim IX and during petitioner's trial also.

274) As defense counsel John Lyke cross-examined detective Bursch, the court
interrupted and gave a personal opinion to counsel's question (See R. ex. T.R EE 119).

275) Also, as the state closed its argument in the motion to quash, the Court interrupted
and claimed it asked the State to articulate when the arrest occurred, but the Court
never asked the state that question (See R. ex. T.R EE 144).

276) The Court showed bias when it ruled on the credibility of the witnesses,
before determining, if probable cause existed for the warrantless arrest in a
private residence (See R.ex. T.R EE 156-161).

277) The Court became angry with petitioner's counsel, when he requested a continuance
to locate a critical eyewitness (See R.ex. T.R EE 169-173).

278) Once Petitioner's counsel located the eyewitness and requested a continuance to interview
the witness, the Court became irritated and visibly angry again at counsel (See R.ex. T.R GG 3-7).

279) The court became angry and made insensitive remarks about a defense witness
child, after petitioner's counsel requested to extend the subpeona to the day the
witness would testify (See R.ex. T.R GG 10-11, GG 15-19).

280) The Court even interrupted petitioner's counsel as he attempted to make a record about the continuances he requested that was denied, causing a verbal argument and a recess (See R.ex. T.R. GG11-13).

281) The Court showed bias when it implied it would deny the motion to quash, before hearing all the evidence and arguments (See R.ex. T.R. GG30).

282) When petitioner's counsel filed the motion to bar and was addressing the denied continuances, the Court became angry and interrupted (See R.ex. T.R. 3-6LL).

283) The Court showed bias when it interrupted petitioner's counsel cross-examinations of State witnesses in front of the jury (See R.ex. T.R. 97-98LL, ex. T.R. NN152-153 ex. T.R. 163NN).

284) The Court continued to get irritated and angry at petitioner's counsel during trial, and had to order side bars (See R.ex. T.R. 164-165NN, ex. T.R. 00251).

285) The Court also showed bias when it refused to strike a sustained question and answer for petitioner's counsel, and later interrupted counsel and told him not to respond to the Court's rulings (See R.ex. T.R. 00166, 00234).

286) After deliberations, the jury found petitioner not guilty of causing proximate death to Turner, but the Court showed bias to petitioner, when it sentenced petitioner to 60 years on each count he was acquitted on (See R.ex. T.R. pp 5 ex. T.R. RR83-84, ex. R)

287) Petitioner was prejudiced by the Court's abuse of discretion, because when it showed bias towards petitioner and his counsel, during the motions and trial, it was not acting as a neutral magistrate. The Court displayed personal emotions and opinions towards petitioner and his counsel throughout petitioner's proceedings, and had it not been for the Court's actions, the outcome of petitioner's motions and trial would have been different. Petitioner's 4th, 5th, 6th and 14th amendment rights were violated. Petitioner asks the Court to review this claim in conviction with claims VII, VIII and IX, and reverse the conviction.

Claim XIV    Trial Court abused its discretion when it made evidentiary
rulings that favored the State.

288) At petitioner's motions and trial, the Court made evidentiary rulings
that favored the State, regardless of which attorney objected. Petitioner's
counsel had to request side bars to get objections sustained, and the State didn't.
The Court's rulings were one sided, and it allowed inadmissible testimony
of state witnesses, and state's argument to be heard, and prevented some of
the defense evidence to be heard. The Court's actions were not impartial and
that of a neutral magistrate, and was reversible error.

289) The Court showed an abuse of discretion, when it overruled petitioner's
counsel objection for no foundation existing (See R.ex. T.R. EE43).

290) Petitioner's counsel made an objection and after a sidebar was ordered, the
Court never made a ruling, then counsel objected again, and another sidebar was
ordered (See R.ex. T.R. 172-173 NN).

291) The Court overruled petitioner counsel's objection based on facts not in evidence,
and after ordering a sidebar, the Court overruled the objection again, and denied
petitioner counsel's requested sidebar (See R.ex. T.R. 00183-184, Claim V).

292) The Court also overruled every defense objection, during the state's
closing argument and rebuttal argument, regardless of basis (See R.ex. T.R. 00208,
00223, 00268-269, 00281, 00287-288).

293) The Court then sustained multiple objections for the State, during the
defense's closing argument (See R.ex. T.R. 00227, 00234-235, 00251, 00265).

294) When trial ended and petitioner's counsel filed a post-trial motion,
the Court sustained objections by the State, with no basis giving (See R.ex. T.R. RR26).

295) The Court also allowed the State to argue facts not in evidence, by overruling
petitioner counsel's objections (See R.ex. T.R. RR35, Claim V).

296) Petitioner was prejudiced by the abuse of discretion of the Court, when it became an ally of the State and not a neutral magistrate. IF the Court would have stayed in a neutral position, petitioner's motions and possible trial would have turned out differently. The State's case was built on entirely circumstantial evidence, and when the Court allowed inadmissible evidence to be heard by the State by overruling petitioner counsel's objections, and denying admissible evidence to be heard by petitioner's counsel by sustaining the state's objections, denied petitioner of fundamental fairness and due process of law, by the Court's favoritism. Petitioner was also prejudiced by appellate counsel's failure to raise this claim on direct appeal, where the appellate court could have addressed the trial Court's error. Petitioner's 5th, 6th and 14th amendment rights under the U.S and IL const, to fundamental fairness, effective assistance of appellate counsel and due process of law, was violated. Petitioner asks the Court to review this claim in conjunction with all the attached claims and reverse and remand or reverse and vacate petitioner's conviction.

Claim XV | Trial Court abused its discretion when it sustained its own objections and acted as an advocate for the State.

297) At petitioner's trial, the trial Court abused its discretion, when it chose to sustain it's own objections, during petitioner's counsel examinations of Witnesses, where the questions were not egregious or objected to by the state. The Court stopped being a neutral magistrate, and started showing a personal interest in the State's case. The Court's actions affected the jury's outlook on petitioner and his counsel, causing them to stop being impartial and become suspicious towards them. As stated in the previous claim XIV, the State's case was entirely circumstantial, and came down to the credibility of petitioner and the State's star Witness, co-defendant Aaron Bronson. The case was closely balanced and the Court's actions affected the outcome of petitioner's trial.

298) As petitioner's counsel John Lyke, cross-examined the eyewitness, Anthony McGee, the Court sustained its own objection, without an objection by the State (See R.ex. T.R. 88 LL).

299) When petitioner's counsel cross-examined police officer Adam Rose, the Court sustained another objection on it's own (See R.ex. T.R. 170LL).

300) When petitioner's counsel cross-examined detective Henry Borsch, the sustained another objection on its own, and struck petitioner counsel's response (See R.ex. T.R. MM 121).

301) As petitioner's counsel cross-examined co-defendant Aaron Bronson, the Court again, chose to sustain its own objection (See R.ex. T.R. 126 NN).

302) Even when petitioner's counsel was examining petitioner, the Court chose to sustain its own objection without the state objecting (See R.ex. T.R. OO 157).

303) During petitioner counsel's closing argument, the Court purposely interrupted, prompting the State attorney to object (See R.ex. T.R.00253).

304) Also during petitioner's counsel's closing argument when he was explaining a letter Aaron Branson wrote to one of his associate's, the Court chose sustain its own objections and strike counsel's response again (See R.ex. T.R.00260).

305) When the trial ended, petitioner's counsel filed a post-trial motion, alleging the Court acted as an advocate for the State (See R.ex. T.R. RR19, RR29-33).

306) In the post-trial motion, the Court claimed its obligation was to sustain its own objections, when it feels there is potential reversible error, or that Justice and fairness to both sides needs to be handled with that kind of response by the Court (See R.ex. T.R. RR42-43)

307) Petitioner was prejudiced by the Court's interference, because it caused the jury to look at petitioner and his counsel, as if they were violating the rules of law, when no violation existed. The Court's actions caused the jury to look at petitioner and his counsel with suspicion, because a jury will naturally view the Court's actions as being correct and by the law. The Court's actions caused the burden to go from the State proving petitioner's guilt, to petitioner having to prove his innocence to the jury. Petitioner was also prejudiced by appellate counsel's failure to raise this claim on direct appeal. Petitioner's 5th, 6th and 14th amendment rights, under the U.S and IL. Const, were violated, because of the lack of fundamental fairness, effective assistance of appellate counsel, and due process. Petitioner asks the Court to review this claim in conjunction with all attached claims and reverse and vacate petitioner's conviction.

Claim XVI | Insufficient evidence to prove Petitioner's guilt beyond a reasonable doubt for intentional murder

308) After a week long trial of circumstantial evidence presented by the State, and the testimony of Co-defendant Aaron Bronson, that alleged petitioner was the actual shooter, the jury found petitioner not guilty of firing a firearm that killed Ralph Turner. The jury however, still convicted petitioner of first degree intentional murder, based on insufficient evidence. The State's theory prior to trial and throughout trial, was petitioner possessed the firearm that was used to shoot and kill the Victim Ralph Turner, a burden the state failed to prove. If the State's Star Witness Aaron Bronson and petitioner are both deemed incredible, Without any credible evidence proving petitioner's guilt, the jury should return a verdict of not guilty, where the burden is on the state to prove guilt and not petitioner to prove Innocence.

309) The State presented Ralph Turner sr, who was the victim's father and a retired C.P.D. officer and cook county sheriff (See R.ex. T.R 37-38 JJ.)

310) The State also presented Dr. Rupert Evans, who was a close friend of the victim Ralph Turner, and on January 30th 2009, standing at a roulette table with him, Micheal Wright and Robert Currie (See R.ex. T.R 48-52 JJ).

311) Evans claimed he noticed Turner and a tall, medium brown skinned, African American male, wearing a dark hoody and Jeans, hanging around the table not playing (See R.ex. T.R 51-56 JJ, 81 JJ).

312) Evans also claimed he was at the slot machine twenty feet away watching his friends and the African American male in dark clothing, and left the casino around 2am (See R.ex. T.R 58 JJ).

313) Evans then claimed, he later received a phone call that Ralph Turner had

been shot and killed, and he later viewed a photo array and couldn't identify anyone (See R.ex. T.R. 59-60 JJ).

314) Evans claimed he was later shown a second photo array, where he identified petitioner, as the person he saw watching them at the casino, and he later went to the police station and identified petitioner in a line-up (See R.ex. T.R. 57 JJ, 61-71 JJ).

315) Evans also claimed he told detective Barsch the person was between 5,9 and 6,0 feet tall and not wearing a hat (See R.ex. T.R. 72-75 JJ).

316) Evans then claimed he didn't remember telling Barsch the person was light skinned but remembered saying, petitioner watched them, and that he didn't remember exactly what he said four years earlier (See R.ex. T.R. 75-76 JJ).

317) The State presented Robert Currie, who was like a brother to Ralph Turner and on Jan 30th 2009, Currie valeted the black Mercede's they rode to the casino in (See R.ex. T.R. 85 JJ, 88-89 JJ).

318) Currie claimed he went to the roulette table with Ralph Turner, Anthony McGee, and Steve Price (See R.ex. T.R. 92 JJ, compare to ex. 6).

319) Currie also claimed he saw video of himself at the roulette table, and he was betting five and twenty-five dollar chips, and would yell when he won and have Turner cash in chips for him (See R.ex. T.R. 94-95 JJ, 97 JJ, 100-105 JJ, 125 JJ, 139 JJ).

320) Currie then claimed he was focused on winning and doesn't remember Ralph Turner gambling (See R.ex. T.R. 138-140 JJ).

321) Currie saw a video clip of himself, Turner, McGee and Wright leaving the casino in his Mercede's, and claimed they took the skyway to Turner's house, and when he dropped Turner and McGee off, he never saw anyone else or heard any gunshots, before pulling off (See R.ex. T.R. 107-108 JJ, 111 JJ, 113-114 JJ, 141-142 JJ).

322) Currie also claimed he received a phone call that Ralph Turner had been shot, where he later went to the police station to view a photo array, but couldn't identify anyone (See R.ex. T.R. 115-118JJ).

323) Currie then claimed the police came to his house to show him the photo array, and even though he didn't identify petitioner, his picture was in the photo array and Currie denied discussing the case with the police, while in his home (See R.ex. T.R. 125-129JJ)

324) Currie claimed on the night of Jan 31st 2009, he went to view a line-up at the police station, where he identified petitioner as the person he saw at the casino, and Currie denied discussing the line-up with his friends in the waiting room (See R.ex. T.R. 118-121JJ, 129-131JJ).

325) Currie also claimed he broke down and cried after identifying petitioner, because he knew petitioner did it, even though the photo array contained three people with braids and the line-up only contained petitioner with braids, and Currie identified petitioner in-court (See R.ex. T.R. 121-123JJ, 131-134JJ).

326) The State presented eye witness Anthony McGee, who was friends with Ralph Turner for over fifty years, and while at the casino, only him, Evans, Currie, Turner, and Wright went to gamble, and McGee didn't notice nothing out the ordinary (See R.ex. T.R. 30LL, 35LL, 53-54LL, 66LL).

327) McGee claimed when they left the casino and arrived at Turner's house, they both had to walk behind Currie's car when they exited, and McGee didn't notice any other cars on the street during the two or three minutes, he talked to Ralph Turner (See R.ex. T.R. 37-41LL, 66LL, 68LL).

328) McGee also claimed, as he walked to his vehicle, an SUV pulled up behind him, causing McGee to turn and see someone exit the passenger side of the

SUV (See R.ex. T.R. 42-43LL, 73-74LL).

328) McGee then claimed he thought it was Turner's son, so he kept walking to his car, until he heard a gunshot, then he ran toward's Turner's house (See R.ex. T.R. 44LL, 83-85LL).

330) McGee also claimed he was next to his car when the SUV pulled up behind him, and McGee never saw the person walk towards Ralph Turner, nor could he see Turner from the street (See R.ex. T.R. 44LL, 74-78LL, 117LL, ex. T).

331) McGee claimed he didn't see Turner when he ran to the sidewalk, but he saw the person that exited the SUV, and McGee wasn't scared of the first gunshot, but ran after the second one (See R.ex. T.R. 44-46LL, 86-88LL).

332) The General progress report for Anthony McGee doesn't state, McGee ran to the sidewalk and saw the person from the SUV (See R.ex. T).

333) McGee also denied the gunshots were back to back, and claimed the person he saw exit the SUV, was 6,4 or 6,5, wearing a dark hoodie and dark pants and he told that to the detective (See R.ex. T.R. 43-46LL, 87-90LL).

334) The General progress report for Anthony McGee, doesn't state a description for the person that exited the SUV (See R.ex. T).

335) McGee claimed he never told the police the person who exited the SUV, wore a mask and that he was unable to identify anyone in the photo array or the line-up (See R.ex. T.R. 59-62LL, 99-102LL, 107LL, 116LL, ex. T).

336) McGee also claimed he told the detective the person that exited the SUV was equal height to Ralph Turner, but denied he told the detective, he saw Turner on the ground with someone standing over him (See R.ex. T.R. 91-94LL, 103LL).

337) The General progress report doesn't state any of those facts made by McGee (See R.ex. T).

-A283-

338) At trial, McGee was asked to identify petitioner in the photo array, where he identified the wrong person, and was also unable to tell petitioner's height from the line-up photo (See R.ex. T.R. 96-98LL, 104-107LL).

339) The State presented Pamela Snow Woodard, who was Ralph Turner's sister, and claimed on January 2009, she was awaking by a gunshot and when she looked out the window, she saw a man in a black hoodie, searching the pockets of a man on the ground (See R.ex. T.R. 118-121LL, 124-125LL, 132-135LL).

340) The detective supplementary report for Pamela Woodard, stated she was awakened by two gunshots (See R.ex. ●S).

341) Woodard claimed she never saw the person turn her way or remove any from Turner's pockets and as she went to call the police, Turner's wife notified her he'd been shot (See R.ex. T.R. 126-127LL, 134-135LL).

342) Woodard also claimed she was at the police station in a waiting room, with Currie, McGee and Debora Bonner on Jan 31st 2009, waiting to view a line-up, where she didn't identify anyone (See R.ex. T.R. 128-129LL, 136-137LL).

343) The State presented officer Adam Rose, who worked for the Chicago Police force, and who responded to the shooting on 81st and Eberhart, and as he was in route, Rose observed a male black in dark clothing and conducted a field investigation (See R.ex. T.R. 139-142LL, 144-145LL, 157LL, 159LL, 162LL, 167LL).

344) Rose claimed he approached petitioner with his firearm out and placed him in cuffs, before searching petitioner, recovering his photo I.D., an insignificant amount of money and no weapons (See R.ex. T.R. 147-148LL, 150-154LL, 157LL, 170-174LL, 178LL).

345) In the interview Adam Rose had with Asa Kim Ward on October 7, 2010, Rose never mentioned he drew his weapon or placed petitioner in handcuffs (See R.ex. ●●U).

346) Rose denied at trial, that he told Asa Kim Ward during the interview, that

he had petitioner empty his pockets, and claimed petitioner was cooperative, didn't try to run and didn't have blood on him (See R.ex. T.R. 163-164LL, 168-170LL, 176-177LL, ex. ☐ U).

347) Rose also claimed he didn't recall calling for a description of the suspect, or that the suspect was light skinned, but petitioner was wearing a brown jacket, black hoodie and pants (See R.ex. T.R. 147LL, 160LL, 164-166LL, 179LL, ex. ☐ V).

348) Rose then claimed he wasn't aware multiple calls were made to 911, but turned around and said he was aware 911 calls were made giving a description of the suspect, and Rose didn't mark the suspicious box on the contact card for petitioner (See R.ex. T.R. 150LL, 162LL, 166-168LL, 175-176LL, ex. ☐ V).

349) Rose claimed he released petitioner after verifying he didn't have a warrant, and never took petitioner to the scene of the crime, and also identified petitioner in court (See R.ex. T.R. 145-146LL, 154-156LL, 167LL, 177LL).

350) The State presented Jennifer Czerwinski, who was a lead surveilance operator for the Horseshoe casino, and its thousands of working cameras, and on Jan 30th 2009, Czerwinski met with detective Barsch (See R.ex. T.R. 185-190LL, 193-194LL, 262LL).

351) Czerwinski claimed she back tracked the casino video and concentrated on a specific area, where she saw a suspect at the same table Ralph Turner was playing at (See R.ex. T.R. 199-200LL, 204-206LL, 210-217LL, 225LL).

352) Czerwinski also claimed she never saw video of Turner playing at a table, or going to the cashier counter, or see his friends with a large sum of money (See R.ex. T.R. 260-263LL).

353) Czerwinski then claimed she saw petitioner engaged in conversation with people, and walking from one table to another (See R.ex. T.R. 217-221LL, 225LL, 265LL).

354) Czerwinski claimed petitioner never stopped directly behind Turner, and she saw video of Turner and petitioner both walking towards Valeta, and back tracked the vehicle's license plate that petitioner entered (See R.ex. T.R. 200-201LL, 226-230LL, 233-238LL, 240-241LL, 244LL, 255-258LL, 264LL, 268LL).

355) Czerwinski also claimed the driver of the SUV was not identified as the suspect, but noticed he wore dark clothing with a hood, and petitioner never wore a hood (See R.ex. T.R. 263-264LL).

356) Czerwinski did a timeline and placed the video on disc form for detective Barsch (See R.ex. T.R. 194LL, 201LL, 261LL).

357) The State presented police officer Anthony Ellis, who responded to 81st and Eberhart, and the first arrive to find Ralph Turner dead, McGee, a cellphone, a pair of eye glasses and a torn pants leg (See R.ex. T.R. 270-275LL, 278-281LL, 285-288LL).

358) The State presented police officer Carl Brasic, was a forensic investigator, and assigned the homicide at 81st and Eberhart, where he placed markers next to the evidence (See R.ex. T.R. MM 8-10, MM 15-16, MM 19, MM 22, MM36).

359) The State presented a stipulation that ten year old Damien Johnson found a cellphone on January 30th 2009 at 434 E 82nd street, and Johnson's mother gave it to officer Jose Lopez (See R.ex. T.R. MM 41-43).

360) The State presented Detective Henry Barsch, who claimed he received Turner's case, and saw Turner's body had a gunshot wound, then interviewed witnesses on the scene, and notified of a cellphone found in the street that didn't belong to Turner (See R.ex. T.R. MM 44-49, MM 51-53, MM 100).

361) Barsch also claimed he received a list of 911 callers, describing what happened on 81st and Eberhart, and didn't follow up with multiple callers (See R.ex. T.R.

R.ex. T.R. MM101-108).

361) Barsch then claimed he didn't recall the exact description of the suspect, but seen it in the course of the investigation, and it didn't include a brown jacket, a black brim hat or a mask (See R.ex. T.R. MM112, MM120-122).

362) Barsch claimed he spoke to McGee on the scene and learned he had returned from the casino, and the shooter was 6,4 or 6,5 even though he didn't include it in the GPR or supplemental report (See R.ex. T.R. MM53, MM158-160, ex. T).

364) Barsch also claimed McGee told him he yelled and ran away from the shot, not towards it, that McGee saw someone standing over Turner, when the second shot went off (See R.ex. T.R. MM161-162

365) The General progress report for Anthony McGee doesn't say, McGee saw someone standing over Turner, during a second gunshot (See R.ex. T).

366) Barsch claimed when he interviewed Robert Currie on the scene, he learned they took the skyway from the casino (See R.ex. T.R. MM54-55).

367) Barsch also claimed that Rupert Evans said he saw people standing around the table watching them play, but watching them play is not in the GPR or Supp. report, and Evans described the person, as light to medium complexed, 5,9 and 160 pounds (See R.ex. T.R. MM155-156)

368) Barsch then claimed when he spoke with Deborah Foster Bonner, she never told him the person had on a dark jacket and was twenty feet from her house (See R.ex. T.R. 203-204NN).

369) Barsch claimed Bonner said she couldn't see the person's face because the lighting was poor (See R.ex. T.R. 204NN).

370) Barsch also claimed he spoke with Czerwinski and said he was looking

for a tall thin man, wearing a black hoody, baggy jeans and an SUV (See R. ex. T.R. MM56-57).

371) Barsch then claimed he saw video of Turner sitting at the roulette table, but never saw him betting or receiving chips, or petitioner following Turner to the cashier (See R. ex. T.R. MM57, MM143-145, MM167).

372) Barsch claimed he looked at casino video for three to four hours, and learned Turner's group won a large sum of money (See R. ex. T.R. MM167).

373) Barsch also claimed he saw substantial video of a man in a black hoody watching the roulette table, and video of Turner and the suspect entering separate vehicles (See R. ex. T.R. MM58-59, MM141).

374) Barsch then claimed he saw the license plate of the SUV on video and learned it belonged to Aaron Bronson at 6315 S. Champlain, and ran the cellphone from the scene and obtained petitioner's picture (See R. ex. T.R. MM58-67).

375) Barsch claimed he showed Woodard, Bonner, Evans and McGee photo arrays, and only Evans identified petitioner, as being at the casino (See R. ex. T.R. MM69-73).

376) Barsch also claimed that Bronson and petitioner were listed at 6315 S. Champlain, and they executed a search warrant on the first floor, which was the wrong apartment, then he went to a second floor apartment and saw petitioner in a chair handcuffed (See R. ex. T.R. MM74-77, MM114).

377) Barsch then claimed he learned petitioner didn't try to run or resist during his arrest, and none of Turner's belongings were found (See R. ex. T.R. MM115, MM136-137).

378) Barsch claimed he learned Shawanna Chester, Bronson and petitioner split the rent on Champlain, and the guns were found in Chester's room (See R. ex. T.R. MM80, MM86-87, MM125).

379) Barsch also claimed the money recovered on 63rd and Champlain didn't have

-A288-

any blood on it, and when petitioner was taken into custody, he was placed in a line-up (See R. ex. T.R. MM87, MM122-123).

380) Barsch then claimed he was responsible for collecting evidence, and thought he saw blood on petitioner's boots, so he had petitioner's clothes, fingerprints, and the gun tested for blood or DNA (See R. ex. T.R. MM100, MM126-129, MM139).

381) Barsch claimed he never requested a gunshot residue test on petitioner's clothes or boots, and no prints were found on the gun (See R. ex. T.R. MM130-135, MM140, MM165-166).

382) Barsch also claimed the information he received, alleged only one person committed the shooting (See R. ex. T.R. MM164)

383) Barsch then claimed Currie, Evans, Bonner, Woodard, and McGee waited in a room together to view a line-up, and Evans and Currie identified petitioner (See R. ex. T.R. MM90-93, MM146).

384) Barsch claimed no one ever identified petitioner, as shooting Ralph Turner (See R. ex. T.R. MM114, MM146).

385) Barsch also claimed he learned officer Rose stopped petitioner five minutes after the shooting and let him go, and another officer interviewed Rose, when they actually didn't (See R. ex. T.R. MM112-113, MM116-120, MM149).

386) Barsch claimed he requested an arrest warrant for Aaron Bronson in October 2009 and Bronson was arrested in November 2010 (See R. ex. T.R. MM95-97, MM140).

387) The State presented Dr. Ponni Arunkumer, who was an expert in performing autopsies and assigned Ralph Turner's case (See R. ex. T.R. MM173-189, MM196).

388) Dr. Arunkumer claimed both bullets traveled downward and was not at close range, and Turner's toxicology test came back positive for cocaine and alcohol (See R. ex. T.R. MM183-185, MM197-200).

389) It was stipulated that Tiffany Kimble was an expert in finger print I.D and assigned Turner's case, where she examined the revolver, four bullets and a cellphone, and revealed no latent prints (See R.ex. T.R. MM 203-206).

390) It was also stipulated that Kerri Broaddus was an expert DNA analyst, and found no DNA on the phone (See R.ex. T.R. MM 210).

391) Debra Ann Foster Bonner claimed she was awaken by two loud noises, and when she went to the window, she could look both ways at the same time, but didn't see the person's face (See R.ex. T.R. MM 213-214, MM 224-235, MM 228-238, MM 232-233, MM 244-245).

392) Bonner also claimed she saw a black car reversing down the street, but never saw anyone get out the car or the license plate (See R.ex. T.R. MM 215-216, MM 227-274).

393) Bonner then claimed she saw a person twenty feet from her window, coming from the direction of Turner's house, and described him as tall, thin, black, wearing dark clothing, a dark bulky jacket with a hood, and pacing back and forth (See R.ex. T.R. MM 217-220, MM 235-240).

394) Bonner denied tell detectives she couldn't see the person's face, because of poor lighting and the hood was up, but claimed she went up to the second floor window for a better view (See R.ex. T.R. MM 218-219, MM 227).

395) Bonner also claimed she didn't know the loud noises were gunshots, and didn't see anyone get shot, or identify anyone out a line-up (See R.ex. T.R. MM 220-223, MM 234-235, MM 241-242).

396) The State presented Justin Barr, who was an expert in firearm I.D, and verified the bullets were fired from the revolver (See R.ex. T.R. 4-7NN, 17NN).

397) The State also presented Detective David Scarriot, who was an evidence technican, that photographed the cellphone and line-up, and collected petitioner's

clothes, and also identified petitioner in court (See R.ex. T.R. 32-33NN).

398) The State then presented it's star witness co-defendant Aaron Bronson, who admitted he had a juvenile felony conviction for robbery, and his description was 6,3 black, slim, light complexed, and claimed he lived in South bend, Indiana (See R.ex. T.R. 38NN, 41-42NN, 49NN, 92NN, 97NN).

399) Bronson also claimed he lived with his cousin, Shawanna Chester, and petitioner, at 6315 s. Champlain, second FL, and Bronson identified an enter-tainment system, as being in chester's room (See R.ex. T.R. 42-47NN, 147-148NN).

400) Bronson claimed he was in chicago at the Horse shoe casino, and considered himself an experienced gambler, even though he lost $500 dollars, and also claimed he didn't remember who suggested going to the casino (See R.ex. T.R. 49-50NN, 93-95NN).

401) Bronson claimed he wore a white tee, blue Jeans, a brown hoodie and coat, and petitioner wore all black to the casino (See R.ex. T.R. 55NN, 59NN, 95NN).

402) Bronson also claimed he played poker and petitioner played dice, and they spoke multiple times on the phone, then Bronson claimed when he left the casino around 1:40am, he went to get more money, not a gun (See R.ex. T.R. 52-55NN, 90-91NN, 97-98NN).

403) Bronson claimed petitioner lost all his money and wanted to rob Ralph Turner of the thirty thousand dollars he won, so Bronson watched from the slot machine to verify Turner had some money, and saw him putting chips in his pocket (See R.ex. T.R. 56-58NN, 69-71NN, 74NN, 101-103NN, ex. W).

404) The supplemental report prepared by det. Barsch for Aaron Bronson, doesn't state Bronson went and watch Turner from a slot machine to verify he had money or saw Turner put chips in his pocket (See R.ex. W).

405) Bronson then denied seeing Turner place chips in his pockets, and claimed he went to play video roulette, after discussing robbing Turner with petitioner (See R.ex. T.R. 58NN, 60NN, 104NN).

406) Bronson also claimed he went to get the SUV, while petitioner followed Turner to the valet area, and calling wasn't part of the plan (See R.ex. T.R. 61-65NN, 113-114NN).

407) Bronson then claimed he wore a hood, because it was cold outside and when he entered the truck, he called petitioner, and also learned petitioner followed Turner to the cashier (See R.ex. T.R. 62-66NN, 105NN, 159NN).

408) Bronson claimed petitioner told him what car Turner was in, then claimed he saw Turner enter the car (See R.ex. T.R. 67-72NN).

409) Bronson also claimed he had a couple hundred dollars in chips when they left the casino, and him and petitioner discussed robbing Turner, as they took side streets to 81st and Eberhart (See R.ex. T.R. 72-77NN, 95NN, 100-101NN, 105NN, 146NN, 162-163NN).

410) Bronson admitted he lied about switching places with petitioner to minimize his involvement and get a deal, plus he wasn't under oath (See R.ex. T.R. 105-108NN, 122NN, 154-155NN).

411) Bronson claimed he sold petitioner a revolver previously, and when Bronson stopped behind the benz, petitioner jumped out with that gun and walked up to Turner (See R.ex. T.R. 73-80NN, 95-96NN, 108NN, 146NN).

412) Bronson also claimed he didn't remember telling the police that petitioner said he needed the money, before jumping out, then claimed he never told the police that (See R.ex. T.R. 146NN, 175-176NN).

413) Bronson then claimed petitioner wore a jacket with the hood up, a hat

-A292-

a mask and black clothes, and that petitioner was knocked out by Turner, and Bronson drove off in reverse, and McGee ran before any gunshots were fired (See R. ex. T.R. 80-82NN, 109-112NN, 114-118NN).

414) Bronson claimed Currie's car pulled off when the gunshots went off and McGee ran across the median, and petitioner was on the ground; when he shot Turner, then saw petitioner hovering over Turner (See R. ex. T.R. 81-83NN, 109-110NN, 118-119NN).

415) Bronson also claimed he didn't recall telling the detective or state attorney, that petitioner was hovered over Turner, or that petitioner threw the gun and had to go get it (See R. ex. T.R. 118-120NN, ex.(W))

416) Bronson then claimed he never got out of the truck and he left petitioner and went to 63rd and Champlain, because that was on petitioner, and Bronson never called the police or petitioner (See R. ex. T.R. 81-83NN, 112NN, 151NN, 155-156NN).

417) Bronson claimed he told petitioner to get rid of the gun, then Bronson fled to Indiana for several years avoiding police, until he was arrested in South Bend, Indiana (See R. ex. T.R. 87-90NN, 147NN, 151-152NN).

418) Bronson also claimed he tried to get immunity from the state's attorney and covered times he lied to the police (See R. ex. T.R. 103-104NN, 122NN, 145NN).

419) Bronson then claimed, after the shooting when he saw petitioner at the apartment on Champlain, petitioner told him he didn't get any money, he lost his phone and was stopped by police (See R. ex. T.R. 84-85NN).

420) Bronson claimed he didn't recall telling the police or state attorney that petitioner went back to get the gun, because his prints might be on it, but claimed he told the police about the gun to try and keep himself out of it, and it can't affect Bronson now (See R. ex. T.R. 86NN, 90-91NN, 119-120NN, 122-123NN, 150NN).

57

-A293-

155NN;159-161NN).

421) Bronson also claimed his memory was fresher when he was arrested than at petitioner's trial, and Bronson had requested a plea deal from the State, where he pled guilty for 24 years, as an accessory (See R.ex.p,ex.Q,ex. T.R. 39-40NN,123-125NN,130-133NN,143-145NN,151NN,153-154NN,163-164NN).

422) Bronson claimed he had no reason to lie, and had to testify truthfully or face perjury charges, and on the night of May 17th 2013, he talked to ASA Kim Ward, but Bronson denied knowing trial had already begun (See R.ex. T.R 40-41NN,120-121NN,124NN,159-162NN, ex.O, ex.P, ex.Q).

424) Bronson admitted he wrote a female attorney that worked for petitioner's lawyer, claiming petitioner snitched on him, so Bronson's going to snitch, because the State wanted Bronson to testify (See R.ex. T.R 133-138NN,142NN,160NN).

425) Bronson claimed he felt bad about testifying against petitioner, and didn't want to jeopardize his deal, but would do anything for her, then claimed to be on drugs, while he wrote the letter (See R.ex. T.R 138-142NN,160NN).

426) The State presented Salandra Haddock, who worked for U.S. cellular and familar with the company's phone records, and Haddock identified a phone number belonging to Bronson, and an unidentified 773 number, where Haddock claimed Bronson called the 773 number 16 times and the 773 number called Bronson 10 times (See R.ex. T.R 180-184NN,187-192NN).

427) Haddock claimed calls can show up as two calls, when its only one, and after double checking, claimed Bronson's phone made 10 calls and the other phone made only 6 calls (See R.ex. T.R 193-198NN).

428) It was stipulated that detective Brian Johnson was a Chicago

police officer, who spoke with Aaron Bronson, and was never told that Bronson saw Ralph Turner put chips in his pocket or go to the cashier, that petitioner wore a brown jacket and hovered over Turner, or that petitioner threw the gun and went to get it (See R.ex. T.R. 204-206NN, ex. W).

429) Det. Johnson was told by Bronson, that he didn't know what happened to the gun (See R.ex. T.R. 206NN, ex. W)

430) Petitioner claimed to be a father of four and enrolled in college, until his arrest, stood 6,3 or 6,4, and the cellphone he owned was registered in the name Marcell Gray and the U.S. cellular's store address (See R. ex. T.R. 0012-13, 0054, 0097-98, 00141-143, 00167-168).

431) Petitioner was shown a picture of Bronson wearing a dark hoody and jacket, and claimed Bronson stood about 6,3 (See R.ex. T.R. 00173).

432) Petitioner claimed he lived with Bronson and chester, and he used the middle bedroom, Bronson used the front bedroom, and chester used the back room, where Bronson also stored his things (See R.ex. T.R. 0013-14, 0043-48)

433) Petitioner also claimed it was Bronson's idea to go to the casino, and when they arrived, they separated for 3 or 4 hours, until petitioner checked to see if Bronson was ready to leave, and when he wasn't, petitioner walked around (See R.ex. T.R. 0015-17, 0048, 0054-57, 0062).

434) Petitioner claimed to have seen Bronson 3 or 4 times at the casino, and while petitioner walked around, he noticed people clapping at tables and knew they were winning, but didn't notice Ralph Turner in particular, yelling or playing (See R.ex. T.R. 0017-18, 0038-39, 0058-62, 0067, 0070-74, 0077-82, 0094, 00161).

435) Petitioner also claimed Bronson never went to any tables with him

and petitioner never saw Bronson in any videos with Turner, and petitioner never spoke to Bronson about robbing Turner of thirty thousand dollars he won (See R.ex. T.R. 0018-19, 0021, 0038, 0060, 0082, 00162).

436) Petitioner then claimed he never saw Ralph Turner or his friends arrive at the casino, and petitioner never purposely followed Turner anywhere (See R.ex. T.R. 0038).

437) Petitioner claimed he was at the casino nine hours, and only saw five minutes of himself on video between 1am and 3:30am, and petitioner was unaware Bronson left the casino and returned (See R.ex. T.R. 0019-20, 0057, 00158-161).

438) Petitioner also claimed he switched phones with Bronson when they were leaving, because the battery was low, and petitioner saw video of himself in the valet area, while he waited on Bronson, because petitioner left his coat in Bronson's SUV (See R.ex. T.R. 0020-21, 0084-89, 0093-96, 00147-149, 00162-163, 00180).

439) Petitioner then claimed he wasn't shown the video of him using the pay phone in the valet area, but was shown video of him and Turner leaving the casino around the same time (See R.ex. T.R. 0095, 00163-164).

440) Petitioner claimed he didn't know when Turner left the casino floor, but was shown video of Turner entering a black Mercedes (See R.ex. T.R. 0021, 0083).

441) Petitioner also claimed he entered Bronson's SUV to go to the apartment on Champlain, and after he put his coat on, petitioner went to sleep, until the truck stopped suddenly and woke him up, and petitioner saw Bronson jump out (See R.ex. T.R. 0021-22, 0096-98, 00176-179).

442) Petitioner then claimed he saw McGee and Turner walking in opposite directions, when Bronson approached Turner, and Turner punched Bronson

then they both fell to the ground and McGee turned around and headed towards them (See R.ex. T.R. 0022-23, 0098, 00103-108, 00114-117, 00179).

443) Petitioner claimed he attempted to get out the truck to break up the fight, until he heard two gun shots, and since petitioner didn't know where they came from, he jumped back in the SUV and climbed in the driver's seat, and lost his phone in the process (See R.ex. T.R. 0023-24, 0033, 00120, 00123-124, 00177-178).

444) Petitioner also claimed he pulled off in reverse, and didn't realize he dropped the phone, until after parking the truck, and didn't know if McGee was the person that was shooting, and petitioner left Bronson, because it was none of petitioner's business (See R.ex. T.R. 0024-26, 0033, 00128-129, 00139-140, 00164-165, 00185).

445) Petitioner didn't run when he was stopped by officer Rose, and claimed he was ordered to empty his pockets, where he gave officer Rose his I.D. card, then Rose radioed in, filled out a contact card on petitioner and released him (See R.ex. T.R. 0025-28).

446) Petitioner claimed he gave his mother's number to be contacted, because he lost his phone, and petitioner never mentioned hearing gunshots (See R.ex. T.R. 00140-141, 00165-166).

447) Petitioner also claimed when he made it to the apartment on Champlain after the shooting, he tried calling his and Bronson's phone, and when he didn't get an answer, petitioner laid down, until Bronson woke him angry (See R.ex. T.R. 0029-30, 0040-41, 00130).

448) Petitioner then claimed he told Bronson he was stopped by police, but never told Bronson, petitioner threw a gun and went to get it, petitioner never brought a gun from Bronson, never wore a mask, and never shot and

robbed Ralph Turner (See R.ex. T.R. 0028, 0032-35, 0039, 00175, 00180).

443) Petitioner claimed he never went to the gun, but he did replace the lost phone, and kept the same phone number (See R.ex. T.R. 0032-36, 0067-68).

445) Petitioner also claimed the police entered the apartment and woke him, and told petitioner which clothes to put on, and petitioner claimed the gun wasn't his and the money belonged to Angela Baker (See R.ex. T.R. 0036-38, 0052-54, 00138-139, 00150, 00153, 00168-169, 00175).

451) Petitioner then claimed he was questioned for hours by police after being arrested, and even though petitioner put Bronson out the vehicle, It was det. Barsch who mentioned a robbery taking place (See R.ex. T.R. 0030, 0045, 00126, 00143-148, 00153-154, 00163-164, 00169-170, 00172).

452) The State gave it's closing argument and rebuttal argument on what it claimed the evidence proved (See R.ex. T.R. 00207-226, 00266-289).

453) Petitioner's counsel then gave its closing argument (See R.ex. T.R. 00226-265)

454) The Court instructed the Jury, that the State had to prove petitioner's guilt beyond a reasonable doubt, and what the propositions were to meet that burden (See R.ex. T.R. 00298, 00310-312, 00315-316)

455) After hours of deliberation, the Court had the Jury sequestered and when they returned the following day, found petitioner guilty of first degree murder, and not guilty of personally discharging a firearm (See R.ex. T.R. 00331-338, ex. T.R. PP5).

456) Petitioner's counsel then filed a motion for retrial, claiming the state failed to prove guilt beyond a reasonable doubt (See R.ex. T.R. RR10-12, RR85).

457) The State argued the reasonable doubt claim (See R.ex. T.R. RR20).

458) The Court stated Bronson continued to change his story, but never

addressed the reasonable doubt claim, before denying petitioner's motion for retrial (See R. ex. T.R. RR 38-44).

45) The Court also stated during petitioner's reconsideration motion, that it accepted the facts of Bronson's scenario and accepted the verdict as well (See R. ex. T.R. RR 81-82).

46) "It is always the duty of the Court to examine the evidence in a criminal case and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt, the conviction will be reversed" (People v. Williams, 414 Ill. 414, 111 N.E. 2d 343; People v. Fontana, 356 Ill. 461, 190 N.E. 2d 910; Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781)

46) "To justify a conviction, circumstantial evidence must be of such a nature as to produce a reasonable and moral certainty that the accused committed the crime. Where the circumstances can be explained upon a reasonable hypothesis consistent with innocence and leave a serious and grave doubt of guilt, a conviction cannot stand" (See People v. Magnafichi, 9 Ill. 2d 169, 137 N.E. 2d 256; Marzen v. People, 173 Ill. 43, 50 N.E. 2d 249; People v. Grizzel, 382 Ill. 11, 46 N.E. 2d 78)

46) "Uncorroborated accomplice testimony should be subject to careful scrutiny, acted on with great caution and should have the absolute conviction of the truth. Uncorroborated accomplice testimony can form the basis for a conviction, so long as accused is found guilty beyond a reasonable doubt (See People v. Wilson, 66 Ill. 2d 346, 362 N.E. 2d 291, 5 Ill. Dec. 820; People v. Smith, 708 N.E. 2d 365, 236 Ill. Dec. 779; People v. Ash, 102 Ill. 2d 485, 468 N.E. 2d 1153, 82 Ill. Dec. 373; People v. Smith, 141 Ill. 2d 40, 152 Ill. Dec. 218, 565; People v. Williams, 65 Ill. 2d 258, 357 N.E. 2d 525; People v. Baynes, 58 Ill. Dec. 819, 430 N.E. 2d 1070,

463) "There simply was not the absolute conviction of truth in Bronson's testimony (People V. Hermens, 5 Ill. 2d 277, 125 N.E. 2d 500; People V. Marshall, 326 N. E. 2d 246).

464) "Material corroboration or direct contradiction of accomplice testimony is entitled to great weight" (See Marshall, 326 N.E. 2d 246).

465) There's no meaningful difference in the language constituting the offense of first degree murder and the enhancement language. If a jury found, in effect both that a defendant killed the victim with a bullet from a gun and defendant didn't kill the victim, the two verdicts are diametrically opposed to one another, because a guilty verdict on first degree murder and an acquittal on the firearm enhancement are irreconcilable (People V. Peoples, 35 N.E. 3d 1156, 394 Ill. Dec. 187; People V. Reed, 396 Ill. App. 3d 636, 336 Ill. Dec. 181, 919 N.E. 2d 1106).

466) The State's case rested on an eyewitness and occurrence witnesses, that never identified petitioner as the shooter, or committing any crime at all, the uncorroborated accomplice testimony of Aaron Bronson, and circumstantial evidence, that was insufficient to prove petitioner committed intentional murder or any crime. Bronson's testimony was bias and his credibility was destroyed through his own testimony and the testimonies of the State's more credible witnesses. Petitioner was found guilty on a general verdict form and not guilty of personally discharging a firearm. Petitioner was sentence for intentional murder.

467) Petitioner denied having any involvement in the shooting death of Ralph Turner, and claimed Aaron Bronson was framing petitioner for a crime Bronson committed for a lesser sentence. Petitioner was never

seen committing a crime, and after the shooting occured, petitioner never tried to avoid the authorities, like Bronson did. Petitioner went and purchased a new phone and kept the same phone number as the last phone, and also never tried to flee. Furthermore, Bronson's story was far-fetched, when he claimed, petitioner stalked a man who wasn't gambling, and identified Ralph Turner, as having won thirty thousand dollars. There was evidence that Bronson left the casino for almost an hour, then returning without petitioner knowing, and if petitioner was suppose to let Bronson know when to come to the valet area, as Bronson claimed, why would Bronson continue to circle the valet area, until Currie's car arrived, instead of sitting parked and waiting.

46) The State's evidence was insufficient to prove petitioner guilty of intentional murder beyond a reasonable doubt, where Aaron Bronson was incredible. Even if you considered petitioner incredible as well, the burden of proof is on the State, to prove guilt and not on petitioner to prove innocence. Without the state presenting credible evidence that petitioner shot and killed Ralph Turner, the jury should return a verdict of not guilty. When the jury found petitioner not guilty of causing proximate death to Turner, which was the State's only theory, Petitioner should have been acquitted of all charges, and had it not been for the State's actions in claim XI and the Court's actions in claim XII, petitioner would have been found not guilty of intentional murder.

46) Petitioner was denied effective assistance of counsel on direct appeal, where appellate counsel failed to raise this claim on direct appeal, along

With the attached cumulative errors. Even if the individual errors do not rise to the level of reversal, this court should alternatively grant petitioner's relief, where all the errors when taken cumulatively result in such fundamental unfairness, that petitioner was deprived of due process. A criminal defendant has a right to due process guaranteed by our federal and State constitutions (People V. Blue, 189 Ill.2d 99, 138 (2000); Where a defendant's right to a fair, orderly and impartial trial has been denied, "the Court must take corrective action so that it may preserve the integrity of the judicial process".

470) Here, the appellate counsel failed to raise as an issue on appeal (1) Ineffective assistance on Trial counsel for failing to produce crucial impeaching evidence against detectives. (2) Appellate counsel failed to raise detectives committed perjury. (3) Failed to raise Prosecutorial Misconduct on state for knowing use of perjury. (4) Failed to raise Prosecutorial Misconduct on State for purposely misstating evidence. (5) failed to raise multiple abuse of discretion claims on Trial court, during the motion to quash arrest. (6) Failed to raise Trial court erred in denying the motion to Bar Aaron Bronson's testimony. (7) Failed to raise Prosecutorial Misconduct on the State for bolstering Bronson's credibility. (8) Failed to raise prosecutorial Misconduct On the State for improperly misleading the jury to believe accountability applied to petitioner's case. (9) Failed to raise Trial court abused it's discretion when it tendered the accountability instruction to the jury, when it showed bias to petitioner and his counsel; when its evidentiary rulings favored the state, and when it sustained its own objections, acting as an advocate for the state. (10):

failed to raise the evidence was insufficient to prove petitioner guilty of intentional murder beyond a reasonable doubt.

471) Petitioner was prejudiced, where each of the errors committed by Appellate counsel deprived petitioner of effective assistance of counsel on direct appeal. "A defendant is entitled to effective assistance of counsel on appeal" (Evitts v. Lucey, 469 U.S. 387, 83 (1985). The failure to raise meritorious issues on appeal is ineffective assistance of counsel (People v. Frank, 48 Ill. 2d 500, 272 N.E. 2d 25; People v. Downey, 198 Ill. App. 3d 704, 556 N.E. 2d 300, 1st Dist. 1990). The failure of appellate to raise these issues on direct appeal, denied petitioner effective assistance of counsel. No reasonable strategy exists for not raising these issues on direct appeal, where they were meritorious.

472) For these errors, a new trial should be ordered, because the issues should have been raised on appeal, and had they, the outcome of petitioner's appeal could have been different. A post-conviction petition is the proper method of raising a meritorious issue on appeal, Frank, supra. The remedy for such a violation is to order a new trial, not order a new appeal. People v. Hightower, 333 Ill. App. 3d 188, 596 N.E. 2d 482 (5th Dist. 1992); People v. Ferro, 195 Ill. App. 3d 282, 551 N.E. 2d 1398 (2 Dist. 1990).

473) While appellate counsel's ineffectiveness may be ascertained to some degree from the appellate record, assessing the reasonableness of the appellate counsel's conduct requires an evidentiary inquiry at a post-conviction proceeding (Downey, supra, 556 N.E. 2d at 307). In Downey, the appellate court found that the issue of trial counsel's ineffectiveness was a meritorious appellate issue, and appellate counsel's failure to raise the issue on direct

appeal was objectively unreasonable. Here, appellate counsel's failure to raise the issues in the above paragraphs 61 through 75 on direct appeal was objectively unreasonable. Petitioner's 5th and 6th and 14th amendment rights, under the U.S and IL. Const., to fundamental fairness, effective assistance of appellate counsel and due process of law was violated. Wherefore, petitioner respectfully prays for an evidentiary hearing on this petition, and therefore asks for the entry of an order acquitting petitioner, or in the alternative a new trial.

## Conclusion And Prayer for Relief

Wherefore, Petitioner Arthur Grady, pro'se respectfully
request the following relief:

1) Grant petitioner the right to advance to second stage.

2) Grant petitioner other relief as this Court deems proper.

Respectfully submitted

Arthur Grady, pro'se
#R01363
P.O. Box 112
Joliet, IL 60434

Case: 21-3162    Document: 22    Filed: 11/23/2022    Pages: 433
Case: 1:20-cv-02530 Document #: 18-1 Filed: 10/14/20 Page 1 of 3 PageID #:97
People v. Grady, Not Reported in N.E.3d (2015)
2015 IL App (1st) 132160-U

2015 IL App (1st) 132160-U

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

Appellate Court of Illinois,
First District, Sixth Division.

The PEOPLE of the State of Illinois, Plaintiff–Appellee,

v.

Arthur GRADY, Defendant–Appellant.

No. 1–13–2160.
|
Oct. 16, 2015.

Appeal from the Circuit Court of Cook County. No. 11 CR 169, Rosemary Grant Higgins, Judge Presiding.

**ORDER**

Justice HALL delivered the judgment of the court:

*1 ¶ 1 *Held:* The trial court did not abuse its discretion in imposing a sentence of 60 years' imprisonment for first degree murder.

¶ 2 Following a jury trial, defendant Arthur Grady was convicted of first degree murder and sentenced to 60 years in prison. On appeal, defendant contends that his sentence is excessive and that the mittimus should be corrected to reflect 1,600 days of presentencing custody credit. For the reasons that follow, we affirm and order correction of the mittimus.

¶ 3 Defendant's conviction arose from the January 30, 2009 shooting death of Ralph Turner, Jr. Defendant was charged along with Aaron Bronson, who pleaded guilty and testified against defendant. The State's theory of the case was that defendant and Bronson planned to rob the victim, whom they had followed out of a casino, but that when the victim resisted, defendant shot him. The medical examiner who conducted the autopsy of the victim testified that the cause of death was one gunshot wound to the chest and one gunshot wound to the thigh.

¶ 4 At trial, the State presented evidence that on the night in question, the victim and a group of his friends went to the Horseshoe Casino in Hammond, Indiana. At the end of the evening, one of the men drove the victim and one of his friends to the victim's house in Chicago and dropped them off. The victim's friend testified that as he walked in the street toward his car, an SUV stopped in front of the victim's house and a man in a dark hoodie got out of the passenger seat. The man heard two gunshots before he ran away. A woman who lived down the block from the victim testified that she heard two loud noises just before 4 a.m. She then looked out her window and saw an SUV driving in reverse down the street.

¶ 5 A Chicago police officer testified that when he was on his way to the scene, he saw a person matching the general description given by the dispatcher. The officer stopped the man, identified in court as defendant, and conducted a protective pat-down search, but found no weapons. The officer found no investigative alerts or active warrants for defendant in the police computer system, so he released defendant.

¶ 6 Using information gleaned from a cell phone recovered at the scene of the shooting, video surveillance footage from the casino, and a photo array identification made by one of the victim's friends, a Chicago police detective identified defendant as a suspect in the shooting and obtained a search warrant for his address. When the warrant was executed the day after the shooting, the police recovered two guns. A firearm expert determined that the fired bullet and bullet jacket found inside the victim's body were fired from one of the guns. Defendant was arrested at his residence, while Bronson was arrested nine months later in Indiana.

¶ 7 Aaron Bronson testified that he pleaded guilty to first degree murder in the instant case in exchange for a sentence of 24 years in prison. Bronson testified that on the night in question, he and defendant went to the Horseshoe Casino to gamble. At some point, defendant told Bronson that he had lost all his money, but that he saw a group of men who had about $30,000 and thought they should rob them. Bronson agreed to the plan. Later, defendant approached Bronson, told him the group was leaving, and directed Bronson to get his truck. Bronson testified that he retrieved his truck and then drove around until defendant called him to say it was time to pick him up. Bronson drove up to the valet and saw the

Exhibit A

-A306-

Case: 21-3162    Document: 22    Filed: 11/23/2022    Pages: 433
Case: 1:20-cv-02530 Document #: 18-1 Filed: 10/14/20 Page 2 of 3 PageID #:98

People v. Grady, Not Reported in N.E.3d (2015)

2015 IL App (1st) 132160-U

group of men get into a Mercedes. After defendant got into Bronson's truck, Bronson followed the Mercedes to Chicago.

 *2  ¶ 8 Bronson testified that the Mercedes stopped briefly and two of its passengers got out. Defendant jumped out of the truck with a gun and ran up to the victim. The victim punched defendant, who fell down toward the ground. Bronson put his truck in reverse and started to drive away. As he did so, he saw the second of the Mercedes' passengers running across the median and heard two or three gunshots. Bronson also saw defendant "hovered over" a man lying on the ground. Bronson did not wait for defendant, but fled to defendant's apartment. Defendant returned several hours later, reported that "he ain't get no money, and he got pulled over that night by the police and they let him go, and he lost his phone." Defendant also reported that he threw the gun, but told Bronson that he was going to go back to get it because it might have his fingerprints on it. Defendant left, and when he came back, Bronson saw him with the gun. Bronson left for Indiana the next day.

¶ 9 Defendant testified that he and Bronson went their separate ways at the casino. Defendant walked around the casino to pass the time until Bronson was ready to leave. Whenever defendant heard people clapping and cheering, he would walk up to them to see what was going on. Among the tables he walked up to was the victim's. Defendant denied talking with Bronson about robbing anyone.

¶ 10 Eventually, defendant and Bronson decided to leave. Bronson got his truck and picked up defendant at the valet area. Defendant testified that he plugged his cell phone into the charger and went to sleep. When the truck came to a sudden stop, defendant woke up. Defendant looked out the window and saw two men walking on the sidewalk in opposite directions. Bronson got out of the truck, approached one of the men on the sidewalk, and engaged him in conversation. The man punched Bronson and both men fell to the ground. Defendant saw the second man turn back and head toward the fight. Defendant got out of the truck, intending to stop the fight, but when he heard two gunshots, he got back in the truck, put it in reverse, and drove off.

¶ 11 About two blocks away, defendant parked the truck. He could not find his cell phone, so he walked to a nearby gas station. While he was walking, he was stopped by the police, but then let go. Eventually, defendant went home, where the police arrested him the next day. According to defendant, the gun recovered from his apartment was Bronson's.

¶ 12 In rebuttal, the State introduced a certified copy of conviction for defendant's prior convictions of aggravated battery to a police officer and resisting / obstructing a police officer, causing injury.

¶ 13 The jury found defendant guilty of first degree murder, but also found that the State had not proven the allegation that defendant personally discharged a firearm that proximately caused death to another person. The trial court denied defendant's motion for a new trial.

 *3  ¶ 14 At the sentencing hearing, the State presented certified copies of convictions reflecting that defendant had been convicted of possession of a controlled substance, aggravated battery to a police officer, and resisting and obstructing a police officer. In mitigation, defendant's grandfather testified that defendant was a smart man who was close to his two daughters. Defense counsel noted that defendant was working on an associate's degree at the time he was arrested, that he had worked in landscaping and painting, and had worked on housing development with the Woodlawn Organization. In allocution, defendant stated that he was sorry for the victim's family's loss, but maintained that he had nothing to do with Bronson's crime and stated that he should not have been held accountable for Bronson's actions.

¶ 15 The trial court indicated that it had listened to the testimony of all the witnesses and had reviewed the presentence investigation report. The court stated that defendant had excellent role models in his life, finished high school, and had continued with his education. The court also noted defendant's prior convictions and lack of remorse, stated that it accepted the scenario presented by Bronson, and observed that it was defendant who was "stalking" the victim and his friends at the casino. The trial court stated that it found defendant had very little, if any, rehabilitative potential because he had "all of those opportunities" but made more than one bad mistake. As such, the trial court sentenced defendant to 60 years in prison.

¶ 16 The trial court subsequently denied defendant's motion to reconsider sentence, reiterating that defendant had many opportunities in his life, but did not make the "right decisions," and that therefore, it found defendant had very little rehabilitative potential, if any.

¶ 17 On appeal, defendant contends that his sentence is excessive. He argues that the trial court abused its discretion in imposing what is essentially a life sentence where the

Case: 21-3162    Document: 22    Filed: 11/23/2022    Pages: 433
Case: 1:20-cv-02530 Document #: 18-1 Filed: 10/14/20 Page 3 of 3 PageID #:99

People v. Grady, Not Reported in N.E.3d (2015)

2015 IL App (1st) 132160-U

jury found that he was not the shooter, but rather, was only accountable for his codefendant's actions; his criminal history was not extensive; his education and work history indicates that he has rehabilitative potential; and his codefendant received a 24–year sentence. Defendant further argues that the circumstances of the offense do not warrant a maximum sentence, because while he and Bronson planned to rob the victim, the murder was not premeditated.

¶ 18 Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern,* 189 Ill.2d 48, 53 (1999). We will not disturb a sentencing determination absent an abuse of discretion. *People v.. Hauschild,* 226 Ill.2d 63, 90 (2007). Sentences within the permissible statutory range may be deemed the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey,* 193 Ill.2d 203, 210 (2000).

 *4  ¶ 19 Here, the record indicates that the trial court was well aware of the facts of the case, including the jury's finding that the State had not proved defendant personally discharged the firearm that caused the victim's death, as well as the testimonies of both defendant and codefendant that while the robbery was planned, the shooting was not. The trial court also was aware of the mitigating factors defendant has identified on appeal. Not only was the information regarding defendant's criminal background, employment history, and education included in the presentence investigation report that was considered by the trial court, but it was also noted by the attorneys at the sentencing hearing. Where mitigating evidence has been presented, it is presumed that the trial court considered it. *People v. Sven,* 365 Ill.App.3d 226, 242 (2006). As for defendant's argument that his sentence is disproportionate to Bronson's, it is well established that a sentence entered after a guilty plea does not provide a valid basis of comparison to a sentence imposed after a trial. *People v. Nutall,* 312 Ill.App.3d 620, 635 (2000).

¶ 20 The trial court sentenced defendant to 60 years' imprisonment, a term within the permissible statutory range for first degree murder of 20 to 60 years. 730 ILCS 5/5–4.5–20(a)(1) (West 2010). The record indicates that the trial court properly considered the evidence in aggravation and mitigation. Given the facts of the case, the interests of society, and the trial court's consideration of relevant aggravating and mitigating factors, we cannot find that defendant's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey,* 193 Ill.2d at 210. Accordingly, we find no abuse of discretion in the length of defendant's sentence.

¶ 21 Defendant's second contention on appeal is that the mittimus should be corrected to reflect 1,600 days of presentencing custody credit. The State concedes the issue. Accordingly, we order the clerk of the circuit court to correct the mittimus to reflect 1,600 days of presentence custody credit.

¶ 22 For the reasons explained above, we affirm the judgment of the circuit court and order correction of the mittimus.

¶ 23 Affirmed; mittimus corrected.

Presiding Justice ROCHFORD and Justice DELORT concurred in the judgment.

**All Citations**

Not Reported in N.E.3d, 2015 IL App (1st) 132160-U, 2015 WL 6156100

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

48 N.E.3d 674 (Table)
(This disposition of a Petition for Leave to Appeal
is referenced in the North Eastern Reporter.)
Supreme Court of Illinois

People

v.

Arthur Grady

NO. 120122

|

JANUARY TERM, 2016

|

January 20, 2016

**Synopsis**

Lower Court: No. 2–13–2160

**Opinion**

Disposition: Denied.

**All Citations**

48 N.E.3d 674 (Table), 400 Ill.Dec. 387

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S.
Government Works.

Exhibit B

-A309-

Post - Conviction Notice                                              (3/24/11) CCCR 0049

## OFFICE OF THE CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### 2650 S. CALIFORNIA AVE. 5TH FLOOR
### CHICAGO, ILLINOIS 60608
### TELEPHONE 773-674-6967

Date: _____ OCTOBER 07 , 2016 _____

PETITIONER

v.

THE PEOPLE OF THE STATE OF ILLINOIS
RESPONDENT

}

Case No. 11CR00169-01 _____

TO: _____ ARTHUR GRADY #R01363 _____

ADDRESS: P.O. BOX 112 _____

CITY/STATE/ZIP: JOLIET, IL 60434-0112 _____

## NOTICE

Pursuant to Illinois Supreme Court Rule 651, as Amended and Adopted on January 25, 1996, and effective the same day to read as follows:

"You are hereby notified that on _____ SEPTEMBER 28 , 2016 _____ the court entered an order, a copy of which is enclosed herewith. You may have a right to appeal. In the case of an appeal from a post-conviction proceeding involving a judgment imposing a sentence of death, the appeal is to the Illinois Supreme Court. In other cases, the appeal is to the Illinois Appellate Court in the district in which the circuit court is located. If you are indigent, you have a right to a transcript of the record of the post-conviction proceedings and to the appointment of counsel on appeal, both without cost to you. To preserve your right to appeal you must file a notice of appeal in the trial court within 30 days from the date the order was entered."

_Dorothy Brown_
Clerk of the Circuit Court of Cook County, Illinois

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**



Exh # 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Post-Conviction Petition |
| | ) | 11-CR-00169-01 |
| v. | ) | |
| | ) | |
| ARTHUR GRADY, | ) | Honorable Erica L. Reddick, |
| | ) | Judge Presiding |
| Defendant-Petitioner. | ) | |

## ORDER

Petitioner, Arthur Grady, seeks post-conviction relief from the judgment of conviction entered against him on June 19, 2013. Following a jury trial, petitioner was convicted of first-degree murder. The trial court subsequently sentenced petitioner to 60 years of imprisonment in the Illinois Department of Corrections. As grounds for post-conviction relief, petitioner claims: (1) the State and two detectives committed perjury; (2) ineffective assistance of trial counsel; (3) the trial court made erroneous credibility determinations; (4) the trial court improperly influenced the State to change its theory during the arguments on petitioner's motion to quash; (5) the trial court erred in denying petitioner's motion to quash; (6) the trial court erred in denying petitioner's motion to bar Aaron Bronson's new statements; (7) the State improperly vouched for Aaron Bronson's credibility; (8) the State erred by telling the jury that it may find petitioner guilty under a theory of accountability, and the trial court also erred by allowing an accountability instruction; (9) the trial court was biased against petitioner and his counsel; (10) the State failed to prove petitioner guilty beyond a reasonable doubt; and (11) ineffective assistance of appellate counsel.

1

**BACKGROUND**

Petitioner's conviction stems from the fatal shooting of Ralph Turner, Jr. on January 30, 2009 in Chicago. Petitioner was charged along with Aaron Bronson, who pled guilty and testified against petitioner. The State's theory was that petitioner and Bronson planned to rob the victim, whom they had followed out of a casino, but that when the victim resisted, petitioner shot him. The medical examiner who conducted the autopsy of the victim testified that the cause of death was one gunshot wound to the chest and one gunshot wound to the thigh.

At trial, the State presented evidence that on the night in question, the victim and a group of his friends went to the Horseshoe Casino in Hammond, Indiana. At the end of the evening, one of the men drove the victim and one of his friends to the victim's house in Chicago and dropped them off. The victim's friend testified that as he walked in the street toward his car, an SUV stopped in front of the victim's house and a man in a dark hoodie got out of the passenger seat. The victim's friend heard two gunshots before he ran away. A woman who lived down the block from the victim testified that she heard two loud noises just before 4 a.m. She then looked out her window and saw an SUV driving in reverse down the street.

A Chicago police officer testified that when he was on his way to the scene, he saw a person matching the general description given by the dispatcher. The officer stopped the man, identified in court as petitioner, and conducted a protective pat-down search, but found no weapons. The officer found no investigative alerts or active warrants for petitioner in the police computer system, so he released petitioner.

Using information gleaned from a cell phone recovered at the scene of the shooting, video surveillance footage from the casino, and a photo array identification made by one of the victim's friends, a Chicago police detective identified petitioner as a suspect in the shooting and

2

obtained a search warrant for his address. When the warrant was executed the day after the shooting, the police recovered two guns. A firearm expert determined that the fired bullet and bullet jacket found inside the victim's body were fired from one of the guns. Petitioner was arrested at his residence, while Aaron Bronson was arrested nine months later in Indiana.

Aaron Bronson testified that he pled guilty to first-degree murder in the instant case in exchange for a sentence of 24 years in prison. Bronson testified that on the night in question, he and petitioner went to the Horseshoe Casino to gamble. At some point, petitioner told Bronson that he had lost all his money, but that he saw a group of men who had about $30,000 and thought they should rob them. Bronson agreed to the plan. Later, petitioner approached Bronson, told him the group was leaving, and directed Bronson to get his truck. Bronson drove up to the valet and saw the group of men get into a Mercedes. After petitioner got into Bronson's truck, Bronson followed the Mercedes to Chicago. Bronson testified that the Mercedes stopped briefly and two of its passengers got out. Petitioner jumped out of the truck with a gun and ran up to the victim. The victim punched petitioner, who fell down toward the ground. Bronson put his truck in reverse and started to drive away. As he did so, he saw the second of the Mercedes' passengers running across the median and heard two or three gunshots. Bronson also saw petitioner "hovered over" a man lying on the ground. Bronson did not wait for petitioner, but fled to petitioner's apartment. Petitioner returned several hours later, reported that "he ain't get no money, and he got pulled over that night by the police and they let him go, and he lost his phone." Petitioner also reported that he threw the gun, but told Bronson that he was going to go back to get it because it might have his fingerprints on it. Petitioner left, and when he came back, Bronson saw him with the gun. Bronson left for Indiana the next day.

3

Petitioner testified that he and Bronson went their separate ways at the casino. Petitioner walked around the casino to pass the time until Bronson was ready to leave. Whenever petitioner heard people clapping and cheering, he would walk up to them to see what was going on. Among the tables he walked up to was the victim's. Petitioner denied talking with Bronson about robbing anyone. Eventually, petitioner and Bronson decided to leave. Bronson got his truck and picked up petitioner at the valet area. Petitioner testified that he plugged his cell phone into the charger and went to sleep. When the truck came to a sudden stop, petitioner woke up. Petitioner looked out the window and saw two men walking on the sidewalk in opposite directions. Bronson got out of the truck, approached one of the men on the sidewalk, and engaged him in conversation. The man punched Bronson and both men fell to the ground. Petitioner saw the second man turn back and head toward the fight. Petitioner got out of the truck, intending to stop the fight, but when he heard two gunshots, he got back in the truck, put it in reverse, and drove off. About two blocks away, petitioner parked the truck. He could not find his cell phone, so he walked to a nearby gas station. While he was walking, he was stopped by the police, but then let go. Eventually, petitioner went home, where the police arrested him the next day. According to petitioner, the gun recovered from his apartment was Bronson's.

## PROCEDURAL HISTORY

On direct appeal, petitioner argued that: (1) his sentence was excessive; and (2) his mittimus should be corrected to reflect 1,600 days of presentencing custody credit. On October 16, 2015, the appellate court affirmed petitioner's sentence and ordered that his mittimus be corrected. *People v. Grady*, No. 1-13-2160 (2015) (unpublished order under Supreme Court Rule 23). On January 20, 2016, the Illinois Supreme Court denied petitioner's petition for leave to appeal. *People v. Grady*, 2016 Ill. LEXIS 199.

4

## ANALYSIS

On July 6, 2016, petitioner filed the instant *pro se* petition for post-conviction relief, which is before this court for an initial determination of its legal sufficiency pursuant to section 2.1 of the Post-Conviction Hearing Act ("the Act"). 725 ILCS 5/122-2.1 (West 2016). A post-conviction petition is a collateral attack on a prior conviction, *People v. Simms*, 192 Ill. 2d 348, 359 (2000), and is limited to constitutional issues which were not and could not have been raised on direct appeal. *People v. King*, 192 Ill. 2d 189, 192-93 (2000). When petitioner raises non-meritorious claims, the court may summarily dismiss them. *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

Under the Act, the petitioner is not entitled to an evidentiary hearing; rather, to obtain a hearing, the petitioner has "to make a substantial showing of a violation of a constitutional right." *People v. Cloutier*, 191 Ill. 2d 392, 397 (2000); *People v. Johnson*, 191 Ill. 2d 257, 268 (2000). However, a *pro se* post-conviction petition may be summarily dismissed as frivolous or patently without merit during the first stage of post-conviction review unless the allegations in the petition, taken as true and liberally construed, present the gist of a valid constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). A petition is frivolous and patently without merit when the petition has no arguable basis in either fact or law. *People v. Hodges*, 234 Ill. 2d 1, 23 (2009). The Act requires that a petition be supported by affidavits, records, or other evidence supporting its allegations. 725 ILCS 5/122-2. The failure to either include these necessary items or explain their absence is fatal to a petition for post-conviction relief and may alone justify the summary dismissal of the petition. *People v. Collins*, 202 Ill. 2d 59, 66 (2002); *but see People v. Allen*, 2015 IL 113135 (summary dismissal based on petitioner's failure to notarize an affidavit is improper at first stage post-conviction proceedings).

5

Further, post-conviction proceedings are not a continuation of or an appeal from the original case. *People v. Flowers*, 208 Ill. 2d 291, 303 (2004). Therefore, the issues raised on post-conviction review are limited to those that could not be or were not previously raised on direct appeal or in prior post-conviction proceedings. *People v. McNeal*, 194 Ill. 2d 135, 140 (2000). "Rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised, but were not, are waived." *People v. Miller*, 203 Ill. 2d 433, 437 (2002). Post-conviction petitions may be summarily dismissed at the first stage based on the doctrines of waiver and *res judicata*. *People v. Blair*, 215 Ill. 2d 427, 442 (2005); *People v. Rogers*, 197 Ill. 2d 216, 221 (2001).

## I.    PRELIMINARY CONSIDERATION: DOCTRINE OF WAIVER

All of the issues raised by petitioner, except for ineffective assistance of appellate counsel, are barred by the doctrine of waiver. In Illinois, the law is clear: "Rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised, but were not, are waived." *Miller*, 203 Ill. 2d at 437. Moreover, summary dismissal of post-conviction petitions based on the doctrine of waiver is appropriate. *Rogers,* 197 Ill. 2d at 221. Therefore, the above-mentioned issues are procedurally barred by the doctrine of waiver. However, as discussed below, even if these claims were not procedurally barred, they nevertheless fail on the merits.

## II.    PERJURY

Petitioner advances several claims of perjury against Detectives Weber and Barsch, as well as against the prosecutor, who petitioner claims solicited the detectives' testimony knowing it was false. The United States Supreme Court has recognized that a conviction based upon false testimony offends notions of fundamental fairness. *Giglio v. United States*, 405 U.S. 150, 153

6

(1972). Accordingly, Illinois courts have aptly characterized perjury as "the mortal enemy of justice." *People v. Shannon*, 28 Ill. App. 3d 873, 878 (1st Dist. 1975). However, where the claims of perjury are merely conclusory in nature and not supported by further allegations of specific facts, the petition may be dismissed without an evidentiary hearing. *People v. Ashley*, 34 Ill. 2d 402, 411 (1966). Hence, it is incumbent upon petitioner to substantiate his allegations with specific facts establishing the falsity of the trial testimony. *People v. Martin*, 46 Ill. 2d 565, 568 (1970). This means that the petitioner must specify the nature of the alleged perjury, its source, and the evidence which proves that the testimony was false. *Ashley*, 34 Ill. 2d at 411. The petitioner must also demonstrate that there is a "reasonable likelihood that the false testimony could have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 345 (1997).

### A. Recovery of Cell Phone

First, petitioner claims that Detectives Weber and Barsch committed perjury when they testified at petitioner's motion to quash hearing that the cell phone recovered at the crime scene was registered to petitioner and 6315 S. Champlain. With the above standard in mind, petitioner's claim fails. Petitioner's claim of perjury stands completely unsupported by any specific facts establishing the falsity of the detectives' testimony. Instead, as evidence of fabrication by the detectives, petitioner merely states that their testimony was contradicted by "evidence [that] was presented by the State attorney showing that the cell phone was registered to Marcell Gray and 501 Stony Island" [sic]. Petitioner fails to specify which evidence presented by the State indicated that the cell phone was registered to Marcell Gray and 501 Stony Island. Furthermore, even if the State did present evidence indicating that the cell phone was registered to Marcell Gray and 501 Stony Island, there is a substantial problem with drawing the inference that such evidence demonstrates that Detectives Weber and Barsch committed perjury. Just

7

because the detectives' testimony was inconsistent with other evidence, it does not necessarily follow that the detectives' testimony was false. Because petitioner has failed to provide any extrinsic evidence establishing the falsity of the detectives' testimony, he has failed to state a claim for relief. *See People v. Hilliard*, 109 Ill. App. 3d 797, 802 (1st Dist. 1982) (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### B. Videos

Next, petitioner alleges that Detectives Weber and Barsch committed perjury when they testified that there was a video of petitioner watching the victim gambling. Petitioner's claim of perjury stands completely unsupported by any specific facts establishing the falsity of the detectives' testimony. Instead, as evidence of fabrication by the detectives, petitioner merely states that "no video was played showing Turner ever gambling at any time at the casino". However, petitioner's assertion is directly refuted by the record. At trial, the State introduced video clips depicting Turner gambling in the casino and petitioner nearby watching the victim. *Transcript of Proceedings* at 205-LL–238-LL (May 20, 2013). Accordingly, because petitioner's claim is directly refuted by the record, this claim fails.

Petitioner further alleges that the State committed perjury by "claim[ing] there was extensive video evidence of petitioner associated with co-defendant Aaron Bronson". Once again, with the above standard in mind, petitioner's claim fails. Petitioner's claim of perjury stands completely unsupported by any specific facts establishing the falsity of this testimony. Instead, as evidence of fabrication by the detectives, petitioner merely states that "at trial, the State only presented a video clip of petitioner entering Bronson's vehicle, far from extensive

8

video". Simply because a video of petitioner directly associating with Bronson was not played at trial does not mean such video does not exist. Because petitioner has failed to provide any extrinsic evidence establishing the falsity of the detectives' testimony, he has failed to state a claim for relief. *See Hilliard*, 109 Ill. App. 3d at 802 (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### C. Angela Baker's Signing of the Consent Form

Petitioner claims that Detectives Weber and Barsch committed perjury when they testified that there were several officers present when Angela Baker signed the consent form and that Detective Barsch was on the first floor for fifteen minutes. Here, petitioner's claim of perjury stands completely unsupported by any specific facts establishing the falsity of this testimony. Instead, as evidence of fabrication by the detectives, petitioner points to the attached supplementary report. This report does not state that Detectives Weber and Barsch were the only officers present when Baker signed the consent form, nor does it state anything which would indicate that Detective Barsch was not on the first floor for fifteen minutes. Instead, the report merely states that Baker invited Detectives Weber and Dougherty into her apartment, that Detective Dougherty observed petitioner standing in a hallway and placed him into custody, and that "[r]eporting detectives spoke to Angela Baker….and explained the consent to search procedures to her. Angela Baker then signed a consent to search form." Accordingly, because petitioner has failed to provide any extrinsic evidence establishing the falsity of the detectives' testimony, he has failed to state a claim for relief. *See Hilliard*, 109 Ill. App. 3d at 802 (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of

falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### D. Recovery of Money from the Middle Bedroom

Next, petitioner alleges that Detective Weber committed perjury when he testified that he recovered money from the middle bedroom. Here, petitioner's claim of perjury stands unsupported by any specific facts establishing the falsity of this testimony. Instead, as evidence of fabrication by Detective Weber, petitioner merely states that Detective Weber's testimony was contradicted by the attached supplementary report. There is a substantial problem with drawing this inference. Just because Detective Weber's testimony was inconsistent with the police report, it does not necessarily follow that Detective Weber's testimony was false; instead, it is possible that the officer who authored the report had a different perception of what transpired, or that Officers Weber and Dougherty both recovered money from the middle bedroom. Accordingly, because petitioner has failed to provide any extrinsic evidence establishing the falsity of Detective Weber's testimony, he has failed to state a claim for relief. *See Hilliard*, 109 Ill. App. 3d at 802 (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### E. Rupert Evans' Identification of Petitioner

Petitioner alleges that the State committed perjury by stating that Rupert Evans identified petitioner as watching the victim win money at the casino. With the above standard in mind, petitioner's claim fails. Petitioner's claim of perjury stands completely unsupported by any specific facts establishing the falsity of this statement. As evidence of fabrication by the State,

10

petitioner merely points to the fact that this information was not contained in the police reports. There is a substantial problem with drawing this inference. Just because this statement was not included in a police report, it does not necessarily follow that the statement was false; instead, it is possible the information was simply not included in the reports. Police reports are summaries and do not include every single statement made by every single witness. Because petitioner has failed to provide any extrinsic evidence establishing the falsity of this statement, he has failed to state a claim for relief. *See Hilliard*, 109 Ill. App. 3d at 802 (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### F. Remaining Statements by Prosecutors

Finally, petitioner claims that the prosecutors committed perjury by telling the jury that: (1) the money recovered from 63rd and Champlain was connected to Turner's death, and (2) every 911 caller saw a person exit the passenger side of the SUV. These claims of perjury stand completely unsupported by any specific facts establishing the falsity of these statements. Because petitioner has failed to provide any extrinsic evidence establishing the falsity of these statements, he has failed to state a claim for relief. *See Hilliard*, 109 Ill. App. 3d at 802 (contradictions in testimony are not enough to support a claim of perjury; extrinsic evidence of falsity must be shown); *see generally Collins*, 202 Ill. 2d at 66 (a post-conviction petition must be supported by specific facts that establish the existence of a constitutional violation).

### III. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILURE TO IMPEACH DETECTIVES' PERJURED STATEMENTS

Next, petitioner claims his trial counsel was ineffective for failing to impeach Detectives Weber and Barsch's perjured statements. For the reasons discussed in Section II, petitioner has

11

failed to demonstrate that Detectives Weber and Barsch committed perjury. Accordingly, because petitioner has failed to demonstrate that Detectives Weber and Barsch committed perjury, petitioner's claim that his trial counsel was ineffective for failing to impeach the detectives' perjured statements must fail.

## IV.     TRIAL COURT ERRED IN ITS CREDIBILITY DETERMINATIONS

Petitioner next asserts that during the hearing on petitioner's motion to quash, the trial court erred by determining that witnesses Shawanna Chester and Angela Baker were not credible, and that Detectives Weber and Barsch were credible. Specifically, petitioner argues that Chester and Baker had no motive to lie, and the detectives' testimony was "full of inconsistencies". Claims regarding witness credibility are essentially sufficiency of the evidence claims, which are inappropriate for post-conviction review. *Rogers,* 197 Ill. 2d at 221 (while the requirement of proof of guilt beyond a reasonable doubt is a matter of constitutional right, it is not the purpose of the Post-Conviction Hearing Act to re-determine guilt or innocence); *see also People v. Boyd*, 347 Ill. App. 3d 321, 335 (1st Dist. 2004). Accordingly, this claim fails as it is inappropriate for post-conviction review.

## V.     TRIAL COURT IMPROPERLY INFLUENCED THE STATE TO CHANGE ITS THEORY

Petitioner claims that during the arguments on petitioner's motion to quash, the trial court improperly influenced the State to change its theory. Specifically, petitioner contends that the State argued that police arrested petitioner, and at the end of the State's argument, "the court interrupted, and improperly implied that petitioner was being detained, when neither detective ever testified to any detainment, or any argument by the State, of detainment, until after the court introduced it into the motion" [sic].

12

In this case, petitioner fails to demonstrate prejudice. Even if the trial court had suggested that police only detained, rather than arrested, petitioner during the pendency of the search, this would not have impacted the outcome of the hearing. The trial court noted in its ruling that even at the time petitioner was handcuffed prior to the execution of the search warrant, there was a "mountain of circumstantial evidence" which constituted probable cause to arrest petitioner. *Transcript of Proceedings* at HH-22 (May 16, 2013). The court further explained:

> While I agree that the State conceded that the arrest occurred at the moment where Mr. Grady was handcuffed and placed in the chair, and I also agree though after considering the evidence carefully that the circumstantial evidence was great enough under the totality of the circumstances to have justified an arrest at that time, but this Court is not obligated to follow the Detective's determination of when the arrest occurred or the State's determination of when the arrest occurred. I find an arrest would have been appropriate at that time based on the circumstantial evidence.

*Id.* at HH-19. Thus, the trial court explicitly found that there was probable cause to arrest petitioner at the point he was handcuffed, regardless of whether the State characterized this action as an arrest or detention during a search. Therefore, petitioner fails to demonstrate prejudice and this claim fails.

## VI.    TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION TO QUASH

Petitioner next contends that the trial court erred in denying petitioner's motion to quash because police lacked probable cause to arrest him. The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Similarly, article I, section 6 of the Illinois Constitution provides: "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable

13

searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. art I, § 6. Probable cause to arrest an individual exists when the facts known to an officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *People v. Wear*, 229 Ill. 2d 545, 563 (2008). Here, prior to his arrest:

> The Defendant in this case was observed on video surveillance and identified in a photo array as having been near the victim and his friend at the time that the victim was playing at the Horseshoe Casino. He was also on his cell phone. He was observed leaving that location with the co-offender's when the co-offender's license plate was identified. At the scene of the crime was the Defendant's phone, which then the subscriber information sent the State back to the Champlain address where the Defendant was located. Now, when he was not at that first-floor address where the police received the search warrant and searched, they did a canvass, and they were looking to find out whether or not Mr. Grady had moved and where he had moved to. He happened to be there. They recognized him. They had enough probable cause to arrest.

*Transcript of Proceedings* at HH-20 - HH-21 (May 16, 2013). As the trial court noted, prior to arresting petitioner, detectives were in possession of a "mountain of circumstantial evidence" indicating that petitioner committed this offense. This evidence was sufficient to establish probable cause to arrest petitioner. Accordingly, petitioner's claim that the trial court erred in denying his motion to quash fails.

### VII.   TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION TO BAR AARON BRONSON'S NEW STATEMENTS

Petitioner claims that the trial court erred in denying petitioner's motion to bar Aaron Bronson's new statements. Specifically, petitioner alleges that the State did not inform the defense until the trial was already underway that Bronson was going to materially deviate from his taped interrogations by stating that petitioner was the shooter. Petitioner asserts that this resulted in a trial by ambush.

14

Here, petitioner is mistaken – the deviations Bronson made from his videotaped statement involved merely: (1) who was driving the vehicle; and (2) petitioner discussing the gun with Bronson after the shooting. These deviations did not involve Bronson stating for the first time that petitioner was the shooter. The record indicates that the State learned that Bronson intended to make these deviations after the trial had already begun while they were preparing Bronson to testify, and disclosed the information to petitioner's counsel immediately. As the trial court accurately stated:

> …[I]n the course of trial when you interview witnesses, they flip you all the time. Actually this flip helps you from this court's estimation and doesn't help you [sic]. In my opinion, this hurts the State. The fact that Aaron Bronson can't stick with one statement is your strongest argument. And I don't see how this is a trial by ambush. I see what this prosecutor is doing is actually following every single *Brady* requirement in a timely fashion.

*Transcript of Proceedings* at 27-LL (May 20, 2013). A witness changing his story is not within a prosecutor's control, nor is it something a prosecutor can predict. Here, the State fully complied with *Brady*'s ongoing disclosure requirement by disclosing Bronson's new statements to petitioner's counsel as soon as the State became aware of them. For these reasons, petitioner's claim that the trial court erred by denying petitioner's motion to bar Bronson's new statements fails.

## VIII. THE STATE IMPROPERLY VOUCHED FOR AARON BRONSON'S CREDIBILITY

Petitioner next alleges that the State improperly vouched for Aaron Bronson's credibility. Specifically, petitioner alleges that: (1) "The State argued to the jury that it didn't like Bronson, and there's no surprise Bronson is who he is, but they have to believe him"; (2) "The State also argued that part of Bronson's plea agreement is he has to tell the truth or he could be charged

15

with perjury"; and (3) "The State then argued Bronson had no motive to lie, and if the jury believed Bronson didn't want to receive any more time, then they knew he wasn't lying".

Prosecutors have wide latitude in making their closing arguments. They are allowed to comment on the evidence and reasonable inferences from the evidence, including a defendant's credibility or the credibility of the defense's theory of the case. However, prosecutors are not permitted to vouch for the credibility of a government witness, nor are they permitted to use the credibility of the state's attorney's office to bolster a witness's testimony. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. In this case, the prosecutor's arguments that the jury "had to believe [Bronson]", that "part of Bronson's plea agreement is he has to tell the truth or he could be charged with perjury", and that "Bronson had no motive to lie" did not amount to the prosecutor personally vouching for Bronson. Rather, these arguments were merely persuasive statements regarding the evidence and reasonable inferences which can be drawn from the evidence regarding a witness's credibility. Accordingly, this claim fails.

## IX.    ACCOUNTABILITY

Petitioner contends that the State erred during closing arguments by telling the jury that it may also find petitioner guilty under a theory of accountability, and that the trial court erred by allowing an accountability instruction. Specifically, petitioner claims that this was improper because the State's theory of the case throughout the trial was that petitioner was the shooter and that "the sudden change of theory was misleading to petitioner's jury". Contrary to petitioner's contention, the State did not have a "sudden change of theory" that misled the jury. The State's theory throughout the entire trial was that petitioner was the shooter. The State did not deviate from this theory during closing arguments, nor did the State argue at any point that petitioner was not the shooter. In fact, during closing arguments, the prosecutor clearly stated: "Aaron is

16

not the shooter in this case. He is not. The only – he might be tall. He might be thin, but the only person there that night, the only person dressed in all dark clothes, the only person in black was the defendant. The defendant is the one, the defendant." *Transcript of Proceedings* at OO-282 (May 23, 2013). Accordingly, because it is directly refuted by the record, petitioner's claim fails.

## X. TRIAL COURT WAS BIASED AGAINST PETITIONER AND PETITIONER'S COUNSEL

Petitioner alleges that the trial court was biased against petitioner and his counsel. Specifically, petitioner contends that: (1) instead of immediately issuing a ruling following the hearing on petitioner's motion to suppress, the trial court "issued a two day continuance without either attorney requesting it"; (2) the trial court became "irritated and angry" at petitioner's counsel for requesting continuances and interrupted counsel multiple times; (3) the trial court overruled petitioner's counsel's objections, but sustained multiple objections from the State; and (4) the trial court "chose to sustain its own objections, without the State objecting".

First, petitioner's contention that the trial court was biased against petitioner and his counsel because the trial court "issued a two day continuance without either attorney requesting it" prior to ruling on petitioner's motion to suppress fails. The trial court issued a continuance following arguments on the motion to suppress to allow both parties to submit additional case law to the court. Additionally, there is no rule that prohibits a trial court from continuing a case for ruling on a motion. Moreover, petitioner fails to demonstrate how he was prejudiced by this continuance. For these reasons, this claim fails.

Next, petitioner's claim that the trial court became "irritated and angry" at petitioner's counsel for requesting continuances and interrupted counsel multiple times fails. Petitioner fails to demonstrate that the trial court was in fact "irritated and angry" with petitioner's counsel.

17

However, even if the trial court was irritated with and interrupted petitioner's counsel, petitioner fails to demonstrate how he was prejudiced as a result. Accordingly, this claim fails.

Next, petitioner asserts that the trial court was biased against petitioner because it overruled petitioner's counsel's objections, but sustained those of the State. Petitioner points to several of his counsel's objections that he argues were erroneously overruled, but petitioner fails to specify why he believes the objections should have been sustained. Petitioner also fails to specify why he believes the State's objections should have been overruled. Non-factual and non-specific assertions which merely amount to conclusory statements are insufficient to require a hearing under the Act. *People v. Brown*, 236 Ill. 2d 175, 205 (2010). In this case, because petitioner's allegations are merely unsupported conclusory statements, petitioner fails to make a substantial showing of a constitutional violation.

Finally, petitioner contends that the trial court was biased against petitioner because the trial court "chose to sustain its own objections, without the State objecting". Petitioner argues that this "affected the jury's outlook on petitioner and his counsel, causing them to stop being impartial and become suspicious towards them". Petitioner claims that the court "sustained its own objections" during the examinations of Anthony McGee, Adam Rose, Henry Barsch, Aaron Bronson, and petitioner. However, petitioner does not point to the specific comments which he believes constitute the court improperly "sustaining its own objections". As stated above, non-factual and non-specific assertions which merely amount to conclusory statements are insufficient to require a hearing under the Act. *Id.* In this case, because petitioner's allegations are merely unsupported conclusory statements, petitioner fails to make a substantial showing of a constitutional violation.

18

### XI.  THE STATE FAILED TO PROVE PETITIONER GUILTY BEYOND A REASONABLE DOUBT

Petitioner claims that the State failed to prove petitioner guilty beyond a reasonable doubt.  Claims of insufficiency of the evidence are inappropriate for post-conviction review. *Rogers*, 197 Ill. 2d at 221 (while the requirement of proof of guilt beyond a reasonable doubt is a matter of constitutional right, it is not the purpose of the Post-Conviction Hearing Act to re-determine guilt or innocence); *see also Boyd*, 347 Ill. App. 3d at 335.  Accordingly, petitioner's claim is inappropriate for post-conviction review and therefore fails.

### XII.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner claims his appellate counsel rendered ineffective assistance by failing to raise the above issues on direct appeal.  It is axiomatic that a criminal petitioner is guaranteed the effective assistance of counsel on appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). However, effective assistance in a constitutional sense means competent, not perfect, representation.  *People v. Easley*, 192 Ill. 2d 307, 344 (2000).  In assessing claims of ineffective assistance of appellate counsel, the court follows the two-pronged test of *Strickland v. Washington*.  *People v. Smith*, 326 Ill. App. 3d 831, 854 (1st Dist. 2001).  To succeed on a claim of ineffective assistance of appellate counsel, petitioner must show that the failure to raise a particular issue was objectively unreasonable and that his appeal was prejudiced by the omission. *People v. Williams*, 209 Ill. 2d 227, 243 (2004).  "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong."  *Easley*, 192 Ill. 2d at 329.  Thus, petitioner has not suffered prejudice from appellate counsel's decision not to raise certain issues on appeal unless such issues were meritorious.  *Id.*  In the instant matter, as the above discussion indicates, the issues raised in this

19

petition are not meritorious. Petitioner has therefore not suffered prejudice from appellate counsel's decision not to raise these issues on appeal, and counsel's assistance was therefore not ineffective. Accordingly, this claim is without merit and must fail.

## CONCLUSION

The court finds that the issues raised and presented by petitioner are frivolous and patently without merit. Accordingly, the petition for post-conviction relief is hereby dismissed. Petitioner's requests for leave to proceed *in forma pauperis*, for appointment of counsel, and for free transcripts, are also denied.

**ENTERED:**

Honorable Eric L. Reddick
No. 2038
Circuit Court of Cook County
Criminal Division

DATED: _28 September 2016_



20

Certified Report of Disposition                                    (11/1/05) CCCR 0002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS

v.                                    Case No.   11CR00169-01

ARTHUR GRADY

CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge ERICA L. REDDICK ON

SEPTEMBER 28, 2016.  SEE ATTACHED CONCLUSION.

I hereby certify that the foregoing has been entered of record on the above captioned case.

Date:   OCTOBER 07, 2016

Dorothy Brown, Clerk of the Circuit Court

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

No. 1-16-3012

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Respondent-Appellee, | ) ) ) | |
| -vs- | ) ) | No. 11 CR 169 |
| ARTHUR GRADY, | ) ) | Honorable Erica L. Reddick, |
| Petitioner-Appellant. | ) ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

JAMES E. CHADD
State Appellate Defender

PATRICIA MYSZA
Deputy Defender

JENNIFER L. BONTRAGER
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle St., 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR PETITIONER-APPELLANT

**ORAL ARGUMENT REQUESTED**

Exhibit J

POINT AND AUTHORITIES

Page

Arthur Grady's *pro se* Post-Conviction Petition Set Forth At Least an Arguable Claim That His Attorney On Direct Appeal Provided Constitutionally Ineffective Assistance By Failing To Challenge the Sufficiency Of the Evidence, Where Police Stopped Grady Moments After the Shooting and Found Neither a Weapon Nor Robbery Proceeds On Him, and the Key Evidence Against Him Was the Significantly Impeached Testimony Of His Co-Defendant. .................................. 8

    *People v. Hodges*, 234 Ill. 2d 1 (2009) .............. 8, 9, 10, 14, 15

    725 ILCS 5/122-2.1 (West 2016) .......................... 8, 15

    *People v. Edwards*, 197 Ill. 2d 239 (2001) ...................... 9

    *People v. Brown*, 336 Ill. App. 3d 711 (1st Dist. 2002) ............ 9

    U.S. Const. amends. VI, XIV .................................. 9

    Ill. Const. 1970, art. I, §8 ..................................... 9

    *Strickland v. Washington*, 466 U.S. 668 (1984) ................. 9

    *Evitts v. Lucey*, 469 U.S. 387 (1985) .......................... 9

    *People v. Perez*, 148 Ill. 2d 168 (1992) ......................... 9

    *People v. McCarter*, 385 Ill. App. 3d 919 (1st Dist. 2008) ........ 9, 11

    *People v. Moore*, 177 Ill. 2d 421 (1997) ................. 10, 14, 15

    *People v. Salazar*, 162 Ill. 2d 513 (1994) ...................... 10

    *People v. Hanks*, 355 Ill. App. 3d 894 (1st Dist. 2002) ......... 10, 15

    U.S. Const., amend. XIV ..................................... 10

    Ill. Const. 1970, art. I, §2 .................................... 10

    *In Re Winship*, 397 U.S. 358 (1970) .......................... 10

    *People v. Weinstein*, 35 Ill. 2d 467 (1996) ..................... 11

    *Jackson v. Virginia*, 443 U.S. 307 (1979) ..................... 11

i

*People v. Smith*, 185 Ill. 2d 532 (1999) . . . . . . . . . . . . . . . . . .    11, 12, 14

*People v. Ash*, 102 Ill. 2d 485 (1984) . . . . . . . . . . . . . . . . . . . . . . . . .    11

*People v. Davis*, 278 Ill. App. 3d 532 (1st Dist. 1996). . . . . . . . . . . .    11

*People v. Gomez*, 215 Ill. App. 3d 208 (2d Dist. 1991) . . . . . .    11, 12, 14

*People v. Gutierrez*, 387 Ill. App. 3d 1 (1st Dist. 2008). . . . . . . . . . .    11

*People v. Hansen*, 28 Ill. 2d 322 (1963) . . . . . . . . . . . . . . . . . . . . . .    12

*People v. Natal*, 368 Ill. App. 3d 262 (1st Dist. 2006). . . . . . . . . . . .    13

*People v. Runde*, 44 Ill. App. 3d 598 (3d Dist. 1976). . . . . . . . . . . . .    14

*People v. Thomas*, 2014 IL App (2d) 121001. . . . . . . . . . . . . . . . . . .    14

725 ILCS 5/122-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

725 ILCS 5/122-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

ii

## NATURE OF THE CASE

Petitioner-Appellant Arthur Grady appeals from a judgment dismissing

his petition for post-conviction relief at the first stage of post-conviction proceedings.

An issue is raised concerning the sufficiency of the post-conviction pleadings.

## ISSUE PRESENTED FOR REVIEW

Whether Arthur Grady's *pro se* post-conviction petition set forth at least

an arguable claim that his attorney on direct appeal provided constitutionally

ineffective assistance by failing to challenge the sufficiency of the evidence, where

police stopped Grady moments after the shooting and found neither a weapon

nor robbery proceeds on him, and the key evidence against him was the significantly

impeached testimony of his co-defendant.

## JURISDICTION

Petitioner-Appellant Arthur Grady appeals the dismissal of his post-conviction

petition. The judgment being appealed was entered on September 28, 2016. (C.

323-342). Notice of appeal was timely filed on October 18, 2016. (C. 345-346).

Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the

Illinois Constitution, and Supreme Court Rule 651(a).

1

## STATEMENT OF FACTS

### *Background*

After spending the late evening and early morning hours of January 29 and January 30, 2009, with his friends at the Horseshoe Casino in Hammond, Indiana, Ralph Turner was shot and killed outside his home on Eberhart Avenue between 81st and 82nd Streets in Chicago. *People v. Grady*, 2015 IL App (1st) 132160-U, ¶¶3-4. A cellphone found in the street near the scene and video from the casino led police to Aaron Bronson and Arthur Grady, and a search of their apartment revealed the murder weapon in a rear storage room. *Grady*, at ¶6. Police arrested Grady and Bronson, and the State subsequently charged both men with first-degree murder and armed robbery. *Id.*; (Tr.C. 27-36).

Bronson negotiated with the State and pled guilty to a single amended count of first-degree murder in exchange for a sentence of 24 years' imprisonment and his testimony implicating Grady. *Grady*, at ¶7; (Tr.R. NN39-41).

The evidence at Grady's jury trial established the following: After enjoying dinner and gambling at the casino over the course of several hours, Robert Currie dropped off Turner and Anthony McGee near Turner's apartment and McGee's parked car. (Tr.R. JJ111). Currie had been on a hot streak at the casino, and Turner acted as his "bank," holding onto chips and cashing them in. (Tr.R. JJ51-53, JJ99). Currie and another friend, Rupert Evans, identified Grady as someone they noticed at the casino. (Tr.R. JJ55-57, JJ117-123).

As he walked to his car after Currie dropped him off, McGee noticed a dark SUV pull up and a man in a dark hoodie get out. (Tr.R. LL39-43). McGee heard a gunshot, and then another, and ran around the corner and called police. (Tr.R.

2

LL44-45). Two neighbors were awakened by the shots, and saw a tall, thin man on the sidewalk. (Tr.R. LL121-124, MM213-218). Neither identified Grady as the offender. (Tr.R. LL129, MM221). McGee also did not identify Grady as the offender. (Tr.R. LL59-62).

Bronson provided the key testimony against Grady. *Grady*, at ¶¶7-8. Bronson said that he and Grady gambled separately at the casino, though they talked via cellphone several times throughout the night. (Tr.R. NN52-53). At some point, Grady told Bronson that he lost all his money and that they should rob some men who had won about $30,000. (Tr.R. NN56); *Grady*, at ¶7. Bronson saw the men Grady mentioned, and saw they were winning a lot of money. (Tr.R. NN57). Bronson told Grady that he followed one of the men to the bathroom and to the cashier's counter where he cashed in a lot of chips. (Tr.R. NN63). Bronson then gambled more and Grady told Bronson when the winning men appeared to be leaving. *Grady*, at ¶7. Bronson went to his truck while Grady watched the men. *Id.*; (Tr.R. NN65-67).

Bronson picked up Grady at the valet and Grady told Bronson the men were in a black Mercedes Benz in front of them. *Grady*, at ¶7. Bronson followed the Mercedes to 81st and Eberhart. (Tr.R. NN76). While in the car, Bronson said he and Grady discussed the plan to rob the men and Bronson knew that Grady had a revolver that Bronson had previously sold to him. (Tr.R. NN76). On Eberhart, the Mercedes stopped in the middle of the street and Bronson stopped his SUV about ten feet behind it. (Tr.R. NN77-78). Two men got out the back of the Mercedes and walked to the curb. *Grady*, at ¶8. While wearing a mask, Grady told Bronson he needed the money, jumped out of the car, and ran up to Turner. (Tr.R. NN79). Turner punched Grady, and Grady fell. (Tr.R. NN80). Bronson put his truck in

reverse and backed down the street; a median prevented him from making a u-turn. (Tr.R. NN80-81). While driving in reverse, Bronson heard two gunshots. (Tr.R. NN81-82). Bronson also said he saw Grady "hovered over" a man lying on the ground. *Grady*, at ¶7.

Bronson drove back to the apartment on Champlain. *Grady*, at ¶8. Grady got home a few hours later, telling Bronson that he did not get any money from the man, that he lost his cellphone, and that he was stopped but let go by police. *Id.* Grady told Bronson that he had thrown the gun away after the incident but had to go get it, because he was afraid his prints were on it. *Id.* Grady left the apartment and came back after an hour, with the gun. *Id.* Bronson left Chicago the next day, went to South Bend, and moved around to try to evade police. *Id.*; (Tr.R. NN89-90).

Bronson admitted that he lied when he told a detective that although he drove the SUV first, Grady switched places with him and began driving the SUV at some point while behind the Mercedes. (Tr.R. NN105-106). Bronson also lied to the detective when he said he went into the back seat to look for gloves and something to cover his face. (Tr.R. NN107). Bronson also did not tell detectives about Grady retrieving the gun, claiming he was trying to keep himself out of the incident. (Tr.R. NN121-122, NN159).

Bronson also admitted that he wrote a letter to defense counsel's associate after she interviewed him. (Tr.R. NN133). In the letter, Bronson told the associate he had fallen in love with her and wanted a picture of her. (Tr.R. NN141). Bronson also complained that Grady "snitched" on him, saying, "what goes around comes around." (Tr.R. NN137). Bronson said the sound of him being a credible witness

4

was "creepy," and suggested that he was high on cannabis and pills when he wrote the letter. (Tr.R. NN139-140).

In the defense case, the parties stipulated to several points of impeachment of Bronson's testimony. (Tr.R. OO4-6).

Grady testified on his own behalf. *Grady*, at ¶9. That night, Grady lost all his money early, so he spent his time walking around the casino, joining tables to share in the excitement when he heard people cheering that they had won. *Id.*; (Tr.R. 16-18). Grady never had a conversation with Bronson at the casino about robbing anyone. *Grady*, at ¶9.

When they decided to leave, Bronson agreed to pick Grady up at the valet because Grady did not want to walk outside, as it was very cold out and he had left his coat in the car. (Tr.R. OO20-21). When Grady got into Bronson's truck, he put on his coat, put his cellphone, which was attached to the charger, in his lap, and fell asleep.(Tr.R. OO22).

Grady woke when the truck came to a sudden stop, jerking him forward. *Grady*, at ¶10; (Tr.R. OO22). Grady did not recognize the street. (Tr.R. OO22). He saw two men walking on the sidewalk, one walking north and one south. (Tr.R. OO22). Bronson jumped out of the car, approached one of the men, and started talking to him. *Grady*, at ¶10. The man punched Bronson in the face and the two started fighting and fell to the ground. *Id.*; (Tr.R. OO23). Grady had just stepped out of the car to break up the fight when he heard two gunshots. *Grady*, at ¶10; (Tr.R. OO23). Grady jumped back into the truck, climbed over to the driver's seat, shut the driver's door, and drove the truck in reverse up to the cross street, where he went west onto 82nd and parked about a block away. (Tr.R. OO23-24). At that

point he realized his cellphone was missing. *Grady*, at ¶11. He tried to use a pay phone at a gas station to call Bronson, but it was broken. (Tr.R. OO24-25). On his way to another gas station, he was stopped by the police. *Grady*, at ¶11. The officer patted him down and he emptied his pockets for the officer. (Tr.R. OO25-26). After checking his identification, the officers let him go.(Tr.R. OO28); *Grady*, at ¶11.

Grady eventually made it to his apartment and went to sleep. (Tr.R. OO28-29). He used his home phone to call his own cellphone and Bronson's phone, but received no answer. (Tr.R. OO29). He woke up some time later, with Bronson hovering over him, angry at Grady for leaving him at the scene. (Tr.R. OO29).

Later that day, Grady replaced his missing cellphone. (Tr.R. OO31). That night, when police arrived to search his apartment, they arrested him. (Tr.R. OO32-33). Grady testified that Bronson and another roommate, Shawana Chester, stored items in the back room of the apartment, but he did not. (Tr.R. OO47). The gun found at his apartment belonged to Bronson. (Tr.R. OO175).

Grady admitted that the cellphone found at the scene was his. (Tr.R. OO67). He acknowledged that he lied when speaking to Detective Barsch after he was arrested when he said that he ran from the scene of the shooting, explaining that he did not want to be involved and did not want Bronson to get in trouble. (Tr.R. OO124-126, OO164).

In the State's rebuttal case, the parties stipulated that Angela Baker would testify that she was Grady's girlfriend and that on the morning of the apartment search, she withdrew some of her income tax return from an ATM. (Tr.R. OO202-203). She placed the money, which was between $1,000 and $1,1000, on a stand

6

-A340-

by a picture frame in the apartment. (Tr.R. OO203).

The jury found Grady guilty of first degree murder, but found the allegation not proven that Grady personally discharged a firearm and proximately caused death. *Grady*, ¶13. The judge sentenced Grady to 60 years in prison. *Id.* at ¶15.

### *Direct appeal*

On timely appeal, appellate counsel argued that Grady's sentence was excessive. *People v. Grady*, 2015 IL App (1st) 132160-U, ¶1. Grady also filed a *pro se* supplemental brief raising several trial errors. This appellate court rejected Grady's sentencing claim, and did not address Grady's *pro se* claims. *Grady*, at ¶¶1, 17-20.

### *Pro se post-conviction petition*

On June 28, 2016, Grady mailed a *pro se* post-conviction petition raising several overlapping claims of error. (C. 68-145). Grady averred that counsel on direct appeal provided ineffective assistance by failing to raise several meritorious claims, including her failure to challenge his conviction on reasonable doubt grounds. (C. 120-142). In addition to his own affidavit, Grady attached several documents supporting the petition. (C. 147-322).

On September 28, 2016, the trial judge dismissed the petition, finding no merit to any of the claims. (C. 323-342). Grady filed a timely notice of appeal. (C. 345-346).

7

## ARGUMENT

**Arthur Grady's *pro se* Post-Conviction Petition Set Forth At Least an Arguable Claim That His Attorney On Direct Appeal Provided Constitutionally Ineffective Assistance By Failing To Challenge the Sufficiency Of the Evidence, Where Police Stopped Grady Moments After the Shooting and Found Neither a Weapon Nor Robbery Proceeds On Him, and the Key Evidence Against Him Was the Significantly Impeached Testimony Of His Co-Defendant.**

Police stopped Arthur Grady moments after a shooting in which the shooter struggled with the victim and tore at his clothing, stealing a phone and wallet. Grady not only had none of those items on him, but also was not carrying a gun. The only direct evidence against Grady came from his co-defendant, Aaron Bronson, who had every reason to lie and frame Grady for the murder. Given the evidence, Grady's allegation that his attorney on direct appeal provided ineffective assistance by failing to challenge the sufficiency of the evidence had an arguable basis in both fact and law, and the trial judge erred in summarily dismissing Grady's post-conviction petition as frivolous and patently without merit. (C. 323-342); *see People v. Hodges*, 234 Ill. 2d 1, 16-22 (2009) (reversing first-stage dismissal where *pro se* claim was "at least arguable"). Reviewing this issue *de novo*, this Court should reverse the dismissal of Grady's petition and remand this cause for second-stage proceedings. *Hodges*, 234 Ill. 2d at 9, 18-23; 725 ILCS 5/122-2.1(b) (West 2016).

Pursuant to the Post-Conviction Hearing Act ("Act"), a *pro se* post-conviction petition may be dismissed at the first stage only if it is "frivolous and patently without merit." 725 ILCS 5/122-2.1. Traditionally, a petitioner at the first stage need only state the "gist" of a constitutional claim, which is necessarily "a low threshold," because petitioners "are often persons of limited education . . . [and] requiring *pro se* petitioners to state their claims in greater detail than this would

8

have the practical effect of depriving many such persons of their right of meaningful access to the courts." *People v. Edwards*, 197 Ill. 2d 239, 245 (2001); *People v. Brown*, 336 Ill. App. 3d 711, 719 (1st Dist. 2002). The Illinois Supreme Court explained the proper standard for assessing first-stage post-conviction petitions, holding that they may be dismissed "only if the petition has no arguable basis either in law or fact." *Hodges*, 234 Ill. 2d at 16. A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation," such as "one which is completely contradicted by the record . . . Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 16-17. Judges must give *pro se* petitions "liberal construction" at the first stage, and review them "with a lenient eye, allowing borderline cases to proceed." *Id.* at 21.

Criminal defendants have a constitutional right to effective assistance of counsel both at trial and when pursuing a first appeal as of right. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). Defense counsel provides ineffective assistance when his representation falls below an objective standard of reasonableness, and when the deficiencies in his performance undermine confidence in the outcome of the proceedings or deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687-689; *People v. Perez*, 148 Ill. 2d 168, 194 (1992). To meet the prejudice prong of *Strickland*, a defendant need not show that he *would have* been acquitted, only that a different outcome would be reasonable, as "prejudice may be found even when the chance that minimally competent counsel would have won an acquittal is significantly less than 50 percent." *People v. McCarter*, 385 Ill. App. 3d 919, 935 (1st Dist. 2008); *see also Strickland*, 466 U.S.

9

at 693-94. Appellate counsel will be deemed ineffective if she failed to raise a meritorious issue that may have resulted in relief for the defendant. *People v. Moore*, 177 Ill. 2d 421, 428 (1997); *People v. Salazar*, 162 Ill. 2d 513, 522 (1994); *People v. Hanks*, 355 Ill. App. 3d 894, 900 (1st Dist. 2002). In the context of a first-stage post-conviction petition, "a petition alleging ineffective assistance may not be summarily dismissed if: (i) it is arguable that counsel's performance fell below an objective standard of reasonableness; and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

Here, Grady's claim that appellate counsel was ineffective for refusing to challenge the evidence as insufficient to sustain his conviction has both factual and legal merit. Indeed, despite co-defendant Aaron Bronson's claim that Grady jumped out of the truck, scuffled with Ralph Turner, and then shot Turner twice, police who stopped Grady moments after the shooting found no evidence of Grady being involved in a scuffle, no gun, and no proceeds of the robbery. Only Bronson's impeached and self-serving testimony directly inculpated Grady; the State otherwise relied on inferences from minor circumstantial evidence to argue Grady's guilt, as no forensic or eyewitness testimony conclusively linked Grady to the shooting. (Tr.R. NN39-41, NN56-89, OO266-289). These facts surely begged appellate counsel to challenge the evidence as insufficient to sustain Grady's conviction beyond a reasonable doubt.

Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2; *In Re Winship*, 397 U.S. 358, 364 (1970). The State bears the burden of proving beyond a reasonable

10

doubt each of the material facts that comprise the crime. *People v. Weinstein*, 35 Ill. 2d 467, 470 (1996). In reviewing a challenge to the sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). In undertaking that review, this Court must "carefully consider the evidence [and] [] reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged." *People v. Ash*, 102 Ill. 2d 485, 492-93 (1984); *Smith*, 185 Ill. 2d at 542. Although a jury's findings are entitled to deference, they are not conclusive. *Smith*, 185 Ill. 2d at 542. If this Court finds that the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt, it must set aside the conviction. *People v. Davis*, 278 Ill. App. 3d 532 (1st Dist. 1996); *Smith*, 185 Ill. 2d at 542.

Appellate counsel's decision to forgo a challenge to the sufficiency of the evidence, resting as it did on the testimony of an admitted liar, was arguably constitutionally ineffective. An argument that the evidence did not establish Grady's guilt beyond a reasonable doubt had at least a reasonable probability of success. *McCarter*, 385 Ill. App. 3d at 935; *People v. Gomez*, 215 Ill. App. 3d 208, 219 (2d Dist. 1991) (reversing conviction where State's case largely circumstantial). Again, the only direct evidence implicating Grady in the shooting was Bronson's self-serving testimony aimed at keeping his sweet deal intact – testimony that was further impeached and tainted by Bronson's own acknowledgment that he lied to

11

investigators. (Tr.R. NN39-41, NN56-89, NN104-108); *People v. Gutierrez*, 387 Ill. App. 3d 1, 7 (1st Dist. 2008) (admitted lying to police damages credibility); *People v. Hansen*, 28 Ill. 2d 322, 332 (1963) (accomplice testimony is suspect and "attended with serious infirmities" because of, *inter alia*, benefits from prosecution). No other evidence directly linked Grady to the shooting: none of the witnesses at the scene identified him, and no forensics linked to him. (Tr.R. LL59-62, LL84, LL124-129, MM135, MM217-221, NN201-210); *Gomez*, 215 Ill. App. 3d at 219.

In addition, the facts conflict with Bronson's tainted account. *Smith*, 185 Ill. 2d at 546 (inconsistencies diminish credibility). Bronson testified that Turner punched Grady and that Grady fell to the ground as a result; there were several inches of snow on the ground, based on other witnesses' testimony and photos taken of the scene. (Tr.R. LL42, NN80; St. Ex. 24, 27). But when Officer Rose stopped Grady moments after the shooting, he bore no sign of having been punched or falling in the snow. (Tr.R. LL176-177). In fact, Grady bore no sign of having been involved in an armed robbery or shooting at all: he had no blood on his hands or clothes despite witnesses claiming the shooter had rummaged through Turner's pockets, had no proceeds from the robbery on him, even though Turner's cellphone and wallet had been taken, and did not have a gun on him. (Tr.R. LL144-177); *Smith*, 185 Ill. 2d at 541 (reversing jury verdict where no physical evidence corroborated weak State witnesses). And although Turner's cellphone was later found about two blocks from the scene, nothing linked the phone to Grady, and Turner's wallet was never recovered. (Tr.R. MM41-43).

Bronson's testimony about the murder weapon being found in the apartment on Champlain is also suspect. Despite telling investigators he had no idea how

12

the murder weapon got into this apartment on Champlain, he testified at trial that Grady said he tossed the gun at the scene, but then later left and returned to the apartment with it. (Tr.R. NN85-86, NN120-123). In addition to being inconsistent with his prior statements, Bronson's account makes little sense, as it is unlikely that Grady, having already been stopped as a possible offender and frisked by police moments after the shooting, returned to the scene of the crime and risked being stopped again, with the gun. (Tr.R. LL144-156). Police found the gun in a room where Bronson stored furniture, not in Grady's room, and the gun had no forensic evidence linking it to Grady. (Tr.R. MM75-87, NN201-210).

In contrast, the evidence corroborates Grady's testimony. His lack of involvement in scuffling with and killing Turner easily explains the lack of any evidence of physical contact with Turner or several inches of snow, as does the lack of a gun or any robbery proceeds on his person mere moments after the shooting. (Tr.R. LL144-177, OO23-28); *see People v. Natal*, 368 Ill. App. 3d 262, 266-67 (1st Dist. 2006) (possessing proceeds of crime raises inference of guilt). Also corroborating Grady's testimony is the physical location of his phone. Police found it in the street, exactly where it would have landed if, as Grady claimed, it had fallen out of his lap when he briefly stepped out of the SUV to see what was going on between Bronson and Turner. (Tr.R. MM49, OO23; St. Ex. 27, 28). If he had lost it while searching Turner's pockets, as witnesses described the offender doing, the phone would have fallen near Turner's body, in the yard or on the sidewalk, not several feet away and well into the street. (Tr.R. LL122; St. Ex. 24, 27, 36). And police finding Grady's phone in the street is not evidence of his guilt, as his presence near the scene and flight therefrom is not sufficient to prove his guilt beyond a

13

reasonable doubt. *See, e.g., People v. Runde*, 44 Ill. App. 3d 598, 600 (3d Dist. 1976).

Given the above, it is at least arguable that no reasonable strategy endorses appellate counsel's refusal to challenge Grady's conviction on the grounds that the evidence did not establish his guilt beyond a reasonable doubt; such an argument bore at least a reasonable probability of success. *Smith*, 185 Ill. 2d at 541-46 (reversing where evidence conflicted); *Gomez*, 215 Ill. App. 3d at 219 (reversing where State's evidence largely circumstantial). Appellate counsel's erroneous strategy is especially noticeable given that Grady's jury expressed doubt about the evidence, asking multiple questions over the course of several hours of deliberation, at the conclusion of which it rendered a split verdict finding Grady guilty of murder but finding that the allegation that Grady personally discharged a weapon had not been proven. (Tr.R. OO328-332, PP4-5).

Likewise, it is at least arguable that appellate counsel's failure to challenge the sufficiency of the evidence on direct appeal prejudiced Grady. As detailed above, the record confirms that this was an arguably meritorious claim. *See Moore*, 177 Ill. 2d at 428 ("If defendant's claim … is meritorious, then clearly, counsel's failure to raise this issue on direct appeal resulted in prejudice to defendant"). Appellate counsel's failure to raise the issue was arguably prejudicial for the same reason that it was arguably unreasonable: the issue had arguable merit. That is enough to satisfy first-stage requirements. *Hodges*, 234 Ill. 2d at 17 (petition alleging ineffective assistance of counsel may not be summarily dismissed if counsel's performance was arguably deficient and if petitioner was arguably prejudiced); *see also People v. Thomas*, 2014 IL App (2d) 121001 (remanding for second stage

14

proceedings on arguable claim that appellate counsel was ineffective for failing to raise priest-penitent privilege issue on direct appeal). Thus, appellate counsel's failure to raise this meritorious issue on direct appeal deprived Grady of his right to the effective assistance of appellate counsel. *Moore*, 177 Ill. 2d at 428; *Hanks*, 335 Ill. App. 3d at 900, 903.

Arthur Grady's *pro se* post-conviction claim that his attorney on direct appeal deprived him of the effective assistance to which he was constitutionally entitled when counsel refused to challenge the evidence as insufficient to sustain his conviction beyond a reasonable doubt is supported by both facts and law, and is far from "indisputably meritless." *Hodges*, 234 Ill. 2d at 16-22. Thus, Grady's petition "did not lack an arguable basis either in law or in fact and it should not have been dismissed as frivolous and patently without merit." *Hodges*, 234 Ill. 2d at 22. Accordingly, this Court should reverse the circuit court's order summarily dismissing Grady's post-conviction petition and remand this cause for second-stage proceedings under the Act. *Id.*; 725 ILCS 5/122-2.1(b), 5/122-4-5/122-6.

15

## CONCLUSION

For the foregoing reasons, Arthur Grady respectfully requests that this

Court reverse the dismissal of his *pro se* post-conviction petition and remand for

second-stage post-conviction proceedings.


Respectfully submitted,

PATRICIA MYSZA
Deputy Defender

JENNIFER L. BONTRAGER
Assistant Appellate Defender
Office of the State Appellate Defender
First Judicial District
203 N. LaSalle St., 24th Floor
Chicago, IL 60601
(312) 814-5472
1stdistrict.eserve@osad.state.il.us

COUNSEL FOR PETITIONER-APPELLANT

16

-A350-

## CERTIFICATE OF COMPLIANCE

I, Jennifer L. Bontrager certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages  or words contained in the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is **16** pages.

JENNIFER L. BONTRAGER
Assistant Appellate Defender

## APPENDIX TO THE BRIEF

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

Certified Report of Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-11

Circuit Court's Conclusion Denying *Pro Se* Petition for Post-Conviction Relief.  A-12

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-13

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                    **Page**

**Vol. 1 of 2**

Certified Statement of Conviction/Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Motion to Proceed in Forma Pauperis and Request for Free Transcripts . . . . . . . . . . . . .  44

Letter from Defendant to Dorothy Brown (February 19, 2014) . . . . . . . . . . . . . . . . . . . . .  47

Letter from Circuit Court Denying Request for Free Transcripts (June 13, 2014) . . . . . .  52

Mandate from Appellate Court No. (13-2160) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

Rule 23 Order from the Appellate Court No. (13-2160) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

Sentencing Order (April 22, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

*Pro Se* Motion to Appoint Counsel (July 6, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

*Pro Se* Petition for Post-Conviction Relief (July 6, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . .  71

**Vol. 2 of 2**

*Pro Se* Petition for Post-Conviction Relief Continued . . . . . . . . . . . . . . . . . . . . . . . . . . . .  250

Circuit Court's Order Denying *Pro Se* Petition for Post-Conviction Relief () . . . . . . . . . .  323

Attorney's 651 (c) certificate (September 28, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  343

Certified Report of Disposition () . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  344

Notice of Appeal (October 25, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  346

**Supplemental Common Law Record (S.C.)**

2 photocopy of envelopes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

**Supplemental Common Law Record (S.C.)**

Letter from Defendant to Dorothy Brown (September 6, 2016) . . . . . . . . . . . . . . . . . . . . . .  3

*Pro Se* Motion to Appoint Counsel (July 6, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

A-1

**Report of Proceedings ("R")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|

September 28, 2016

Petition for Post-Conviction Relief - Denied                                J4

### Index to the Direct Appeal
### Appellate Court No. 1-13-2160

**Common Law Record ("C")**                                                **Page**

Memorandum of Orders ("Half Sheet")........................................ C2

Arrest Report (January 31, 2009) ........................................... C11

Complaint for Preliminary Examination (February 1, 2009) ...................... C17

Appearance (February 26, 2009)............................................ C21

Motion for Buccal Samples from the Defendant (February 26, 2009)................. C23

Indictment (December 29, 2010) ........................................... C25

State's Motion for Discovery (October 27, 2011) ................................ C55

Motion to Produce (January 10, 2012) ....................................... C64

Motion to Suppress Evidence Illegally Seized (October 17, 2012)................... C74

Motion for Continuance (April 22, 2013)...................................... C83

Certificate of Judge Adjudging Named person a Material Witness (May 13, 2013 ...... C90

Motion to Supplemental Motion to uash Arrest and Suppss Evidence Illegally Seized (May 13, 2013)............................................................ C93

Defendant's Response to State's Memorandum of Law (May 16, 2013) .............. C102

Defense Motion in Limine (May 16, 2013) .............................. C05-C107

Supplemental Motion in Olimine (May6 16, 2013) ............................. C109

Motion to Bar Testimony (May 20, 2013).............................. C115, C246

Witness List (May 16, 2013) ......................................... C120, C249

A-2

Jury Note to Honorable Rosemary Higgins-Grant (May 23, 2013) . . . . . . . . . . . . . . . . . . C125

Jury Instructions () . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C128

Jury Verdict Form Signed (May 24, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C158

Presentence Investigation Report (June 19, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . C162

Victim Impact Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C224-C235

Order Assessing Fines, Fees and Costs (June 19, 2013) . . . . . . . . . . . . . . . . . . . . . . . . C237

Sentencing Order (June 19, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C240

Motion to Reconsider Sentence (June 19, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C242

Motion for New Trial (June 19, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C243

**Volume II**

Memorandum of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C254

Notice of Appeal (June 19, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C300

Circuit Court Appoints Office of the State Appellate Defender to Represent
Defendant on Appeal (June 28, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C303

## Report of Proceedings ("R")

|  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| **Volume I** | | | | |
| January 12, 2011 - Continuance | | | | A2 |
| January 12, 2011 - Continuance | | | | B2 |
| January 20, 2011 - Continuance | | | | C5 |
| March 1, 2011 - Continuance | | | | E5 |
| April 7, 2011 - Continuance | | | | F3 |
| May 19, 2011 - Continuance | | | | H3 |
| June 28, 2011 - Continuance | | | | I-2 |
| September 25, 2013 - Continuance | | | | J2 |
| August 23, 2011 - Continuance | | | | K4 |

A-3

|                                              | Direct | Cross | Redir. | Recr. |       |
|----------------------------------------------|--------|-------|--------|-------|-------|
| September 30, 2011 -Continuance              |        |       |        |       | L4    |
| October 27, 2011 - Continuance               |        |       |        |       | M5    |
| December 1, 2011 - Continuance               |        |       |        |       | N2    |
| January 10, 2012 -Continuance                |        |       |        |       | O3    |
| February 7,  2012 -Continuance               |        |       |        |       | P2    |
| March 22, 2012 - Continuance                 |        |       |        |       | Q3    |
| April 18, 2012 - Continuance                 |        |       |        |       | R2    |
| June 5, 2013 - Continuance                   |        |       |        |       | S2    |
| July 12, 2012 - Continuance                  |        |       |        |       | T3    |
| September 6,m 2012 - Continuance             |        |       |        |       | U3    |
| October 17, 2012 - Continuance               |        |       |        |       | V2    |
| December 11, 2012 - Continuance              |        |       |        |       | W3    |
| December 27,  2012 -Continuance              |        |       |        |       | Y3    |
| January 16, 2013 - Continuance               |        |       |        |       | Z4    |
| March 14, 2013 - Continuance                 |        |       |        |       | AA3A  |
| April 22, 2013 - Continuance                 |        |       |        |       | CC5   |
| May 8, 2013 - Continuance                    |        |       |        |       | DD10  |

**Volume II**

May 13, 2013

Supplemental Motion to Quash arrest and suppress evidence

Defense Witnesses

|                  | Direct | Cross | Redir. | Recr.  |        |
|------------------|--------|-------|--------|--------|--------|
| Angela Baker     | EE4    | EE14  | EE27   |        |        |
| Shawana Chester  | EE30   | EE43  | EE56   |        |        |
| Matthew Weber    | EE66   | EE75  | EE96   | EE 100 |        |

Defense Rests                                                                    EE105

A-4

|  |  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|---|
| State Witness |  |  |  |  |  |
|  | Henry Barsch | EE105 | EE114 | EE127 | EE 119 |
| State Rest |  |  |  |  | EE128 |
| Defense Rebuttal Witnesses |  |  |  |  |  |
|  | Shawana Chester | EE129 |  |  |  |
|  | Angela Baker | EE132 |  |  |  |
| Defense Rests |  |  |  |  | EE134 |
| Arguments |  |  |  |  |  |
|  | Ms. Ward |  |  |  | EE135 |
|  | Mr. Lyke |  |  |  | EEE 150 |
| Court's Rulings |  |  |  |  | EE155 |
| **Volume III** |  |  |  |  |  |
| May 15, 2013 |  |  |  |  |  |
| Memorandum of Law |  |  |  |  | GG2 |
| Continuance |  |  |  |  | GG24 |
| May 16, 2013 |  |  |  |  |  |
| Memorandum of Law |  |  |  |  |  |
| Arguments |  |  |  |  |  |
|  | Mr. Lyke |  |  |  | HH4 |
|  | Ms. Mojica |  |  |  | HH7 |
| Rebuttal by | Mr. Lyke |  |  |  | HH13 |
| Court's Ruling |  |  |  |  | HH17 |
| Supplemental Motion to Quash arrest and suppress evidence |  |  |  |  |  |

A-5

|  |  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|---|
| Court's Ruling |  |  |  |  | HH18 |
| **Jury Trial** |  |  |  |  |  |
| Jury Selection |  |  |  |  | HH35-HH99 |
| **Volume IV** |  |  |  |  |  |
| Jury Selection (cont.) |  |  |  |  | II-2-II-217 |
| **Volume V** |  |  |  |  |  |
| May 17, 2013 |  |  |  |  |  |
| Opening Statements |  |  |  |  |  |
|  | Ms. Ward |  |  |  | JJ16 |
|  | Mr. Lyke |  |  |  | JJ25 |
| State Witnesses |  |  |  |  |  |
|  | Ralph Turner Sr. | JJ37 |  |  |  |
|  | Dr. Rupert Evans | JJ46 | JJ73 |  |  |
|  | Robert Currie | JJ83 | JJ125 |  |  |
| **Volume VI** |  |  |  |  |  |
| May 20, 2013 |  |  |  |  |  |
| Motion to Bar Testimony |  |  |  |  |  |
| Argument |  |  |  |  |  |
|  | Mr. Lyke |  |  |  | LL6 |
|  | Ms. Ward |  |  |  | LL16 |
| Court's Rulings |  |  |  |  | LL27 |
| (Trial cont.) |  |  |  |  |  |
|  | Anthony McGee | LL29 | LL62 | LL108 | LL111 |

A-6

|  |  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|---|
|  | Pamela Snow Woodard | LL118 | LL132 |  |  |
|  | Officer Adam Rose | LL139 | LL158 |  |  |
| **Volume VII** | Jennifer Czerwinske | LL185 | LL259 |  |  |
|  | Officer Anthony Ellis | LL270 | LL282 |  |  |
| **Volume VIII** | Officer C Brasic | MM6 | MM31 | MM37 | MM 39 |
|  | Henry Barsch | MM44 | MM 100 | MM 162 | MM 166 |
|  | Dr. Ponni Arunkumar | MM 172 | MM 196 |  |  |
|  | Debra Bonner | MM 211 | MM 221 | MM 244 |  |
| **Volume IX** | Justin Barr | NN4 |  |  |  |
|  | Det. David Scarriot | NN22 |  |  |  |
|  | Aaron Bronson | NN36 | NN92 | NN153 NN161 NN172 | NN 176 |
|  | Salandra Haddock | NN180 | NN190 |  |  |
| State Rests |  |  |  |  | NN 198 |
| Motion for Directed Verdict - Denied |  |  |  |  | NN 202 |
| Stipulation |  |  |  |  | NN 203 |
| Defense Rests |  |  |  |  | NN 207 |
| Jury Instruction Conference |  |  |  |  | NN 209 |
| **Volume X** |  |  |  |  |  |

A-7

|  |  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|---|
| May 13, 2013 |  |  |  |  |  |
| Leave to reopen - granted |  |  |  |  | OO4 |
| Defense Witness |  |  |  |  |  |
|  | Arthur Brady | OO12 | OO43 | OO155 | OO 181 |
| Defense Rests |  |  |  |  | OO 189 |
| Jury Instruction Conference |  |  |  |  | OO 190 |
| State's Stipulation |  |  |  |  | OO 202 |
| People Rest in Rebuttal |  |  |  |  | OO 204 |
| **Volume XI** |  |  |  |  |  |
| May 23, 2013 |  |  |  |  |  |
| Closing Arguments |  |  |  |  |  |
|  | Ms. Miller |  |  |  | OO 207 |
|  | Mr. Lyke |  |  |  | OO 226 |
| Rebuttal by | Ms. Ward |  |  |  | OO 266 |
| Jury Instructions |  |  |  |  | OO 289 |
| **Volume XII** |  |  |  |  |  |
| May 24, 2013 |  |  |  |  |  |
| Verdict of Guilt |  |  |  |  | PP5 |
| Jury Polled |  |  |  |  | PP6 |
| June 19, 2013 |  |  |  |  |  |

|                                  |              | Direct | Cross | Redir. | Recr. |
|----------------------------------|--------------|--------|-------|--------|-------|
| Motion for New Trial             |              |        |       |        |       |
| Arguments                        |              |        |       |        |       |
|                                  | Mr. Lyke     |        |       |        | RR3   |
|                                  | Ms. Ward     |        |       |        | RR12  |
| Rebuttal by                      | Mr. Lyke     |        |       |        | RR20  |
| Court's Rulings                  |              |        |       |        | RR38  |
| Sentencing Hearing               |              |        |       |        |       |
| State's Witness in Aggravation   |              |        |       |        |       |
|                                  | Michael Turner | RR44 |       |        |       |
|                                  | Evelyn Turner  | RR48 |       |        |       |
|                                  | Ralph Turner   | RR56 |       |        |       |
| Defense Witness in Mitigation    |              |        |       |        |       |
|                                  | Edward Grady   | 61   |       |        |       |
|                                  | Argument in Aggravation |  |    |        | RR68  |
|                                  | Argument in Mitigation  |  |    |        | RR77  |
|                                  | Allocution   |        |       |        | RR77  |
| Imposition of Sentence           |              |        |       |        | RR77  |
| Motion to Reconsider Sentence    |              |        |       |        |       |
| Arguments                        |              |        |       |        |       |
|                                  | Mr. Lyke     |        |       |        | RR84  |
|                                  | Ms. Ward     |        |       |        | RR90  |
| Court's Ruling                   |              |        |       |        | RR91  |

**Supplemental Report of Proceedings (SR.I)**

A-9

-A361-

|  | Direct | Cross | Redir. | Recr. |
|--|--------|-------|--------|-------|

2 volumes of exhibits (photos)

A-10

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS

v.                                          Case No.   11CR00169-01

ARTHUR GRADY

## CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge ERICA L. REDDICK ON
SEPTEMBER 28, 2016.  SEE ATTACHED CONCLUSION.

I hereby certify that the foregoing has been entered of record on the above captioned case.

Date:  OCTOBER 07, 2016

*Dorothy Brown*, Clerk of the Circuit Court

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

A-11

C · 000300

counsel's decision not to raise these issues on appeal, and counsel's assistance was therefore not ineffective. Accordingly, this claim is without merit and must fail.

CONCLUSION

The court finds that the issues raised and presented by petitioner are frivolous and patently without merit. Accordingly, the petition for post-conviction relief is hereby dismissed. Petitioner's requests for leave to proceed *in forma pauperis*, for appointment of counsel, and for free transcripts, are also denied.

ENTERED:



Honorable Eric L. Reddick
No. 2038
Circuit Court of Cook County
Criminal Division

DATED: 28 September 2016

ENTERED

SEP 28 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

A-12

C:00342

THE PEOPLE OF THE )
STATE )
OF ILLINOIS )
) No. 11CR1169
v. )
)
)
Arthur Grady )
Defendant/Appellant )

## Notice of Appeal

An appeal is taken from the order or judgment described below:

(1) Court to which appeal is taken: 1st District Appellate Court
160 North Lasalle st. Suite 1400, Chicago, IL 60601

(2) Name of appellant and address to which notices shall be sent:
Name: Arthur Grady #R01363
Address: P.O. Box 112

(3) Name and address of appellant's attorney on appeal:
Name: Don't Have an Attorney
Address:
If appellant is indigent and has no attorney, does he want one appointed?
Yes I would like one appointed and copy of transcripts

(4) Date of judgment or order: September 28th 2016 ✓

(5) Offense of which convicted: 1st Degree Murder

(6) Sentence: 60 Yrs

(7) If appeal is not from a conviction, nature of order appealed from: From
denial of Post-conviction Petition at 1st stage.

Signed Arthur Grady
(May be signed by appellant, attorney for appellant, or clerk of circuit court)

Revised Jan 2002

FILED
OCT 25 2016
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

A-13

435 Ill.Dec. 708

140 N.E.3d 266 (Table)
(This disposition of a Petition for Leave to Appeal
is referenced in the North Eastern Reporter.)
Supreme Court of Illinois.

PEOPLE State of Illinois, Respondent,

v.

Arthur GRADY, Petitioner.

No. 125399
|
January 29, 2020

Leave to appeal, Appellate Court, First District. 1-16-3012

**Opinion**

Petition for Leave to Appeal Denied.

**All Citations**

140 N.E.3d 266 (Table), 435 Ill.Dec. 708

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S.
                                       Government Works.

Exhibit D
-A367-

RECEIVED ER
4/24/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

SCANNED AT STATEVILLE CC and E-mailed
4-24-20 by ___ 19 pages
date      Initials   No.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

United States of America ex rel.

Arthur Grady
(Full name and prison number)
(Include name under which convicted)

PETITIONER

vs.

Warden David Gomez
(Warden, Superintendent, or authorized
person having custody of petitioner)

RESPONDENT, and

(Fill in the following blank **only** if judgment
attacked imposes a sentence to commence
in the future)

ATTORNEY GENERAL OF THE STATE OF

Illinois
(State where judgment entered)

**1:20-CV-2530**

CASE NO: _____
(Supplied by Clerk of this Court)

**JUDGE ROWLAND
MAGISTRATE JUDGE JANTZ
PC12**

Case Number of State Court Conviction:

11CR1169

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Cook County 2650 S. California Avenue. Chicago Illinois 60608

2. Date of judgment of conviction: May 24th 2013

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
First Degree Murder: count 1 + 7 (A)(1) 0735000, Count 2 + 8 (A)(2)0735100; count 3 + 9(A)(3)0735200

4. Sentence(s) imposed: 60 years

5. What was your plea? (Check one)
   (A) Not guilty    (X)
   (B) Guilty        ( )
   (C) Nolo contendere ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

PART I – TRIAL AND DIRECT REVIEW

1.  Kind of trial:  (Check one):      Jury  (X)         Judge only  (  )

2.  Did you testify at trial?        YES  (X)         NO        (  )

3.  Did you appeal from the conviction or the sentence imposed?  YES (X)   NO (  )

   (A)  If you appealed, give the

      (1)  Name of court:  _Clerk of Appellate Court First District_

      (2)  Result:  _Affirmed_

      (3)  Date of ruling:  _10-16-2015_

      (4)  Issues raised:  _Arthur Grady's 60 Year sentence was excessive_

      _____

      _____

      _____

   (B)  If you did not appeal, explain briefly why not:

      _____

      _____

4.  Did you appeal, or seek leave to appeal, to the highest state court?  YES (X)   NO (  )

   (A)  If yes, give the

      (1)  Result  _P.L.A. Denied_

      (2)  Date of ruling:  _2-24-2016_

      (3)  Issues raised:  _Appellate Court erred that Grady's 60 Year sentence was not_

      _excessive_  _____

      _____

   (B)  If no, why not:  _____

5.  Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes (  )  No (X)

   If yes, give (A) date of petition: _____  (B) date *certiorari* was denied: _____

2

PART II- COLLATERAL PROCEEDINGS: Continued

c. Issues raised: Assistance of appellate counsel for failing to raise detectives committed perjury on direct appeal. d. Ineffective for failing to raise prosecutorial misconduct for knowing use of perjury. e. Ineffective for failing to raise prosecutorial misconduct for purposely misstating evidence. f. Ineffective for failing to raise Trial Court erred in weighing witness credibility. g. Ineffective for failing to raise abuse of discretion for improperly influencing the state to change their theory during motion to quash arrest. h. Ineffective for failing to raise Trial Court erred in ruling probable cause existed. Ineffective for failing to raise abuse of discretion for denying motion to bar statements made after trial had already started. i. Ineffective for failing to raise prosecutorial misconduct for improperly bolstering Bronson's credibility. k. Ineffective assistance for failing to raise prosecutorial misconduct for purposely misleading jury with improper accountability elements to obtain conviction. L. Ineffective for failing raise abuse of discretion for tendering accountability instruction. m. Ineffective for failing to raise abuse of discretion on Trial Court for showing bias. n. Ineffective for failing to raise abuse of discretion on evidentiary rulings favoring State. o. Ineffective for failing to raise abuse of discretion for acting as a advocate for the state. p. Ineffective for failing to raise insufficiency of evidence

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)   NO ( )

With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A. Name of court: Cook County Circuit Court of Illinois

B. Date of filing: July 16th 2016

C. Issues raised: a. ineffective assistance of Trial counsel John Lyke for failing to produce evidence to show detectives committed perjury under auth b. Appellate counsel was ineffective for failing to raise Ineffective assistance of trial counsel John Lyke on direct appeal. c. Ineffective

D. Did you receive an evidentiary hearing on your petition?    YES ( )   NO (X)

E. What was the court's ruling? Summarily dismissed as frivolous and patently without merit

F. Date of court's ruling: September 28th 2016

G. Did you appeal from the ruling on your petition?    YES (X)   NO ( )

H. (a) If yes,    (1) what was the result? Affirmed

   (2) date of decision: May 10th 2019

   (b) If no, explain briefly why not: _____

I. Did you appeal, or seek leave to appeal this decision to the highest state court?

   YES (X) NO ( )

   (a) If yes,    (1) what was the result? Denied

   (2) date of decision: March 4th 2020

   (b) If no, explain briefly why not: _____

3

2. With respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )    NO (X)

A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

1. Nature of proceeding _____ NA _____

2. Date petition filed _____ NA _____

3. Ruling on the petition _____ NA _____

3. Date of ruling _____ NA _____

4. If you appealed, what was the ruling on appeal? _____ NA _____

5. Date of ruling on appeal _____ NA _____

6. If there was a further appeal, what was the ruling? _____ NA _____

7. Date of ruling on appeal _____ NA _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in federal court? YES ( )    NO ( )

A. If yes, give name of court, case title and case number: _____ NA _____

_____

B. Did the court rule on your petition? If so, state

(1) Ruling: _____ NA _____

(2) Date: _____ NA _____

4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

YES ( )    NO (X)

If yes, explain: _____

_____

4

PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.

(A) Ground one  The Trial Court abused its discretion when it sentenced Arthur

supporting facts (Tell your story briefly WITHOUT CITING cases or law):

Grady to 60 years in prison - essentially a life sentence - for first degree murder, where the jury found that he was not the shooter, his criminal history was not extensive, he has rehabilitative potential warranting a sentence below the maximum, violating Grady's United States and Illinois constitutional rights. Appellate counsel argued Grady's 60 yr sentence was excessive, where the mitigating factors established rehabilitative potential and the aggravating factors did not warrant a maximum sentence. Appellate counsel also addressed that Grady was convicted as the accomplice after Grady was acquitted of possessing and personally discharging the firearm that killed Ralph Turner (DEF. App. Br. 16-20; DEF. R. Br. 1-5). The State argued that Grady was actually convicted as the shooter based on co-defendant Aaron Bronson's testimony and the 60 year sentence was not excessive (St. Br. 14-28).

The Court abused its discretion when it found the facts occurred as Bronson indicated, where Bronson was not credible and the facts presented by the state did not convince Grady's jury, that Grady was the person who shot and killed Ralph Turner, and sentencing facts need to be accurate, not speculative (TR. RR77-83; RR93; St. Br. 19-28). In light of the evidence presented by the state, Grady should have at least received a lesser sentence, where the jury's inconsistent verdicts created a reasonable presumption that the jury believed Bronson was the shooter. The court also failed to properly balance the aggravating and mitigating factors before sentencing Grady to the maximum 60 yr sentence, where additional findings of facts beyond those found by the jury were necessary before the court could impose a sentence in excess of 20 years.

Grady was sentenced three times the minimum sentence for first degree murder. It is undisputed that the facts contained in Grady's jury verdict were insufficient to sentence Grady to a 60 yr term of imprisonment, and judicial fact finding was the predicate for extending Grady's sentence beyond the statutory prescribed 20 yrs. Grady was also sentenced on the three counts of first degree murder that he was found not guilty on, where Grady has a due process right to be convicted and sentenced based on accurate information, and not on materially untrue assumptions or misstatements, where the court is obligated to be sure the information it relies on during Grady's sentencing is both reliable and accurate.

The Court's understanding of the facts was unreasonable, where the court believed Grady could be convicted as the shooter or as the accomplice, after the state already conceded that Grady was the actual shooter, which was an unreasonable and improper application of the law, violating Grady's right to a fair sentencing hearing, resulting in an abuse of discretion (T.R. 215NN-217NN; RR 82-83). The court estimation of the facts were also unreasonable, where the court believed Grady stalked Turner at the casino, based on co-defendant Bronson's impeached testimony, that was contradicted by other state witnesses, and the duplicate video clips shown by the state that totaled a time of less than five minutes out of five hours (T.R. 138-140JJ; 199LL-209LL, 260-265LL; MM57, MM143-145, MM167; 0039, 0048-59, 0074-95, 00159; RR80-53).

The circumstances of the offense do no warrant a maximum sentence, where the incident only turned deadly when Turner punched the shooter and did not rise to the level of a premeditated murder. The sentence was grossly excessive where Grady was found accountable, but the jury did not find that the state proved Grady was the shooter (T.R. NN80). Grady was 30 years old at the time of his arrest and Grady's sentence is 40 years above the minimum, where Grady will have to serve everyday of the 60 year sentence which is a life term, or de facto life sentence. The sentence imposed on Grady effectively negates any possibility of defendant's rehabilitation.

The Court exhibited a possible temptation to be bias towards Grady during the post-trial Motion after being notified by the State, that Grady's attorney alleged the Court acted as an advocate for the state, where the court became visibly upset and defensive. At the Sentencing phase, the Court exhibited another possible temptation to be bias, as it was known to the Court that Ralph Turner's father, was a retired Chicago police officer and a recently retired Cook County Sheriff, when the Court stated Grady was not rehabilitative due to a class 4 drug possession conviction and a class 3 aggravated battery on a police officer conviction. The Court also found Grady not to be remorseful after Grady apologized to the Turner family, but maintained his innocence (Tr. RR77-83, RR91-93; St.Br, 19-28).

The Court also used misstated facts as substantial evidence during Grady's Sentencing phase, which is a violation of Grady's due process rights to a fair trial, where the Court pierced the veil of Impartiality during Grady's proceedings, where the Court was bias toward Grady and his attorney, acted as an advocate for the prosecutor's, where the Court's evidentiary rulings improperly favored the State throughout all of Grady's proceedings before and after trial. The evidence presented at Grady's trial was closely balanced and had not it been for the Court's abuse of discretion, the outcome of Grady's proceedings would have been different, resulting in a Plain error violation.

The Appellate Court was unreasonable, where it upheld the Circuit Courts decision against Grady, and indicated the circuit court properly considered the evidence in aggravation and mitigation, however the circuit court weighed Grady's mitigating factors of having a good upbringing and making bad choices as a aggravating factor to not be rehabilitative.

The Appellate court was also unreasonable, where it could not find that Grady's sentence was greatly at variance with the law, or manifestly disproportionate to the nature of the offense to find an abuse of discretion in the length of Grady's sentence, where Grady was acquitted of personally discharging the firearm that killed Ralph Turner, but was sentenced to the maximum term possible under the law, resulting again in an abuse of discretion by the court.

(B) Ground Two: <u>Grady argues that Appellate counsel was ineffective for failing</u>
Supporting Facts:

to raise insufficiency of evidence on direct appeal, where the evidence was insufficient for the jury to find the essential element that Grady actually shot Turner beyond a reasonable doubt. The jury convicted Grady of three counts of first degree murder as the shooter and simultaneously acquitted Grady of three counts of first degree murder while possessing and discharging the firearm that killed Ralph Turner, rendering inconsistent verdicts that were metaphysically impossible to reconcile, leaving no logical or legal explanation on how Grady could be both the shooter and not the shooter, which resulted in a violation of Grady's United States and Illinois Constitutional rights, warranting relief and a reversal of Grady's conviction.

Appellate counsel's failure to raise the sufficiency claim, where the evidence presented by the state only demonstrates that Grady was present at the scene and had an acquaintance with Aaron Bronson, however the evidence pointing to Grady's guilt as the shooter is quite speculative, where Grady was not identified by the eye witness as the shooter, and reasonable speculation is not proof beyond a reasonable doubt, therefore appellate counsel's failure to raise claim on direct appeal violated Grady's rights to effective assistance of counsel, has subjected Grady to cruel and unusual punishment, and a violation of Grady's due process of law, therefore prejudicing Grady, where the outcome of Grady's direct appeal would have been different (Pet. Br. 8-15, Pet. R. Br. 1-5).

The State tried Grady only as the shooter in the death of Ralph Turner, and presented evidence by co-defendant Aaron Bronson who had previously entered into a plea deal and testified that Grady allegedly possessed and discharged the gun that killed Turner. The State also presented circumstantial surveillance video evidence of Grady at the Horseshoe casino that did not corroborate Bronson's alleged testimony that Turner was gambling and had won thirty thousand dollars, nor show that Grady was actually the person who shot and killed Turner after leaving the casino (St.Br.18-29). There was no forensic evidence linking Grady to the gun that was recovered (T.R.LL129; MM221; NN201-210; St.Br.24).

When the shooting death of Ralph Turner took place, multiple calls were made to 911 and a description was given, and officers responding to the 911 calls stopped Grady, where Grady fit a general description, but bore no signs of being involved in a crime, and after a protective pat down, Grady showed identification, where a contact card was made, then Grady was released without being taken to the scene of the crime for a show up (T.R.LL42,LL59-62,LL129,LL144-177; MM221; NN80; 0026-28; St.EX.24,27).

Aaron Bronson's testimony could not be taking as absolute truth, where Bronson had motive to lie, was impeached multiple times, and made new statements after Grady's trial had already started, and opening arguments had been given and several state witnesses had testified, leaving a reasonable inference that Bronson attempted to frame Grady for a crime Bronson committed alone (T.R.55NN-86NN, 100NN-120NN, 159NN).

Grady denied having any involvement in the death of Ralph Turner and provided reasonable explanations to the circumstantial evidence presented by the State (T.R.0015-0029,0039). Grady has highlighted the absence of facts demonstrating that Grady in fact shot and killed Ralph Turner. Grady's case involves an inconsistency on the same counts with the same defendant and to enter an acquittal, the Trial Court would have needed to disregard the fact that the Jury expressly found Grady guilty and to enter a guilty verdict, the Trial Court would have needed to overlook the special verdict findings that Grady did not personally discharge the firearm at issue, which was an error of constitutional magnitude.

The jury's verdict when read in its entirety reveals that the state failed to prove an essential element of the charged offense, which was the identity of the shooter. For the jury to find Grady guilty of murder, an essential element the government was required to prove beyond a reasonable doubt was that Grady was the person who committed the act of shooting Ralph Turner and causing death. When the jury found the state did not prove the allegation that Grady personally discharged the firearm that caused the death to Turner, Grady is entitled to a judgement of acquittal. The unanimous finding of not guilty by the jury on the special verdict form negates an essential element of the offense of first degree murder, and is only susceptible to one interpretation, that the state failed to prove Grady guilty of first degree murder beyond a reasonable doubt.

Appellate counsel omitted a dead-bang winner where the jury clearly expressed doubt about the state's evidence when it rendered verdicts that were factually inconsistent and diametrically opposed to one another, where the guilty verdict on first degree murder as the shooter, and the acquittal of first degree murder on personally discharging the firearm that caused proximate death to Ralph Turner are inconsistent and irreconcilable, rendering the state's evidence unsatisfactory, justifying a reasonable doubt of Grady's guilt, and acknowledgement that Grady's appellate counsel was ineffective, warranting relief and a reversal of Grady's conviction (Pet. R. Br. 4-5).

Grady challenges the presumption of correctness by the state and appellate court, finding that Grady was not prejudiced on direct appeal, where the evidence was overwhelming. The finding involves an unreasonable application of clearly established federal law addressing effective assistance of counsel, cruel and unusual punishment, and due process of law as determined by the U.S. supreme court, where the decisions were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, although the appellate court identified the standard of review for a sufficiency challenge, it wholly dismisses particular items of evidence as immaterial, such as someone other than Grady committing the crime, and ignored the law, that the state must prove each element of an offense beyond a reasonable doubt, where the state failed to convince the trier of fact that Grady was the person who shot and killed Ralph Turner (T.R. 263LL-265LL; MM56-57; 00282, 00285; App. O. pg 9-14).

(C) Ground Three   Ineffective Assistance of Appellate Counsel for failing to raise

Supporting Facts:

Prosecutorial Misconduct on appeal, where the prosecutor constructively amended the charges against Grady during rebuttal argument, After the state had already conceded that Grady was the shooter and only the shooter, The prosecutor improperly told the Jury 'it could convict Grady if the Jury didn't believe Grady was the shooter, by holding Grady legally responsible for state witness co-defendant Aaron Bronson, who pled guilty in exchange to testify against Grady (Tr. 00282-285). Permitting the Jury to convict Grady upon the factual basis that Grady was not the shooter, but accountable for Bronson's actions, effectively modified an essential element of the charged offense which broadened the indictment and constituted reversible error (TIR JJ 16-25; 00207-00219).

The prosecutor's comments unduly influenced the perspective from which the Jurors viewed the case, where it relieved the state of its burden of proving Grady's guilt beyond a reasonable doubt, by allowing the Jury to convict Grady without believing Grady actually shot Turner, tipping the balance in the prosecution's favor, constituting plain error, where the evidence was closely balanced. While the prosecutor may strike hard blows, they may not strike foul ones against Grady, where its duty is to refrain from producing a wrongful conviction. The prosecutor's statements prejudiced Grady, where the outcome of Grady's trial would have resulted in a different outcome, without the improper comments to the Jury.

When the Trial court allowed the accountability instruction to be tendered to the Jury over counsel's objection, Grady's indictment was constructively amended, where the Jury's confusion on the essential elements necessary to convict Grady, resulted in Grady being found guilty of first degree murder as the accomplice, and acquitted of the Prosecutor's theory of being the shooter, where Grady was found not guilty of personally discharging the firearm that actually killed Ralph Turner. There was a crucial impact of what the prosecutor told the Jury with great potential for Jury confusion and persuasion, where the evidence was closely balanced. Those types of characterizations of Grady, not based on evidence was prejudicial and likely to influence the Jury's deliberations, where it's reasonable the Jury did not find Bronson's testimony credible, resulting in plain error and a violation of Grady's United states and Illinois rights to due process for Grady's wrongful conviction.

2. Have all grounds raised in this petition been presented to the highest court having Jurisdiction? YES (x) NO ( )

3. If you answered "No" to question (16), state briefly what grounds were not so presented:

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _____

(B) At arraignment and plea  _John Lyke_  1505 E 53rd street suite 200

(C) At trial  _John Lyke._

(D) At sentencing  _John Lyke._

(E) On appeal  _Arianne Stein_ Appellate Defender 1st Dist 203 N La Salle St, Chicago IL 60601  24th FL

(F) In any post-conviction proceeding  _Pro'se_

(G) Other (state):  _Appeal Jennifer Bontrager_ Appellate defender 203 N. LaSalle St  24th FL

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )  NO (X)

Name and location of the court which imposed the sentence: _____ N/A

Date and length of sentence to be served in the future _____ N/A

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _3-23-20_
　　　　　(Date)

_____
Signature of attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Signature of petitioner)
_R01363_
(I.D. Number)
_P.O. Box 112 Joliet, IL 60434_
(Address)

7

NO. 1-13-2160

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

                                        Plaintiff-Appellee,

                        vs.

ARTHUR GRADY,

                                        Defendant-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **Rosemary Higgins-Grant**, Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

———

                    ANITA ALVAREZ,
                    State's Attorney,
                    County of Cook,
                    Room 309 - Richard J. Daley Center,
                    Chicago, Illinois 60602

                    Attorney for Plaintiff-Appellee

ALAN J. SPELLBERG,
MATTHEW CONNORS,
MARI R. HATZENBUEHLER,
Assistant State's Attorneys,
    Of Counsel.

Exhibit H

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

                                        Plaintiff-Appellee,

                        vs.

ARTHUR GRADY,

                                        Defendant-Appellant.

**POINT AND AUTHORITIES**

**I.**

**THE CIRCUIT COURT PROPERLY SENTENCED DEFENDANT TO 60 YEARS IN THE ILLINOIS DEPARTMENT OF CORRECTIONS WHERE IT PROPERLY CONSIDERED ALL THE EVIDENCE AND FACTORS IN AGGRAVATION AND MITIGATION, AND IMPOSED A SENTENCE WITHIN THE PERMISSIBLE STATUTORY RANGE** ................................................................. 19

*People v. Stacey*, 193 Ill. 2d 203 (2000) ......................................................... 19,20

*People v. Fern*, 189 Ill. 2d 48 (1999) ................................................................ 19

*People v. Smith*, 258 Ill. App. 3d 1003 (1st Dist. 1994) ................................. 19

*People v. Evans*, 373 Ill. App. 3d 948 (1st Dist. 2007) ................................. 20,21

*People v. Hindson*, 301 Ill. App. 3d 466 (2d Dist. 1998) ............................... 20

*People v. Hayes*, 409 Ill. App. 3d 612 (1st Dist. 2011) ................................. 20

*People v. Payne*, 294 Ill. App. 3d 254 (4th Dist. 1998) ................................. 20,22

*People v. Whitehead*, 171 Ill. App. 3d 900 (1st Dist. 1988) ........................... 20

i

*People v. Boclair*, 225 Ill. App. 3d 331 (1st Dist. 1992) ................................. 21

*People v. Canet*, 218 Ill. App. 3d 855 (1st Dist. 1991)................................... 22

*People v. Roberts*, 338 Ill. App. 3d 245 (2d Dist. 2003) ............................... 22

*People v. Givens*, 364 Ill. App. 3d 37 (1st Dist. 2005) .................................. 24

*People v. Dinwiddie*, 299 Ill. App. 3d 636 (1st Dist. 1998) ......................... 24-25

*People v. Martin*, 2012 IL App (1st) 093506.............................................. 25

*People v. Spriggle*, 358 Ill. App. 3d 447 (1st Dist. 2005)............................. 25

*People v. Caballero*, 179 Ill. 2d 205 (1997) ............................................... 26

*People v. Taylor*, 318 Ill. App. 3d 464 (1st Dist. 2000) .............................. 26

*People v. Vasquez*, 327 Ill. App. 3d 580 (1st Dist. 2001)............................. 26

730 ILCS 5/5-4.5-20(a)(1)(West 2008) ...................................................... 21

## II.

**THIS COURT SHOULD CORRECT THE MITTIMUS
TO CREDIT DEFENDANT WITH 1600 DAYS FOR
TIME SERVED BEFORE HE WAS SENTENCED ........   29**

*People v. Williams*, 239 Ill. 2d 503 (2011) ................................................... 29

*People v. Latona*, 184 Ill. 2d 260 (1998) ..................................................... 29

ii

## ISSUES PRESENTED FOR REVIEW

Whether the circuit Court properly sentenced defendant to 60 years in the Illinois Department of Corrections where it considered all the evidence and factors in aggravation and mitigation, and imposed a sentence within the permissive statutory range.

Whether the mittimus should be corrected to credit defendant 1600 days for time served in custody before he was sentenced.

## STATEMENT OF FACTS

Defendant, Arthur Grady, along with co-defendant Aaron Bronson, who is not party to this appeal, was charged by indictment with the first degree murder and armed robbery of Ralph Turner, Jr. (CL 28-46) On August 7, 2012, Aaron Bronson pled guilty to first degree murder. (R. NN39-41; People's Exhibit 103) Pursuant to Bronson's plea agreement, Bronson agreed to testify truthfully at defendant's trial in exchange for a sentence of twenty-four years in the Illinois Department of Corrections. (NN39; People's Exhibit 103) Following a jury trial, defendant was found guilty of first degree murder. (R. PP5) However, the jury found that the allegation was not proven that during the commission of the offense of first degree murder that defendant personally discharged a firearm that proximately caused the death to another person. (R. PP5) Defendant was sentenced to sixty years in the Illinois Department of Corrections. (R. RR83)

On January 29, 2009, Robert Currie invited a group of his close friends to Horseshoe Casino in Hammond, Indiana for dinner, drinks and gambling. (R. JJ85-88) Included in the group of eight men were the victim, Ralph Turner, Jr., Dr. Rupert Evans, Anthony McGee and Michael Wright. (R. JJ50, JJ87; LL32) Robert drove Ralph,

1

Anthony and Michael in his black Mercedes to the casino. (R. JJ88; LL33) Robert parked

his car with the valet. (R. JJ89) The men arrived to the Casino at approximately 6:30

p.m. and had dinner at the Binion Steakhouse located inside the Casino. (R. JJ49, JJ87;

LL32) They remained at the steakhouse for 2 ½ to 3 hours and then went down to the

casino VIP room. (R. JJ50-51, JJ90-91; LL34-35) Approximately 2 hours later, the group

left the VIP room and went to the casino floor. (R. JJ51, JJ91; LL34-35) Several of the

men went to the roulette tables while the others went to the craps table. (R. JJ52, JJ92;

LL35-36) Ralph, Robert, Rupert and Michael were at the roulette table. (R. JJ52, JJ92;

LL35) Rupert played roulette with Robert and Michael while Ralph stood next to Robert.

(R. JJ52) Robert was winning at the roulette table and would yell or scream because he

was happy that he was winning. (R. JJ99, JJ101) As Robert was winning, Ralph would

from time to time cash in the chips that Robert won with the cashier so that Robert would

not use that money to continue to gamble. (R. JJ53, JJ101) Ralph would give Robert

some of the cash and would hold on to the rest of the cash. (R. JJ101)

After a while, Rupert stopped playing roulette but remained at the table and

watched his friends play. (R. JJ54) At this time, Rupert noticed that there were several

people that were just hanging around, not playing, not placing bets, and watching their

group. (R. JJ54) Specifically, Rupert observed a man, who he described as African-

American wearing a dark hoody and jeans, watching the table as Robert was winning and

watched Ralph take Robert's winnings and cash them out. (R. JJ55-56) Rupert identified

defendant as that man. (R. JJ57) Rupert had a clear view of defendant. (R. JJ58) Rupert

left the casino shortly before 2:00 a.m., and before his friends. (R. JJ58)

At approximately 3:22 a.m., Ralph, Robert, Michael and Anthony left the roulette

2

table and Ralph, Michael and Anthony went to the coat check while Robert went to the valet to get his car. (R. JJ104-105; People's Exhibit 8)  Robert drove the men and was going to drop Ralph and Anthony off at Ralph's house located at 8125 South Eberhart. (R. JJ86, JJ107-108; LL38)    Robert pulled up to Ralph's house and double parked in front to allow Ralph and Anthony to exit the car. (R. JJ111-113; LL38-39)  Robert gave Ralph one of the chips that he won from the casino. (R. JJ125)  Robert and Anthony testified that they did not notice any other cars on the street, did not see any other cars parked in the middle of the street, and did not see any other people on the street. (R. JJ113; LL40-41)  Ralph and Anthony spoke for a couple of minutes and then Anthony began to walk back to his car that was parked 3 houses from 8125 South Eberhart. (R. LL39, LL41- 42) Anthony testified that he had to walk in the street because the sidewalk had not been shoveled. (R. LL42)  As Anthony was walking in the street, he saw lights appear behind him. (R. LL42)  Anthony stopped and turned around to make sure that the car that was driving down the street could drive past him without injuring him. (R. LL42) The car stopped behind Anthony and he saw that it was an SUV. (R. LL42)

Anthony saw the passenger door of the SUV open and an individual jump quickly out from the SUV. (R. Ll43) Anthony initially thought it was Ralph's son because he owned an SUV. (R. LL43)  He saw the person go in between a car that was parked and appeared to be in front of 8125 South Eberhart. (R. LL43)  Since he thought it was Ralph's son, Anthony started to get into his car. (R. LL43)  Anthony heard one gunshot. (R. LL43)  Anthony hollered and screamed "Hey, what's going on," and ran towards Ralph's house. (R. LL44-45)  Anthony did not know what was happening and wanted to help his friend. (R. LL45)  Anthony saw a profile of a man wearing a dark hoodie with

3

dark pants. (R. LL44, LL89)  Within seconds, Anthony heard another gunshot. (R. LL45, 87)  After Anthony heard the second shot, he ran in the opposite direction. (R. LL87)  Anthony ran down Eberhart to the corner, made a right turn and hid between two cars. (R. LL44-45, LL87)  Anthony called Ralph's wife and asked her to call the police. (R. LL45)  Anthony also called 911. (R. LL45)  When the police arrived on the scene, they took Anthony to Ralph's apartment. (R. LL46)  Anthony remained in Ralph's apartment until about 10:50 p.m. when the detectives arrived. (R. LL57-58)  Anthony was shown some photographs but did not recognize anyone. (R. LL59)  Anthony went to the police station the next day to view a line-up but did not identify anyone in the lineup. (R. LL60-62)

Robert testified that when he returned home that evening, his wife was on the phone with Anthony. (R. JJ115)  Anthony said that Ralph had been shot. (R. JJ115)  On January 30 at 11:05 p.m., Anthony went to the police station and spoke to the detective assigned to the case.  (R. JJ115)  Anthony was shown some photographs, but was unable to identify anyone in the photo array. (R. JJ115-118)   On January 31 at 6:30 p.m., Anthony went to the police station and identified defendant as  the person he saw by the roulette table in the casino.  (R. JJ118-124)

Rupert testified that he received a phone call in the morning on January 30, and was told that Ralph had been shot and that he was dead. (R. JJ59) Detectives arrived at his house a short time later and showed him a black and white photo array and asked him if he could identify any of the individuals in the photo array. (R. JJ59-60)  Rupert was unable to identify anyone in the photo array. (R. JJ60) Rupert was shown another set of photographs later that evening.  (R. JJ61-62)   Rupert identified defendant as the

4

individual that he observed watching Ralph and Robert in the casino the night that they were at the roulette table. (R. JJ64-65) On January 31, at about 6:30 p.m., Rupert went to the police station at 111th Street to view a lineup and identified defendant in the lineup as the individual he saw at the casino watching the roulette table. (R. JJ66-70)

Pamela Snow Woodward was Ralph's sister and lived on the first floor at 8125 South Eberhart. (R. LL118-119) Ralph lived on the second floor. (R. LL119) On January 30, shortly before 4:00 a.m., she was asleep in her bed when she heard a gunshot. (R. LL121) Pamela got up and looked out her front window and saw a person laying on the ground. (R. LL121-122) She recognized the person as her brother because of the socks that he was wearing. (R. LL123-124) Pamela observed another person wearing a black hoodie over his head, crouched down and digging through the pockets of her brother's pants. (R. LL121, LL124) Pamela went to call the police on her house phone when her sister-in-law ran down the stairs and said "Ralph's been shot." (R. LL126-127) Pamela was still on the phone with the police and told them that she saw a body out on her front lawn and that a man with a black hoodie was searching the pockets. (R. LL127) She told the police that it was her brother. (R. LL127) Pamela returned to the window and saw the police arriving and that the person with the black hoodie was gone. (R. Ll128) Pamela went to the police station the next day to view a physical lineup, but was unable to make an identification. (R. LL128-129)

On January 30 at approximately 4:00 a.m., Officer Adam Rose was on routine patrol with his partner Officer Towanda Taylor, when they monitored a call regarding a shooting that had just occurred at 81st Eberhart and was given the description of a male black dressed in dark clothing. (R. LL140-143) Officer Rose testified that as he was

5

driving toward the location, he observed a male black fitting the description. (R. LL144-146) Officer Rose identified defendant as the man he observed. (R. LL146) Defendant was wearing a brown jacket, a black hoodie and black pants. (R. LL147) Officer Rose conducted a street stop and field investigation of defendant and performed a protective pat down search. (R. LL147) Officer Rose searched defendant's pockets and recovered defendant's photo ID. (R. LL148) Officer Rose ran defendant's ID and determined that there were no investigative alerts or active warrants out for defendant. (R. LL148) Officer Rose did not find a weapon on defendant. (R. LL150) Once the officer verified defendant's identification and made sure that there was nothing holding defendant, he let defendant go. (R. LL154) Officer Rose stopped defendant approximately 3 blocks from 8125 South Eberhart. (R. LL150) Officer Rose testified that he did not take defendant back to the scene to be identified because the victim was deceased and there were no witnesses at that time. (R. LL167)

Officer Anthony Ellis testified that he received a call on January 30 and was directed to 8219 South Eberhart where he observed a victim laying face up on the ground. (R. LL271-274) He was the first officer on the scene. (R. LL279) Officer Ellis surveyed the scene and saw a cell phone and a pair of glasses between two cars. (R. LL275, LL285) Officer Carl Brasic testified that he arrived on the scene a little after 5:00 a.m. and saw the body of Ralph Turner, Jr. with part of his pants leg missing. (R. MM6-12) Officer Brasic also observed a black Samsung U.S. Cellular phone on the street. (R. MM15) Officer Brasic testified that he recovered a $500 gambling chip from underneath Mr. Turner's body after the body had been removed. (R. MM16)

The parties stipulated that Damien Johnson would testify that on January 30,

6

2009, he was 10 years old and was on his way to school with his younger brother when he found a black LG AT&T flip cellular phone on the front steps of 434 East 82nd Street. (R. MM41) Damien gave the phone to his mother Yolanda Johnson when he returned home from school that day. (R. MM41)  The parties further stipulated that Officer Jose Lopez received one black LG AT&T flip cell phone from Yolanda Johnson on January 30. (R. MM42-43)

Detective Barsch was a homicide detective and received an assignment of a person shot during a robbery at approximately 4:30 in the morning on January 30, 2009. (R. MM44-47) Detective Barsch was directed to go to 8125 South Eberhart. (R. MM47) When he arrived on the scene, he observed a body laying on a gangway walk-up in between 8125 and 8129 South Eberhart. (R. MM47)  As he approached the body of Ralph Turner, he observed that the left side of his pants was ripped off, and that his leg was exposed.  (R. MM48)  The part of the pants that had been ripped off from his leg was recovered approximately 5 houses down the block. (R. MM49)  The pants leg had blood on it. (R. MM49)  Detective Barsch also observed a gunshot wound to the left side of Mr. Turner's chest. (R. MM48)  Detective Barsch testified that there was a Samsung flip cell phone in between two cars on the street. (R. MM50)  Detective Barsch tried to ascertain who the phone belonged to. (R. MM51) When he opened the phone, he saw that the screensaver was of a young girl and that her name was printed across the front of the picture. (R. M51)  He showed the phone to the victim's father, Ralph Turner Sr., but he did not recognize the phone. (R. MM51)  Detective Barsch testified that when he opened up the call log, he was able to see that several calls had been made to, and were from, a person named Aaron. (R. MM51)  After speaking to the victim's father, he determined

7

that the phone did not belong to Ralph Turner, Jr. (R. MM53)

While he was on the scene, Detective Barsch spoke to Anthony McGee and was able to ascertain that he was one of the people who was with the victim at Horseshoe Casino in Hammond, Indiana. (R. MM53-54) After speaking to witnesses on the scene, Detective Barsch testified that he was looking for an offender wearing a black hooded sweatshirt and baggy jeans, and was also looking for a dark colored SUV. (R. MM57)

Detective Barsch went to the Hammond Horseshoe Casino on January 30 and met with Jennifer Czerwinski, a security surveillance supervisor at the casino. (R. MM56-57; LL185) Ms. Czerwinski explained that the casino was equipped with thousands of surveillance cameras that cover all areas of the casino: every table, game, valet and parking garages have cameras. (R. LL187) Ms. Czerwinski retrieved videos from multiple cameras in connection with this case and put them on a DVD that was admitted as People's Exhibit 8. (R. LL190-199) She reviewed the videos with Detective Barsch and they were able to locate the victim and the suspect in the casino and as they were leaving. (R. LL200-253; MM58) While they were viewing the video, they were able to backtrack the movements of the suspect wearing the black hooded sweatshirt and the baggy jeans back through the casino and observed the suspect spending a substantial amount of time observing the roulette game. (R. MM59) They were also able to backtrack the movement of the black SUV into the parking garage. (R. M59) They were able to obtain the license plate number of the vehicle. (R. M59) The video showed the person with the black hooded sweatshirt and jeans enter the passenger seat of the dark colored SUV at the same time that the victim entered the Mercedes. (R. M59) Detective Barsch learned that the SUV was registered to Aaron Bronson. (R. MM60)

8

In the course of his investigation, Detective Barsch received information regarding the possible owner and address of the cell phone that had been found close to the scene. (R. MM62) Based on this information, he obtained a photo of defendant and compared it to the video obtained from the Horseshoe Casino. (R. MM62-63) Defendant was in the video. (R. MM66) Detective Barsch showed a photo array to Rupert Evans who positively identified defendant as the person he observed at the roulette wheel. (R. MM72) After Rupert Evans viewed the photo array, they started to gather information to conduct a search warrant at 6315 South Champlain because the address was listed for Aaron Bronson and Arthur Grady. (R. MM74)

On January 31, at approximately 1:55 a.m., Detective Barsch went to 6315 South Champlain with over 10 other officers to execute the search warrant. (R. MM75) When he entered the second floor apartment, he saw defendant handcuffed and seated in a chair in the front bedroom. (R. MM77-79) Detective Barsch met with Shawana Chester in the apartment and she led him to a back bedroom. (R. MM79-80) While Detective Barsch was speaking to her in the back bedroom, he observed a hollowed out speaker, and inside the speaker, he saw two guns. (R. MM80) One of the guns was loaded with bullets. (R. MM162-163) Detective Barsch saw four 38 special live rounds inside the weapon he recovered. (R. MM163) Detective Barsch also went to a middle bedroom in the apartment, which was where defendant slept, and saw a picture of a girl that was the same girl whose picture was used as a screensaver on the flip phone that had been recovered. (R. MM83, MM125) Defendant was subsequently taken to Area 2. (R. MM87) Later that day, a number of witnesses went to the police station to view a lineup. (R. M90) Rupert Evans and Robert Currie separately viewed the lineup and both identified defendant as

9

the person they recognized from the casino. (R. M92)

     Detective Barsch testified that he was still assigned to this case in October 2009 and obtained an arrest warrant for Aaron Bronson. (R. MM95-96)  On November 23, 2010, he executed the arrest warrant on Aaron Bronson in South Bend, Indiana and transported him back to Area South Detective division. (R. MM96-97)

     Aaron Bronson testified on behalf of the People. (R. NN36)  Bronson had been friends with defendant for 4 to 5 years before the murder. (R. NN37)  Bronson testified that was currently living in Menard Correction facility. (R. NN39)  Bronson testified that he entered into a plea agreement with the State. (R. NN39; People's Exhibit 103)  Bronson had been charged under indictment number 11 CR 169 with First Degree Murder and Armed Robbery. (People's Exhibit 103, ¶ 1)  Pursuant to the plea agreement, Bronson voluntarily agreed to plead guilty to the charge of First Degree Murder because was guilty of First Degree Murder. (People's Exhibit 103, ¶ 1)  Bronson also agreed to cooperate in the prosecution of his co-defendant Arthur Grady with the understanding that the State would recommend a sentence of 24 years in the Illinois Department of Corrections. (People's Exhibit 103, ¶ 2)  Bronson testified that in exchange for his plea of guilty and sentence of 24 years, he was required to testify truthfully and stated that if he did not, "his deal was off the table." (R. NN40)

     Bronson testified that in 2009, he lived in South Bend Indiana, but would occasionally go to Chicago and stay on the second floor at 6315 Champlain. (R. NN41-42)  He lived with defendant and his cousin, Shawana Chester. (R. NN42-43)  Bronson lived in the front bedroom and defendant lived in the middle bedroom. (R. NN43)  Bronson testified that on January 29, 2009, he had a dark blue Tahoe. (R. NN49) In the

10

evening, Bronson and defendant went to the Horseshoe Casino to gamble and parked in

the garage. (R. NN50-51) Bronson played poker and defendant played dice. (R. NN52)

Bronson testified that he had a conversation with defendant at the poker table during

which defendant told him that "he had lost all his money and he saw some guys who had

about $30,000 and we should stick them up." (R. NN56) Defendant told him that he had

followed one of the men to the bathroom and then to the cashier's window and that the

person cashed in some chips and received a lot of money. (R. NN63) Bronson testified

that he did not believe they had that much money, but "I was like it's whatever though."

(R. NN56) Bronson told defendant that if defendant "wanted to do it, he would do it too."

(R. NN56) Bronson agreed to commit the robbery with defendant. (R. NN56) Bronson

and defendant walked over to see if the men actually had some money. (R. NN57)

Bronson testified that the men were winning money and saw that they had stacks of $25

chips. (R. NN57-58)

Bronson and defendant discussed how they were going to rob the men. (R. NN58)

At trial, Bronson reviewed the video from the casino and confirmed that defendant was

wearing a black hoodie, black shirt, black jeans, black hat and was wearing Timberland

boots. (R. NN59) Bronson testified that he was at a video roulette machine when

defendant approached him and told him that they were leaving. (R. NN60-61) Bronson

went to the parking lot alone to get his truck because the plan was for defendant to follow

the men and Bronson to drive behind their car so that he and defendant could drive

behind them. (R. NN61-62) Bronson picked up defendant at the valet and followed the

black Mercedes Benz to 81st and Eberhart. (R. NN67-72) As they followed the Mercedes,

defendant and Bronson spoke about how they were going to rob the men and also how to

11

keep Bronson's car from being identified by the license plates. (R. NN76) Bronson continued to follow the car until it stopped in the middle of the street and double parked. (R. NN77) Bronson explained that there was a median in the middle of Eberhart which would prevent another car from driving past a car that was parked in the street. (R. NN77) Bronson stopped behind the Mercedes and observed two of the car doors open and two people get out of the car. (R. NN78)    Bronson told defendant to wait because the victims could see the truck. (R. NN79) Defendant said he needed the money and jumped out and ran up on the victim. (R. NN79) Bronson testified that when defendant jumped out of his car, he had the gun in his hand and was wearing all black. (R. NN80) Bronson saw the victim punch defendant in the face and defendant fall to the ground. (R. NN80) Upon seeing this, Bronson put his car in reverse and started to back up down the street. (R. NN81) As he was backing up, Bronson heard 2 or 3 gunshots. (R. NN82-83) Bronson testified that he did not wait for defendant because "I ain't want to get in trouble and that was on him at that point." (R. NN82-83) Bronson drove back to 63rd and Champlain. (R. NN83) Bronson testified that defendant returned later to the apartment and told Bronson that "he ain't get no money, and he got pulled over that night by the police and they let him go, and he lost his phone." (R. NN83-85) Defendant also told him that he threw the gun and had to go back to the scene because his fingerprints might be on the gun. (R. NN86) Defendant left the apartment and returned later with the gun. (R. NN86) Defendant put the gun in his room. (R. NN90) Bronson went to South Bend the next day. (R. NN88)

The parties stipulated that Detective Brian Johnson would testify that on December 1, 2010, he spoke with Aaron Bronson and that Aaron Bronson never told him

12

that he saw the man put chips into his pocket, that he never told him that he saw the man

go to the cashier, that he never told him that defendant told him that defendant had

thrown the gun, and that his fingerprints might be on it, and that he had to go back and

get it. (R. NN205)  Aaron Bronson also never told Detective Johnson that defendant left

and returned with a gun and took it to his bedroom. (R. NN205)

The parties further stipulated that Tiffany Kimble was an expert in the field of

fingerprint identification and analysis and was assigned to the case involving a victim

named Ralph Turner. (R. MM203-205)  Ms. Kimble received and examined one revolver

and four live cartridges for fingerprints and it was her expert opinion that there were no

latent impressions suitable for comparison. (R. NN205)  Thereafter, the State rested. (R.

NN207)

Defendant testified on his own behalf.  Defendant stated that on January 29, 2009,

around 5:30 to 6:00 p.m., he was at his apartment at 63rd and Champlain where he lived

with Aaron Bronson and Shawana Chester and that Bronson's things were stored in the

back bedroom.  (R. OO14)  Defendant and Bronson went to Horseshoe Casino and drove

in Bronson's blue Tahoe. (R. OO15)   When they arrived at the casino, Bronson told

defendant that he was going to the poker room and defendant walked around the casino to

decide which game he was going to play. (R. OO15)  Defendant played Texas Hold'em

for 3 to 4 hours and after he lost, he asked Bronson if he was ready to go and Bronson

responded that he was not ready to go. (R. OO16)  Defendant testified that he walked

around the casino to pass time and watched other people play games. (R. OO17)

Defendant admitted that he walked around Ralph Turner's table at different times but that

was not the only table in the casino that he walked around. (R. OO18)

13

Defendant denied that he had a conversation with Bronson at the slot machines about robbing Ralph Turner and his friends. (R. OO18-19)  Defendant denied that when he saw the black Mercedes and the four people getting into the car, he talked to Bronson about robbing them. (R. OO21)  Defendant testified that when he entered Bronson's truck, he put on his jacket, put his phone on his lap and fell asleep. (R. OO21-22)  Defendant testified that he woke up when he felt the truck come to a sudden stop. (R. OO22)  Defendant looked out of the passenger window and saw 2 people walking down the sidewalk. (R. OO22)  Defendant testified that Bronson parked his truck, got out of the truck and approached one of the men who was walking down the sidewalk.  (R. OO23)  Defendant testified that it looked like Bronson and the man were having a conversation and the man then punched Bronson in the face.  (R. OO24)  They started fighting and then they fell to the ground. (R. OO24)  Defendant testified that he saw the other man, who had walked in the opposite direction, turn around and head back toward Bronson and the victim. (R. OO24)  Defendant tried to get out of the truck and break up the fight, but once he stepped out, defendant heard two rapid gunshots, and then got back into the truck. (R. OO23)

Defendant testified that he climbed over to the driver's seat and closed the driver's door.  (R. OO23)  Defendant testified that he put the truck in reverse and backed up. (R. OO24)  Defendant parked the truck and looked for his cell phone, but could not find the phone.  (R. OO24)  Defendant walked to a gas station at 83rd and Vernon and unsuccessfully tried to use the pay phone to call Bronson. (R. OO24-25)  While on his way to another gas station, he was stopped by the police. (R. OO25)  Defendant testified that he did not run from the police because he did not do anything.  (R. OO26)  The

14

police pulled up and asked defendant to put his hands on the hood, which he did. (R. OO26) The officer patted him down and told defendant to empty his pockets and put everything on the hood which defendant did. (R. OO26) Defendant gave the officers his driver's license. (R. OO26) The officer filled out a card and then told defendant to get his stuff off the hood and told him that he could leave. (R. OO28) Defendant went back to his house and went to bed. (R OO28-29) Defendant denied telling Bronson that he threw the gun or that his prints were on the gun. (R. OO36) Defendant testified that he did not plan a robbery with Aaron Bronson.(R. OO37-38) Defendant denied following Ralph Turner to the bathroom or following him to the cashier. (R. OO38) Defendant testified that he did not shoot or rob Ralph Turner. (R. OO39) Defendant testified that the money that had been recovered from the entertainment center was his girlfriend's tax refund. (R. OO150-151) Defendant also testified that he did not have a gun at 6315 South Champlain, did not sell a gun to Bronson and did not buy a gun from Bronson. (R. OO175) Defendant also stated that he never had a mask. (R. OO180)

In rebuttal, the parties stipulated that Angela Baker would testify that she still considered herself and defendant dating and that in the morning of January 31, 2009, she received her income tax refund and went to the ATM to withdraw money. (R. OO203) Angela placed the money on a stand by a picture frame and amount of money was between $1,000 and $1,100. (R. OO203)

The People also introduced People's Exhibit 112, a certified copy of defendant's criminal conviction under case number 07 CR 16391 of two counts of aggravated battery to a police officer and one count of resisting and obstructing a police officer, causing injury. (R. OO204) The People rested their case in rebuttal. (R. OO204)

15

Following closing arguments, the jury found defendant guilty of first degree murder, but found that the People had not proven the allegation that defendant personally discharged a firearm during the commission of the offense. (R. PP5)  Defendant's motion for new trial was denied. (R. RR44)

On June 19, 2013, defendant's sentencing hearing was held.  In aggravation, the People presented victim impact statements written by Anthony McGee and Robert Currie. (R. RR48)  The People also presented the live testimony of Michael Turner and Ralph Turner, Sr. and Patricia Alexis Cobb read the victim impact statements from the victim's mother, Evelyn Turner, and the victim's sister, Pamela Woodward. (R. RR45-60)  The People also presented  a certified copy of conviction for defendant for Class 4 possession of controlled substance under 00 C 330716 dated December 15, 2000. (R. RR60)  The People also presented a certified copy of conviction for defendant under case number 07 CR 16391 for two counts of Class 3 aggravated battery to a police officer, one count of Class 4 felony, resisting and obstructing an officer. (R. RR60)   In mitigation, the defense presented the live testimony of defendant's grandfather. (R. RR61)   The parties presented arguments in aggravation and mitigation. (R. RR68-77)  Defendant made a statement during which he said that he had nothing to do with Bronson's crime. (R. RR77)

When rendering its sentencing decision, the trial court stated, "I have listened to the testimony of the witnesses.  I have read through the pre-sentence investigation, which as [defense counsel] has pointed out, described living a very healthy life, a very emotionally sound life." (R. RR77)  The court further considered the mitigation evidence and the testimony of defendant's grandfather and that defendant was given

16

"an opportunity to get a high school diploma, and he got it. He

was given an opportunity to go further with his education, and he did. He

said that he had two years of college. He was given an opportunity to live

with a family that loved him, cared for him, that watched carefully his

actions and his involvement in the community, so that he remained safe.

He had a grandfather that went out and found him in the streets, to make

sure that he came back and was not engaged in the same kind of street

activity that caused these crimes." (R. RR77-78)

The court further stated, "[i]n mitigation you certainly have had every opportunity

to be given a young man. You certainly have been given a grandfather who loved you

very much and cared for you. You have been given a mother who is another role model

who served this country honorably in several different forms, both in active duty and then

as a reserve officer in the national guard. You have been given ongoing support by your

grandfather and then by your aunt, who allowed you to love with them, in a suburban

area, a nice community, away from the violence of the city of Chicago." (R. RR78-79)

The circuit court also considered the factors in aggravation and that defendant had

two prior felony convictions including a conviction for aggravated battery to police

officer and resisting arrest. (R. RR80) The court further found that defendant had an

opportunity to express his remorse, but he chose not to do so. (R. RR80) The court also

considered the facts in the case and accepted the version presented by Mr. Bronson. (R.

RR81) The court stated "This Court takes into consideration that the sentence that I give

should account for all the facts that the State pointed out, the fact that you stalked, you,

Mr. Grady, you are the one on that video stalking Ralph Turner and his friends. You are

17

the one who circled repeatedly, looking for the winnings. And looking for the opportunities. Salivating at the moment that your opportunity would come. And you waited and watched and you moved and you stalked. And you did it for a long period of time. Then you followed them out of the casino. In that car. And you got to that scene." (R. RR81-82) The court also specifically considered defendant's rehabilitative potential. (R. RR83) The trial court then sentenced defendant to 60 years in the Illinois Department of Corrections for first degree murder. (R. RR83)

In denying defendant's motion to reconsider his sentence, the trial court stated that "This Court weighs the factors with regard to his previous criminal convictions, as well as the fact he had all these opportunities in determining that he, even given those opportunities, did not make those choices, was not willing to make good choices." (R. RR92) The court confirmed that it considered defendant's rehabilitative potential, but found that "there is very little...if any." (R. RR92) Defendant appeals his sentence.

18

ARGUMENT

I.

**THE CIRCUIT COURT PROPERLY SENTENCED DEFENDANT TO 60 YEARS IN THE ILLINOIS DEPARTMENT OF CORRECTIONS WHERE IT PROPERLY CONSIDERED ALL THE EVIDENCE AND FACTORS IN AGGRAVATION AND MITIGATION, AND IMPOSED A SENTENCE WITHIN THE PERMISSIBLE STATUTORY RANGE.**

Defendant argues that the circuit court abused its discretion when it sentenced him to 60 years in the Illinois Department of Corrections for the first degree murder of Ralph Turner, Jr. (Def. Br. 16) Specifically, defendant contends that his sentence "was not warranted by either a lengthy criminal history, the circumstances of the offense, or a lack of mitigating factors, and that the co-defendant received a 24-year sentence, and where the jury determined that the State only proved [defendant] accountable for the actions of the co-defendant." (Def. Br. 16) This Court should not be persuaded by defendant's contentions because his sentence was the result of the careful consideration of all of the evidence that was presented at sentencing, both in aggravation and in mitigation. While defendant posits that his sentence is excessive, defendant has not borne his burden of showing that the circuit court abused its discretion when it arrived at that sentence. Thus, this Court should reject defendant's argument and affirm his sentence.

It is well settled that a circuit court's sentencing decisions are entitled to great deference and weight. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000), citing *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A reasoned judgment as to a proper sentence must be based upon the particular facts of each case. *People v. Smith*, 258 Ill. App. 3d 1003, 1028 (1st Dist. 1994). Additionally, a trial court is in a superior position to judge the credibility

19

of witnesses and weigh the evidence at the sentencing hearing. *Stacey*, 193 Ill. 2d 15 209. Absent an abuse of discretion, a defendant's sentence will not be altered upon review, and a reviewing court may not substitute its judgment for that of the trial court merely because it would have weighed the factors in aggravation and mitigation differently. *Id.* at 209.

"[T]he most important factor a court considers when deciding a sentence is the seriousness of the offense." *People v. Evans*, 373 Ill. App. 3d 948, 968 (1st Dist. 2007). "The seriousness of the offense or the need to protect the public may outweigh any mitigating factors and the goal of rehabilitation." *People v. Hindson*, 301 Ill. App. 3d 466, 475 (2d Dist. 1998). Moreover, the trial court is not required to give a greater weight to a defendant's rehabilitative potential than to the seriousness of the crime. *People v. Hayes*, 409 Ill. App. 3d 612, 629 (1st Dist. 2011), citing *Coleman*, 166 Ill. 2d at 261. There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (4th Dist. 1998). Moreover, when a defendant claims that the trial court failed to consider evidence in mitigation, even though the trial court heard and rejected such evidence during a sentencing hearing, the defendant's claim amounts to an improper request that the reviewing court balance the factors differently, and independently conclude that the sentence is excessive. *People v. Whitehead*, 171 Ill. App. 3d 900, 908 (1st Dist. 1988). That is the argument defendant makes on appeal.

Whenever a sentence imposed falls within the statutorily mandated guidelines, it

20

is presumed to be proper and will not be overturned unless there is an affirmative showing that the sentence varies greatly from the purpose and spirit of the law, or is manifestly violative of constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1st Dist. 1992). The spirit and purpose of the law are promoted "when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant." 225 Ill. App. 3d at 335. Finally, it must be noted that a defendant's rehabilitative potential is not entitled to any more weight than any other evidence adduced at sentencing. *People v. Evans*, 373 Ill. App. 3d 948, 968 (1st Dist. 2007). The application of these guiding principles will lead this Court to reject defendant's arguments.

Defendant was sentenced to 60 years after his conviction for first degree murder. The sentence for first degree murder "shall be a determinate term of not less than 20 years and not more than 60 years." 730 ILCS 5/5-4.5-20(a)(1)(West 2008). Defendant does not dispute that his current sentence is within the applicable sentencing range. Because defendant has failed to make an affirmative showing that his sentence varies from the purpose of the law or is violative of constitutional guidelines, his 60 year sentence for first degree murder is presumptively proper and within the proscribed term for his criminal conduct.

Defendant nevertheless claims that the circuit court failed to adequately consider the mitigation evidence that was presented on his behalf at sentencing. (Def. Br. 16-20) The record belies defendant's contention. The record clearly demonstrates that the circuit court considered mitigation when it determined defendant's sentence. The court read through the pre-sentence investigation report, heard the evidence at trial, heard counsel's

21

sentencing arguments, listened to defendant's allocution statement and considered defendant's motion for new sentence. (R. RR45-93)   There is a presumption that the circuit court considered all factors in determining a sentence and that presumption will not be overcome without explicit evidence from the record that the circuit court did not consider mitigating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (4th Dist. 1998). To rebut this presumption, defendant must affirmatively show that the circuit court did not consider relevant factors. *See, People v. Canet*, 218 Ill. App. 3d 855, 864 (1st Dist. 1991).   Indeed, defendant must point to something beyond the sentence itself to demonstrate that the mitigation evidence was not considered. *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2d Dist. 2003).  Defendant has not made such a showing.

The record demonstrates that the circuit court heard and considered all the relevant aggravating and mitigation factors.  At the beginning of the sentencing hearing, the court stated that it "listened to the testimony of the witnesses. I have read through the pre-sentence investigation, which as [defense counsel] has pointed out, described living a very healthy life, a very emotionally sound life." (R. RR77)  The court told defendant that "it is my obligation to look at your background and to look at it from both mitigation and aggravation." (R. RR78) In mitigation, the circuit court found that defendant "certainly had every opportunity to be given a young man. You have certainly been given a grandfather who loved you very much and cared for you.  You have been given a mother who is another role model who served this country honorably in several different forms, both in active duty and then as a reserve officer in the National Guard." (R. RR78-79) The court was aware that defendant obtained a high school diploma and had two years of college. (CL 163, 167; R. RR79)  The court was aware that defendant had four children

22

but did not provide them with any financial support. (CL 163) The court was aware that defendant had been paid cash doing side jobs with a contractor. (CL 169)

The circuit court was also aware that defendant stood before the court already having been convicted of three felony offenses: Class 4 possession of a controlled substance in 2000, and in 2010, a Class 3 aggravated battery to a police officer, and a Class 4 felony, resisting and obstructing an officer, both for which he was sentenced to 3 years in prison. (CL 164-165; R. RR60) Defendant had also been convicted of several misdemeanor offenses of criminal trespass to vehicle and state land. (CL 164) The circuit court was therefore, correct to remark that "this Court takes into consideration most especially the conviction of an aggravated battery to police officer and resisting arrest. You didn't just make one mistake." (R. RR80)

The circuit court was aware of the brutal and calculating nature of defendant's actions. The court took into consideration the fact that defendant stalked defendant and his friends as shown on the video. (R. RR82) The court stated, "You are the one who circled repeatedly, looking for the winnings. And looking for the opportunities. Salivating at the moment that your opportunity would come. And you waited and watched and you moved and you stalked. And you did it for a long period of time." (R. RR82). The court continued to recount the facts, "Then you followed them out of the casino. In that car. And you got to that scene. And whether or not you actually fired that gun, [the jury] found that the allegation wasn't proven....Your engagement and involvement in this was intimate from the beginning. And in this Court's estimation, controlling from the beginning. Every turn of that table, you were preparing. Every phone call you made, you were preparing. Every bit of detail you passed back to (co-

23

-A406-

defendant) Bronson, you were preparing.  You were preparing to take the life of a man who gave everything to this society." (R. RR82-83)  The court stated, "I am most certainly weighing the facts of this trial.  And I'm saying this sentence must include those facts, because it is to deter others.  Because you had every opportunity to make right choices.  You had every opportunity. (R. RR83)  The circuit court indicated, "I find you have very little, if any, rehabilitative potential.  Because you had all those opportunities.  You didn't just make a wrong choice, one bad mistake." (R. RR83)

When the circuit court denied defendant's motion to reconsider sentence, it explained that it weighed "the factors with regard to his previous criminal convictions, as well as the fact he had all these opportunities in determining that he, even given those opportunities, did not make those choices, was not willing to make good choices." (R. RR92)  The court explained that it was impressed with defendant's grandfather and the continuous support that he provided to defendant. The court stated, "His grandfather, even after he made mistakes, tried to help him clarify those and correct them, by working on the expungement and still helping him to find jobs.  He still wasn't willing to follow that path.  That's another reason this Court finds that there is very little rehabilitative potential, if any." (R. RR92-93)  The circuit court concluded, "This sentence was an appropriate one based on the facts, based on my belief that he has very little rehabilitative potential.  Those are the primary factors that this Court took into consideration here." (R. RR93)  The forgoing makes clear that the circuit court believed that the severity of the offense, when coupled with defendant's lack of rehabilitative potential, required a lengthy period of incarceration. See, *People v. Givens*, 364 Ill. App. 3d 37 (1st Dist. 2005) (defendant's sentence of 60 years for first degree murder affirmed); *People v. Dinwiddie*,

24

299 Ill. App. 3d 636 (1st Dist. 1998)(defendant's sentence of 60 years for first degree murder affirmed where defendant convicted of killing an innocent victim).

It is apparent that defendant has done nothing more than ask this Court to revisit the evidence presented at the sentencing hearing and independently conclude, contrary to the circuit court's determination, that defendant should have received a different sentence. This Court has already recognized that, so long as a defendant's lengthy prison sentence is not otherwise an abuse of discretion, it will not be found improper merely because it arguably amounts to a *de facto* life sentence. *People v. Martin*, 2012 IL App (1st) 093506, ¶ 50.

Finally, defendant contends that his sentence must be reduced because it is disparate from the sentence received by his co-defendant Aaron Bronson. (Def. Br. 19) Bronson was sentenced to 24 years imprisonment even though, as defendant claims, defendant and Bronson "are at least equally culpable for the offense." (Def. Br. 19-20) Defendant argues that the disparity was arbitrary and unreasonable and that he was denied fundamental fairness. (Def. Br. 19) Defendant's claim is without merit.

Although similarly situated defendants should not receive grossly disparate sentences, a mere disparity in the sentences, in and of itself, is insufficient to constitute a violation of fundamental fairness. *People v. Spriggle*, 358 Ill. App. 3d 447, 455 (1st Dist. 2005). A disparity of sentences will not be disturbed when it is warranted by the difference in the nature and extent of each defendant's participation in the offense, and may be justified by a defendant's degree of culpability, potential for rehabilitation, or criminal history. *Id.* Importantly, a sentence imposed on a co-defendant following the entry of a guilty plea does not provide a valid basis of comparison to a sentence imposed

25

following a trial. *People v. Caballero*, 179 Ill. 2d 205, 217 (1997). Dispositional concessions are properly granted to defendants who plead guilty when the interest of the public in the effective administration of criminal justice would thereby be served. *Id.* at 218. A defendant who pleads guilty cannot be compared to a defendant who proceeds to trial because the defendant who pleads guilty acknowledged his guilt and showed willingness to assume responsibility for his conduct and made a public trial unnecessary. *Id.*

In *People v. Taylor*, 318 Ill. App. 3d 464, 477 (1st Dist. 2000), this Court rejected the defendant's argument that his sentence was disparate to his co-defendant's sentence. The defendant was sentenced to concurrent terms of 24 years on charges of armed robbery and home invasion, and 4 years on a charge of residential burglary. The defendant argued that his sentence was disproportionate where his co-defendant, who pled guilty to the more serious crime of murder, received only a 20-year sentence. *Id.* This Court held that a sentence imposed on a co-defendant who pleaded guilty as part of a plea agreement does not provide a valid basis for comparison to a sentence entered after a trial. *Id.*

Similarly, in *People v. Vasquez*, 327 Ill. App. 3d 580, 593 (1st Dist. 2001), the defendant was sentenced to 30 years' imprisonment for armed robbery while the co-defendants entered into negotiated guilty pleas to first degree murder and armed robbery and received consecutive sentences of 25 years for murder and 6 years for armed robbery. *Id.* This Court found that since the defendant in *Vasquez* declined the plea agreement and chose to proceed to trial, the defendant could not establish that his sentence was disparate to that of his co-defendants. *Id.*

26

Here, because co-defendant Bronson accepted responsibility for his actions by choosing to plead guilty, he and defendant were not similarly situated. (People's Exhibit 103) As such, the disparity in their sentences for first degree murder was warranted.

Throughout his brief, defendant claims that he was convicted as an "accomplice" but that argument is a red herring. The jury found defendant guilty of first degree murder based on the evidence presented at trial, including the testimony of Aaron Bronson. Bronson testified that defendant told him at the casino that he had lost a lot of money and that they should rob the victim and his friends because they were winning money. (R. NN56-58) Bronson testified to the plan that defendant had that Bronson would get his truck and pull the truck up behind the men and pick up defendant so that they could follow the men. (R. NN61-64) Bronson testified that he had numerous phone conversations with defendant during which defendant directed Bronson to pick up his car and drive around until the victim and his friends left the casino and got into the Mercedes Benz. (R. NN65-69) Bronson testified that he followed the car at defendant's direction. (R. NN72) Bronson testified that when they arrived at 81st and Eberhart, defendant said that he needed money and jumped out of the truck and ran toward one of the men who had exited the Mercedes Benz. (R. NN79-80) Bronson testified that he saw the gun in defendant's hand and that he was wearing all black. (R. NN79-80) Bronson saw the victim punch defendant in the face and defendant fall to the ground. (R. NN80) After Bronson saw this, he put his truck in reverse and backed down the street. (R. NN81) As Bronson did this, he heard 2 or 3 shots fired. (R. NN81) It is clear from the above testimony that the jury properly found defendant guilty of first degree murder.

In short, because defendant's sentence is within the statutory range and because

27

the record shows that the circuit court gave consideration to all the evidence presented, in both aggravation and mitigation, there is not a compelling argument that the circuit court abused its discretion or that defendant's sentence was excessive. This Court should therefore reject defendant's arguments and affirm his sentence.

28

## II.

### THIS COURT SHOULD CORRECT THE MITTIMUS TO CREDIT DEFENDANT WITH 1600 DAYS FOR TIME SERVED BEFORE HE WAS SENTENCED.

Defendant contends that the mittimus does not correctly reflect the number of days he was incarcerated prior to his sentencing. (Deft. Br. 21) The People agree that the mittimus does not correctly reflect the number of days that defendant was incarcerated prior to sentencing and agree that defendant is entitled to 1600 days credit.

Defendant was arrested on January 31, 2009, and remained in custody until he was sentenced on June 19, 2013. (CL11) Defendant should receive credit for 1600 days from arrest until sentencing, not counting the day of sentencing. *People v. Williams*, 239 Ill. 2d 503, 505-509 (2011). The number of days from January 31, 2009 until June 19, 2013 is 1600 days.

The Appellate Court has the authority to correct the mittimus. *People v. Latona*, 184 Ill. 2d 260, 278 (1998). As such, this Court should instruct the clerk of the circuit court to correct defendant's mittimus to reflect that defendant was incarcerated 1600 days prior to sentencing.

29

CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's sentence for first degree murder.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(West 2004) and 55 ILCS 5/4-2002.1 (West 2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (West 2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

ANITA ALVAREZ,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

ALAN J. SPELLBERG,
MATTHEW CONNORS,
MARI R. HATZENBUEHLER,
Assistant State's Attorneys.
   Of Counsel.

30

**CERTIFICATE OF COMPLIANCE**

I certify that this brief conforms to the requirements of Rules 341 (a) and (b). The length of this brief, excluding the pages containing the Rule 341 (d) cover, the Rule 341 (h)(1) statement of points and authorities, the Rule 341 (c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 30 pages.

By: _____

MARI R. HATZENBUEHLER,
Assistant State's Attorney

To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Ralph Turner.

It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an unlawful act, such as to commit armed robbery, and that the deceased was killed by one of the parties committing that unlawful act.

The defendant is charged with the offense of First Degree Murder. The defendant has pleaded not guilty.

The charge against the defendant in this case is contained in a document called the indictment. This document is the formal method of charging the defendant and placing the defendant on trial. It is not any evidence against the defendant.

The State has also alleged that, during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person.

The defendant has denied the allegation.

The State has also alleged that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person.

If you find the defendant is not guilty of the offense of first degree murder you should not consider the State's additional allegation regarding the offense of first degree murder.

If you find the defendant is guilty of first degree murder, you should then go on with your deliberation to decide whether the State has proved beyond a reasonable doubt the allegation that during the commission of the offense of first degree murder the defendant, personally discharged a firearm that proximately caused death to another person.

Accordingly you will be provided with two verdict forms as to the allegation: "We the jury find the allegation was not proven that during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person" and, "We the jury, find the allegation was proven that during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person"

From these two (2) verdict forms, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one of these verdict forms.

Your agreement on your verdict as to the allegation must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.

When you retire to the jury room you first will elect one of your members as your foreperson. He or she will preside during your deliberations on your verdict.

Your agreement on a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.

The defendant is charged with the offense of first degree murder. You will receive two forms of verdict. You will be provided with both a "not guilty" and "guilty" form of verdict. From these two verdict forms, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one verdict form.

A person commits the offense of armed robbery when he, while carrying on or about his person, or while otherwise armed with a dangerous weapon, knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

To sustain the allegation made in connection with the offense of first degree murder, the State must prove the following proposition:

That during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately cause death to another person. A person is considered to have "personally discharged a firearm" when he, while armed with a firearm, knowingly and intentionally fires a firearm causing the ammunition projectile to be forcefully expelled from the firearm.

If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition has not been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was not proven.

To sustain the charge of first degree murder, the State must prove the following propositions:

First:  That the defendant, or one for whose conduct he s legally responsible, performed the acts which caused the death of Ralph Turner;  and

Second:  That when the defendant, or one for whose conduct he is legally responsible, did so,

he intended to kill or do great bodily harm to Ralph Turner;

or

he knew that his acts would cause death to Ralph Turner;

or

he knew that his acts created a strong probability of death or great bodily harm to Ralph Turner;

and

he was committing the offense of armed robbery.


If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.


If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

Members of the jury, the evidence and arguments in this case have been completed, and I now will instruct you as to the law.

The law that applies to this case is stated in these instructions, and it is your duty to follow all of them. You must not single out certain instructions and disregard others. When I use the word "he" in these instructions, I mean a male or a female.

It is your duty to determine the facts and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case.

You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation. It is the function of the trial judge to determine the sentence should there be a verdict of guilty.

Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry.

From time to time it has been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions and exhibits which were withdrawn or to which objections were sustained.

Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

You should disregard testimony and exhibits which the court has refused or stricken.

The evidence which you should consider consists only of the testimony of the witnesses, the exhibits and stipulations which the court has received.

You should consider all the evidence in the light of your own observations and experience in life.

Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be.

Faithful performance by you of your duties as jurors is vital to the administration of justice.

Members of the jury, the trial is about to commence, and I now will instruct you as to the law regarding some of your duties during trial and deliberations.

You should not do any independent investigation or research on any subject or person relating to the case. What you may have seen or heard outside the courtroom is not evidence. This includes any press, radio, or television programs and it also includes any information available on the Internet. Such programs, reports, and information are not evidence and your verdict must not be influenced in any way by such material.

For example, you must not use the Internet or any other sources to search for any information about the case, or the law which applies to the case.

During the course of the trial, do not communicate with, provide information personally, in writing, or electronically to anyone about this case — not even your own families or friends, courtroom personnel, and also not even among yourselves until instructed otherwise.

Lawyers, parties, and witnesses are not permitted to speak with you about any subject, even if unrelated to this case, until after the case is over and you are discharged from your duties as jurors.

Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case.

You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness.

Opening statements are made by the attorneys to acquaint you
with the facts they expect to prove.  Closing arguments are made by
the attorneys to discuss the facts and circumstances in the case and
should be confined to the evidence and to reasonable inferences to
be drawn from the evidence.  Neither opening statements nor closing
arguments are evidence, and any statement or argument made by the
attorneys which is not based on the evidence should be disregarded.

Those of you who took notes during trial may use your notes to refresh your memory during jury deliberations.

Each juror should rely on his or her recollection of the evidence. Just because a juror has taken notes does not necessarily mean that his or her recollection of the evidence is any better or more accurate than the recollection of a juror who did not take notes.

When you are discharged from further service in this case, your notes will be collected by the deputy and destroyed. Throughout that process, your notes will remain confidential and no one will be allowed to see them.

The defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.

The State has alleged that during the commission of the offense of first degree murder the defendant personally discharged a firearm that proximately caused death to another person. The defendant is presumed to be innocent of this allegation. This presumption remains with the defendant throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the allegation is proven.

The State has the burden of proving the allegation beyond a reasonable doubt and this burden remains on the State throughout the case.

The defendant is not required to disprove the allegation.

Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

It is proper for an attorney to interview or attempt to interview a witness for the purpose of learning the testimony the witness will give.

The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when
   1. the statement was made under oath at a trial, hearing, or proceeding;
                               or
   2. the statement narrates, describes, or explains an event or condition the witness had personal knowledge of;
                          and
   the statement was accurately recorded by a tape recorder, videotape, recording, or a similar electronic means of sound recording.

It is for you to determine whether the witness made the earlier statement, and, if so what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made.

Evidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness.

Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged.

When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case.

A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense.

A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death,

> he intends to kill or do great bodily harm to that individual;

> > or

> he knows that such acts will cause death to that individual;

> > or

> he knows that such acts create a strong probability of death or great bodily harm to that individual;

> > or

> he is committing the offense of armed robbery.

# ILLINOIS DEPARTMENT OF CORRECTIONS
## INTERNET INMATE STATUS
### AS OF: Friday, October 21, 2022



## M30723 - BRONSON, AARON

| | |
|---|---|
| **Parent Institution:** | SHAWNEE CORRECTIONAL CENTER |
| **Offender Status:** | IN CUSTODY |
| **Location:** | SHAWNEE |

## PHYSICAL PROFILE

| | |
|---|---|
| **Date of Birth:** | 08/10/1981 |
| **Weight:** | 195 lbs. |
| **Hair:** | Brown |
| **Sex:** | Male |
| **Height:** | 6 ft. 02 in. |
| **Race:** | Black |
| **Eyes:** | Brown |

## MARKS, SCARS, & TATTOOS
NONE RECORDED

## ADMISSION / RELEASE / DISCHARGE INFO

| | |
|---|---|
| **Admission Date:** | 08/10/2012 |
| **Projected Parole Date:** | 11/13/2034 |
| **Last Paroled Date:** | |
| **Projected Discharge Date:** | 11/13/2037 |

## SENTENCING INFORMATION

| | |
|---|---|
| MITTIMUS: | 11CR0016902 |
| CLASS: | M |
| COUNT: | 1 |
| OFFENSE: | MURDER/INTENT TO KILL/INJURE |
| CUSTODY DATE: | 11/13/2010 |
| SENTENCE: | 24 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |
| MITTIMUS: | 11CR0016902 |
| CLASS: | M |
| COUNT: | 1 |
| OFFENSE: | MURDER/OTHER FORCIBLE FELONY |
| CUSTODY DATE: | 11/13/2010 |
| SENTENCE: | 24 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |

-A440-

State of Illinois | DEPARTMENT OF CORRECTIONS | Inmate Search Results

The information made available on this database service is for the general public and law enforcement to promote the interest of public safety.  The best effort has been made to ensure that information published is true and complete, however the information can quickly change. Accordingly, before making any assumption that said information is factual and complete, please send written correspondence to the Illinois Department of Corrections- Public Information Office, 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794-9277. Please see the Illinois Department of Corrections full disclaimer page for important information.

**conduct another search**
return to the IDOC homepage

Illinois Department of Corrections
1301 Concordia Court, PO Box 19277
Springfield, Illinois, 62794-9277
217-558-2200 | 800-546-0844 TDD

-A441-

# ILLINOIS DEPARTMENT OF CORRECTIONS
## INTERNET INMATE STATUS
### AS OF: Friday, October 21, 2022



## R01363 - GRADY, ARTHUR

**Parent Institution:**        STATEVILLE CORRECTIONAL CENTER
**Offender Status:**           IN CUSTODY
**Location:**                  STATEVILLE

## PHYSICAL PROFILE

**Date of Birth:**   08/25/1978
**Weight:**          200 lbs.
**Hair:**            Black
**Sex:**             Male
**Height:**          6 ft. 03 in.
**Race:**            Black
**Eyes:**            Brown

## MARKS, SCARS, & TATTOOS

TATTOO, ABDOMEN - "PRAY FA MY DOWNFALL"
TATTOO, ARM, LEFT UPPER - HEART "MARCELL N MOB"
TATTOO, ARM, RIGHT UPPER - HEART RIBBON "KESHAWN/KIARA/EBON
TATTOO, FOREARM, LEFT - "DON JUAN OUTLAWZ"

## ADMISSION / RELEASE / DISCHARGE INFO

**Admission Date:**            06/20/2013
**Projected Parole Date:**     01/09/2069
**Last Paroled Date:**
**Projected Discharge Date:**  01/09/2072

## SENTENCING INFORMATION

| | |
|---|---|
| MITTIMUS: | 11CR0016901 |
| CLASS: | M |
| COUNT: | 2 |
| OFFENSE: | MURDER/STRONG PROB KILL/INJURE |
| CUSTODY DATE: | 01/09/2009 |
| SENTENCE: | 60 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |
| MITTIMUS: | 11CR0016901 |
| CLASS: | M |
| COUNT: | 2 |
| OFFENSE: | MURDER/OTHER FORCIBLE FELONY |
| CUSTODY DATE: | 01/09/2009 |
| SENTENCE: | 60 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |

| | |
|---|---|
| MITTIMUS: | 11CR0016901 |
| CLASS: | M |
| COUNT: | 2 |
| OFFENSE: | MURDER/INTENT TO KILL/INJURE |
| CUSTODY DATE: | 01/09/2009 |
| SENTENCE: | 60 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | NO |
| | |

| | |
|---|---|
| MITTIMUS: | 07CR1639101 |
| CLASS: | 3 |
| COUNT: | 2 |
| OFFENSE: | AGG BTRY/OFFICER/EMPL/GOVT |
| CUSTODY DATE: | 12/01/2009 |
| SENTENCE: | 3 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | YES |
| | |

| | |
|---|---|
| MITTIMUS: | 07CR1639101 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | RESIST/OBSTRUC OFFICER/INJURY |
| CUSTODY DATE: | 12/01/2009 |
| SENTENCE: | 3 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | YES |
| | |

| | |
|---|---|
| MITTIMUS: | 00C330716 |
| CLASS: | 4 |
| COUNT: | 1 |
| OFFENSE: | POSS AMT CON SUB EXCEPT(A)/(D) |
| CUSTODY DATE: | 09/16/2000 |
| SENTENCE: | 1 Years 0 Months 0 Days |
| COUNTY: | COOK |
| SENTENCE DISCHARGED?: | YES |
| | |

The information made available on this database service is for the general public and law enforcement to promote the interest of public safety. The best effort has been made to ensure that information published is true and complete, however the information can quickly change. Accordingly, before making any assumption that said information is factual and complete, please send written correspondence to the Illinois Department of Corrections- Public Information Office, 1301 Concordia Court, P.O. Box 19277, Springfield, IL 62794-9277. Please see the Illinois Department of Corrections full disclaimer page for important information.

**conduct another search**
return to the IDOC homepage

Illinois Department of Corrections
1301 Concordia Court, PO Box 19277
Springfield, Illinois, 62794-9277
217-558-2200 | 800-546-0844 TDD

-A443-

## CERTIFICATE OF SERVICE

I certify that on November 23, 2022, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that the following counsel of record will be served electronically (*see* Cir. R. 25(d)):

> Katherine M. Doersch
> Office of the Illinois Attorney General
> 100 West Randolph Street,
> State of Illinois Center
> Chicago, IL 60601

*Counsel for Appellee David Gomez*

I further certify that, in compliance with this Court's forthcoming order, I will transmit to the Clerk 15 copies of the short appendix (bound with the brief) and 10 copies of the remainder of the appendix. *See* Cir. R. 31(b).

  /s/ *Kelly M. Ellis*

Dated: November 23, 2022